**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| **HENRIETTA AUSTIN,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Case No. 3:15cv40/MCR |
| | ) |
| vs. | ) Pensacola, Florida |
| | ) May 15, 2017 |
| | ) 8:37 a.m. |
| | ) |
| **FL HUD ROSEWOOD, LLC,** | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**JURY SELECTION**

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
CHIEF UNITED STATES DISTRICT JUDGE
(Pages 1-111)

**APPEARANCES**

FOR THE PLAINTIFF:       ***RICHARD D. BARLOW, ESQUIRE***
Odom & Barlow, PA
1800 North "E" Street
Pensacola, Florida  32501

FOR THE DEFENDANT:       ***JEREMY C. BRANNING, ESQUIRE***
***DANIEL E. HARRELL, ESQUIRE***
Clark, Partington, Hart, Larry
  Bond & Stackhouse
125 West Romana Street, Suite 800
Pensacola, Florida  32502

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | (Court called to order at 9:31 a.m.; Parties |
| 3 | present with counsel.) |
| 4 | **THE COURT:**  Good morning, ladies and |
| 5 | gentlemen.  I'm Judge Casey Rodgers.  It's my pleasure |
| 6 | to welcome you all to jury selection here in the |
| 7 | United States District Court for the Northern District |
| 8 | of Florida. |
| 9 | For those of you who may be unfamiliar with |
| 10 | the federal court system, the District Court, which is |
| 11 | what this is, is a trial court, and we hear both civil |
| 12 | as well as criminal trials in this court.  There are |
| 13 | 94 federal judicial districts throughout the country. |
| 14 | They're organized geographically by state.  Florida is |
| 15 | divided into three judicial districts.  There's the |
| 16 | Southern District of Florida, the Middle District of |
| 17 | Florida, and of course, this is the Northern District |
| 18 | of Florida. |
| 19 | The Northern District of Florida stretches |
| 20 | geographically approximately 350 miles beginning here |
| 21 | at the Northwest Florida/Alabama border to the east |
| 22 | and southeast around Gainesville.  We have courthouses |
| 23 | in Gainesville, Tallahassee, Panama City, and of |
| 24 | course, this is the Pensacola division of our court. |
| 25 | With both Gators and Seminoles in our district, we |

1    consider ourselves a district conflicted.

2         And I can't explain why we don't encompass or

3    include Jacksonville in the Northern District of

4    Florida.  That was a decision made many, many years

5    ago, long before my time by probably a legislator, or

6    I've heard stories a judge and a legislator that had

7    something to do with football.  But like I said, we're

8    lucky we have both the Gators and the Seminoles in our

9    district, so we're special.

10        So the Pensacola division of our court is

11   made up of four counties -- Escambia, Santa Rosa,

12   Okaloosa, and Walton.  So hopefully you all reside in

13   one of those four counties.  If you don't, then I'd

14   like you to tell me that now, because we'll call you

15   for jury duty in a different division if that's the

16   case.  But it sounds like everyone here is a resident

17   of one of those four counties.

18        So our purpose today or this morning will be

19   to select one jury to hear a civil trial that will

20   begin later this morning.  Now, a civil trial is

21   distinct from a criminal trial.  In a criminal

22   trial -- I'll start with that -- obviously, there is a

23   criminal charge against someone brought by the

24   government, and obviously someone's liberty is at

25   stake in those types of cases.

1          The case that we have to select a jury for
2    today is not a criminal trial.  As I said, it's a
3    civil trial, which typically involves a dispute
4    between -- could be two individuals, could be a
5    private citizen and a corporation, could also involve
6    a governmental agency.  But it's most often related to
7    a claim for some type of an injury, a personal injury,
8    property, commercial, or business injury, which one
9    party, which we call the plaintiff, the person who has
10   filed the lawsuit, is seeking compensation or damages
11   for that injury.  And that's the type of case we have
12   here to select a jury for.  And I'll be giving you a
13   little bit more description of the case in a few
14   moments.
15          This trial is expected to last only a couple
16   of days.  I would like to say the trial would be over
17   tomorrow, but as soon as I do that it won't be -- as
18   soon as I tell you that, we will be here on Wednesday.
19   And that may be the case.  That would be on the far
20   end, I think, Wednesday.
21          We never know how long a jury may require for
22   its deliberations.  That's something that we can't
23   predict either.  So there's a chance, if you're
24   selected to serve, that you may be here on Wednesday.
25   But a couple of days is certainly, relatively

1   speaking, a brief trial in this courthouse.

2          We oftentimes have trials that last weeks or

3   even months.  But regardless of the duration of the

4   trial, we certainly recognize that, if you're selected

5   to serve on this jury, that will require a sacrifice

6   on your part, may also require a sacrifice on your

7   employer's part; or if you're an employer, then on

8   your clients' or your employee's part, and certainly

9   may also require a sacrifice on your family's part as

10  well.

11         You would not be sequestered in this trial if

12  you're selected on the jury.  But nonetheless, if

13  you're like the rest of us, you have probably a

14  professional life or an employment life, but you also

15  have a personal life, and you have family matters and

16  other personal matters to attend to that a trial

17  usually interferes with if you're selected as a juror.

18         I don't know how many of you have served on

19  juries in the past.  I know you have filled out those

20  questionnaires, and we appreciate that.  I haven't had

21  a chance to go over them yet with a fine-toothed comb,

22  so I don't know how many of you have served before.

23  But I suspect, if you have served, then you know --

24  and if you haven't served, then I'm here to tell you

25  -- that that sacrifice that jurors make is part of the

1    duty that the citizens in our system assume so that we

2    can complete the trial as part of our justice system.

3         And without people such as yourself making

4    those types of sacrifices, then the single most

5    important facet of our judicial system, and I consider

6    the single most important facet of our democracy,

7    would come to a screeching halt, and that, of course,

8    is our right to trial by jury.

9         You all, I believe, watched the DVD this

10   morning "Called to Serve," and I don't want to repeat

11   everything you heard from the justices on the video,

12   but I do want to take a moment to personally emphasize

13   to you the importance of jury duty.

14        So first, it's important for everyone to

15   understand that the right to trial by jury is not of

16   modern creation.  It's not something that the courts

17   designed in order to make the judge's job easier.  It

18   certainly wasn't designed to inconvenience hardworking

19   citizens such as yourself.  It has nothing to do with

20   politics.  It has nothing to do with court

21   administration.

22        To the contrary, and as you heard on the DVD

23   this morning, the right to trial by jury has been

24   recognized as one of our most important and valuable

25   safeguards to liberty since the earliest days in our

1    nation's history.

2         And in fact, our founding fathers understood

3    this so well that they preserved the right to trial by

4    jury in our nation's most historic and sacred

5    documents, and they preserved that right for future

6    generations.

7         The right to trial by jury is referenced,

8    actually, in the Declaration of Independence as one of

9    the chief or principal reasons for the colonists to

10   declare their independence from England.  And that is

11   because the king at the time, King George III,

12   abolished the right to trial by jury in the new

13   colonies.  And this, again, is one of the things that

14   so angered the colonists that they listed it as one of

15   the reasons for our separation from England, and so it

16   is one of the things that actually led to the American

17   Revolution.

18        Also, the right to trial by jury is

19   referenced in our United States Constitution.  In

20   Article III of the United States Constitution it

21   states that the trial of all crimes except in cases of

22   impeachment must be tried by jury.

23        And then the Bill of Rights, which are the

24   first ten amendments to the Constitution, there are

25   three protections or preservations of the right to

1    trial by jury in three of those ten amendments.  The

2    Fifth Amendment guarantees a right to a grand jury in

3    cases of felony crimes.  The Sixth Amendment

4    guarantees the right to trial by jury in criminal

5    cases, which I spoke of just a moment ago.  And the

6    Seventh Amendment guarantees the right to trial by

7    jury in civil cases, which is why you are all here

8    today.  You are here today because of the Seventh

9    Amendment to the Bill of Rights to the United States

10   Constitution.

11        Now, you probably did not think when you woke

12   up this morning -- in fact, maybe you moaned and

13   groaned a little bit when you realized that you had to

14   be downtown in Pensacola for jury selection.  You, I'm

15   sure, were not thinking that you were going to be

16   participating in something so historic and so

17   important to our democratic way of life.  Most people

18   don't.  And unfortunately, for many people jury duty

19   is seen as an unwanted burden, and sadly, many people

20   try to avoid jury duty at all cost.

21        I have a difficult time understanding that,

22   and it's not just because of where I sit, although

23   obviously that's part of it.  But there are people all

24   around the world who would and, in fact, who have

25   given their life to live in a country with a system

1    like we have in this country with a jury system, and

2    they can only dream about living under such a system.

3         When I talk to potential jurors about the

4    importance of jury duty, I always ask them to consider

5    that, if someone wanted to do away with our American

6    form of democracy -- so if we had a foreign invader

7    come into this country and seek to overthrow our

8    government, one of the very first they would eliminate

9    from our system of government is the right to trial by

10   jury.  And the reason for that is that the right to

11   trial by jury belongs to the people.  It belongs to

12   the people, and it is the bedrock of our democracy.

13         And in fact, when democracies are sought to

14   be set up in other parts of the world and other

15   countries seek to model the democracy that we have in

16   this country, one of the very first things that is put

17   into place in those new systems of government is the

18   right to trial by jury because it's fundamental that

19   the people have this right in any democratic society.

20         It's also fundamental in any democratic

21   society -- I think we probably all can recognize

22   this -- that the citizens in that society individually

23   take responsibility for the protection and the

24   preservation of the liberties and the rights and

25   freedoms that are enjoyed by everyone in that society.

```
 1    One of the ways that we do that in this country is
 2    through jury duty.
 3           It's often argued that jury service is one of
 4    the most important duties that an American citizen has
 5    the opportunity -- I like to say the privilege -- of
 6    performing, and certainly that's true in peacetime,
 7    but I think we can all agree that it's probably even
 8    more true in the circumstances that we find ourselves
 9    in today.  Because at this time in our nation's
10    history it's vitally important that each and every one
11    of us does everything that we can do as individual
12    citizens to protect and preserve the rights and the
13    freedoms that we all cherish.  And again, one of the
14    ways that we do that here in this country is through
15    jury duty.
16           And of course, as I am sitting here speaking
17    to you all and giving you this brief history or civics
18    lesson, we have men and women who are serving in our
19    nation's military, they are making extreme sacrifices
20    to protect our nation's security, and they're also
21    making extreme sacrifices to protect and preserve our
22    rights and our freedoms.  And again, one of those
23    rights is the right to trial by jury.
24           Now, a citizen's service as a juror certainly
25    doesn't involve the same measure or degree of
```

1    sacrifice as made by our men and women in the armed

2    forces, but jury duty is as genuinely important as

3    military service is to the protection of our right to

4    trial by jury.

5         So I have given you this brief civics lesson

6    so that hopefully you will have a better understanding

7    of how important and how special and, frankly, how

8    fragile the right to trial by jury is in our system,

9    and the fact that, although not perfect, the American

10   jury system is, by far, the best and the most

11   democratic method of justice that's ever been designed

12   in the history of the world.  And that's something our

13   founding fathers understood very well, and that's why

14   they took the steps that they did -- very significant

15   steps -- to preserve that right for all of us in

16   future generations.

17        So please know that by your service here

18   today, regardless of whether you are selected to serve

19   on this jury, you are participating in something very

20   historic and something very important to our

21   democracy.

22        Now, briefly just a few words about how the

23   jury system works.  Again, I'm not sure how many of

24   you have served on juries in the past, but in our

25   system the judge and the jury work together during a

1   trial as a team to accomplish certain things.  We work

2   together to protect constitutional rights and

3   liberties, to ensure fairness to all the parties

4   involved in the trial, and to administer justice.

5          And although the judge and the jury work

6   together during the trial to achieve those goals, they

7   each have a separate and an independent role to play

8   during the trial.  As the judge, my role, and the role

9   of every judge when they preside over a jury trial, is

10  to decide the law, so the law that the jury will apply

11  in deciding the case, the ultimate outcome of the

12  case.

13         The jury's responsibility, on the other hand,

14  is to decide the facts of the case -- the who, what,

15  why, when, where, and how.  Those factual matters or

16  determinations are solely for the jury to make.  I

17  can't decide the facts, the jury can't decide the law.

18  And so we work together with me deciding the law and

19  the jury deciding the facts, and in that way we are

20  able to resolve disputes and conduct trials and bring

21  them to conclusion in our court.  But in a very real

22  way the jury becomes a part of the Court itself in

23  resolving the dispute, so it's very, very important.

24         Now, as I explained just a little bit ago,

25  the trial is expected to be, relatively speaking, a

brief trial, a couple of days.  Our trial schedule
with the jury runs from 8:30 in the morning to 5:30 in
the early evening.

Now, we do recognize -- in spite of
everything I've just explained to you about the
importance of jury duty, we do recognize that on
occasion jury duty can present an impossible situation
or an extreme hardship for someone.  Jury duty is not
intended to impose a hardship or an extreme situation
on anyone.

However, with that said, jury duty is rarely
convenient for anyone.  And for that reason, the law
permits me only a very few and narrow reasons for
which I can excuse someone from jury duty.  And just
so you know, employment is not one of those reasons
that I'm permitted to excuse someone from jury duty.

If it were -- if I could excuse people from
jury duty, I assure you we would have a very difficult
time seating a jury.  In fact, I think our right to
trial by jury would probably come to a screeching
halt.  Because most people -- if I had to venture a
guess, I would say 99 percent of you, if not 100
percent of you, have a job, somewhere that you need to
be instead of here listening to me or instead of
performing jury duty.

1          So I'm going to ask now -- I believe you were
2     asked this morning downstairs.  I'm going to ask again
3     if there's something that's come up in your life for
4     one of you, or any of you, that maybe you did not
5     anticipate or could not have anticipated that you'd
6     like to make me aware of right now that would make
7     jury duty an impossible situation for you between now
8     and, say, Wednesday?  Anyone?
9          *(No response.)*
10         Thank you.
11         Now that I've explained to you the importance
12    of jury service and our citizens' participation in
13    that process, I want to take just a moment to explain
14    that process of jury selection and the purpose of it.
15         So the purpose of jury selection is to find
16    people who will fairly and impartially try this
17    specific case that I'm going to tell you about in just
18    a moment, try this specific case without being
19    influenced by any outside factors.  And what I mean by
20    outside factors are perhaps some experience that
21    you've had in the past in your life that relates to
22    the subject matter to be tried in the case, maybe some
23    training, education, special knowledge that you have,
24    or perhaps some personal opinion that you hold related
25    to the subject matter of the trial.

1          So we are looking for people who will decide
2     this trial based solely on the evidence that's
3     presented here in the courtroom, nothing else, without
4     being influenced by any outside factors, meaning
5     anything outside this courtroom.
6          So based solely on the evidence or what --
7     the evidence is actually the facts that will be
8     presented to you as the jury, and then the law that I
9     will give you, those are the only things that a jury
10    can base its decision on in any trial.  And of course,
11    we'll always look for people who will agree to follow
12    the law that the court instructs them on at the
13    conclusion of the trial.
14         Now, this process will involve me asking you
15    some questions.  If you've participated in jury
16    selection in the past in state court, then it's
17    probably a little bit different experience or process
18    there.  You know that the lawyers typically ask the
19    questions in state court.  But in federal court, the
20    judge asks the questions.  So I'll be asking you
21    questions that are specially designed to elicit
22    responses from you that will tell us whether you can
23    be fair and impartial in this specific case based upon
24    the facts in this case.
25         Now, again, I know you have filled out those

1  questionnaires, and we appreciate you taking the time

2  to do that.  I want to apologize in advance.  There

3  may be a little bit of overlap in my questions and

4  some of the questions -- I'll try to avoid that -- but

5  in my questions and some of the questions that you

6  answered on the questionnaire.

7       But please know that, in spite of the fact

8  that there may be some overlap, answering or filling

9  out that questionnaire was not a waste of your time.

10  The Court and the attorneys and parties rely on those

11  questionnaires extensively during the jury selection

12  process.  They're designed to help move the process

13  along more efficiently here in the courtroom.

14       Another word about the questionnaires:  The

15  attorneys do not keep the questionnaires.  So after --

16  well, let me back up.  You came into the courthouse

17  today with your original questionnaire that you filled

18  out in your hand.  We made copies of that

19  questionnaire.  I have a copy and the attorneys have

20  copies of your questionnaire.

21       At the conclusion of jury selection this

22  morning, we will retrieve those copies, and all of the

23  copies will be destroyed.  The original questionnaire

24  that you filled out in your own hand will be filed

25  under seal in the court record in this case, which

1    means that no one can have access to your

2    questionnaire after today absent a court order from

3    me.  And it would be a very rare occasion on which I

4    would enter such an order.

5         Also, please keep in mind as we go through

6    the jury selection process that we know that you all

7    have life experiences, you have your own thoughts and

8    opinions.  No juror is ever a blank slate.  And the

9    critical question, though, is whether you can set

10   aside anything that you may know about the subject

11   matter of this case in deciding the issues in the

12   case.

13        So if it turns out when you answer one of my

14   questions that maybe you had some experience related

15   to the subject matter of the case, I'll ask you if you

16   can set that aside.  And you'll have to decide whether

17   you feel you can set that aside in deciding the issues

18   in this case based upon the evidence or the facts in

19   this case and the law in this case.

20        The next thing we're going to do is actually

21   to meet each of you.  And so the way we do this is

22   we'll go down the line -- we have a list, and your

23   names are each on this list, and we will start and

24   just one at a time I'm going to ask you to rise and

25   speak loudly.  I think Mr. Thomas may have a

1    microphone for you.

2          There are certain pieces of information that

3    I need from you.  And if you can't remember all of

4    this, I'll help you as we go along.  The first thing

5    I'd like you to do is to tell us your name; if you're

6    married, your spouse's name; the area of our division,

7    one of those four counties that you live in.  So I

8    don't want a street address, but if you live in Gulf

9    Breeze, DeFuniak Springs, Jay, Perdido, Navarre, Santa

10   Rosa Beach -- I know you had a long drive, some of you

11   -- just tell us that.

12         And then tell us how you're employed.  If

13   you're retired, tell us the line of work you're

14   retired from.  And the same for your spouse; so if

15   they're employed or if they're retired, what line of

16   work they retired from.  If they're a homemaker, tell

17   us that.

18         And then also I'd like to know whether you or

19   your spouse has any military service in your

20   background.  I don't need to know about kids or

21   parents but just you or your spouse if you have any

22   military service.

23         So I know there was some order to what may

24   have felt like madness this morning, and for that

25   reason I think Ms. Gaitor is first.

1          Ms. Gaitor, would you rise, please, and could
2     I have your full name.
3               **MS. GAITOR:**  Naisha Kiteem Gaitor.
4               **THE COURT:**  Ms. Gaitor, are you married?
5               **MS. GAITOR:**  No, ma'am.
6               **THE COURT:**  Have you ever been married?
7               **MS. GAITOR:**  No, ma'am.
8               **THE COURT:**  What area do you live in.
9               **MS. GAITOR:**  Escambia County.
10              **THE COURT:**  And can you be a little bit more
11    specific as to what part of the county.
12              **MS. GAITOR:**  I live in Warrington.
13              **THE COURT:**  Okay, that's fine, in Warrington.
14    Are you employed.
15              **MS. GAITOR:**  Yes, ma'am.
16              **THE COURT:**  What line of work are you
17    employed in.
18              **MS. GAITOR:**  I'm a housekeeper.
19              **THE COURT:**  And how long have you performed
20    that type of work.
21              **MS. GAITOR:**  A little over a year now.
22              **THE COURT:**  And now I am going to ask you who
23    you're employed with.
24              **MS. GAITOR:**  The Navy Gateway on the base,
25    NAS.

1    **THE COURT:**  What is the Gateway?

2    **MS. GAITOR:**  It's a hotel for the military.

3    **THE COURT:**  Any military service in your

4    background?

5    **MS. GAITOR:**  No, ma'am.

6    **THE COURT:**  Thank you, ma'am.

7    And then Ms. -- is it Bruning?

8    **MS. BRUNING:**  Yes.

9    **THE COURT:**  Your full name, please.

10    **MS. BRUNING:**  Deborah Jenkins Bruning.

11    **THE COURT:**  Are you married.

12    **MS. BRUNING:**  Yes.

13    **THE COURT:**  Your spouse's name, please?

14    **MS. BRUNING:**  Darrell.

15    **THE COURT:**  Where do you and Darrell reside?

16    **MS. BRUNING:**  We live in Niceville in

17    Okaloosa County.

18    **THE COURT:**  Are you employed?

19    **MS. BRUNING:**  I'm retired from teaching

20    elementary and middle school.

21    **THE COURT:**  Bless you.  And what do you do to

22    keep yourself busy after your retirement?  Do you

23    volunteer?

24    **MS. BRUNING:**  I volunteer at my last place of

25    employment two days a week, and I sing in a community

1   chorus.

2           **THE COURT:**  And is your husband employed?

3           **MS. BRUNING:**  My husband is retired also.  He

4   was in the military for 26 years as an Air Force

5   chaplain.

6           **THE COURT:**  Air Force, you said?

7           **MS. BRUNING:**  Yes.

8           **THE COURT:**  And does he work in that field in

9   any way?

10          **MS. BRUNING:**  No.

11          **THE COURT:**  Any military service on your part

12  other than supporting him all those years?

13          **MS. BRUNING:**  Just as a spouse.

14          **THE COURT:**  Thank you, ma'am.

15          Mr. Thayer?  Your name, please?

16          **MR. THAYER:**  Alexander Charles Thayer.

17          **THE COURT:**  Are you married?

18          **MR. THAYER:**  Yes.

19          **THE COURT:**  And her name, please.

20          **MR. THAYER:**  Brittney.

21          **THE COURT:**  Where do you all live?

22          **MR. THAYER:**  We live in south Pensacola.

23          **THE COURT:**  Is that the downtown area?

24          **MR. THAYER:**  Yeah, roughly.

25          **THE COURT:**  Are you employed?

| | |
|---|---|
| 1 | **MR. THAYER:**  I am. |
| 2 | **THE COURT:**  What do you do? |
| 3 | **MR. THAYER:**  I work as telecommunications |
| 4 | technician. |
| 5 | **THE COURT:**  And is Brittney employed? |
| 6 | **MR. THAYER:**  Yes. |
| 7 | **THE COURT:**  What does she do? |
| 8 | **MR. THAYER:**  She's an LMT at a chiropractor's |
| 9 | office. |
| 10 | **THE COURT:**  LMT, you said? |
| 11 | **MR. THAYER:**  Yes. |
| 12 | **THE COURT:**  And that's licensed massage |
| 13 | therapist? |
| 14 | **MR. THAYER:**  Yes, ma'am. |
| 15 | **THE COURT:**  Do either of you have any |
| 16 | military service in your background? |
| 17 | **MR. THAYER:**  No, ma'am. |
| 18 | **THE COURT:**  Thank you, sir. |
| 19 | Ms. Spencer, your name, please? |
| 20 | **MS. SPENCER:**  Mary Spencer. |
| 21 | **THE COURT:**  You are very soft-spoken. |
| 22 | **MS. SPENCER:**  Mary Spencer. |
| 23 | **THE COURT:**  Thank you.  Are you married, |
| 24 | Ms. Spencer? |
| 25 | **MS. SPENCER:**  Yes. |

1      **THE COURT:**  What's his name?

2      **MS. SPENCER:**  Daniel.

3      **THE COURT:**  Where do you and Daniel reside.

4      **MS. SPENCER:**  Navarre.

5      **THE COURT:**  Are you employed?

6      **MS. SPENCER:**  Yes.

7      **THE COURT:**  What type of work do you do?

8      **MS. SPENCER:**  Retail; I work at Walgreens.

9      **THE COURT:**  And is your husband employed.

10     **MS. SPENCER:**  He's retired.

11     **THE COURT:**  From what?

12     **MS. SPENCER:**  Mechanic.

13     **THE COURT:**  Any military service?

14     **MS. SPENCER:**  No.

15     **THE COURT:**  And you said he was a mechanic?

16     **MS. SPENCER:**  Yes.

17     **THE COURT:**  Thank you, ma'am.

18     Mr. Kempson, your name, please?

19     **MR. KEMPSON:**  Michael Kempson.

20     **THE COURT:**  Are you married.

21     **MR. KEMPSON:**  Yes, I am; her name is Karen.

22     **THE COURT:**  Where do you all reside.

23     **MR. KEMPSON:**  Over on Okaloosa Island.

24     **THE COURT:**  Are you employed.

25     **MR. KEMPSON:**  Yes.

1          **THE COURT:**  What do you do?

2          **MR. KEMPSON:**  I'm a nurse.  I was a medic in

3     the Air Force.

4          **THE COURT:**  Where do you work now as a nurse?

5          **MR. KEMPSON:**  I work in the psychiatric

6     department.

7          **THE COURT:**  At what facility?

8          **MR. KEMPSON:**  Fort Walton Beach Medical

9     Center.

10          **THE COURT:**  And you said you were a medic?

11          **MR. KEMPSON:**  Medic in the Air Force.

12          **THE COURT:**  How many years did you serve in

13     the Air Force?

14          **MR. KEMPSON:**  Twelve years.

15          **THE COURT:**  And your wife, is she employed?

16          **MR. KEMPSON:**  She's retired.

17          **THE COURT:**  From what line of work?

18          **MR. KEMPSON:**  She's had several businesses

19     over the years doing different things.

20          **THE COURT:**  So she was self-employed.

21          **MR. KEMPSON:**  She did design, she did

22     interior design to -- she had a cleaning business, and

23     a lot of stuff that kept me busy.

24          **THE COURT:**  Any military service on her part?

25          **MR. KEMPSON:**  No.

1        **THE COURT:**  Thank you, sir.

2        Ms. Chambers?

3        **MS. CHAMBERS:**  Joanne Chambers.

4        **THE COURT:**  Are you married?

5        **MS. CHAMBERS:**  Yes, David Chambers.

6        **THE COURT:**  Where do you all live?

7        **MS. CHAMBERS:**  Navarre.

8        **THE COURT:**  And are you employed?

9        **MS. CHAMBERS:**  No, as of four years ago, no.

10  I stay home, and I also care for my mother.  She lives

11  in Winter Park, Florida, which is near Orlando.  So I

12  travel there every month to every other month to go

13  see her and take care of her.

14        **THE COURT:**  That's nice.  What type of work

15  did you do up until four years ago?

16        **MS. CHAMBERS:**  I did other health insurance.

17  I worked on Eglin Air Force Base at the hospital

18  there.

19        **THE COURT:**  In billing?

20        **MS. CHAMBERS:**  In the resource management

21  office.  My job was to train the clinics on the

22  program for other health insurance.

23        **THE COURT:**  Military service on your part?

24        **MS. CHAMBERS:**  Yes, my husband served 28

25  years in the Air Force.

1       **THE COURT:**  And what did he do?

2       **MS. CHAMBERS:**  He was a vehicle maintenance

3   mechanic, and then as he moved up in rank, supervisor.

4   And he does that now with the military, after being

5   retired he works for the --

6       **THE COURT:**  Is he civil service?

7       **MS. CHAMBERS:**  Department of Defense, yes.

8       **THE COURT:**  Did I ask where you all reside?

9       **MS. CHAMBERS:**  Yes, Navarre, Florida, Santa

10   Rosa County.

11       **THE COURT:**  Thank you very much.

12       Now to Ms. Swensen.

13       **MS. SWENSEN:**  My name is Caroline Swensen.  I

14   am married.  My husband is Brian.  We live in Pace.

15       **THE COURT:**  Are you employed?

16       **MS. SWENSEN:**  Yes.

17       **THE COURT:**  What do you do?

18       **MS. SWENSEN:**  I am a referral specialist at

19   Urgent Care in Pace.  I've been there for almost eight

20   years.

21       **THE COURT:**  What does a referral specialist

22   do.

23       **MS. SWENSEN:**  I cover everything from urgent

24   care referrals to all of our business health, Workers'

25   Comp.

1      **THE COURT:**  Is your husband employed?

2      **MS. SWENSEN:**  He is.  He is an engineer.  He

3  repairs medical equipment for the same company that I

4  work for.

5      **THE COURT:**  Any military service?

6      **MS. SWENSEN:**  He was in the Army for eight

7  years.

8      **THE COURT:**  And you all reside in Pace, you

9  said?

10      **MS. SWENSEN:**  Yes, ma'am.

11      **THE COURT:**  Thank you, ma'am.

12      Mr. Andris?

13      **MR. ANDRIS:**  Yes, Alan Andris.  My spouse's

14  name is Kevin.  I am currently employed at Pyramid,

15  Incorporated.  It's an adult day-training center for

16  adults with developmental disabilities.  And I teach

17  computer kills.

18      **THE COURT:**  Where is that located?

19      **MR. ANDRIS:**  It is right up the road from the

20  Navy hospital, right off of 98.

21      **THE COURT:**  And Kevin, is he employed?

22      **MR. ANDRIS:**  Yes.

23      **THE COURT:**  What does he do?

24      **MR. ANDRIS:**  He's a cook at a restaurant.

25      **THE COURT:**  Any military service?

1      **MR. ANDRIS:**  No, for neither of us.

2      **THE COURT:**  Thank you, sir.

3      Ms. Sharon?

4      **MS. SHARON:**  Chelsey Sharon.  My husband is

5  Jordan.  We live in Fort Walton Beach, Florida.  I

6  work as a web content specialist/programmer for an ad

7  agency, e-commerce based all online.  And my husband

8  owns his own business, it's an automotive collision

9  repair business.

10     **THE COURT:**  Any military service.

11     **MS. SHARON:**  Not for either of us.

12     **THE COURT:**  Thank you, ma'am.

13     Ms. Colbert?

14     **MS. COLBERT:**  Kassandra Lee Colbert.  My

15  husband's name is Clinton Colbert.  We reside in

16  Shalimar.

17     **THE COURT:**  And are you employed?

18     **MS. COLBERT:**  Yes.

19     **THE COURT:**  What do you do?

20     **MS. COLBERT:**  I'm an administrative

21  assistant.

22     **THE COURT:**  In what type of industry or

23  field?

24     **MS. COLBERT:**  Medical/health care.

25     **THE COURT:**  Can you get a little more

1    specific for me.

2            **MS. COLBERT:**  I do credentialing and

3    facilitate contracts for independent practitioners in

4    the local area in Okaloosa County.

5            **THE COURT:**  And your husband, is he employed.

6            **MS. COLBERT:**  He is a correctional officer

7    for Okaloosa County jail.

8            **THE COURT:**  Any military service?

9            **MS. COLBERT:**  He did.  He served eight years

10   in the Air Force.

11           **THE COURT:**  And do you know -- was that

12   during the time that you were married?

13           **MS. COLBERT:**  No, ma'am.

14           **THE COURT:**  Do you happen to know what he did

15   in the Air Force?

16           **MS. COLBERT:**  Last I know is he was in

17   medical.

18           **THE COURT:**  Thank you very much.

19           Ms. Hattaway, your name, please?

20           **MS. HATTAWAY:**  Barbara Hattaway.  I live in

21   Okaloosa County.

22           **THE COURT:**  Are you married?

23           **MS. HATTAWAY:**  Divorced.

24           **THE COURT:**  How long ago?

25           **MS. HATTAWAY:**  '98.

1        THE COURT:  We don't need to go into that,

2   then.  And you're employed?

3        MS. HATTAWAY:  I work at Sacred Heart

4   Hospital, clinical laboratory scientist, three years.

5        THE COURT:  Any military service?

6        MS. HATTAWAY:  I was in the Army National

7   Guard when I was younger.

8        THE COURT:  Thank you, ma'am.

9        Ms. Williams?

10       MS. WILLIAMS:  My name is Jordyn Barbara

11   Williams.  I reside in northeast Pensacola off the

12   Scenic Highway area.  I'm single.  I work at a real

13   estate title company called Emerald Coast Title.  I'm

14   a processor there, so I work basically from start to

15   finish to close on files, close on property.

16       THE COURT:  Any military service?

17       MS. WILLIAMS:  No, ma'am.

18       THE COURT:  Thank you, ma'am.

19       Ms. Reed?

20       MS. REED:  I'm Stephanie Reed.  I live in

21   north Pensacola.  I'm single.  And I don't -- I work

22   as an adjunct professor as my main occupation and --

23       THE COURT:  Where do you teach?

24       MS. REED:  I teach for Pensacola State

25   College in two different departments.

1          **THE COURT:**  And what do you teach?

2          **MS. REED:**  I teach adult education for

3    students pursuing GED, and I also teach mostly public

4    speaking for the communications department.

5          **THE COURT:**  Any military service?

6          **MS. REED:**  No.

7          **THE COURT:**  Thank you, ma'am.

8          Ms. Morrow, your name, please?

9          **MS. MORROW:**  Saranne Morrow.

10         **THE COURT:**  Are you married?

11         **MS. MORROW:**  Yes, ma'am.  My husband is

12   Jason.

13         **THE COURT:**  Where do you all reside?

14         **MS. MORROW:**  We live in Pensacola.

15         **THE COURT:**  What part of Pensacola?  I mean,

16   do you live in the city?

17         **MS. MORROW:**  Yes, in the area.

18         **THE COURT:**  Are you employed?

19         **MS. MORROW:**  Yes, I work for the Florida

20   Department of Health.

21         **THE COURT:**  In what capacity?

22         **MS. MORROW:**  I work in Escambia County Health

23   Department in performance management, strategic

24   planning, business process improvement.

25         **THE COURT:**  Your husband, is he employed?

1       **MS. MORROW:**  He is.  He works for Enterprise,

2    he's the manager.

3       **THE COURT:**  The car rental company?

4       **MS. MORROW:**  Yes.

5       **THE COURT:**  Any military service?

6       **MS. MORROW:**  No, ma'am.

7       **THE COURT:**  Thank you, ma'am.

8       Mr. -- is it Duclos?

9       **MR. DUCLOS:**  My name is Keith Robert Duclos.

10   I live on the west side of town, Bellview.  I'm

11   employed at Victory Bible Baptist Church as a cleaner,

12   maintenance.  I have 20 years and 3 days fire service

13   in the United States Navy.

14      **THE COURT:**  Thank you.  Did you say you are

15   married or not married?

16      **MR. DUCLOS:**  I'm single.

17      **THE COURT:**  You're single, okay.  How long

18   have you worked in sort of the facilities and

19   housekeeping maintenance area?

20      **MR. DUCLOS:**  Eleven years.

21      **THE COURT:**  Seven?

22      **MR. DUCLOS:**  Eleven.

23      **THE COURT:**  Eleven, okay.  That's fine for

24   now.  I like your tie.

25      **MR. DUCLOS:**  Thank you.

1          **THE COURT:**  That's nice.

2          Ms. Kaschak?

3          **MS. KASCHAK:**  Suzanne Lynn Kaschak.

4          **THE COURT:**  Are you married?

5          **MS. KASCHAK:**  I'm divorced.

6          **THE COURT:**  More than ten years ago?

7          **MS. KASCHAK:**  Yes.

8          **THE COURT:**  Are you employed?

9          **MS. KASCHAK:**  I am.

10         **THE COURT:**  What do you do?

11         **MS. KASCHAK:**  Child Protective Services.  I'm

12    a court facilitator, which is similar to a mediator.

13         **THE COURT:**  Now, are you employed, then, with

14    the State of Florida or the county.

15         **MS. KASCHAK:**  No.  FamiliesFirst Network of

16    Lakeview is contracted by --

17         **THE COURT:**  So you're employed by

18    FamiliesFirst?

19         **MS. KASCHAK:**  Uh-huh.

20         **THE COURT:**  And where do you reside?

21         **MS. KASCHAK:**  In Navarre.

22         **THE COURT:**  Any military service?

23         **MS. KASCHAK:**  No, just former military

24    spouse.

25         **THE COURT:**  Thank you, ma'am.

1           Ms. Robinson?

2           **MS. ROBINSON:**  Jeanine Anne Robinson.  I live

3   in the Dorcas area of Crestview.  I work at Fort

4   Walton Beach Medical Center.  I'm a respiratory

5   therapist.  I am married.  My husband's name is

6   Travis.  He's -- oh, I forgot, I was in the military

7   for two years, I was a weather observer.

8           **THE COURT:**  Oh, interesting.  In what branch?

9           **MS. ROBINSON:**  Navy.

10          **THE COURT:**  Navy, okay.

11          **MS. ROBINSON:**  My husband, Travis, is right

12  now an investigator for the Crestview Police

13  Department, but he also put in 20 years with the

14  Okaloosa County Sheriff's Department as an

15  investigator.

16          **THE COURT:**  Does he have military service?

17          **MS. ROBINSON:**  Yes.  He was in the Air Force

18  as a fuel systems -- on F-15s and F-16s for 20 years.

19          **THE COURT:**  Thank you, ma'am.

20          Ms. Clausen?

21          **MS. CLAUSEN:**  Hello.  My name is Erika

22  Clausen.

23          **THE COURT:**  Are you married?

24          **MS. CLAUSEN:**  I am.  My husband is Frank.

25          **THE COURT:**  Where do you all reside?

1    **MS. CLAUSEN:**  We live in the East Hill area
2    of Pensacola.
3            **THE COURT:**  Are you employed?
4            **MS. CLAUSEN:**  I am a server at Jackson's
5    Steakhouse.
6            **THE COURT:**  Is your husband employed.
7            **MS. CLAUSEN:**  He is.  He's actually a
8    part-time student, and he also works as an independent
9    contractor for construction.
10           **THE COURT:**  Is he pursuing any particular --
11           **MS. CLAUSEN:**  He's actually a musician, so
12   he's learning actually to read music and all that
13   comes along with that.
14           **THE COURT:**  Oh, I'm jealous over that.  I'd
15   like to learn that as well.
16           Any military service for either of you?
17           **MS. CLAUSEN:**  None for either of us.
18           **THE COURT:**  Thank you, ma'am.
19           Ms. Coggins?
20           **MS. COGGINS:**  My name is Gina Coggins.  We
21   live in Scenic Heights.  I'm married.  My husband's
22   name is John.  We own our own business, Coggins
23   Insurance Agency, on the west side of town.
24           **THE COURT:**  Any military service for either
25   of you?

1     **MS. COGGINS:**  Yes, ma'am, both of us.  I've

2  done four years, and my husband is retired.  He was an

3  aviation ordnanceman, and he retired as a command

4  master chief.

5          **THE COURT:**  Was he Air Force?

6          **MS. COGGINS:**  Navy.

7          **THE COURT:**  And what branch did you serve in.

8          **MS. COGGINS:**  Navy.

9          **THE COURT:**  And what did you do?

10          **MS. COGGINS:**  I was yeoman, administrative.

11          **THE COURT:**  Thank you, ma'am.

12          And then, Ms. Owens?

13          **MR. OWENS:**  Sheila Owens.  I live in Beulah.

14  I work for State Farm Insurance, divorced seven years,

15  no military.

16          **THE COURT:**  So because you've been divorced

17  within the past ten years, can you tell me what he did

18  at the time you were married?

19          **MS. OWENS:**  He was a firefighter.

20          **THE COURT:**  Any military service?

21          **MR. OWENS:**  No, ma'am.

22          **THE COURT:**  Thank you, ma'am.

23          Did I overlook anyone?  Hopefully not.

24          *(No response.)*

25          Thank you all for sharing that with us.  And

1   now I'm going to tell you a little bit about the case

2   that will be tried and also introduce you to those who

3   will be participating in the trial.

4         What I'm going to tell you about the case is

5   fairly barebones.  I mean, if you're selected to serve

6   on this jury, obviously you're going to learn a whole

7   lot more about the case.  But for our purposes here as

8   far as jury selection, what I just need to know -- I'm

9   going to tell you enough to where we can determine

10   whether you have any knowledge about this case,

11   whether you've heard about it from any source or think

12   you may know about it.

13         The case is entitled Henrietta Austin versus

14   FL HUD Rosewood, LLC.  Now, I do want to point out

15   that Rosewood is not affiliated with any state agency.

16   They're a private corporation.  And so throughout the

17   rest of jury selection and then probably also in the

18   trial they'll be referred to more commonly just as

19   Rosewood, or maybe Rosewood, LLC.

20         So Ms. Henrietta Austin, who is the

21   plaintiff, meaning the person who has filed the

22   lawsuit, she's filed a civil action against her former

23   employer, Rosewood, LLC, which we'll refer to as the

24   Defendant.  The Defendant is the person or party

25   against whom a lawsuit has been filed.

1    She's filed this lawsuit for employment
2    retaliation under the Age Discrimination in Employment
3    Act and the Florida Civil Rights Act claiming that
4    Rosewood unlawfully retaliated against her after she
5    complained about age discrimination by her supervisor.
6    Rosewood denies that the supervisor or in
7    fact anyone else at Rosewood retaliated against
8    Ms. Austin as a result of complaints, and that any
9    job-related actions involving Ms. Austin were taken
10   for legitimate business purposes.
11   So any of you here think you may know about
12   this case, heard anything about it, even sounds
13   familiar to you?
14   *(No response.)*
15   Now, I'll introduce you to those who will be
16   participating in the trial.  First I'll ask
17   Ms. Henrietta Austin if she would please stand.
18   *(Ms. Austin and Mr. Barlow standing.)*
19   This is Ms. Austin, the Plaintiff in the
20   case, and now her attorney, Mr. Richard Barlow, is
21   also standing.  Mr. Barlow is an attorney with the law
22   firm of Odom & Barlow here in Pensacola.
23   So I'd like to ask now if any of you think
24   you may know of, have heard anything of any
25   significance about either Ms. Austin or Mr. Barlow,

1    anyone?

2           *(No response.)*

3           Anyone here have any dealings with Odom &

4    Barlow?

5           *(No response.)*

6           Any contact with an attorney by the name of

7    Bradley Odom, which would be Mr. Barlow's partner,

8    anyone?

9           *(No response.)*

10          And of course, no one knows or recognizes

11    Ms. Austin?

12          *(No response.)*

13          In like fashion, I'm going to introduce you

14    now to those who will be participating on the Defense

15    side of the case.  First I'll introduce you to

16    Mr. Gene Triplett.

17          *(Mr. Triplett standing.)*

18          Mr. Triplett is here as the corporate

19    representative of Rosewood.

20          Thank you.

21          *(Defense counsel standing.)*

22          And then representing Rosewood is Mr. Jeremy

23    Branning and Mr. Daniel Harrell, who are attorneys

24    with the law firm of Clark, Partington, which is a law

25    firm with offices here in Pensacola, and both Mr.

```
 1    Harrell and Mr. Branning work here in Pensacola.
 2              Thank you, gentlemen.
 3              So in similar fashion, I'd like to ask if any
 4    of you recognize or think you may know Mr. Gene
 5    Triplett or Mr. Jeremy Branning or Mr. Daniel Harrell?
 6              Yes, ma'am?
 7              MS. MORROW:   I know Mr. Harrell.
 8              THE COURT:   Would you rise, please, and give
 9    me your name, because my memory is just getting
10    terrible.
11              MS. MORROW:   Saranne Morrow.
12              THE COURT:   Ms. Morrow, how do you know Mr.
13    Harrell?
14              MS. MORROW:   Our parents are friends and our
15    children attend the same school together.
16              THE COURT:   So you say your parents are
17    friends.  Are you friends with Mr. Harrell; and if so,
18    on what level?  I mean, do you socialize together?
19    Does he come to your home?  Have you been to his home?
20    Those sorts of questions.
21              MS. MORROW:   No.  We're acquaintances.  We're
22    in the same friend circles, but have not been at each
23    other's homes.
24              THE COURT:   Can you tell me the last time
25    you've had any personal communications with Mr.
```

1  Harrell?

2      **MS. MORROW:**  I think I said hello at the

3  school gate sometime in the past month.

4      **THE COURT:**  Do you feel as though your

5  relationship with Mr. Harrell is significant enough

6  that it would interfere with your ability to be fair,

7  say, to Ms. Austin in this case, who is on the other

8  side of the case?

9      **MS. MORROW:**  No, ma'am.

10     **THE COURT:**  If you're selected to serve on

11  this jury, Ms. Morrow, and the other members of the

12  jury and yourself come to a decision that's contrary

13  to the position taken by Mr. Harrell in this case,

14  would that give you any cause for concern if you run

15  into him again in the future?

16     **MS. MORROW:**  No, ma'am.

17     **THE COURT:**  Thank you, ma'am.

18     Anyone else?

19     *(No response.)*

20     Anyone here have any contacts, either

21  existing or former, with the Clark, Partington law

22  firm?

23     Let's just start -- remind me of your name.

24     **MS. WILLIAMS:**  My name is Jordyn.  I have a

25  friend who is an attorney at their firm, his name is

1   William Stokes.

2         THE COURT:   And your last name?

3         MS. WILLIAMS:   Williams.

4         THE COURT:   The attorney, how well do you

5   know Mr. Stokes?

6         MS. WILLIAMS:   Pretty well.  We've been

7   friends for, I would say, almost two years.  He's more

8   of an acquaintance to me these days.  If I see him

9   downtown or if I see him at a restaurant I say hello

10  and things like that.  But I haven't actually had a

11  personal relationship with him in a very long time.

12        THE COURT:   Has he ever discussed -- I don't

13  know how long he's worked at the firm.  Was he with

14  the firm two years ago?

15        MS. WILLIAMS:   Yes.

16        THE COURT:   Has he ever discussed

17  Mr. Branning or Mr. Harrell with you?

18        MS. WILLIAMS:   No, ma'am.

19        THE COURT:   Do you feel that the fact that

20  Mr. Stokes works at Clark Partington, and the Clark

21  Partington law firm is representing a party in this

22  case, that that would cause you any difficulty in

23  being fair in this case?

24        MS. WILLIAMS:   No, ma'am.

25        THE COURT:   Thank you, ma'am.

```
 1              Next?
 2         MS. SHARON:  Chelsey Sharon.
 3         THE COURT:  Ms. Sharon?
 4         MS. SHARON:  My interaction was from a
 5    banking side.  I was a personal banker for years, and
 6    we had interactions with them as a client, but nobody
 7    in particular.  And I don't have any personal
 8    relationships with any of them.
 9         THE COURT:  And you're not still working in
10    that capacity?
11         MS. SHARON:  No, ma'am, not anymore.
12         THE COURT:  Anything you can think of that
13    would cause you difficulty as a result of that in
14    being fair in this case?
15         MS. SHARON:  I don't believe so, no.
16         THE COURT:  Thank you, ma'am.
17              Anyone else?
18         THE COURT:  It's okay, you don't have to
19    apologize.  Ms. Morrow?
20         MS. MORROW:  Personal friends with the
21    Clarks, the Partingtons, the Harts, and with several
22    attorneys there.
23         THE COURT:  Do you feel, Ms. Morrow, that
24    that would cloud your decision-making in this case
25    that Clark Partington is representing -- and they're
```

1 not a party, I mean, they're just the law firm

2 representing a party --

3    **MS. MORROW:** No, ma'am.

4    **THE COURT:** Again, if you are selected to

5 serve and you and the other members of the jury reach

6 a decision that's contrary to the position taken by

7 the Clark Partington law firm in this case, is that

8 going to cause you any discomfort when you see any of

9 those attorneys in the future?

10    **MS. MORROW:** No, ma'am.

11    **THE COURT:** Thank you.

12    Anyone else?

13    *(No response.)*

14    Ladies and gentlemen, I'm going to read a

15 list of names to you.  These are names of people who

16 may be called as witnesses to give testimony during

17 the trial.  Just because I call out their name,

18 though, does not necessarily or automatically mean

19 they're going to be called, but it's an indication

20 that they could be called, and so it's important for

21 us to know whether you know any of these individuals.

22    And the reason for that is -- I didn't

23 explain this earlier, but as the decider of the facts

24 in this case, the issue of witness credibility is

25 solely for the jury to decide.  So it will be up to

1    you to decide which witnesses to believe or not to
2    believe, how much of a witness's testimony to accept
3    or to reject.  So it's very important for us to know
4    whether you have any relationship or knowledge of any
5    of the potential witnesses.
6            So I'm just going to read names.  They may or
7    may not mean anything to you or sound familiar to you.
8    What I'll ask you to do is, if you recognize a name,
9    to please raise your hand.
10            For instance, if I call out the name Tom
11    Smith and your brother-in-law is named Tom Smith, I
12    want you to raise your hand, and then I'll ask you
13    some questions about the Tom Smith that you know, and
14    then we'll decide whether it's the same Tom Smith that
15    may be called as a witness.
16            Nicole Partridge, Gene Triplett, Tonette
17    Arnold --
18            And counsel, if I mispronounce a name, please
19    do correct me.
20            Larry Bender, Miriam Clark, Patsy Williamson.
21            Counsel, I believe that's everyone.  Did I
22    miss anyone?
23                *(All counsel indicating in the negative.)*
24            All right, no hands were raised.  Thank you.
25            And I'm going to get into some more questions

1    with you.  Some of these are sort of general questions

2    that I ask of every jury panel in a civil case.  Some

3    of the questions will also be more specific to the

4    facts of this case and the claim in this case.

5          Just some ground rules for this part of the

6    process:  Please, obviously, anytime you are answering

7    a question, please answer openly and honestly, which

8    I'm sure you all have done thus far.  Please answer

9    the questions loudly, so stand up and please speak

10   loudly and make sure everyone can hear you.

11         If you find yourself sitting there in doubt

12   about whether you should respond to a question, maybe

13   you're not sure about exactly what I'm asking, I'm

14   going to ask that you resolve that doubt in favor of

15   speaking up.  If you end up providing a response

16   that's not truly responsive to the question that I

17   ask, that's probably my fault for not wording it

18   better, so don't worry about that.  Again, I'd rather

19   you err on the side of responding than not responding.

20         However, with that said, I don't need you to

21   tell us the same thing twice.  So some of my questions

22   may overlap and double back.  If you've already

23   responded in a prior response to a question that I ask

24   later, we'll remember that, you don't need to tell us

25   again.

1          Now, I'm going to be asking you questions

2    about yourself as well as members of your immediate

3    family.  When I say immediate family, I mean husband,

4    children, parents, brothers, sisters.  And then I'm

5    also going to ask you to include very close personal

6    friends.  And what I mean by that is someone that is

7    so close to you that their outlook on the world might

8    affect your outlook on the world, because you are so

9    close to that person and you have deep conversations

10   with them.

11         As you know, sometimes when you have very

12   close personal friends, their thoughts and opinions

13   can affect or influence yours.  So I don't need to

14   know about that third cousin of yours unless that

15   third cousin is your best friend in the whole wide

16   world, then I would want you to include them in your

17   response.

18         Are any of you, immediate family, or very

19   close personal friends associated in any way with the

20   judicial system as a judge, as a lawyer, a clerk of

21   court, or support staff to a court?

22         Yes, ma'am?

23         **MS. KASCHAK:**  Support staff.

24         **THE COURT:**  And your name?

25         **MS. KASCHAK:**  Suzanne Kaschak.

1     **THE COURT:**  Ms. Kaschak, who do you -- is it

2     a family member or friend that you know.

3          **MS. KASCHAK:**  It's myself.

4          **THE COURT:**  Oh, yourself.

5          **MS. KASCHAK:**  Yes.

6          **THE COURT:**  You said that, with

7     FamiliesFirst.  I apologize.  How long have you worked

8     with FamiliesFirst Network?

9          **MS. KASCHAK:**  Fifteen years.

10         **THE COURT:**  And so you, I'm sure, or I

11    suspect you regularly appear in court?

12         **MS. KASCHAK:**  Weekly, sometimes twice, three

13    times a week.

14         **THE COURT:**  But you're not familiar with any

15    of the attorneys in this case?

16         **MS. KASCHAK:**  (Indicating negatively.)

17         **THE COURT:**  Anything about that experience --

18    of the experience that you have in your job that you

19    think might affect your ability to be fair and

20    impartial in this case, given the very little bit you

21    know about this case and the claim?

22         **MS. KASCHAK:**  I do not believe so.

23         **THE COURT:**  Thank you, ma'am.

24         And Ms. Morrow?

25         **MS. MORROW:**  Very close personal friend is

```
1    Judge Amy Brodersen.
2              THE COURT:  Newly appointed?
3              MS. MORROW:   Newly appointed.
4              THE COURT:  And we're all happy about that.
5              MS. MORROW:  Yes.
6              THE COURT:  So you say very close personal
7    friend.  Are you close enough that she discusses her
8    work with you?
9              MS. MORROW:  She doesn't discuss her work.
10             THE COURT:  Or her cases, anything like that?
11             MS. MORROW:   No.
12             THE COURT:  Is there anything, Ms. Morrow,
13   that you know about Ms. Brodersen, whether as a lawyer
14   or as a judge, that you think might influence your
15   opinion in a case like this, anything you can think
16   of?
17             MS. MORROW:  No, ma'am.
18             THE COURT:  That's all I need to know.  Thank
19   you.
20             Anyone else?
21             (No response.)
22             Prior jury service.  I referenced this
23   earlier.  And again, I know this is on your
24   questionnaire, but I'm going to narrow that question
25   now and ask if any of you have ever served on a jury
```

```
 1    in any jurisdiction that involved an employment type
 2    claim?  Anyone ever serve on a jury where there was a
 3    claim of any type of employment claim against an
 4    employer?
 5              (No response.)
 6              Other than family law matters, such as
 7    divorce or custody or something like that, have any of
 8    you ever filed a lawsuit against someone or ever been
 9    sued by someone?  So have you ever been a plaintiff or
10    a defendant in a civil case?
11              Yes, ma'am, your name, please?
12              MS. SPENCER:  Mary Spencer.  I was -- as a
13    result of an auto accident, I was sued.
14              THE COURT:  So you were sued.  Were you
15    represented by an insurance company?
16              MS. SPENCER:  Yeah, yeah.
17              THE COURT:  How long ago was that?
18              MS. SPENCER:  The accident was in '14, and
19    they resolved it through mediation.
20              THE COURT:  So it was in 2014?
21              MS. SPENCER:  Yes, I'm sorry, 2014.
22              THE COURT:  Was there actually a lawsuit?
23              MS. SPENCER:  She went straight to an
24    attorney and then they filed the lawsuit.
25              THE COURT:  And you were represented by the
```

```
 1   insurance company's attorney?
 2          MS. SPENCER:  By the insurance company, and
 3   it was resolved during mediation.
 4          THE COURT:  Were you satisfied with the
 5   resolution?
 6          MS. SPENCER:  Oh, yeah.  Oh, yeah.
 7          THE COURT:  Were there any out-of-pocket
 8   expenses for you?
 9          MS. SPENCER:  No, ma'am.
10          THE COURT:  Thank you, ma'am.
11          Anyone else?  Yes, ma'am.
12          MS. COLBERT:  Kassandra Colbert.  It was an
13   auto accident in 2004.
14          THE COURT:  Did you file the suit?
15          MS. COLBERT:  I filed the suit and we settled
16   through mediation.
17          THE COURT:  You said 2004?
18          MS. COLBERT:  Yes.
19          THE COURT:  Were you satisfied with the
20   resolution?
21          MS. COLBERT:  Yes, ma'am.
22          THE COURT:  Was there insurance involved in
23   that case?
24          MS. COLBERT:  I believe her insurance, yes,
25   ma'am.
```

1    **THE COURT:**  Thank you, ma'am.

2         Anyone else?  Ms. Morrow?

3    **MS. MORROW:**  We had a large family property,

4    and there was a lawsuit between all of the property

5    owners, which were a lot of my family members, with

6    Orange Beach, Alabama.

7         **THE COURT:**  So you were a plaintiff in the

8    case?

9    **MS. MORROW:**  Yes, ma'am.

10        **THE COURT:**  Along with other family members?

11   **MS. MORROW:**  Yes, ma'am.

12        **THE COURT:**  What was the resolution of the

13   case?

14   **MS. MORROW:**  It was very complicated, but I

15   was never -- I never appeared or was deposed, because

16   I was just one family member.

17        **THE COURT:**  Do you know whether you prevailed

18   or lost?

19   **MS. MORROW:**  We prevailed.

20        **THE COURT:**  How long ago?

21   **MS. MORROW:**  It was the late '90s, early

22   2000.

23        **THE COURT:**  Okay, thank you, ma'am.

24        Ms. Kaschak?

25   **MS. KASCHAK:**  Two.  One was a car accident,

1    and then one is a group of us did sue our employer.

2         **THE COURT:**  Tell me about the car accident

3    first and how long ago that lawsuit was.

4         **MS. KASCHAK:**  It was 1997, and it was a car

5    accident.  First it was insurance companies, but then

6    I was married at the time and our attorney went after

7    actually the United States Air Force because there's

8    like a part where when dependents are in transport to

9    a new base they're not covered under the TRICARE at

10   that time, so they were charging $40,000 and our

11   attorney was going after that from the Air Force to

12   take that money, because obviously he was covered but

13   I wasn't.

14        **THE COURT:**  How did that end up?

15        **MS. KASCHAK:**  We prevailed.

16        **THE COURT:**  And then as far as the later --

17   or the other suit, was that later in time?

18        **MS. KASCHAK:**  Oh, yes, yes.  I believe it was

19   2012, maybe, maybe earlier, I don't remember, but

20   there was a group of us under FamiliesFirst Network

21   where I'm employed, which is owned by Lakeview Center,

22   so Lakeview Center was the one that was sued being

23   that they owned them.  We were not paid overtime,

24   family services counselors and child protective

25   services were not paid overtime, so a large group went

1    after them and prevailed.  It was actually -- I'm

2    sorry, Your Honor, it was a settlement.

3              THE COURT:  And just so counsel knows, that

4    case was before me.  I didn't realize it until you

5    started talking, but that case was before me.

6              So that was under the Fair Labor Standards

7    Act --

8              MS. KASCHAK:  Yes.

9              THE COURT:  -- you were seeking overtime

10   compensation?

11             MS. KASCHAK:  That's right.

12             THE COURT:  And you're still employed with

13   FamiliesFirst?

14             MS. KASCHAK:  Yes.

15             THE COURT:  That's all I have for now.  Thank

16   you.

17             Anyone else?

18             (No response.)

19             Have any of you, just personally yourself --

20   not a family member or close personal friend -- ever

21   appeared as a witness in a case, other than those who

22   have already -- if that would be included in the

23   answer you just gave, you don't need to respond again.

24             Yes, ma'am?

25             MS. SPENCER:  I appeared as a witness to a

1    car accident.

2              THE COURT:  How long ago was that?

3              MS. SPENCER:  Four years.

4              THE COURT:  What court was that in?

5              MS. SPENCER:  Traffic court.

6              THE COURT:  Anything about that experience

7    that you feel has affected your view of the judicial

8    system, lawsuits, anything like that?

9              MS. SPENCER:  It gave me more faith because

10   --

11             THE COURT:  Because why?

12             MS. SPENCER:  Just because I witnessed the

13   accident and actually it, you know --

14             THE COURT:  It made a difference, your

15   testimony?

16             MS. SPENCER:  Yes.

17             THE COURT:  So it was in traffic court.  Who

18   called you as the witness?

19             MS. SPENCER:  There was an accident that I

20   witnessed, and it involved -- you know how you stop

21   for ambulances and fire engines --

22             THE COURT:  Right.

23             MS. SPENCER:  -- and stuff like that, but you

24   don't just stop dead?

25             THE COURT:  Okay.

1    **MS. SPENCER:**  There's an odd -- Holley By The

2    Sea in Navarre, there's a fireplace back there -- not

3    a fireplace --

4         **THE COURT:**  Fire station, yes.

5         **MS. SPENCER:**  Fire station.

6         **THE COURT:**  I understood.

7         **MS. SPENCER:**  And somebody coming through the

8    area doesn't know that.  Locals know it.  So if you

9    hear the siren on 98, you don't know where it's coming

10   from.  And they went through the intersection -- the

11   vehicle that was hit went through the intersection,

12   noticed the fire engine leaving Holley By The Sea and

13   just stop dead, where you're supposed to safely pull

14   over.  So the guy that was behind him, he applied his

15   brakes and tried to stop, but it was -- you just don't

16   dead stop, and that's why it felt like, you know, he

17   needed a witness.

18        **THE COURT:**  And so was that person's ticket

19   dismissed?

20        **MS. SPENCER:**  Yes.

21        **THE COURT:**  That's why you say you felt it

22   made a difference?

23        **MS. SPENCER:**  Yes.

24        **THE COURT:**  Thank you, ma'am.

25        Anyone else?

1          *(No response.)*

2               Have any of you -- and I will ask you to

3     expand this now to immediate family members, close

4     personal friends, had any special training or work

5     experience in the field of human resources or

6     personnel management?  Human resources or personnel

7     management?

8               And your name again?

9          **MR. ANDRIS:**  Alan Andris.  I did hiring and

10    filing of paperwork for new hires for a local

11    restaurant that was expanding through a couple of

12    states.  I also did payroll for those states as well.

13         **THE COURT:**  How long ago?

14         **MR. ANDRIS:**  That was about three years ago.

15         **THE COURT:**  And in that capacity -- did you

16    supervise employees in that capacity?

17         **MR. ANDRIS:**  No.  I was merely

18    administrative.

19         **THE COURT:**  Did you have any involvement in

20    any type of education or training on workplace

21    discrimination policies, anything of that nature?

22         **MR. ANDRIS:**  No, ma'am.

23         **THE COURT:**  And in your capacity in the

24    administrative area, was there ever any claim made

25    against you by any employee for how you did your job?

1        **MR. ANDRIS:**  No, ma'am.

2        **THE COURT:**  Thank you.

3        Ms. Morrow?

4        **MS. MORROW:**  I do leadership development and

5   coaching for supervisors at our workplace, administer

6   360 evaluations, employee satisfaction surveys, that

7   type of thing.

8        **THE COURT:**  Do you get involved with the

9   policies of discrimination, you know, how an employee

10  should handle a complaint of discrimination?

11       **MS. MORROW:**  Only in the fact that I train on

12  that.

13       **THE COURT:**  That's what I mean.  So you do

14  conduct that type of training with management,

15  supervisors?

16       **MS. MORROW:**  I don't actually teach it.  I

17  administer that piece, I don't teach that piece.

18  They're online courses through the State of Florida.

19       **THE COURT:**  Oh, I see.  So you're not

20  actually conducting the training?

21       **MS. MORROW:**  Not for that piece.

22       **THE COURT:**  Do you supervise employees in

23  your position?

24       **MS. MORROW:**  I have none that report directly

25  to me.  I'm over several teams.  But in the line of

1    reporting, I do not have any that report directly to
2    me.
3            THE COURT:  Do you ever get involved or have
4    you ever been involved in administering a complaint of
5    discrimination by an employee?
6            MS. MORROW:  Not specifically.  I mean, the
7    360 evaluations have a lot of complaints, but it's not
8    anything specifically filed.
9            THE COURT:  Any complaint ever made against
10   you for how you perform your administrative positions
11   or functions?
12           MS. MORROW:  No, ma'am.
13           THE COURT:  Thank you.
14           MS. COGGINS:  When I worked for the
15   Department of the Navy for 16 years, I worked for a
16   program that would hire college graduates, veterans,
17   which was to train them to be the Department of Navy
18   and Marine Corps's budget analysts, accountants, and
19   auditors.
20           We oversaw their training from the time that
21   they started -- it was a two-year program -- until the
22   time that they graduated.  However, they were all over
23   the United States at all Navy and Marine Corps bases.
24   The only time that we ever had contact with them was
25   the initial orientation welcoming them to the program.

1          And then after that, each site or command

2    would then, you know, do the everyday overall

3    day-to-day complaints.  If it ever got elevated, it

4    would come back to our office, and then we would, of

5    course, have to go up the chain of command for that.

6          **THE COURT:**  Your name again, please?

7          **MS. COGGINS:**  Gina Coggins.

8          **THE COURT:**  So, Ms. Coggins, were you

9    involved in that orientation piece with educating or

10   training on discrimination, harassment, things of that

11   nature?

12         **MS. COGGINS:**  We would normally bring in our

13   HR folks to do that.  So, although, yes, I was at

14   every orientation that they did, we would bring people

15   specifically that were geared to go over those types

16   of things.

17         **THE COURT:**  Which was not your function?

18         **MS. COGGINS:**  Which was not my function.  We

19   just oversaw, you know, go out and do career fairs,

20   stuff like that.

21         **THE COURT:**  Thank you, ma'am.

22         Anyone else?  Yes, sir?

23         **MR. KEMPSON:**  Michael Kempson.  We had a

24   cleaning and a restaurant business for the '80s and

25   the '90s.

1    THE COURT:  Through the '80s and the '90s?

2    MR. KEMPSON:  (Indicating affirmatively.)

3    THE COURT:  When was the last time you owned

4    the business?

5    MR. KEMPSON:  '98 or so.

6    THE COURT:  And how many employees did you

7    have in that business?

8    MR. KEMPSON:  The cleaning business, we had

9    about 20, 25, and in the restaurant we had maybe 15.

10    THE COURT:  How many years did you own the

11    cleaning business?

12    MR. KEMPSON:  I think that was like ten

13    years.

14    THE COURT:  Did you employ supervisors to

15    manage the employees -- mainly the cleaning business

16    I'm asking about now -- or did you and/or your wife do

17    that personally?

18    MR. KEMPSON:  We did have a manager at the

19    end of the business.

20    THE COURT:  But there was a period of time

21    where you all did that yourselves?

22    MR. KEMPSON:  Correct.

23    THE COURT:  At any point with either company

24    -- now I'm going to include the restaurant business as

25    well -- did you have any complaints of

1  employment-related discrimination against the

2  business?

3         **MR. KEMPSON:**  Not really.  I mean, we had one

4  lady, she really wasn't able to perform the things,

5  but she had a lot of good management experience, so we

6  put her -- she became our manager.  She wasn't

7  physically able to do the job as well.

8         **THE COURT:**  Was she in the cleaning business?

9         **MR. KEMPSON:**  (Indicating affirmatively.)  So

10  we made accommodations for her.

11         **THE COURT:**  Was there ever any complaint that

12  you were aware of, whether informal or formal,

13  regarding discrimination on the basis of race,

14  religion, disability, age, anything like that,

15  national origin, harassment, sexual harassment?

16         **MR. KEMPSON:**  No, we've never had any type of

17  lawsuit brought against us.

18         **THE COURT:**  What about informally, did you

19  have any complaints that you were aware of informally?

20         **MR. KEMPSON:**  No.

21         **THE COURT:**  Like, you know, *So and so is*

22  *harassing me or discriminating against me,* in the

23  business, or *You're discriminating against me*, or

24  anything like that from any of your employees?

25         **MR. KEMPSON:**  No.  We tried to keep good

1    people.

2        THE COURT:  All right.  Thank you, sir.

3        Anyone else?

4        MS. BRUNING:  When my husband was stationed

5    in California, we lived in Mountain View.  While we

6    lived there for three years, I was the director of a

7    Silvan Learning Center, and I was responsible for

8    hiring and firing.  And there was one incident of a

9    woman who was displeased with my decision to fire her.

10   But when she took the complaint to the franchise

11   owner, and they discussed it, it was found that there

12   was no grounds for her complaints.

13       THE COURT:  What was her complaint?  Why was

14   she upset with you?  What did she think you were doing

15   to her that was unfair or wrong?

16       MS. BRUNING:  She thought she was being

17   treated unfairly because -- it's very strange.  She

18   was mentally unstable, it was determined.  But that

19   she didn't have anyone to take care of her, and so she

20   needed to keep her job in contrast to the women at our

21   center who were married who had family members who had

22   additional, you know, so those families had additional

23   income.  And so it was an ill-founded complaint.

24       THE COURT:  Any other complaints?

25       MS. BRUNING:  No.

1       **THE COURT:**  How long ago was that?

2       **MS. BRUNING:**  It was about 15 years ago.

3       **THE COURT:**  If you're selected to serve on

4  this jury, can you agree to set aside that experience,

5  the claim or complaint of that woman in that case or

6  that situation, in resolving the issues in this case?

7       **MS. BRUNING:**  Yes.

8       **THE COURT:**  Thank you.

9       And Mr. Kempson, I should have asked you that

10  same question.  If you're selected to serve on this

11  jury, can you set aside the experiences that you had

12  as an employer in resolving -- to the extent there was

13  a complaint -- you mentioned one that you accommodated

14  -- can you set aside those issues in deciding the

15  issues in this case?

16       **MR. KEMPSON:**  Yes.

17       **THE COURT:**  Thank you, sir.

18       Anyone else?

19       *(No response.)*

20       My last question may not have been broad

21  enough to encompass this next question, so let me go

22  ahead and ask it.

23       Have any of you, immediate family member,

24  very close personal friend, ever supervised or managed

25  employees?  So if you haven't already responded and

1  that does apply to you, then I would like to hear from

2  you just briefly.

3          **MS. REED:**  Stephanie Reed.  I have supervised

4  employees at a number of positions over the years at

5  various types of jobs.

6          **THE COURT:**  Ever been involved -- and I don't

7  mean solely as to whether the complaint was against

8  you, although my question would include that -- but

9  have you ever been involved in any complaints,

10 informal or otherwise, of an employee?

11         **MS. REED:**  When I worked for the University

12 of West Florida in admissions, I was an assistant

13 director, and there was a complaint filed against the

14 associate director for race discrimination, and I had

15 an interview with HR to give my side of the story.

16         **THE COURT:**  I'm sorry, how long ago was that?

17         **MS. REED:**  It would have been around 2013.

18         **THE COURT:**  Any other involvement in that

19 case or that situation where you gave a statement?

20         **MS. REED:**  It fizzled out, I guess.  I didn't

21 hear anything else about it.  It wasn't disposed or

22 anything.  There was a potential suit filed, but I

23 think it was dropped.

24         **THE COURT:**  Do you know whether you were

25 questioned just because you worked in that department,

1    or did the employee or the associate director sort of

2    offer your name as someone who might be supportive of

3    either position?

4         **MS. REED:**  I think I was interviewed because

5    of my position in the department, but I don't think

6    anyone gave my name specifically.  I think only myself

7    and one other person were asked questions about

8    various incidents.

9         **THE COURT:**  And so I'd like to ask, in your

10   statement, if you know, did you provide information

11   that was supportive of the employee's position or the

12   associate director's position?

13        **MS. REED:**  The associate director's.

14        **THE COURT:**  Thank you, ma'am.

15        There's another hand -- go ahead.  Yes,

16   ma'am?

17        **MS. SHARON:**  My husband and I own a business,

18   and I've had to terminate two employees since 2013.

19        **THE COURT:**  Your name again?

20        **MS. SHARON:**  Chelsey Sharon.

21        **THE COURT:**  Ms. Sharon, how many employees do

22   you all employ?

23        **MS. SHARON:**  Currently we have five full-time

24   employees and one part-time.

25        **THE COURT:**  And the reason for the two that

1    you terminated?

2         **MS. SHARON:**  It basically came down to not

3    showing up on time.  I mean, we had full documentation

4    on each one.  It was not showing up on time, not

5    performing the duties that were assigned to them, and

6    things coming back that they had done and them being

7    basically mistakes.

8         **THE COURT:**  Did anything ever come out of

9    those terminations in terms of a complaint?

10        **MS. SHARON:**  We had an employee, after we let

11   him go, that he had made some complaints around town

12   to other people within our same industry that got back

13   to us.  He never -- I think he was just angry and

14   venting.  He never did anything about it.  And he was

15   actually in a horrific car accident and in the

16   hospital for quite a while after that, but we went to

17   see him and he ended up apologizing so --

18        **THE COURT:**  What got back to you as far as

19   what he was complaining about or what he thought had

20   happened?

21        **MS. SHARON:**  That he didn't fit in among the

22   other employees and that there was favoritism from my

23   husband and myself to certain members of our staff,

24   and that because he was the newer guy that he didn't

25   fit in with the employees so he didn't get our

1   acceptance.  And that's -- it was completely untrue,

2   of course, but --

3          THE COURT:  Anything, to your knowledge,

4   based on a protected characteristic such as race,

5   religion, age?

6          MS. SHARON:  Not that I know of specifically.

7          THE COURT:  Thank you, ma'am.

8          Next?

9          MR. ANDRIS:  Alan Andris.  I was a restaurant

10   manager back 2000 until about 2006.  I did the hiring

11   and did some basic kind of training like handbook

12   training on hiring and discrimination and that sort of

13   thing.  But the main HR department would come in and

14   do it much more detailed.

15          THE COURT:  Any complaints while there?

16          MR. ANDRIS:  Not that I'm aware of, no.

17          THE COURT:  Not just against you, but period,

18   in general?

19          MR. ANDRIS:  That's correct, not that I'm

20   aware of.

21          THE COURT:  Thank you, sir.

22          Anyone else?  Yes, sir?

23          MR. DUCLOS:  During my military service, I

24   oversaw -- I was the night supervisor for the basic

25   commissary in London, England.  I had 18 employees,

1   both American and British employees, and I oversaw

2   their work performance and wrote their evaluations and

3   handled their pay conflicts.

4           **THE COURT:**  Your name again, please?

5           **MR. DUCLOS:**  Duclos.

6           **THE COURT:**  During that time period did you

7   have to fire employees?

8           **MR. DUCLOS:**  No, ma'am.

9           **THE COURT:**  Or transfer them?

10          **MR. DUCLOS:**  No, ma'am.

11          **THE COURT:**  Any complaints that you are aware

12  of?

13          **MR. DUCLOS:**  Just one British employee's pay.

14          **THE COURT:**  About pay?

15          **MR. DUCLOS:**  On his pay differential because

16  we paid in American dollars.

17          **THE COURT:**  I see, okay.  Anything else?

18          **MR. DUCLOS:**  No, ma'am.

19          **THE COURT:**  Thank you, sir.

20          Anyone else?

21          **MR. OWENS:**  Sheila Owens.  Probably about 18,

22  20 years ago I worked at an office where the employee

23  I want to say went to the company with like some

24  sexual complaints against the boss, but I don't think

25  anything ever come of it other than a complaint with

1    the company, and I think it got dropped.

2         **THE COURT:**  What was the type of business?

3         **MR. OWENS:**  Insurance sales.

4         **THE COURT:**  Was this employee in the same

5    office with you?

6         **MR. OWENS:**  We were in the same building, but

7    we had our individual offices.

8         **THE COURT:**  That's what I meant, I'm sorry.

9    But the same location as you?

10        **MR. OWENS:**  Yes, ma'am.

11        **THE COURT:**  Did the employee discuss the

12   complaint with you?

13        **MR. OWENS:**  No, ma'am.

14        **THE COURT:**  You were just aware that he or

15   she -- was it a female?

16        **MR. OWENS:**  Yes, ma'am.

17        **THE COURT:**  -- went to the management with a

18   complaint?

19        **MR. OWENS:**  Yes, ma'am.

20        **THE COURT:**  Were you interviewed or was a

21   statement taken, anything like that?

22        **MR. OWENS:**  No, ma'am.

23        **THE COURT:**  Ma'am, would you agree, Ms.

24   Owens, that if you're selected to serve on this jury,

25   to set aside your memory of that incident in deciding

1    the issues in this case?

2         **MR. OWENS:**  Yes, ma'am.

3         **THE COURT:**  Thank you very much.

4         Have any of you, family member, or close

5    personal friend worked in the housekeeping area or

6    field?  Worked as a housekeeper?

7         We'll start with Ms. Gaitor.

8         Ms. Gaitor, you are currently employed in

9    housekeeping now; is that right?

10        **MS. GAITOR:**  Yes, ma'am.

11        **THE COURT:**  And if you told me this earlier,

12   I apologize for asking it again.  How long have you

13   been employed in that job?

14        **MS. GAITOR:**  A little over a year.

15        **THE COURT:**  Have you worked in the

16   housekeeping area prior to your current employer?

17        **MS. GAITOR:**  Yes, ma'am.

18        **THE COURT:**  How long have you worked in

19   housekeeping over your career?

20        **MS. GAITOR:**  Well, this is my second time

21   working for them, but the first time I worked for them

22   was probably like 13 years ago.

23        **THE COURT:**  And why did you leave the first

24   time?

25        **MS. GAITOR:**  Because I was a little bit

1   younger and wasn't really ready to work.

2          THE COURT:  That's honest.  When you left

3   your employment the first time, was there any type of

4   complaint or anything made by you against your

5   employer or anything like that?

6          MS. GAITOR:  No, ma'am.

7          THE COURT:  And since you've been back

8   working with them, can I ask what your schedule is?

9          MS. GAITOR:  Eight to four Monday -- well, on

10  Friday -- the weekends we work from 8:30 to 5:00, but

11  Monday through Friday is eight to four.

12         THE COURT:  Are there other housekeepers that

13  work with you?

14         MS. GAITOR:  Yes, ma'am.

15         THE COURT:  How many are employed, if you

16  know?

17         MS. GAITOR:  I mean, it's different -- I

18  really don't know in general.  It's a lot of us.  I

19  would say about 50 or more.  But in my personal

20  building it's like six of us that they, you know, I

21  guess, work with our schedule, but in our main

22  building there's only about six of us.

23         THE COURT:  Who makes your schedule?

24         MS. GAITOR:  My supervisor.

25         THE COURT:  Have you ever had any issues with

1    your schedule?

2           **MS. GAITOR:**  No, ma'am.

3           **THE COURT:**  All right.  Thank you, Ms.

4    Gaitor.

5           Anyone else?

6           **MS. SPENCER:**  I have a daughter-in-law who

7    cleans condos, you know, summertime beach rentals for

8    a condo cleaning company.

9           **THE COURT:**  Is she still working in that

10   capacity?

11          **MS. SPENCER:**  No.  And I have a close friend

12   at work that does have a second job cleaning condos.

13          **THE COURT:**  They work for the same employer?

14          **MS. SPENCER:**  No.  I didn't know if that was

15   housekeeping.

16          **THE COURT:**  Have either of them, your

17   daughter-in-law or your close friend, ever said

18   anything to you that gave you the impression that they

19   didn't like the work they were doing or didn't like

20   their employer?

21          **MS. SPENCER:**  No.  They love it.

22          **THE COURT:**  All right.  Thank you, ma'am.

23          Anyone else?

24          *(No response.)*

25          Mr. Kempson, with your cleaning business,

1   tell me a little bit more about -- I know it was a

2   while ago but -- the customers that you had.  Who were

3   you servicing?

4           **MR. KEMPSON:**  We did residential in the day,

5   and then we had a lot of commercials, you know,

6   dealerships and that kind of stuff that we did at

7   night.  We did a lot of condos during the season.

8           **THE COURT:**  So when you or your wife, before

9   you had a manager in place, you all were sort of

10  managing the schedules of your --

11          **MR. KEMPSON:**  Yeah, we were managing it,

12  working it ourselves.

13          **THE COURT:**  All right.  Thank you, sir.

14          Anyone else?  Yes, ma'am?

15          **MS. COLBERT:**  I clean medical offices on the

16  weekend.  Does that --

17          **THE COURT:**  Yes, that would be included.

18          **MS. COLBERT:**  Just to supplement our income.

19          **THE COURT:**  So you work for an employer?

20          **MS. COLBERT:**  No.  My husband and I just do

21  it.

22          **THE COURT:**  You still do that now?

23          **MS. COLBERT:**  Yes, ma'am.

24          **THE COURT:**  So you work directly for the --

25          **MS. COLBERT:**  Physicians.  They're just

1    medical offices, independent physicians.

2           THE COURT:  All right.  Thank you, Ms.

3    Colbert.

4           Anyone else?

5           *(No response.)*

6           Have any of you personally ever brought a

7    claim against your employer, formally or informally,

8    any type of claim, including Workers' Comp?

9           MS. KASCHAK:  Suzanne --

10          THE COURT:  Is this related to the FSLA

11   claim?

12          MS. KASCHAK:  Yes.

13          THE COURT:  Okay, we have that.

14          Anyone else?  Mr. Kempson?

15          MR. KEMPSON:  I got injured -- while I was

16   working as a nurse I got injured on the job and had to

17   get my shoulder repaired.

18          THE COURT:  How long ago?

19          MR. KEMPSON:  About two years ago.

20          THE COURT:  Were you satisfied with the

21   resolution of the Workers' Compensation claim?

22          MR. KEMPSON:  Well, I didn't really do a

23   Workmen's Comp claim.  I mean, they paid to get my

24   shoulder fixed, and they gave me work, you know, that

25   I could perform, you know, I was working and doing

1   office type work in the hospital until I was able to

2   go back to --

3        THE COURT:  So they accommodated you?

4        MR. KEMPSON:  Yeah.

5        THE COURT:  Any lingering issues with that or

6   complaints about how that was handled?

7        MR. KEMPSON:  No.

8        THE COURT:  Thank you.

9        Anyone else?

10       MS. SHARON:  Chelsey Sharon.  I had an

11  informal claim against my employer.  An employee --

12  this is a crazy story -- discharged pepper spray

13  within the office, and it was accidental, but it

14  wasn't known at the time that it was accidental or

15  not, and I did inhale it, got it in my eyes, and I had

16  to go for emergency care and I was out for a little

17  while.  And I'm still being seen occasionally by the

18  eye doctor just to make sure there was no lingering

19  effects from it.  But it was founded to be an accident

20  so --

21       THE COURT:  This was in your work setting?

22       MS. SHARON:  Yeah.

23       THE COURT:  Was this a coworker?

24       MS. SHARON:  It was.  I worked in banking.

25  And she was not in my department but she had an office

1   within the bank.  It was a home office bank, so she

2   had an office there.  And she had discharged her

3   personal pepper spray in her office right before me

4   and my supervisor had walked in there to pull some

5   chairs out for a meeting the next day, and we walked

6   into it.  And we didn't know at the time -- because

7   she had already left the building -- whether or not it

8   was done -- because there was some grief between the

9   three of us -- that we didn't know if it was an

10  intentional really bad decision or if it was an

11  accident and she just didn't say something and should

12  have.

13         **THE COURT:**  Were you satisfied with the way

14  your employer handled it?

15         **MS. SHARON:**  Not at all, no, no.

16         **THE COURT:**  Why were not happy with how your

17  employer handled it?

18         **MS. SHARON:**  They tried to say that it was

19  something before it was.  They tried to make claims

20  against it before they even heard anybody's story.

21  They really just tried to get rid of the whole thing,

22  and it was handled very poorly.

23         **THE COURT:**  Nothing formal?  I'm asking did

24  anything formal come out of this?

25         **MS. SHARON:**  Not on my behalf, no.  My

1   supervisor is still at the company, and to my

2   knowledge she did seek legal counsel on the whole

3   thing, and something may come from that, but I never

4   had, no.

5        THE COURT:  Have you spoken with her lawyer

6   about the incident?

7        MS. SHARON:  No, not her lawyer.  I've spoken

8   with her about the incident since it happened, but not

9   with her attorney.

10        THE COURT:  And you're not involved legally

11   with the situation right now?

12        MS. SHARON:  Not at this point in time, no.

13        THE COURT:  Thank you.

14        Anyone else?

15        MR. DUCLOS:  I had a Workmen's Comp back in

16   2010.  I fell and hurt my right shoulder.  I had

17   rotator cuff surgery, and I'm completely satisfied.

18        THE COURT:  Thank you, sir.

19        Anyone else?

20        (No response.)

21        Just in case I wasn't clear or specific

22   enough, I'd like to ask whether you personally,

23   immediate family member, or close personal friend has

24   ever been accused of workplace discrimination?

25        (No response.)

1           Do any of you personally have such negative

2   opinions about civil lawsuits such that you feel that

3   people should never bring a civil lawsuit asking for

4   monetary damages regardless of the injury?  Anyone

5   feel that way, that regardless of the injury people

6   just shouldn't bring lawsuits and ask for damages?

7           *(No response.)*

8           Do any of you have any ethical, moral, or

9   personal beliefs that would make you uncomfortable

10   serving as a juror in a case like this?

11           *(No response.)*

12           Do any of you have any difficulty reading or

13   understanding the English language such that it would

14   be -- it would interfere with your ability to listen

15   and understand the evidence and the law in this case?

16   Anyone have any difficulty of that nature?

17           *(No response.)*

18           Anyone have any mental or physical impairment

19   or condition that would make it difficult for you to

20   sit comfortably -- we've been at it now for about this

21   long -- for two hours at a time and listen to

22   evidence, that sort of thing?  Anyone have any type of

23   condition that cannot be accommodated in that regard?

24           *(No response.)*

25           As I said earlier, as the judge, it will be

1    my responsibility to explain or define the law to the

2    jury, and the jury will have to apply that law to the

3    facts that the jury has decided are true in the case

4    in deciding the verdict.

5         Now, you may disagree with the law that I

6    instruct you on.  You may say to yourself, you know,

7    Judge Rodgers, that law shouldn't be the law, I don't

8    like that law, it's not a good law.  But if you're

9    selected as a juror, you will be sworn to apply the

10   law that I instruct you on, whether you agree with

11   that law or not, for purposes of this trial.

12        That doesn't mean you're bound by this law

13   when you leave this courtroom.  I had that question

14   come up not too long ago, someone said, *Well, Judge, I*

15   *don't know if I want to agree with your law for the*

16   *rest of my life.*  That's understandable.  I don't

17   blame you.

18        But for purposes of this trial, if you're

19   selected to serve as a juror, you will have to take an

20   oath in which you swear that you will agree to apply

21   the law that I instruct you on.  Is there anyone here

22   who does not feel you can do that and you can accept

23   the law as the law in the way I define it for?

24             *(No response.)*

25        If you're selected, you'll be sworn, again,

1    along with the other jurors, on a number of issues.

2    First, you will be sworn to listen carefully to the

3    evidence, you'll agree to do that.  You will agree

4    that you will not discuss the case with anyone during

5    the trial before the verdict is received.  And in

6    fact, you will not be able to discuss the case amongst

7    yourselves as jurors at any point during the trial

8    until you actually enter the jury room to deliberate

9    on the verdict.  So during the trial you won't be able

10   to discuss the case with one another.

11        You'll also be instructed and have to agree

12   that you will not form any opinion about the merits of

13   the case until the very end of the case when you're in

14   the jury room with the other members of the jury after

15   you've heard all of the evidence and received your

16   instructions on the law.

17        Is there any reason that any of you cannot

18   follow those instructions or would not agree to?

19        *(No response.)*

20        I've asked a number of questions this

21   morning, but I perhaps might have overlooked something

22   that, as you're sitting there now, you know in your

23   heart, after having heard the other questions that

24   I've asked and the little bit that you've heard about

25   the claim and the type of case this is, that in your

1    heart you know or you suspect I would want to know the

2    answer or I would want to know that information about

3    you, maybe something in your past, maybe some opinion

4    that you hold that I've just not asked my questions

5    well enough to cover that.

6            Is there anyone who is sitting here right now

7    thinking that, that *I think she'd like to know this*?

8    Yes, ma'am?

9            **MS. WILLIAMS:**  It's not necessarily that, but

10   I just wanted to let you know that I do work for an

11   attorney.  He owns our company.  He mainly deals with

12   real estate and probate law, but no wrongful

13   termination or anything of that nature.  I think he

14   dealt with a sexual harassment case years and years

15   and years ago.

16           **THE COURT:**  Let me stop you.  Your last name

17   again?

18           **MS. WILLIAMS:**  Williams.

19           **THE COURT:**  Ms. Williams, who is the

20   attorney?

21           **MS. WILLIAMS:**  Michael Tidwell.

22           **THE COURT:**  Michael Tidwell?

23           **MS. WILLIAMS:**  Yes.

24           **THE COURT:**  And you say he may have dealt

25   with a sexual harassment case.  Do you mean filed

1   against him?

2        **MS. WILLIAMS:**   No.  He represented somebody

3   that filed -- this man owned a company or he was the

4   boss, and one of his employees had -- he prevailed in

5   the case, they ended up, you know, coming back and

6   they won.  But it was -- I don't know exactly how long

7   ago.  I've been working for him for almost three years

8   now, and it was before that, and may have even been

9   longer.  It was just a case I had heard about around

10  the office.

11       **THE COURT:**  So you don't have any firsthand

12  knowledge of it?  This was just talk around the

13  office?

14       **MS. WILLIAMS:**  This was just talk around the

15  office.  I actually don't work at -- we just opened

16  our second office in Gulf Breeze, so the title company

17  -- us, we're in Gulf Breeze, and the attorney's office

18  is in Pensacola.

19       **THE COURT:**  I appreciate you making me aware

20  of that.  Ms. Williams, if you're selected as a juror,

21  can you agree to set aside what you've heard about

22  this case involving a client of Mr. Tidwell's years

23  ago in deciding the issue in this case?

24       **MS. WILLIAMS:**  Yes, ma'am.

25       **THE COURT:**  Thank you.

 1          Anyone else?  Yes, Mr. Kempson?

 2          **MR. KEMPSON:**  My wife had been in a car

 3    wreck, and she ended up suing the people that hit her,

 4    and that was in the early '90s, I believe, in

 5    Louisiana.

 6          **THE COURT:**  Was that case resolved?

 7          **MR. KEMPSON:**  Yes.

 8          **THE COURT:**  Was it resolved to --

 9          **MR. KEMPSON:**  We did prevail, you know, and

10    -- I wouldn't say to my agreement because it just

11    barely covered her medical bills but --

12          **THE COURT:**  All right.  Thank you for letting

13    me know that.  Thank you.

14          Anyone else?

15          **MS. BRUNING:**  A number of years ago, perhaps

16    as many as 20, my sister-in-law sued her employer for

17    what she considered gender discrimination and pay

18    differential based on her sex.  And I don't know -- I

19    don't remember whether the suit went to trial or

20    whether it was settled, but she did receive a sizeable

21    settlement or amount of money.

22          **THE COURT:**  This is your sister-in-law?

23          **MS. BRUNING:**  Yes.

24          **THE COURT:**  Who was her employer?

25          **MS. BRUNING:**  Merrill Lynch.

1          **THE COURT:**  Was that here?

2          **MS. BRUNING:**  No.

3          **THE COURT:**  I'm sorry, if you said where it

4  was I didn't hear.

5          **MS. BRUNING:**  I don't think I said.

6          **THE COURT:**  You're Ms. Bruning?

7          **MS. BRUNING:**  Uh-huh.

8          **THE COURT:**  Has your sister-in-law discussed

9  the case -- her feelings about the case, anything with

10 you and your husband?

11         **MS. BRUNING:**  Perhaps with my husband, not

12 specifically with me.

13         **THE COURT:**  Anything about your knowledge of

14 your sister-in-law's case or her claim that you feel

15 might affect your ability to be fair and impartial in

16 this case involving Ms. Austin and Rosewood?

17         **MS. BRUNING:**  No.

18         **THE COURT:**  And can you agree to set aside

19 what you know about your sister's case in deciding the

20 case --

21         **MS. BRUNING:**  Absolutely.

22         **THE COURT:**  -- your sister-in-law -- I

23 apologize -- in deciding this case?

24         **MS. BRUNING:**  Yes, ma'am.

25         **THE COURT:**  If I didn't earlier, then I want

1   to make sure that I've covered everything -- my

2   question about a complaint or claim of discrimination

3   would include, as Ms. Bruning just mentioned, your

4   family members or close personal friends.  If I

5   narrowed it to just you, I shouldn't have, so I'm

6   really glad you brought that up, Ms. Bruning.

7          Let me ask again if all of you, whether close

8   friend or family member, has brought a claim that you

9   are aware of, either formally or informally, against

10  his or her employer for workplace harassment or

11  discrimination?

12         Ms. Morrow?

13  **MS. MORROW:**  Informally I brought a claim

14  against my employer over 20 years ago.  It was in

15  Atlanta.  I worked for CNN, and there was sexual

16  discrimination.  But it was informally through the HR

17  department.

18         **THE COURT:**  When you say sexual

19  discrimination, do you mean gender discrimination or

20  sexual harassment?

21         **MS. MORROW:**  Sexual harassment.

22         **THE COURT:**  So you made that known to the HR

23  department?

24         **MS. MORROW:**  I did.

25         **THE COURT:**  And what happened as a result of

1    that, if anything?

2         **MS. MORROW:**   I made it known in my exit

3    interview.   And I found out later that more people

4    came forward and that particular person moved on and

5    went to another company.

6         **THE COURT:**   Am I right -- am I assuming

7    correctly you were leaving anyway when you made the

8    complaint known?

9         **MS. MORROW:**   Yes.

10        **THE COURT:**   I just want to make sure if there

11   was any retaliation in your mind as a result of your

12   making the complaint.

13        **MS. MORROW:**   Retaliation by me?

14        **THE COURT:**   No, no, by the company against

15   you for making the complaint.

16        **MS. MORROW:**   No, none whatsoever.   They were

17   very glad that I had come forward.

18        **THE COURT:**   Thank you, ma'am.

19             Anyone here, yourself personally, close

20   friend or family member, who has made a complaint

21   against an employer and then felt like you or they

22   were retaliated against because of that complaint?

23        **MS. SHARON:**   *(Hand raised.)*

24        **THE COURT:**   Does that relate to the incident

25   that you mentioned?

1       **MS. SHARON:**  Yes.

2       **THE COURT:**  Anyone else?  Yes, Mr. Kempson?

3       **MR. KEMPSON:**  This was a long time -- this is

4  my wife and this is something she had told me, I think

5  it was '76, '77.  She was working for Johnson &

6  Johnson and was on a loading dock, and it was

7  supposedly just for men only there, and there was some

8  discrimination against her for being a woman working

9  in a man's world, supposedly.  And then she ended up,

10 you know, getting hurt in a boxcar, and so they ended

11 up trying to sue Johnson & Johnson, she said.

12      **THE COURT:**  You say "they."  Who?

13      **MR. KEMPSON:**  Her and the other lady that was

14 in the boxcar with her when they were cleaning it up

15 and some stuff fell on her.

16      **THE COURT:**  Do you know how that resolved?

17      **MR. KEMPSON:**  They didn't collect anything.

18      **THE COURT:**  This was in the '70s, you say?

19      **MR. KEMPSON:**  Yeah, it was a long time ago.

20      **THE COURT:**  Well, I didn't put any time limit

21 on my question.  Thank you.

22      Ms. Sharon, can I ask, why did you leave the

23 bank?

24      **MS. SHARON:**  It's kind of a long story.  I

25 mean, I got a good offer from the job that I'm at now,

1    and that was kind of the nail in the coffin for me.  I

2    was transferred after that incident for no good reason

3    at all.  And I went to them after they told me about

4    the transfer and said that the branch they were

5    transferring me to, the supervisor of that branch and

6    I had had a history of not getting along and that I

7    was not comfortable with it.  They told me I didn't

8    really have an option, that it was either that or find

9    new employment basically, and in the nicest way

10   possible.  And I went over to -- I did the transfer.

11   There was plenty of incidents to be had, and I

12   reported them all to my supervisor.  I found an

13   opening within the company to a different position,

14   and I applied for it.  They did offer it to me, so I

15   went, and ended up having to get myself out of that

16   situation.  But I felt like I was transferred in

17   retaliation to what had happened and --

18          **THE COURT:**  With the pepper spray?

19          **MS. SHARON:**  Absolutely, yeah.  And then

20   there wasn't really a good way out of it, so I

21   transferred to a different -- like a back office

22   department.

23          **THE COURT:**  Did you make your feelings known

24   to the company that you felt the transfer was in

25   retaliation?

1          **MS. SHARON:**  I did, yeah.

2          **THE COURT:**  And then how long after that did

3    you leave the company?

4          **MS. SHARON:**  After I was transferred, I was

5    at that place for probably a month, month-and-a-half,

6    and then I moved to the back office position where I

7    was for two or three months, and then I left the

8    company after that because it just wasn't any better,

9    I didn't feel there was any support from the staff,

10   and it just --

11         **THE COURT:**  So you left voluntarily?

12         **MS. SHARON:**  I did, absolutely, yeah, but bad

13   situation.

14         **THE COURT:**  Thank you.

15         Anyone else?

16         *(No response.)*

17         This is a little bit of an odd question, but

18   do any of you know one another, so like before coming

19   here today you were friends or acquaintances?  I'm

20   always happy when two hands are raised.  Mr. Kempson?

21         **MR. KEMPSON:**  Jeanine and I work together.

22         **MS. ROBINSON:**  We're both at Fort Walton

23   Beach Medical Center.

24         **MR. KEMPSON:**  Fort Walton Beach Medical

25   Center.

1      **THE COURT:**  So you know one another as

2  coworkers?

3      **MS. ROBINSON:**  Yes.

4      **THE COURT:**  Do you socialize outside of work

5  together?

6      **MS. ROBINSON:**  No.

7      **MR. KEMPSON:**  No.

8      **THE COURT:**  My point in asking this question

9  is to find out, if you're both selected to serve as

10  jurors will you be able to decide the case for

11  yourself individually without being influenced by sort

12  of your relationship with the other person.

13      **MS. ROBINSON:**  Yes.

14      **MR. KEMPSON:**  Oh, yeah.

15      **THE COURT:**  No issues for either of you?

16      **MS. ROBINSON:**  No.

17      **MR. KEMPSON:**  (Indicating negatively.)

18      **THE COURT:**  Thank you.

19      Anyone else?

20      *(No response.)*

21      Okay, ladies and gentlemen, if you would, be

22  patient with us for just a moment, I need to call the

23  attorneys up here to the bench.

24      *(Bench conference between the Court and*

25  *counsel:)*

1    **THE COURT:**  Any questions that you feel I

2    should ask that haven't been asked?

3    **MR. BARLOW:**  No, ma'am.

4    **THE COURT:**  Any specific voir dire that you

5    feel is necessary?  Mr. Branning, Mr. Howell?

6    **MR. BRANNING:**  The only thing that I can

7    think of is relative to the nursing home, it's a long

8    term care facility, if anybody had any experiences,

9    positive or negative, from a long term care facility

10   or nursing home.

11   **THE COURT:**  Anything else?

12   **MR. BRANNING:**  No, Your Honor.

13   **THE COURT:**  Individual voir dire that you

14   feel is necessary?

15   **MR. BRANNING:**  No, Your Honor.

16   **THE COURT:**  So nursing home, not assisted

17   living, or both?

18   **MR. BRANNING:**  Both skilled nursing facility

19   as well as permanent residents.

20   *(Bench conference concluded.)*

21   **THE COURT:**  Ladies and gentlemen, one

22   additional question for you all.  Rosewood is a

23   long-term care facility as well as assisted living,

24   but there's also a skilled nursing unit component of

25   Rosewood.  And so I just want to ask if any of you

1    have had a particularly positive or negative

2    experience with a long-term care health facility,

3    residential in nature?

4         Yes, ma'am?

5         **MS. REED:**  Stephanie Reed.  I used to work

6    for Azalea Trace.  I worked there on two different

7    occasions as a companion.  I had both positive

8    experiences, because I liked the residents that lived

9    there and working with them, but I also had, I felt,

10   negative experiences with some administration and

11   staffing issues resulting in what I felt was not

12   adequate care at times for the residents.

13        **THE COURT:**  For the residents?

14        **MS. REED:**  Uh-huh.

15        **THE COURT:**  And this is Azalea Trace, you

16   said?

17        **MS. REED:**  Uh-huh.

18        **THE COURT:**  Not related to Rosewood?

19        **MS. REED:**  No.  Never heard of it.

20        **THE COURT:**  Do you still do that type of work

21   in any capacity?

22        **MS. REED:**  Not for a facility.  I, up until

23   just recently, had one person I was just referred to

24   as a dementia client.  Because I have communication

25   degrees, I work very well with them to help them

1    communicate with the world and everything, so I have

2    kind of a word-of-mouth reputation for people who pull

3    me in and ask me to help out with people.

4         **THE COURT:**  As far as your experience with

5    Azalea Trace, can you agree to set that side, if

6    you're select as a juror in this case, in deciding the

7    issues here based on the facts and evidence and law in

8    this case?

9         **MS. REED:**  Yes, I can.

10        **THE COURT:**  Thank you.

11        Anyone else?  Yes, sir, Mr. Kempson?

12        **MR. KEMPSON:**  I'm a nurse, so I've worked

13   quite a bit with the psychiatric department.

14        **THE COURT:**  Have you worked in a facility

15   outside of -- because you work in an acute care

16   facility as part of the hospital, right?

17        **MR. KEMPSON:**  Yeah, I work in -- yeah, we do

18   intake and do, I mean, in the ERs and --

19        **THE COURT:**  Okay, Mr. Kempson, thank you.

20        Anyone else?

21        *(No response.)*

22        Ladies and gentlemen, we're going to take a

23   recess.  I know we're close to lunch, and your stomach

24   is probably telling you that, but we're not quite

25   ready to actually recess for lunch.  So I'm going to

1    ask you if you'll step out into the lobby area and

2    take care of your most immediate needs, stretch your

3    legs.

4         Please don't leave the courthouse property,

5    though, because we're going to get back together

6    fairly quickly, and we cannot proceed until everyone

7    is back here in the courtroom seated in the seat where

8    you are.  So if you wander off, I'll have to send the

9    guys in the dark jackets to come find you, because

10   otherwise we'll all be sitting here waiting for you

11   because we can't proceed without you.

12        So look to your left and your right at that

13   beautiful face next to you.  And if you see that

14   person lingering when you're invited back in, please

15   grab them and bring them in with you.

16        Please don't discuss the case.  I know you

17   haven't heard any evidence yet, but I would ask that

18   you just not have any discussion about the case during

19   this recess.

20        Yes, ma'am?

21        **MS. SPENCER:**  Can I step outside?

22        **THE COURT:**  To smoke?

23        **MS. SPENCER:**  Yes.

24        **THE COURT:**  I'll let you do that.  The

25   security officers need to know you're doing that, and

1    then come right back in.

2              (Panel out.)

3              Did you all have a chance to give any thought

4    to something I brought up during the pretrial

5    conference about whether you wanted to exercise your

6    cause challenges now so you know what you have left to

7    deal with on your list, or would you like to exercise

8    them when I come back in in about ten minutes before

9    you select a jury?  Any thoughts?

10             **MR. BRANNING:**  We would request to exercise

11   them now.

12             **MR. BARLOW:**  That's fine, Your Honor.

13             **THE COURT:**  Mr. Barlow, do you have any cause

14   challenges?

15             **MR. BARLOW:**  Ms. Morrow.  She knows the

16   Clarks, the Partingtons, the Harts, Mr. Harrell.  She

17   seems to know most of the folks over at Clark,

18   Partington, Hart.

19             **THE COURT:**  Mr. Harrell?

20             **MR. HARRELL:**  Your Honor, she testified

21   specifically that her knowledge of myself and others

22   in the firm would not affect her ability to judge this

23   case fairly.  And for that reason, I don't think a for

24   cause can be found.

25             **THE COURT:**  I don't think so either,

```
 1   Mr. Barlow.  I mean, if one of the attorneys that she
 2   was particularly close to was actually here
 3   representing the Defendant, I would probably agree
 4   with you.  But she knows -- her parents know
 5   Mr. Harrell's parents, and I just don't think that's
 6   close enough given her statement that she feels like
 7   she can be fair to Ms. Austin in the trial, so I'm
 8   going to overrule that objection or deny the request.
 9            Anybody else?  Mr. Harrell, from you all?
10            MR. HARRELL:  None, Your Honor.
11            THE COURT:  Let's take, I think, ten minutes.
12   Can you be ready, Defense?
13            MR. BRANNING:  Yes, Your Honor.
14            THE COURT:  Can you, Mr. Barlow?
15            MR. BARLOW:  Yes, ma'am.
16            THE COURT:  We'll take a recess approximately
17   ten minutes.
18            (Recess taken 11:23 a.m. to 11:38 a.m.)
19            THE COURT:  You all have your list?
20            Mr. Barlow, are you and Ms. Austin ready to
21   proceed with selecting your jury?
22            MR. BARLOW:  Yes, Your Honor.
23            THE COURT:  Mr. Branning, Mr. Harrell, and
24   Mr. Triplett, are you ready to proceed?
25            MR. BRANNING:  Yes, Your Honor, with one
```

1   caveat that we wanted to bring to the Court's

2   attention.

3          **THE COURT:**  Okay.

4          **MR. BRANNING:**   In preparing for this part of

5   the selection process, we realized that Mr. Thayer's

6   questionnaire revealed that he was in a lawsuit last

7   year, and he says it settled out of court.  Mr. Thayer

8   was No. 3, wearing the teal shirt, and he never

9   answered a question.  As we -- as our notes reflect,

10  he never answered any question about litigation or

11  making a claim.

12         **THE COURT:**  Well, let's bring him in here.

13         Mr. Thomas, if you'll see if you can find

14  Mr. Thayer and we'll see what that was about.

15         *(Mr. Thayer present.)*

16         Mr. Thayer, come on up.  I have a question

17  for you just briefly.  I'm sorry, just to the podium

18  there or lectern.

19         **MR. THAYER:**  Yes, ma'am.

20         **THE COURT:**  On your questionnaire there was a

21  question that asked about whether you had ever made a

22  claim or if anyone had ever made a claim against you

23  for personal injury, Workers' Compensation,

24  discrimination, anything of that nature, and you said

25  yes in 2016.

1          **MR. THAYER:**  Correct.

2          **THE COURT:**  But I didn't hear from you here

3     in the courtroom.  Can you tell us what that was

4     about?

5          **MR. THAYER:**  It was related to an auto

6     accident.

7          **THE COURT:**  So you were sued or you sued

8     someone?

9          **MR. THAYER:**  My wife and I sued GEICO

10    Insurance.

11         **THE COURT:**  So a vehicle accident in 2016?

12         **MR. THAYER:**  The accident itself was in 2014.

13         **THE COURT:**  What was the resolution of that?

14         **MR. THAYER:**  We settled out of court.

15         **THE COURT:**  Did you actually have to file a

16    lawsuit?

17         **MR. THAYER:**  I believe so, but it never went

18    to trial or anything like that, but we had an

19    attorney, and they filed and stuff like that, we just

20    did not go all the way through to actually get a court

21    date or anything like that.

22         **THE COURT:**  Were you satisfied with the

23    resolution?

24         **MR. THAYER:**  (Indicating negatively.)

25         **THE COURT:**  No?

1    **MR. THAYER:**  It is what it is.

2    **THE COURT:**  Anything that may still be

3    lingering with you or your wife as far as animosity,

4    hostility towards the judicial system, lawyers?

5    **MR. THAYER:**  Personally I'm an

6    anarcho-communist.  I don't really believe in the

7    judicial system.  But other than that, that's pretty

8    much it.  That's just personal beliefs that -- yeah,

9    so --

10   **THE COURT:**  Right.  No problem with that as

11   long as you'll agree to follow the Court's

12   instructions on the law if you're selected as a juror.

13   That's the only issue the Court would have with that.

14   **MR. THAYER:**  I got you.  I don't think it

15   would be an issue.

16   **THE COURT:**  Even though you don't recognize

17   sort of the authority of the Court?

18   **MR. THAYER:**  It's more of an ethical

19   disagreement, but that's delving into personal beliefs

20   so --

21   **THE COURT:**  I don't need to get into those so

22   much if you're agreeing that, in spite of those

23   personal beliefs, you could participate fully as a

24   juror in terms of listening to the evidence and

25   deciding the factual issues in the case and then

1    applying the law that I give you to those facts.  Can

2    you do that in spite of your personal beliefs about

3    the judicial system, or not?

4              **MR. THAYER:**  Yes, ma'am.

5              **THE COURT:**  Let me see if either attorney has

6    a question for you.

7              Mr. Barlow, anything?

8              **MR. BARLOW:**  No, ma'am.

9              **THE COURT:**  Mr. Branning or Mr. Harrell?

10             **MR. BRANNING:**  Your Honor, I didn't hear what

11   Mr. Thayer said about -- you said an anarcho --

12             **THE COURT:**  Anarchist, I thought is what --

13             **MR. BRANNING:**  Anarchist, I'm sorry.  You

14   said anarchist communist?

15             **MR. THAYER:**  Anarcho-communist.

16             **MR. BRANNING:**  Anarcho-communist.  What is

17   that?

18             **MR. THAYER:**  Basically I'm not big on

19   capitalism, not big on basically -- it's kind of

20   complicated, but basically I've got ethical

21   disagreements with the court system and legitimacy of

22   the United States, but that's personal beliefs and

23   stuff like that.  I've got a lot of issues with the

24   judicial system as a whole but --

25             **MR. BRANNING:**  Thank you.  I didn't know what

1  it was.

2        **THE COURT:**  I just want to make sure,

3  Mr. Thayer, that those personal beliefs and issues

4  with the judicial system would not influence you one

5  way or the other towards one party in this case or the

6  other?

7        **MR. THAYER:**  No, ma'am, I don't think it

8  would be an issue.

9        **THE COURT:**  Anything else?

10        *(No response.)*

11        Thank you, Mr. Thayer, if you'll wait back

12  outside, we'll bring everybody back in in just a few

13  moments.

14        *(Mr. Thayer excused from the courtroom.)*

15        **MR. BRANNING:**  We would move to strike him

16  for cause.

17        **THE COURT:**  On what grounds?  Because he has

18  personal beliefs about the judicial system?  I mean,

19  he told me that he could do exactly what every juror

20  is sworn to do, and he said he would do that.

21        **MR. BRANNING:**  He, one, did not answer

22  questions when the Court asked questions about prior

23  claims.  He did fill it out on his questionnaire, but

24  he sat quiet during the lengthy examination process.

25        **THE COURT:**  I wouldn't strike him for that

1    reason, Mr. Branning, but go ahead.

2         **MR. BRANNING:**  And, two, he told us that he

3    has a serious self-described ano -- anarcho-communist

4    personal beliefs where he questions the legitimacy of

5    the judicial system.  And when the Court asked him if

6    he could follow the law and put those personal beliefs

7    aside, I heard him say something to the effect of "I

8    don't think that will be a problem."

9         **THE COURT:**  Well, I didn't hear it quite that

10   way.  That may be what he said.  But then I know what

11   I heard just a moment ago when I wrapped up and said

12   "Can you participate fully as a juror, to listen to

13   the evidence, apply the law as you're instructed on it

14   in deciding the case," and he said yes.

15        So I -- let me look back at the transcript to

16   make sure I'm not misstating that.

17        **MR. BRANNING:**  I believe he did say yes, Your

18   Honor, he did answer the Court's question to that.

19        **THE COURT:**  The request to strike him for

20   cause is denied.  I'm not going to strike him.  If he

21   had answered differently or equivocated -- but I

22   didn't feel he was equivocating.  So you all will have

23   to strike him, if you want to, with your peremptory

24   challenges.

25        Anything else?

1          Unless, of course, Mr. Barlow, you don't

2     object.  If you think he's a problem as well, then I'm

3     fine.  If you all agree to him being struck, I don't

4     have an issue with that.

5          **MR. BARLOW:**  I think he'll be fine, Judge.

6          **THE COURT:**  To strike him?

7          **MR. BARLOW:**  No.  I think he'll be fine as a

8     juror.

9          **THE COURT:**  All right.

10          **MR. HARRELL:**  Your Honor, could we have one

11     moment of discussion based on that?

12          **THE COURT:**  Okay.

13          *(Conference between counsel.)*

14          **MR. BRANNING:**  Thank you, Your Honor.

15          **THE COURT:**  We're ready then.  You all can be

16     seated during this selection process, that's fine,

17     thank you.

18          We'll start with No. 1.  Mr. Barlow?

19          **MR. BARLOW:**  No. 1 is acceptable to the

20     Plaintiff, Your Honor.

21          **THE COURT:**  Is acceptable?

22          **MR. BARLOW:**  Yes, ma'am.

23          **THE COURT:**  Thank you.

24          Mr. Harrell?

25          **MR. HARRELL:**  We'll strike No. 1.

1      **THE COURT:**  No. 2, Mr. Harrell?

2      **MR. HARRELL:**  Accepted.

3      **MR. BARLOW:**  No. 2 is acceptable to the

4   Plaintiff, Your Honor.

5      **THE COURT:**  No. 3, Mr. Barlow?

6      **MR. BARLOW:**  He is acceptable to the

7   Plaintiff, Your Honor.

8      **THE COURT:**  Mr. Harrell?

9      **MR. HARRELL:**  Strike, Your Honor.

10     **THE COURT:**  No. 4, Mr. Harrell?

11     **MR. HARRELL:**  Accepted.

12     **THE COURT:**  Mr. Barlow?

13     **MR. BARLOW:**  Acceptable as well, Your Honor.

14     **THE COURT:**  No. 5, Mr. Barlow?

15     **MR. BARLOW:**  We'll strike No. 5.

16     **THE COURT:**  No. 6, Mr. Harrell?

17     **MR. HARRELL:**  Accepted.

18     **THE COURT:**  Mr. Barlow, No. 6?

19     **MR. BARLOW:**  We'll strike No. 6, Your Honor.

20     **THE COURT:**  No. 7, Mr. Barlow?

21     **MR. BARLOW:**  No. 7 is acceptable, Your Honor.

22     **THE COURT:**  Mr. Harrell?

23     **MR. HARRELL:**  Accepted, Your Honor.

24     **THE COURT:**  Mr. Harrell, No. 8?

25     **MR. HARRELL:**  Accepted.

1          THE COURT:  Mr. Barlow?

2          MR. BARLOW:  Acceptable as well, Your Honor.

3          THE COURT:  No. 9, Mr. Barlow?

4          MR. BARLOW:  Acceptable.

5          THE COURT:  Mr. Harrell?

6          MR. HARRELL:  Strike.

7          THE COURT:  No. 10, Mr. Harrell?

8          MR. HARRELL:  Accepted.

9          THE COURT:  Mr. Barlow?

10          MR. BARLOW:  Acceptable, Your Honor.

11          THE COURT:  No. 11, Mr. Barlow?

12          MR. BARLOW:  Move to strike No. 11, Your

13   Honor.

14          THE COURT:  No. 13, Mr. Harrell?

15          MR. HARRELL:  Accepted.

16          THE COURT:  Mr. Barlow?

17          MR. BARLOW:  No. 13, Your Honor?

18          THE COURT:  Yes.

19          MR. BARLOW:  Acceptable.

20          THE COURT:  No. 14, Mr. Barlow?

21          MR. BARLOW:  Acceptable.

22          THE COURT:  Mr. Harrell?

23          MR. HARRELL:  Strike, Your Honor.

24          THE COURT:  That's all of the Defense

25   strikes.

1          So No. 15, Mr. Barlow?

2          **MR. BARLOW:**  Strike.

3          **THE COURT:**  And I believe that's all of the

4   Plaintiff's strikes.  It is.

5          So, then, we have two more jurors to select,

6   and that would be Nos. 16 and 17.

7          Okay.  I'm going to read off in reverse order

8   the jurors that have been selected, and just please

9   follow along and confirm that your paperwork looks

10  like mine.

11         No. 17, 16, 13, 10, 8, 7, 4, and 2.

12         Mr. Barlow, is that consistent with what you

13  show?

14         **MR. BARLOW:**  Yes, Your Honor.

15         **THE COURT:**  Mr. Harrell, is that consistent

16  with what you show?

17         **MR. HARRELL:**  Yes, Your Honor.

18         **THE COURT:**  I'm going to bring the panel in.

19  I'll notify those lucky eight who they are.  They'll

20  be taken into the jury room, and then they'll be free

21  to go and get a bite to eat.  And then I'll have some

22  parting remarks for the individuals not selected, and

23  then we'll all recess and we will reconvene at one

24  o'clock.  Thank you.  I'm going to bring them in now.

25              *(Panel seated.)*

1      We have everybody.  Be seated, please.  Thank

2  you, ladies and gentlemen, and thank you for your

3  patience.  I suspect we may have tried your patience a

4  little bit.  But I do have some good news for all of

5  you, and that is during this recess when you all were

6  outside the courtroom the attorneys were able to

7  successfully select the jury.

8      And so in just a moment I'm going to call out

9  the names of those lucky eight individuals who are

10  going to be with us for the rest of the trial.  If you

11  hear your name called, please do raise your hand so

12  that I know that you know that you'll be with us for

13  the next couple of days.  Also, just so you know, you

14  can't avoid jury duty by failing to raise your hand.

15  And I say that for a reason, it has been tried.  So if

16  you hear your name called, please raise your hand.

17      Ms. Bruning, Ms. Spencer, Ms. Swensen,

18  Mr. Andris, Ms. Colbert, Ms. Williams, Mr. Duclos, and

19  Ms. Kaschak.  You eight have been selected as the jury

20  to hear this case.  I'm going to excuse those eight to

21  grab some lunch and then come back.  And actually, why

22  don't we start -- I told the attorneys one, but I'm

23  going to say 1:15.

24      Some of you may not -- all of you are not

25  local, and you may need a few minutes extra to find a

1    restaurant, that sort of thing.  There are plenty in

2    this general vicinity, but just so you're sure to have

3    time for lunch today when you may be in some

4    unfamiliar territory, I'm going to say 1:15.

5         So those eight, if you would please step into

6    the jury room, Mr. Thomas is going to have some

7    instructions for you.  Please don't discuss the case,

8    and I'll see you back at 1:15 ready to go.

9              *(Jury out; remaining venire present.)*

10        Ladies and gentlemen, I won't keep you long.

11   I know you're probably anxious to get on with your

12   day.  I never know whether this is good news or bad

13   news.  It's usually good news because you're not going

14   to have to be here the rest of the afternoon and back

15   tomorrow and maybe Wednesday, and you'll be able to go

16   on about your lives.

17        For some of you it may be disappointing.  You

18   may have been hoping that you were going to be

19   selected and be able to serve.  I can tell you I

20   understand that if you are a little disappointed.  It

21   is a very unique and, as I said earlier, special role

22   that jurors play in our system.

23        For the past 15 years of speaking with juries

24   after verdicts are received in open court, without

25   fail, I hear from every single person that they were

1  pleased that they were selected.  Even those that

2  maybe didn't want to raise their hand or maybe moaned

3  and groaned when they heard their name called, at the

4  end of the day when they've had the experience of

5  serving, again, in my experience they've all been very

6  pleased that they had that opportunity.

7          We do have a consolation prize for you, and

8  that is that for the next two years you'll be excused

9  from further federal jury duty in this court, the

10  United States District Court for the Northern District

11  of Florida.  Now, that doesn't mean that you won't be

12  summoned to return, because that summons process is

13  done at random by a big computer that we don't have

14  any control over.  So it may be that you're summoned

15  to return at some point between now and the next two

16  years.

17          If that happens and you wish not to return,

18  all you need to do is contact the clerk's office --

19  the number will appear on your notice -- and just let

20  them know of your service here, and we'll have a

21  record of it -- just give us your name, we'll have a

22  record of your service here today.  And you'll be

23  excused, no questions asked, for the next two years.

24  And that means you are all off the hook for the rest

25  of the month, you know, you're good to go for the next

1    two years.

2            That doesn't mean we don't want you back.  So

3    if you're summoned to return and you would like to

4    return, then by all means we'd love to have you.  And

5    if it's in my courtroom, it would certainly be my

6    pleasure and privilege to have you back.  Does anyone

7    have any questions about anything?

8            *(No response.)*

9            If you need some form of documentation for

10   your employer, you can stop downstairs at the clerk's

11   office on the first floor, and they'll be happy to

12   provide you with that documentation of where you've

13   been today and your need to be here.

14           Otherwise, with my personal thanks on behalf

15   of our court and I know the thanks of the attorneys

16   and the parties involved in this case, I will excuse

17   you now and bid you farewell, a nice rest of the day.

18           ***(Jury Selection concluded at 11:58 a.m.)***

19           **--------------------**

20   ***I certify that the foregoing is a correct transcript***
     ***from the record of proceedings in the above-entitled***
21   ***matter.  Any redaction of personal data identifiers***
     ***pursuant to the Judicial Conference Policy on Privacy***
22   ***are noted within the transcript.***

23           *Donna L Boland*

                                            **5-28-2017**
24   ***Donna L. Boland, RPR, FCRR***            **Date**
     ***Official Court Reporter***

25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


HENRIETTA AUSTIN,                     )
                                      )
          Plaintiff,                  )
                                      )
                                      )    Case No. 3:15cv40/MCR
                                      )
vs.                                   )    Pensacola, Florida
                                      )    May 15, 2017
                                      )    8:37 a.m.
                                      )
FL HUD ROSEWOOD, LLC,                 )
                                      )
          Defendant.                  )
_____)


DAY ONE


TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.
(Pages 1-164)


**APPEARANCES**


FOR THE PLAINTIFF:          **RICHARD D. BARLOW, ESQUIRE**
                            Odom & Barlow, PA
                            1800 North "E" Street
                            Pensacola, Florida  32501


FOR THE DEFENDANT:          **JEREMY C. BRANNING, ESQUIRE**
                            **DANIEL E. HARRELL, ESQUIRE**
                            Clark, Partington, Hart, Larry
                              Bond & Stackhouse
                            125 West Romana Street, Suite 800
                            Pensacola, Florida  32502

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*100 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

| | |
|---|---|
| 1 | ### *P R O C E E D I N G S* |
| 2 | (Court called to order at 8:37 a.m.; Parties present |
| 3 | with counsel.) |
| 4 | **THE COURT:**  Good morning.  We have jury trial |
| 5 | scheduled to begin this morning in the case of Henrietta Austin |
| 6 | versus FL HUD Rosewood, LLC. |
| 7 | Representing the Plaintiff I have Mr. Barlow along |
| 8 | with the Plaintiff, Ms. Austin.  And then for the Defendants I |
| 9 | have Mr. Branning, Mr. Harrell, and the corporate |
| 10 | representative, Mr. Triplett. |
| 11 | Now, for a confirmation of the Defendant's title, how |
| 12 | the Defendant legally is referred to and then how you want the |
| 13 | Defendant referred to here during the trial. |
| 14 | **MR. HARRELL:**  We received this morning the |
| 15 | introductory statements.  The actual legal name is Florida HUD |
| 16 | Rosewood, LLC.  It doesn't -- it's just a name.  It doesn't |
| 17 | necessarily signify, I guess, Housing and Urban Development. |
| 18 | Although ultimately that's where it came from, it has no real |
| 19 | legal significance.  It's just a short name for the facility. |
| 20 | **THE COURT:**  Is it an agency of the state? |
| 21 | **MR. HARRELL:**  It is not, Your Honor.  It's a private |
| 22 | organization that just happens to call itself Florida HUD |
| 23 | Rosewood as opposed to Rosewood, LLC.  I think the company name |
| 24 | was taken and this is what it came up with.  So Florida HUD has |
| 25 | no legal significance.  It's just the title of the |

1    organization.  So we would prefer for it to be called by that

2    Florida HUD Rosewood, and then I believe we'll all probably

3    refer to the facility as Rosewood in common parlance throughout

4    the trial.

5          **THE COURT:**  I'll need to explain to the jury, or you

6    can, one of us needs to, either you can do it in opening or I

7    can do it -- perhaps I'll do it during jury instruction, that

8    this is -- that Florida HUD -- that the Defendant is not

9    affiliated with the State of Florida.  The jury should not be

10   confused about that.

11         **MR. HARRELL:**  Yes, Your Honor.

12         **THE COURT:**  Because if it was, I would have additional

13   questions in voir dire in regards to that, so I'll just make

14   that briefly clear.  And I will refer then during the trial to

15   the Defendant initially as Florida HUD Rosewood, LLC, and then

16   Rosewood most likely.

17         Is there anything that we need to discuss before the

18   jury is brought in?

19         **MR. BARLOW:**  No, Your Honor.

20         **THE COURT:**  Mr. Branning, from you all?

21         **MR. BRANNING:**  No, Your Honor.

22         **THE COURT:**  Any issues with the statement of the case

23   that -- I didn't receive a joint statement from you all, so I

24   just put that together.  Any issues?

25         *(No response.)*

 1           **THE COURT:**  Not hearing any --

 2           **MR. BARLOW:**  No, ma'am.

 3           **THE COURT:**  As I said when we met for the trial

 4   conference, you'll be receiving the jury questions as quickly

 5   as we can get them copied and get them to you, and you'll have

 6   some time with those before the panel is seated.  Once they're

 7   seated, I'll come in, and we'll get started.

 8           Also, as I explained, depending on the time of morning

 9   when we finish with jury selection, depending on how close we

10   are to an acceptable lunch hour, I'll decide whether we'll

11   recess for lunch or if we'll go ahead and go right into the

12   trial with preliminary jury instructions, opening statements

13   and then take our lunch recess.  It will just depend where we

14   are.  I suspect the jury selection won't take very long.  I

15   went through the questions and it's not a criminal trial so I

16   don't have all of the constitutional issues to discuss with the

17   jury, so it, I think, will wrap up probably more quickly than

18   we do in some of the other jury selections we have.

19           That said, anything else?

20           *(No response.)*

21           If not, I will see you once the panel is seated.

22           **MR. BRANNING:**  May I be heard?

23           **THE COURT:**  Yes.

24           **MR. BRANNING:**  We had a chance to confer with

25   Mr. Barlow and we've come to an agreement on stipulated

1    admissibility of exhibits, and so I don't know if the Court

2    would want to take that up now or take it up before we get into

3    openings.  I didn't know if there would be another break.

4         **THE COURT:**  This is the time, so tell me, please, what

5    the stipulation is.

6         **MR. BRANNING:**  We have agreed to all but one of

7    Plaintiff's exhibits.  And I believe, if I may, it's No. 5.  So

8    all of Plaintiff's exhibits we agree to admissibility and

9    stipulated to that except for No. 5, the objection being

10   relevance to No. 5.

11        **THE COURT:**  Have they been renumbered?

12        **MR. HARRELL:**  Renumbered?

13        **MR. BARLOW:**  I think we did renumber them.

14        **THE COURT:**  What is --

15        **MR. BARLOW:**  It is the employee -- where she's written

16   up for the box fan cleaning.  The number previously was

17   number --

18        **THE COURT:**  I thought we addressed this at the

19   pretrial conference.

20        **MR. BARLOW:**  We did, Your Honor, and you said you'd

21   wait until --

22        **THE COURT:**  I guess I'll have to hear evidence on it

23   before I'll be able to decide.

24        **MR. HARRELL:**  It was previously No. 9, Your Honor.

25        **THE COURT:**  All right.

1          **MR. BRANNING:**  The Plaintiff has stipulated to the

2     admissibility of Defendant's Exhibit 1 through 8, and that will

3     be all of the Defendant's exhibits.

4          **THE COURT:**  Okay.  Thank you.  So as to Plaintiff's

5     Exhibit 5, Mr. Barlow, I would ask that you not reference that

6     in opening statements because I've not decided yet whether it

7     will be admitted.

8          **MR. BARLOW:**  Okay.

9          **THE COURT:**  You say 1 through 8 or 9?

10         **MR. BRANNING:**  8, Your Honor.

11         **THE COURT:**  Very good.  I'll make a statement at the

12    beginning of the trial once the actual jury is seated regarding

13    the stipulation for the admissibility of exhibits and so

14    they'll understand that these have already been agreed to and

15    we won't need to go through the formality of introducing them

16    and seeing if there's any objection and that sort of thing.

17         Anything else?

18         **MR. BRANNING:**  No, Your Honor.

19         **THE COURT:**  We'll be in recess until the panel is

20    seated.

21         *(Whereupon, Jury Selection proceedings were held, the*

22    *transcripts of which were filed under seal.  Following jury*

23    *selection, trial proceedings commenced at 11:58 a.m.)*

24         **THE COURT:**  Anything else before we reconvene at 1:15?

25         *(No response.)*

7

1          As I said at the pretrial conference, I'll have some

2    preliminary instructions for the jury, and that usually takes

3    me anywhere from 20 to 30 minutes to go through those

4    preliminary instructions, and then you all will start your

5    openings.

6          We'll be in recess until 1:15.

7          *(Recess taken 11:58 a.m. to 1:19 p.m.)*

8          **THE COURT:**  Mr. Barlow, are you and Ms. Austin ready

9    to proceed?

10         **MR. BARLOW:**  We are, Your Honor.

11         **THE COURT:**  And Mr. Harrell and Mr. Branning, are you

12   all ready to proceed?

13         **MR. BRANNING:**  Yes, Your Honor.

14         **THE COURT:**  Very good.

15         Bring the jury in, please.

16         *(Jury in the box.)*

17         Ladies and gentlemen of the jury, if you'll remain

18   standing, everyone else can be seated, please.

19         If you all would please raise your right hand to be

20   sworn as the jury to hear this case.

21           *(Jury duly sworn.)*

22         Thank you.  Be seated.

23         Ladies and gentlemen, you have now been sworn as the

24   jury to decide the case of Henrietta Austin versus Rosewood,

25   LLC.  And now that you've been sworn, I'd like to take a little

1    bit of time here at the outset of the trial to give you some

2    preliminary instructions that I hope will be of assistance to

3    you as you participate as jurors in the trial.

4           I don't believe we have any lawyers in the group, and

5    jury duty may be a new experience for you, so I want to make

6    sure that you have the tools that you need at the outset to

7    fully participate as jurors in the trial.

8           I hope that you've met -- I know you've met some of

9    the court personnel this morning.  You met Ms. Simms.

10   Ms. Simms is my courtroom deputy.  She acts as my

11   administrative assistant here in the courtroom.  She is in

12   charge of all of the paperwork, all the evidence that's

13   admitted in the trial.  She'll also be the person to swear the

14   witnesses in before they testify, just as she administered the

15   oath to you, or similarly to how she just administered the oath

16   to you.  If you have any logistical questions pertaining to the

17   jury, most notably how you get paid, that sort of thing would

18   be handled by Ms. Simms, so feel free to direct those questions

19   to her.

20          Also, you've probably met Mr. Thomas and Mr. Raines,

21   Mr. Leonard Thomas and Mr. Tom Raines, our court security

22   officers.  Mr. Thomas will be assisted, I believe, during the

23   trial by Mr. Raines.  They have the responsibility to maintain

24   security here in the courtroom.  They will enforce all of the

25   Court's orders here in the courtroom.  They also have charge of

1    the jury, so their responsibility will be to take care of you

2    as jurors, and they'll be the ones to escort you in and out of

3    the courtroom.  And if you have any personal matter that comes

4    up during the trial that you need to make me aware of and we're

5    not here in the courtroom, please let Mr. Thomas or Mr. Raines

6    be aware of that, and they'll bring the matter to my prompt

7    attention.

8         Seated directly in front of me to my right is

9    Ms. Donna Boland.  Ms. Boland is our court reporter.  She is

10   busy taking down everything that I'm saying right now on that

11   magic machine of hers, and she'll do that throughout the trial.

12   Every single utterance that's made here in open court during

13   the trial will be recorded so that we'll have an accurate

14   transcript of the trial proceedings.

15        With that said, there will not be a transcript for you

16   to review during your deliberations.  This trial is, relatively

17   speaking, brief, and Ms. Boland will not have time to prepare

18   an official transcript because she'll be in the courtroom with

19   us every day.  And so I'm going to permit you to take notes.  I

20   believe you have pads and pens there for that purpose.  I'll

21   give you some instructions in just a moment about notetaking.

22   But do keep in mind you won't have a transcript, so you'll need

23   to definitely pay careful attention to the evidence.

24        To my left is Mr. Luke Killam.  Mr. Killam is a law

25   student.  He's working in my chambers this summer.  He'll be

1    observing and helping out here during the trial.

2          Also, you may see Ms. Tevenia Jacobs come in and out

3    of the courtroom.  Ms. Jacobs is an attorney, she's one of my

4    law clerks, and she's assigned to this case, and she will,

5    undoubtedly, I'm sure, be in and out of the courtroom on

6    occasion to, number one, help me with this case, but also to

7    help me keep the rest of my docket moving as I'm in here with

8    you all.

9          As you recall from this morning during jury selection,

10   I identified the case to you, told you a little bit about the

11   case.  I'm going to repeat what I said to you earlier just to

12   refresh your memory about just the nature of the claim in this

13   case and just in general what it's about.

14         When I'm finish with my preliminary instructions, the

15   attorneys will give their opening statements to you, and

16   obviously you'll learn a lot more about the case through those

17   opening statements.  And then, as we move into the trial and

18   the evidence is presented, you'll become experts of the facts

19   in this case.

20         The case, again, is entitled Henrietta Austin versus

21   Rosewood, LLC.  Ms. Austin, who is the Plaintiff -- that's the

22   person who files the lawsuit in a civil case -- has filed a

23   civil action against her former employer, Rosewood, LLC, which

24   we refer to as the Defendant in a civil case.

25         The claim is for employment retaliation under the Age

1    Discrimination in Employment Act and the Florida Civil Rights

2    Act, in which Ms. Austin claims that Rosewood unlawfully

3    retaliated against her after she complained about age

4    discrimination by her supervisor.

5             Rosewood denies that the supervisor, or anyone else

6    for that matter, at Rosewood retaliated against Ms. Austin as a

7    result of any complaints, and they state that any job-related

8    actions involving Ms. Austin were taken for legitimate business

9    purposes.

10            Now, as I also explained to you this morning, as the

11   jury, you all will have the responsibility to decide the facts

12   in the case, and it will be your responsibility to take the

13   evidence that is presented and admitted here during the trial

14   and decide from that evidence what the facts of the case are.

15            No one other than you -- no one other than you will be

16   the decider of the facts in this case.

17            At the end of the trial, you'll take those facts that

18   you've decided exist, and you'll apply the law that I give you

19   to those facts in arriving at your verdict.  And of course, you

20   must follow all of the law as I instruct you on it, whether you

21   agree with that law or not, and that's in keeping with the oath

22   that you've now taken.

23            Also, as I explained, I have no role in deciding the

24   facts of the case.  And therefore, I do not want you to assume

25   from anything that I may say or do at any time during the trial

1    that I have any opinion concerning any of the factual issues in

2    this case or specifically what your verdict should be, because

3    I do not.

4              And therefore, except for my instructions to you on

5    the law, you are to disregard anything that I may say or do

6    during the trial in arriving at your own decision concerning

7    the facts of the case and ultimately the verdict.

8              Now, the evidence from which you will find the facts

9    in the case will come in various forms.  There will be

10   testimony of witnesses from the witness stand right here.  So

11   people will come in and they will be sworn as witnesses, and

12   they will give factual information, factual testimony to you.

13             The attorneys will also seek to admit certain

14   documents or other pieces of evidence that we call exhibits.

15   They will seek to admit those types of matters into the record,

16   and indeed much of that will be admitted into the record.  And

17   that also would be something that you could base your decision

18   on.

19             Anything that the attorneys might agree to or

20   stipulate to -- we call it a stipulation but it's an agreement

21   between the parties -- that also could be entered into the

22   record, and then that would be something you could base your

23   decision on.

24             Or, lastly, any facts that I might direct that you are

25   to accept as true or established then would also be something

1    you could base your decision on.

2         Your decision -- I hope it's clear to you by now after

3    this morning, but your decision in this case can only be based

4    on the factual information presented to you through the

5    evidence in this trial here in this courtroom and the law.

6    Nothing outside the courtroom is considered evidence, ever.

7         Now, the way that the attorneys will seek to admit

8    certain exhibits, like I said, documents or other physical

9    objects, would be from the document camera.  I'm not sure if

10   you can see the document camera.  Maybe you can see the very

11   top of the camera, it's on the far side of the lectern.  That

12   camera is very sensitive, and the attorneys can zoom in and it

13   will magnify the document on the overhead screen for you when

14   they have a document to show a witness.

15        One caveat or explanation I want to make to you at the

16   outset is there may be a period of time in which everyone in

17   the courtroom can see that document or evidence but the jury.

18   So when it goes onto the camera, I'll be able to see it on my

19   monitor, the attorneys and the parties can see it.  You won't

20   be able to see it until such time as I actually admit it into

21   the record.

22        Now, in this case, the attorneys have actually worked

23   together very diligently to agree or stipulate -- I used that

24   term earlier -- to the admission of the majority of the

25   exhibits in this case, so we probably won't have much of that

1   period of time where you all can't see the exhibit but everyone

2   else can.  But just so you know, that's how the process works,

3   until I actually admit the document or the exhibit into the

4   record, you can't view it because it's not evidence yet, and

5   you can only view the evidence in the case.

6          Now, there are certain things that are not evidence

7   and should never be considered by the jury in any way in

8   arriving at the verdict in the case.  First, as I said, nothing

9   outside this courtroom is evidence in the case, so you cannot

10  consider anything outside the courtroom in deciding the case.

11         But also, inside the courtroom there are certain

12  things that are not evidence.  Statements, arguments, and

13  questions by the attorneys are not evidence.  Nothing the

14  lawyers say at any time during the trial is evidence in the

15  case.  They're not witnesses.  It's only the witnesses that

16  give you the factual information that you can base your

17  decision on.

18         Also, objections by the attorneys to questions that

19  are asked by the other attorney are not evidence.  Now, with

20  that said, each attorney has an obligation to his respective

21  client to make all objections that he believes are proper and

22  required under our Rules of Procedure or Rules of Evidence when

23  the other attorney is asking a question.

24         So the attorney may make an objection, and you will

25  hear that.  You may hear the attorney say, "Objection,

1    hearsay," "Objection, relevance," "Objection, authenticity."

2    There's a number of objections that can be made.

3           If an objection is raised, then nothing can happen in

4    the trial until I rule on that objection.  We can't move

5    forward until that happens.

6           You'll hear me make one of two rulings.  I'll either

7    overrule or sustain the objection.  If I sustain the objection,

8    then the witness will not be permitted to answer the question,

9    and you must not speculate on what the witness's answer might

10   have been or what might have occurred if the objection had not

11   been sustained, and that's because the question itself and the

12   objection are not evidence in the case.  It's only once the

13   witness responds that you have evidence in the case.

14          So if I overrule the objection, then the witness will

15   be permitted to answer, and then you should consider that as

16   evidence, whatever the response is would be evidence in the

17   case.  However, you should do so without regard to the

18   objection and without regard to my ruling on the objection,

19   because just like with the attorneys nothing they say during

20   the trial is evidence in the case, nothing I say during the

21   trial is evidence in the case.

22          Now, on occasion I may admit some evidence for a

23   limited purpose.  If I do that, I'll give you an instruction at

24   that time in which I'll define for you the very limited purpose

25   for which you can consider that evidence.  And you have to

1    follow that instruction the best you can and consider that

2    evidence only for the purpose that I've defined for you and no

3    other purpose.

4           Also, there may be an occasion -- I try to minimize

5    this, but there may be an occasion in which I exclude some

6    evidence that's already come into the record.  So, for

7    instance, the witness responds to a question and maybe the

8    response -- the witness blurts the response out and the

9    attorney didn't quite have time to object, so that response

10   comes into the record.  Well, the question may have been

11   improper or the response may not have been responsive or

12   appropriate, so I would then strike that from the record.

13          I would tell you that you can't consider it, it's

14   excluded from the record.  And you have to follow that

15   instruction, and you have to put that out of your mind, even

16   though you've heard it already, if it's testimony.  Or if it's

17   an exhibit that you've already seen and then I later decide

18   that it was improperly admitted, you would have to exclude it

19   -- I would exclude it, and you would have to exclude it from

20   your mind because it's been excluded from the record and you

21   would not be able to consider it in any way.

22          Now, there are two types of evidence.  You've probably

23   heard -- or watched enough TV to have heard the terms direct

24   and circumstantial evidence.  So we have both direct and

25   circumstantial evidence during trials.  And direct evidence,

1    you may know, is the direct proof of a fact such as the

2    testimony of an eyewitnesses, while circumstantial evidence is

3    proof of facts from which you can infer or conclude that other

4    facts exists.  So I'll give you a couple of examples.

5        For direct evidence, you may have a witness come into

6    the courtroom -- let's just say the trial involves a car

7    accident, the defendant's car ran a red light and hit the

8    plaintiff's car.  So a witness comes in to testify -- that

9    witness was a bystander, maybe at the intersection when the

10   defendant ran the red light.  The witness was standing there,

11   saw the light was red, and saw the defendant's car come through

12   the intersection with the red light and hit the plaintiff's

13   car.

14       That witness would be a witness with direct knowledge

15   of the fact that the light was red at the time that the

16   defendant's car ran the red light.  They were there, had

17   firsthand knowledge of it, saw it themselves.

18       Circumstantial evidence, as I said, is proof of facts

19   or circumstances from which you can infer or conclude that

20   other circumstances exist.  So let's -- for instance, the same

21   type of case, the question is whether or not -- what the

22   weather was on the day in question when the vehicle ran the red

23   light.

24       So a witness comes in and says, *Well, I can't say that*

25   *it was raining at the time that the car ran the red light or*

1    *the defendant ran the red light, but I can tell you that there*

2    *were puddles all over the road, the ground was wet, the sky was*

3    *dark and gray.*  From those facts you could infer that it had

4    recently rained, even though it wasn't raining at the time.  If

5    it was raining at the time and the witness testified about

6    that, that would be direct knowledge or direct evidence of that

7    fact.

8              So I hope that helps you.  But now, that I've given

9    you these elaborate explanations of direct and circumstantial

10   evidence, I'm going to tell you that you can consider both

11   direct and circumstantial evidence in deciding the case, and

12   the law makes no distinction in the weight that you give to

13   either direct or circumstantial evidence.

14             As I also told you earlier, the issue of witness

15   credibility will be solely for you to decide as the trier of

16   fact.  So it will be up to you -- and I hope you will listen

17   very carefully to the testimony, because it will be up to you

18   to decide which witnesses to believe or not to believe or how

19   much of a witness's testimony to accept or reject.  I'll give

20   you additional criteria for evaluating witness credibility when

21   I give you your instructions on the law at the conclusion of

22   the trial, but do keep in mind it is your responsibility to

23   make that determination.

24             Now, just a few words about the jury and what I would

25   ask of you all during the trial.  First, I'll instruct you now,

1    and I will instruct you in this regard every time you leave the

2    courtroom, that you are not to discuss this case during the

3    trial, not amongst yourselves nor with anyone else.

4           So when we retire this evening and you go home for the

5    evening, you cannot talk about this case with anyone, not your

6    loved ones, no one.  If your spouse asks you what you've been

7    doing all day today, you can tell them certainly that you were

8    selected for a jury in a trial, and you have to be in federal

9    court tomorrow morning, but you cannot discuss anything about

10   the trial with your spouse until your duty is completed, and

11   that would be after the verdict has been received here in open

12   court and you're released or dismissed, and again, that

13   includes amongst yourselves.  You can certainly have lunch

14   together, you obviously can chat together in the jury room, but

15   nothing about the specifics of the case at all.

16          Also, I suspect that many, if not all, of you use cell

17   phones and the Internet and other tools of technology.  You are

18   specifically instructed that you must not communicate in any

19   way -- not just verbally, but in any way with anyone about the

20   case on your cell phone.  You can't text about it, you can't

21   send emails about it.  I still don't know what Twitter is

22   exactly, but you can't tweet about it.  You can't be on any

23   blog or website chatting or chat room talking about it, nothing

24   of either oral or written communications about the trial.

25          Now, if anyone should attempt to speak to you about

1    the trial, what I would ask that you do is to advise them that

2    you're on the jury, ask them to stop talking about the case to

3    you or even in your presence.  I don't expect this to happen.

4    Whenever I give this instruction, I always see the jurors'

5    faces kind of change a little bit, a little bit of an alarm.  I

6    don't expect this to happen, but it is a very serious matter,

7    as I'm going to explain in just a moment, so I want you to know

8    what I will ask of you in the remote event that it does occur.

9         So if someone should seek to talk to you about the

10   case or speak about the case in your presence, tell them you're

11   on the jury, ask them to stop talking about the case in your

12   presence, and then I want you to bring that matter to the

13   attention of the court security officer immediately that

14   someone was trying to talk to you about the case.

15        The issue of anyone even attempting to influence the

16   jury and the jury's decision during a trial, again, is a very

17   serious matter.  If it should occur, I want you to let the

18   court security officers know it, they'll bring it to my prompt

19   attention.  It will be dealt with immediately, and it will be

20   dealt with as a matter of criminal contempt of court.  Very,

21   very serious.  So please do keep that in mind and just, if

22   there's any questions about what you think I would ask of you,

23   please, you can ask me now or you can ask the court security

24   officers, but it is simple, just let them know, and please

25   don't engage in any discussions with anyone.

1          Now, the attorneys and the parties understand this,

2   particularly the attorneys.  They're officers of this Court,

3   and they have professional and ethical obligations to avoid

4   even the appearance of impropriety with any member of the jury.

5   What that means is they will go out of their way to avoid

6   anything that could be perceived in any way as attempting to be

7   improper with the jury.

8          So this is a small courthouse.  It may be that you run

9   into one of the attorneys or into a party, I don't know, coming

10  in and out of the courthouse maybe, even on the elevator, the

11  steps coming up to the second floor.  If that happens and they

12  see you, suddenly stop and turn in the other direction, please

13  don't think they're being rude to you or anything of that

14  nature.  They're not.  They're just abiding by their ethical

15  obligation to avoid anything that could ever been construed as

16  improper, so please keep that in mind.

17         And also, I don't know that there will be any news

18  reports of this trial.  I have no idea.  I don't expect there

19  to be.  But I tell every jury in every trial that if there is

20  any type of reporting on the trial, you have to avoid that,

21  whether it's in print media, in television, radio, it doesn't

22  matter, you would need to avoid it, because again, that's

23  information outside of the courtroom that you cannot consider

24  in any way.

25         Also, you should not conduct any research or make any

1     sort of factual inquiry into the matters that are discussed

2     here during the trial on your own.  We used to only have to be

3     worried about encyclopedias and dictionaries, but of course,

4     today with the Internet and the web, it is a much, much greater

5     concern.  You cannot look up anything.  Even if you're confused

6     by something and you have a question and it's very tempting,

7     *Oh, I want to jump on the Google or Safari or whatever and look*

8     *this up,* you cannot do that.  You would be violating your juror

9     oath by doing that.

10         The attorneys have spent a great deal of time

11    preparing their cases for trial.  In our system they have the

12    right to discover certain information prior to trial -- all

13    sorts of information from the other party prior to trial, and

14    then they prepare for trial based on that information that

15    they've spent a long time and a lot of work discovering, and

16    that's so that there are no surprises when they get here to the

17    courtroom.

18         If you were permitted to go out on your own and

19    conduct research and look things up on your own, number one,

20    you might end up considering information that would be improper

21    as a matter of law, but also you would be considering

22    information that the attorneys have no idea about and they have

23    not been given any opportunity to respond to or prepare for.

24    And that's the reason for that rule.

25         And finally, you should not attempt to form any

1    opinion about the merits of the case until the very end of the

2    trial.  And when I mean the end of the trial, I'm referring to

3    you're in the jury room with your fellow jurors and at that

4    point deliberating on the case, you're able to talk to one

5    another about the case, the evidence, the law.  That's when you

6    should decide the merits of the case, but otherwise, keep an

7    open mind throughout the trial.

8            Now, as I said, I'm going to permit you to take notes.

9    You have pads and pens there for your use.  A couple of just

10   cautionary instructions about notetaking.  First, please don't

11   allow your notetaking to distract you or any other member of

12   the jury from listening carefully as the evidence comes into

13   the courtroom.  Sometimes we can become so focused on taking

14   notes that we lose sight of sort of the bigger picture and

15   what's taking place around us, so please don't let that happen.

16           Also, please remember that not everything that appears

17   in your notes or in someone else's notes is exactly how that

18   evidence came into the courtroom.  No one is as good as

19   Ms. Boland in taking down the court record and what's said in

20   court.  None of us have her magic machine.  She will have the

21   only official transcript.  So do keep in mind if something

22   shows up in your notes or someone else's, that's not

23   necessarily -- certainly it's not the evidence.  Right?

24           I mean, it's not the evidence.  It's just your

25   recollection or someone else's recollection of the evidence.

1    I'm not suggesting that that can't be helpful, but just keep in

2    mind that sometimes what's written can be -- or has been

3    interpreted perhaps by you, and you have your own sort of slant

4    on it, and others may do the same.

5          Now, you won't be able to have your pads with you in

6    the jury room until you deliberate.  So every time you leave

7    the courtroom, your pads will remain there on your chairs.

8          At the end of the trial day, Ms. Simms will collect

9    your notepads, they'll be maintained in our vault safely and

10   securely overnight, and they'll be back on your chairs waiting

11   for you in the morning.  You will be able to take them into the

12   jury room when you go in to deliberate.

13         And then, after the trial, Ms. Simms collects your

14   notepads -- she does not look at them, no one ever looks at

15   them -- and she destroys them.  In all these years I've never

16   seen the inside of a juror's notepad, so just keep that in

17   mind, it's yours to write in and to use as you wish.

18         One other comment, though, in that regard.  If you do

19   take notes during opening statements or closing arguments,

20   please do make a notation to yourself on your notepad that

21   that's the phase of the trial that we're in at that time when

22   you're making those notes, because that's lawyer talk, right?

23   That's not evidence.

24         They're important -- opening statements are important,

25   and certainly closing arguments are important, and you do need

1    to listen carefully, and you are free to take notes.  But

2    that's not the witness testifying.  That's the attorney's

3    recollection of what the witness said or what the exhibit said.

4              In just a moment I'm going to stop talking, and I'm

5    going to turn the trial over to the lawyers.  The first thing

6    we'll do is we'll start with opening statements.  Mr. Barlow

7    will go first.  Because Ms. Austin has the burden of proof as

8    the Plaintiff, so he'll go first, and then followed by the

9    Defense.

10             The opening statements is not an opportunity for the

11   attorneys to argue to you about the evidence because -- why is

12   that?  There will not have been one piece of evidence admitted

13   at the time the lawyers give you their opening statements.

14   This will be what the lawyers expect the evidence to show from

15   their preparations for trial.  But again, you will not have

16   heard one syllable from the witness stand and you will not have

17   seen one exhibit at the point of opening statements.

18             Once opening statements have been completed, then

19   Ms. Austin, as the Plaintiff, will begin her case in chief, or

20   her direct case, that's what we call that part of the trial.

21   Mr. Barlow will call witnesses, he will give a direct

22   examination of the witness, and then the Defense, Mr. Branning

23   or Mr. Harrell, will be able to cross-examine that witness, and

24   then Mr. Barlow will be given an opportunity for a brief

25   redirect after the cross-examination.

 1          Once Mr. Barlow has presented all of the evidence that

 2   Ms. Austin has to present in her case, you'll hear him say that

 3   he rests the Plaintiff's case.  At that point will be the

 4   opportunity for Rosewood to present its case to you, and we'll

 5   proceed in like fashion with the Defense attorneys calling

 6   witnesses, Mr. Barlow cross-examining those witnesses, the

 7   Defense attorney conducting redirect.

 8          Once the Defendants have presented all of their

 9   evidence, you will hear them announce that they rest their

10   case.  There will be an opportunity -- it doesn't always occur,

11   but there is an opportunity for the Plaintiff, because the

12   Plaintiff bears the burden of proof, to present a rebuttal

13   case.  That is usually, if it occurs, it's brief in duration,

14   and it's in response to their efforts to respond to the Defense

15   case.  It's a little bit like a tennis match.

16          Once all of the evidence has been admitted into the

17   trial record, then I'm going to give you your instructions on

18   the law followed by the closing arguments of the attorneys, and

19   then you'll retire to begin your deliberations.

20          All right.  As I promised, I'm going to stop taking,

21   and I'm going to turn the trial over to the attorneys.  We'll

22   start with opening statements from Mr. Barlow on behalf of

23   Ms. Austin.

24          You may proceed when you're ready.

25          **MR. BARLOW:**  May it please the Court?

1          **THE COURT:**  Yes, sir.

2                      **OPENING STATEMENTS**

3          **MR. BARLOW:**  Good afternoon, ladies and gentlemen of

4    the jury.  My name is Richard Barlow.  I represent Ms. Austin

5    in the lawsuit that she has filed against Rosewood.

6          We expect that the evidence in this case will show as

7    follows:

8          In 1994, Ms. Austin started working for Rosewood as a

9    housekeeper.  As a simple woman, she was going to sit there and

10   work hard, work as hard as she could and do a good job for

11   Rosewood.  And she did that for a number of years -- decades,

12   more than a decade.

13         She really didn't have any problems with her

14   employment until 2012 when her supervisor became Dwayne Lewis.

15   Ms. Austin helped train Mr. Lewis.  He was new.  She had been

16   there for a while, she knew the ropes, so to speak, and she

17   helped train him.

18         Initially they got along fine, there were no problems.

19   At some point, though, Ms. Austin noticed that Mr. Lewis was --

20   started treating her a little bit differently.  If something

21   came up, say, an employee didn't show up for work, he'd have

22   Ms. Austin go take care of that employee's work as well.

23         The way it was structured, a housekeeper took care of

24   this area, this housekeeper took care of another area, this

25   housekeeper took care of another area, and a couple of

1    housekeepers took care of another area.  And there was also a

2    couple of floor men that would strip and buff the floors of the

3    facility.

4            But anyway, whenever one of these folks didn't show

5    up, Mr. Lewis would have Ms. Austin go do it.  And she noticed

6    that he was never having any of the younger housekeepers go and

7    do this.  So she talked to him about it, and she talked to him

8    about it a number of times.  And it got to the point where

9    Mr. Lewis would tell her, "Hey, look, all you do is complain.

10   You're too old to be whining.  You should just go on and do

11   something else."

12           Undeterred, Ms. Austin would continue to say, "Hey,

13   look, it's not fair.  You're treating me differently.  Why

14   can't you share some of this work load?"  And at some point

15   it -- as most of these cases do, it kind of escalated a little

16   bit.  And Ms. Austin showed up for work one day and -- for the

17   last 19 years, 18 years, the housekeepers would clean the

18   dining room.  There's a main dining room where all of the

19   residents go to eat.  And two housekeepers would clean it in

20   the morning and then two housekeepers would clean it in the

21   afternoon.

22           Well, Ms. Austin shows up for work and she goes to

23   clean the dining room.  She expects her other housekeeping

24   partner, if you will, to be there, but she wasn't.  So

25   Ms. Austin, undeterred, cleans it.  This goes on for a couple

1   of days, and then she talks to Mr. Lewis and says, "Hey, what's

2   going on?  I've got to clean it by myself.  It's really hard."

3   And he says, "Yeah, you're just going to clean it by yourself

4   from now on.  The other girl doesn't have to do it anymore."

5           So Ms. Austin does what she can, and three or four

6   weeks later she goes to see Ms. Partridge, who is the nursing

7   home administrator and she's over Mr. Lewis.  So she goes to

8   see Ms. Partridge and says, "Hey, look, it's not fair.  He's

9   got me cleaning the dining room in the morning by myself.  It's

10  really too much with all the other stuff that I have to do."

11          So the next day Mr. Lewis meets Ms. Austin and says,

12  "Hey, you shouldn't have went to Ms. Partridge," and now she

13  has to do it -- the dining room in the morning by herself and

14  in the afternoon by herself.  So that goes on for a while.

15          Then Ms. Austin goes back to Ms. Partridge and says,

16  "Hey, look, he's doing it again.  He's not being fair.  He's

17  not giving out the work to the younger housekeepers that he's

18  giving out to me."  And so shortly thereafter Mr. Lewis gave

19  Ms. Austin more work.  She had to do the soiled utility room,

20  which is where a lot of the soiled linens and whatnot would be

21  put.  Typically that was done by the floor technicians.  So

22  this complaint to Ms. Partridge got Ms. Austin some more work

23  from Mr. Lewis.

24          This all came to a head in April of 2013.  Ms. Austin

25  had showed up for work.  She was still cleaning the dining room

1   by herself.  Sometimes she would get help, sometimes the floor

2   man could help her clean it.  But on this morning the dining

3   room was especially dirty.  Apparently it was pancake day, and

4   all of the elderly residents have pancake, and they get syrup

5   all over the place and they just make a mess all over the

6   place.

7          So anyway, Ms. Austin asked Mr. Lewis for some help,

8   "Hey, can you get me some help?  It's pretty dirty, I need some

9   help."  And there was some discussion about that, and the

10  upshot of the discussion was Mr. Lewis says, "Hey, look, just

11  give me your keys, give me your radio.  If you don't want to do

12  the work, you can just go home."

13         And Ms. Austin understood him to say "You should clock

14  out."  So she gave him the keys, gave him the radio, and she

15  clocked out.  She had been at work maybe half an hour.

16         So she goes outside, she calls Mr. Triplett, which is

17  the director of operations for Rosewood, and she calls

18  Ms. Partridge.  And she explains to Ms. Partridge what's going

19  on.  Ms. Partridge asks her to come in to -- or stay around

20  until she gets in.  It was probably 7:30 in the morning when

21  this call was made.  Ms. Partridge asks Ms. Austin to *Come in*

22  *and we'll talk about it.*

23         Ms. Partridge shows up nine o'clock or so.  She has a

24  meeting.  Apparently she meets with Mr. Lewis before she meets

25  with Ms. Austin.  And sometime around 10:00, 10:30 or so, a

1    little later that morning, Ms. Austin has a meeting with

2    Mr. Lewis and Ms. Partridge.

3           And when Ms. Austin arrives Ms. Partridge says, "Hey,

4    look, you know, Mr. Lewis told me what happened.  You're

5    insubordinate.  I'm going to have to write you up."  Apparently

6    Mr. Lewis claimed that Ms. Austin had thrown the keys and the

7    radio at him.

8           So anyway Ms. Austin said, "That's not true.  I didn't

9    do that."  And Ms. Partridge said, "Yeah, but I'm going to have

10   to write you up for insubordination."

11          So Ms. Austin didn't want to be written up for being

12   insubordinate, so she left.  She was 65 when she left.

13          **THE COURT:**  Thank you.

14          Mr. Branning?

15          **MR. BRANNING:**  Yes, Your Honor.

16          May it please the Court, counsel.

17          Good morning, everyone.  By a quick refresher, my name

18   is Jeremy Branning, and at counsel table with me is my law

19   partner, Daniel Harrell, and Gene Triplett.  And you heard in

20   the opening statement by Ms. Austin's lawyer the name Gene

21   Triplett.

22          We've all been living with this case for years, we've

23   been living with the witnesses, the facts, what positions the

24   witnesses have at Rosewood, what they did in those positions

25   every day.  And we're about to just pile all of it on to you in

 1  | a matter of about 48 hours, so our job is to make sure that we
 2  | distil the evidence down to where it's understandable, it makes
 3  | sense.
 4  |         And so to start that process, I'm going to step back a
 5  | little bit and explain a little bit about Rosewood, what
 6  | Rosewood does, the people that are there, and the people that
 7  | work there.
 8  |         Rosewood is a skilled nursing facility here in
 9  | Pensacola.  It's a large facility.  It's made up of four
10  | separate halls.  There's an A Hall, a B Hall, a C Hall, and a D
11  | Hall.
12  |         At kind of the management level of Rosewood is an
13  | administrator, and that administrator for the time that
14  | Ms. Austin was working there at the end of her time, the
15  | administrator's name is Nicole Partridge.  And Ms. Partridge
16  | was the most senior management person at the building.
17  |         Gene Triplett works with a company called Gulf Coast
18  | Health Care.  And Gulf Coast Health Care manages and provides
19  | human resources support, management support, personnel support
20  | for facilities like Rosewood.  And Mr. Triplett occupies the
21  | director of operations position, and so he works not only at
22  | Rosewood, but he works at other facilities as well.
23  |         Next coming down the line at Rosewood -- it's the
24  | director of operations, administrator, and then the next are
25  | the departments at Rosewood.  And those departments are

1     laundry, they are housekeeping, they are dietary for the

2     residents, they are activities for the residents.

3          And Ms. Austin worked in the housekeeping department.

4     And the housekeeping department includes typically a day shift.

5     Most of the housekeepers worked from seven a.m. until three

6     p.m. seven days a week, except Ms. Austin generally would work

7     five days a week and then there would be two days where

8     somebody else did Ms. Austin's scope of work, what she would

9     typically do on a daily basis.

10          Now, Rosewood cares for people that often are unable

11    to care for themselves.  Having a team approach to employment

12    at Rosewood is critical.  Now, I know that sounds lofty, and

13    everywhere we work everybody says *Team* and *We all have to work*

14    *together.*  But Rosewood doesn't make allegiances.  Rosewood

15    takes care of people.  And that is a critical function from the

16    most basic level of the floor techs who are making sure the

17    floor is kept clean, to the activities director that are

18    working with the residents, keeping them active, keeping them

19    going, giving them something -- a mission, a purpose every day,

20    it evolves to the kitchen staff who take care and feed the

21    residents, it's to the housekeepers who are there cleaning the

22    facility every day.

23          And they don't just clean the four halls we talked

24    about.  They also have to clean the other areas of the

25    building -- the dining rooms, the activity rooms, the beauty

1    shop.  It's not just the residents' rooms.  There's the

2    administrative offices that have to be cleaned.

3           Having a team approach at Rosewood means everybody

4    pulls their weight, and if you need help, ask for help.  And

5    you'll hear that Ms. Austin regularly asked for help, and

6    you'll hear that she got it.  You'll here that she got it.  If

7    she needed help, she got it.

8           Skipping now to the end of the story, Ms. Austin quit.

9    She quit.  She showed up one day shortly before seven a.m.

10   start time, clocked in, began the day's duties, got upset with

11   cleaning the dining room.  Now, she had been cleaning the

12   dining room for a long time, and she had also complained since

13   the housekeeping assignments had changed.

14          You heard Mr. Barlow reference that Mr. Lewis came on

15   board there in late 2012.  Mr. Lewis was the supervisor of the

16   housekeeping department, and he supervised all of the

17   housekeepers.  After being there a few months, Mr. Lewis posted

18   new housekeeping assignments for everybody, for every

19   housekeeper.

20          Ms. Austin's assignments included cleaning the dining

21   room and cleaning other areas of the building.  And we're going

22   to show you the housekeeping assignments that Mr. Lewis

23   implemented in January of 2014.  We're going to show you every

24   hall that was assigned to the various housekeepers and what

25   other areas of Rosewood each housekeeper was responsible for

1    taking care of during their shifts.

2            What you'll also see is that it wasn't just Ms. Austin

3    who had to take care of the dining room; so did the

4    housekeepers who worked there when Ms. Austin wasn't on the job

5    that day.  Whether it was her two days off that week, whether

6    she was on vacation, whether she called in sick, somebody was

7    cleaning that dining room.  And there were assignments for who

8    was going to take care of that.

9            What we expect the evidence is going to show is that

10   Ms. Austin had been a long-time, productive, valued associate

11   at Rosewood.  She knew more than supervisor Dwayne Lewis,

12   because Mr. Lewis had only been there for a few months.  But

13   like a lot of us who have probably experienced in life,

14   Mr. Lewis came on there as a supervisor, head strong, and he

15   was going to make his mark and come in and try to set up some

16   housekeeping assignments that he thought would allow for a

17   distribution of the work among the housekeepers.

18           The evidence will show Ms. Austin opposed that

19   housekeeping assignment from the time it occurred.  She

20   complained several times about having to clean the dining room.

21   She complained about having to clean it by herself, she

22   complained about having to clean it after breakfast, she

23   complained about having to clean it after lunch.

24           But the dining room wasn't the only place that the

25   residents at Rosewood would eat.  There were other places at

1    Rosewood where the residents would eat and other housekeepers

2    took care of that.  But the B Hall assignment that was made for

3    Ms. Austin, it included the dining after breakfast and after

4    lunch.  And she had never had to do that by herself, and it

5    upset her, and you're going to hear that she complained about

6    it and complained about it.

7            What the evidence is not going to show, ladies and

8    gentlemen, is that Ms. Austin ever told anybody that her

9    assignments had to do anything with retaliating against her

10   because she complained about age discrimination.  She didn't

11   tell her closest friends that worked there.  She didn't tell

12   the administrator.  She didn't tell Gene Triplett, ever, that

13   the assignments given to her were because of her age.  She

14   didn't tell her close friends.

15           The evidence is going to show that Ms. Austin was just

16   upset with the change and was upset with Mr. Lewis and what he

17   had done in implementing these changes.

18           What's wrong with Ms. Austin's case?  We expect the

19   evidence is going to show that it was really her issue with

20   Dwayne Lewis.  It was either a personality conflict, it was

21   being upset with the work reassignments that he had implemented

22   for the entire housekeeping staff.

23           Something changed in those final few months of Ms.

24   Austin's employment to where it finally just boiled over for

25   her and she quit.  She wasn't fired.  She was not demoted.  Her

1    pay rate was never decreased.  She was upset over having to

2    clean the dining room after breakfast and lunch.  She was upset

3    with the way that Mr. Lewis was running the housekeeping

4    department.

5            You'll hear evidence that she would often criticize

6    him about how he did it because she knew it better than he did.

7    He would have to often go to her and ask questions.  I mean,

8    she was a very experienced, knowledgeable associate at

9    Rosewood.  She knew how the building worked, she knew how it

10   ran.  And the change that Mr. Lewis implemented, it just didn't

11   sit with her, and she quit.

12           Rosewood considered these factors before coming to

13   trial.  Rosewood committed to Ms. Austin and all of its

14   associates to provide an equal employment opportunity

15   environment.  Rosewood provided Ms. Austin and all of its

16   associates with policies and procedures to deal with any sort

17   of harassment, whether it's based in sexual harassment, age,

18   race, gender.  You will see evidence during the trial of clear

19   policies and what to do if you're being harassed in any form or

20   fashion, and if it's your supervisor that's harassing you, what

21   to do in that instance.

22           You'll see that Ms. Austin knew about these policies,

23   utilized these policies.  And at no time in the spring of 2013

24   did she report to anyone, utilizing these policies, that she

25   was being retaliated against for making complaints about the

1   workload assignments to her that she thought were attributable

2   to her age.  No one at Rosewood will confirm that or

3   corroborate that.  Ms. Austin is the only one that says that.

4           Now, we're going to be calling witnesses that worked

5   with her for a long, long time.  Now, make no mistake, she

6   complained about the housekeeping assignments, she did.  And

7   the evidence will make it clear that she didn't like it.  The

8   evidence will be clear that she did not like Dwayne Lewis.

9           And by all accounts, Dwayne Lewis, the evidence will

10  show, was not a beloved supervisor at Rosewood.  He had

11  personality conflicts with a lot of people.  But there will be

12  no evidence put on Ms. Austin that she complained that the work

13  assignments allocated out by Mr. Lewis were ever based on her

14  age.

15          Everything that we show you in this trial is for you

16  to see why Rosewood has responded the way it has and how

17  Rosewood operates to provide a place for its residents to live

18  and a place for its associates to work.  By the end of the

19  trial you'll see why Rosewood took the actions it did and made

20  the decisions it made.  You'll also see why Ms. Austin made the

21  decision she made.

22          The Judge will give you questions asking whether

23  Rosewood violated the law by retaliating against Ms. Austin

24  based on her allegedly complaining about harassment based on

25  her age.

1           At the close of the evidence, we're going to ask you

2    to find in favor of Rosewood, and we're going to ask that

3    because we contend the evidence is going to show that Rosewood

4    complied with the law and treated Ms. Austin fairly and equally

5    with every other associate that works there.  Thank you all for

6    your time.

7           **THE COURT:**  All right, thank you.

8           Mr. Barlow, you may call your first witness.

9           **MR. BARLOW:**  Yes, Your Honor.  The Plaintiff calls

10   Mr. Triplett.

11          **THE COURT:**  And also, ladies and gentlemen, I think I

12   alluded to this in my preliminary instructions, the attorneys

13   have agreed to the admission of the majority of the exhibits in

14   this case, and so they have already been admitted or are now

15   admitted without me having to admit them one at a time as

16   they're presented.

17          **MR. BRANNING:**  Your Honor, may I be heard briefly?

18          **THE COURT:**  Okay.

19          **MR. BRANNING:**  Mr. Triplett wears hearing aids, and he

20   informed us after jury selection that he heard about 60 percent

21   of what people said in answering the Court's questions.

22          **THE COURT:**  Uh-oh.

23          **MR. BRANNING:**  And so the lawyers will just have to

24   speak up when speaking to Mr. Triplett.  It's the high ceilings

25   and the sound just doesn't carry very well.

1          **THE COURT:**  We have devices here that actually work

2    very well in the courtroom, that's what they're designed for

3    so --

4          **MR. BRANNING:**  Perfect.  Thank you.

5          **THE COURT:**  I'm sorry, sir, we didn't know that

6    earlier.  Okay, can you hear?  Is that good?

7          **MR. TRIPLETT:**  Yes.

8          **THE COURT:**  All right, good.

9          Go ahead and raise your right hand, please, sir, to be

10   sworn.

11         **GENE TRIPLETT, PLAINTIFF WITNESS, DULY SWORN**

12         **MADAM CLERK:**  Be seated.  Please state your full name

13   and spell your last name for the record.

14         **THE WITNESS:**  My name is Gene Thomas Triplett.

15         **THE COURT:**  Sir, would you spell your last name,

16   please.

17         **THE WITNESS:**  T-r-i-p-l-e-t-t.

18         **THE COURT:**  And I'm just going to point out that the

19   device in front of you, the flat device with the red light on

20   it, that's your microphone.

21         **THE WITNESS:**  Okay.

22         **THE COURT:**  If you'll just scoot up close to that,

23   that would be great.  Thank you.

24         Mr. Barlow, go ahead when you're ready.

25         **MR. BARLOW:**  Thank you, Your Honor.

| 1 | **DIRECT EXAMINATION** |
|---|---|

**BY MR. BARLOW:**

2

3  Q.  Good afternoon, Mr. Triplett.  Are you currently employed?

4  A.  Yes, I am.

5  Q.  Can you hear me okay?

6  A.  Yes, sir.

7  Q.  Can you tell the jury who it is you work for?

8  A.  I work for Gulf Coast Health Care.

9  Q.  What do you do for Gulf Coast Health Care?

10  A.  I'm director of operations.

11  Q.  Can you tell the jury what the director of operations does?

12  A.  I oversee six nursing homes here in Pensacola and one in

13  Crestview.  I have the administrators in each facility that

14  reports to me, and I'm there to help them and assist them in

15  making sure that the facility is run properly.

16  Q.  Is one of the nursing homes under your care Rosewood?

17  A.  It is, yes.

18  Q.  How long have you been, so to speak, in charge of Rosewood?

19  A.  How long have I been?

20  Q.  In charge of Rosewood.  How long has it been under your

21  care?

22  A.  I was in charge of Rosewood from '97 to 2007, and then I

23  came back again in 2009 -- or 2008, and I've currently been in

24  charge of it since.

25  Q.  You had indicated that there were other nursing homes that

1    you oversaw?

2    A.    You want the names?

3    Q.    How many were they?  I don't know that I caught that.

4    A.    I oversee six today.

5    Q.    Are they all here in this general area?

6    A.    Yes.

7    Q.    And how many nursing homes does Gulf Coast Health Care

8    oversee?

9    A.    We have 44.

10   Q.    Are all those located in the southeast United States?

11   A.    Yes, sir, Mississippi, Alabama, and Florida.

12   Q.    But you don't have any -- you're not in charge of any

13   nursing homes that aren't in Florida?

14   A.    Only in Florida.

15   Q.    So you don't actually work for Rosewood; is that correct?

16   A.    That's correct.

17   Q.    Do you know Ms. Austin?

18   A.    Yes, I do.

19   Q.    How do you know Ms. Austin?

20   A.    I know her from being employed at Rosewood Manor.

21   Q.    Do you recall what position she held?

22   A.    She was in housekeeping.

23   Q.    Do you recall approximately when it was that she started

24   working for Rosewood?

25   A.    I do not know the exact date.

1   Q.   Do you understand that before she left she was a long-term

2   employee?

3   A.   I'm sorry?

4   Q.   Do you recall that she was a long-time employee when she

5   left?

6   A.   Yes.

7   Q.   Were you the director of operations when Ms. Austin last

8   worked there?

9   A.   Yes.

10  Q.   How often would you visit Rosewood during the time

11  Ms. Austin worked there, say, the last year of her employment?

12  A.   It would depend.  Every few weeks, sometimes it may be once

13  a month, depending on if they needed my assistance.

14  Q.   Do you recall who the nursing home administrator was when

15  Ms. Austin -- during like the last year of her employment?

16  A.   When she left it was Nicole Partridge.

17  Q.   Do you recall how long Ms. Partridge had been the

18  administrator before Ms. Austin left?

19  A.   Not exactly.

20  Q.   Do you recall receiving a telephone call one morning from

21  Ms. Austin?

22  A.   I do.

23  Q.   Do you recall if you and she spoke?

24  A.   She called me and said she was having some issues.  I asked

25  her did she talk to her supervisor, and if she had and hadn't

1   gotten it resolved, follow her chain of command and talk with

2   her administrator.

3   Q.   Did you recall ever talking with Ms. Austin again?

4   A.   I did not.

5   Q.   Did you ever talk to Ms. Partridge about Ms. Austin's

6   telephone call to you?

7   A.   I did.

8   Q.   What did she say?  What did Ms. Partridge say?

9   A.   Well, I just asked her if she got the problem resolved

10   because I didn't know what the problem was at the time.

11   Q.   What did Ms. Partridge tell you?

12   A.   I don't recall.  I'm sorry.

13   Q.   Did you follow-up with Ms. Austin?

14   A.   No.

15           **MR. BARLOW:**  That's all the questions I have.

16           **THE WITNESS:**  When I --

17           **THE COURT:**  Mr. Branning?

18           **MR. BRANNING:**  Yes, Your Honor.

19                     **CROSS-EXAMINATION**

20   BY MR. BRANNING:

21   Q.   You told us that Ms. Austin called you, Mr. Triplett?

22   A.   Yes.

23   Q.   How did she reach you?  At the office?

24   A.   She called me on my cell phone.  It was around 7:00, 7:30

25   one morning, early.

1   Q.   Do you give out your cell phone to the associates at

2   Rosewood?

3   A.   The facilities have them, and if they ask for them they can

4   get them.  I'm available for -- to help the associates if they

5   first follow the chain of command.

6   Q.   Well, you mentioned the chain of command during the

7   questioning by Mr. Barlow.  What are you referring to when you

8   say the chain of command?

9   A.   The chain of command is you -- first, if you have an issue

10  you go to your immediate supervisor, secondly you go to your

11  administrator, and then you can come to me.  And if it's not

12  resolved to your satisfaction, we have a human resources

13  department that they can also call, an eight-hundred number.

14  Q.   Is that chain of command, is that just Gene Triplett's

15  chain of command, or is that found somewhere in Rosewood's

16  policy?

17  A.   It's in Rosewood's policies.  We have two policies that

18  relates to it.  One, our HR policy that all the employees

19  receive a copy of on orientation and are inserviced on

20  annually; and we also have the same statement in our employee

21  handbook that all associates receive and sign upon orientation.

22  Q.   You just used the term "inservice," and that's a term that

23  I had to learn what that is.  Can you explain to the jury what

24  you mean when you say the term "inservice."

25  A.   Inservice is for when you -- we have to do, by regulations,

 1   certain inservices annually, and that is one of the inservices

 2   we do so that all of the employees are refreshed and know that

 3   they have that chain of command if they have issues that they

 4   don't feel have been corrected.

 5   Q.   Had you worked with Ms. Austin for a long time before she

 6   left Rosewood?

 7   A.   I had.

 8   Q.   Did you know her pretty well?

 9   A.   Yes, I did.

10   Q.   Did Ms. Austin ever contact you to report that she was

11   being subjected to any sort of age discrimination?

12   A.   No, sir.

13   Q.   Did Ms. Austin ever contact you to report that she was

14   being retaliated against?

15   A.   No, sir.

16   Q.   Did Ms. Austin ever report to you that anyone at Rosewood

17   was retaliating against her for making a complaint that she was

18   being treated differently due to her age?

19   A.   No.

20   Q.   Did you ever discuss with the administrator, Nicole

21   Partridge, whether Ms. Austin was being retaliated against for

22   making a complaint reportedly due to her age?

23   A.   No, sir.

24            **MR. BRANNING:**  Your Honor, may I have a moment to

25   confer?  I think I'm done.

1          **THE COURT:**  Yes.

2          *(Conference between Defense counsel.)*

3          **MR. BRANNING:**  Mr. Triplett is on our witness list as

4    well, so we'll call him back in our case in chief to cover the

5    information that's not covered now.

6          **THE COURT:**  That will be fine.

7          **MR. BRANNING:**  Tender the witness, Your Honor.

8          **THE COURT:**  Any redirect, Mr. Barlow?

9          **MR. BARLOW:**  No, Your Honor.

10         **THE COURT:**  You may step down.

11         *(Witness excused.)*

12         Mr. Barlow, you may call your next witness.

13         **MR. BARLOW:**  The Plaintiff calls Nicole Partridge.

14      **NICOLE PARTRIDGE, PLAINTIFF WITNESS, DULY SWORN**

15         **MADAM CLERK:**  Be seated.  Please state your full name

16    and spell your last name for the record.

17         **THE WITNESS:**  Nicole Partridge, N-i-c-o-l-e,

18    P-a-r-t-r-i-d-g-e.

19         **THE COURT:**  Mr. Barlow, when you're ready.

20         **MR. BARLOW:**  Thank you, Your Honor.

21                    **DIRECT EXAMINATION**

22    BY MR. BARLOW:

23    Q.   Good afternoon, Ms. Partridge.  Are you currently employed?

24    A.   Yes.

25    Q.   Can you tell the jury for whom it is you work?

```
 1    A.    Health and Hope Clinic.

 2    Q.    Was there ever a time when you were employed by Rosewood?

 3    A.    Yes.

 4    Q.    Can you tell the jury what approximate dates you were

 5    employed by Rosewood?

 6    A.    June of 2012 through January of 2014.

 7    Q.    What was the position that you held at Rosewood?

 8    A.    Administrator.

 9    Q.    Can you tell the jury what your duties were as

10    administrator of Rosewood?

11    A.    To oversee the operations of the nursing home.

12    Q.    Did you hold any other position at Rosewood other than the

13    administrator position?

14    A.    No, sir.

15    Q.    How many beds did Rosewood have when you were its

16    administrator?

17    A.    155.

18    Q.    How many employees did Rosewood have?

19    A.    Approximately 180.

20    Q.    Do you know Ms. Austin?

21    A.    Yes.

22    Q.    How do you know Ms. Austin?

23    A.    Through employment at Rosewood.

24    Q.    Is it your understanding that she was a housekeeper?

25    A.    Pardon?
```

1    Q.    Is it your understanding that Ms. Austin was a housekeeper

2    at Rosewood?

3    A.    Correct.

4    Q.    Do you recall who Ms. Austin's supervisor was towards the

5    end of her employment?

6    A.    Yes.

7    Q.    Can you tell the jury?

8    A.    Mr. Dwayne Lewis.

9    Q.    What was Mr. Lewis's title?

10   A.    Director of Environmental Services.

11   Q.    Do you recall what other -- well, what does director of

12   environmental services mean?  What does that cover?

13   A.    It includes housekeeping, laundry, and floor technicians.

14   Q.    Do you recall approximately how many housekeeping staff

15   members were on the housekeeping staff?

16   A.    Approximately a dozen to 15.

17   Q.    Do you recall approximately how many laundry people there

18   were on staff?

19   A.    Seven to ten.

20   Q.    And how many floor techs?

21   A.    Four to six.

22   Q.    Do you recall how the housekeeping staff was deployed when

23   Mr. Lewis was the housekeeping supervisor?

24   A.    Define "deployed."

25   Q.    Which housekeepers did which tasks, if you know.

1   A.   Sure.  The housekeepers were assigned tasks per location.

2   Q.   What does that mean, "per location"?

3   A.   The area of service in the facility in which they worked.

4   Q.   I'm going to ask you to take a look at what's been marked

5   Exhibit 2, Plaintiff's Exhibit 2.  Can you read that,

6   Ms. Partridge?

7   A.   Yes.

8   Q.   Is this the housekeeping staff -- the actual tasks assigned

9   to each of the housekeepers, that you can recall?

10  A.   Yes.

11  Q.   Do you know whose handwriting that is on there?

12  A.   Yes.

13  Q.   Whose is it?

14  A.   Mine.

15  Q.   And it's your belief that this document was created and

16  became effective on January 14th, 2013?

17  A.   Yes, sir.

18  Q.   And who has A Hall?

19  A.   Lakisha Gort, Tara Jones Andrews, or Judy Long.

20  Q.   Who has B Hall?

21  A.   Henrietta Austin, Tara Jones Andrews, or Judy long.

22  Q.   Who has C Hall?

23  A.   Kathy Borner, Judy Long, or Quaniqua Newberry.

24  Q.   Who has D Hall?

25  A.   Stacy Tolliver, Judy Long, or Quaniqua Newberry.

1    Q.   And that was the D Hall Odd?

2    A.   Correct.

3    Q.   What does that mean?

4    A.   It's the hall that had the odd room numbers, 11, 13, 15.

5    Q.   And who had D Hall Even?

6    A.   Visa Jones, Judy Long, or Quaniqua Newberry.

7    Q.   And it's your understanding that this was created effective

8    January 14th, 2013?

9    A.   Correct.

10   Q.   And in this case Ms. Austin has B Hall, which is 13 rooms;

11   is that correct?

12   A.   Correct.

13   Q.   Then there's the dining room, she had that twice a day?

14   A.   Correct.

15   Q.   And she had three bathrooms.  Do you recall which bathrooms

16   those were?

17   A.   The B Hall bathrooms.

18   Q.   Were there three on B Hall?

19   A.   That would be my understanding.

20   Q.   And she had one shower?

21   A.   Correct.

22   Q.   Was there one shower on B Hall?

23   A.   By indication of this, yes.

24   Q.   You don't have any specific recollection as you sit here

25   today?

1   A.   Yes, I do recall there was a shower on B Hall.

2   Q.   And the nurse office, what was the nurse office?

3   A.   The nurse office would be the office where the nurses

4   worked.

5   Q.   Would it be near B Hall?  Would it be away from B Hall?  Do

6   you recall?

7   A.   I would believe it to be near B Hall.

8   Q.   Do you recall approximately how much square footage it took

9   up?

10  A.   Probably 4 foot by 8 foot, so make that 32 square feet,

11  perhaps.

12  Q.   So you don't think it was terribly large?

13  A.   No, sir.

14  Q.   Do you know how many folks could be fed at the dining room

15  hall at one time?

16  A.   Which dining area?

17  Q.   The one Ms. Austin was tasked with cleaning.

18  A.   At what interval?

19  Q.   January 14, 2013.

20  A.   Sure.  The reason I ask what interval is because on a

21  typical day the breakfast service and the lunch service

22  depended on who would attend the main dining room.  At other

23  times at maximum capacity you could have 100 people in there.

24  On a given day there's probably 30 or 40 residents in there.

25  Q.   Okay.  So you think it averaged 30, 40 residents for

1    breakfast?

2    A.    Yes.

3    Q.    So was breakfast served from five to seven, seven to nine,

4    any particular time?

5    A.    Breakfast in the dining room would typically occur between

6    seven and eight a.m.

7    Q.    So what was the EDS office?

8    A.    Environmental services office.

9    Q.    What is the number of nurses that would have been -- or

10   that Ms. Austin would have been responsible for cleaning at

11   that nurse's office?  Was there only one nurse's office in the

12   building?

13   A.    There were multiple nurse's offices in the building.

14   Q.    So what I'm asking about is the nurse office that

15   Ms. Austin was tasked with cleaning, how many nurses utilized

16   it?

17   A.    Typically one person.

18   Q.    One nurse?

19   A.    Correct.

20   Q.    Would that be one nurse per shift?

21   A.    Yes.

22   Q.    What's the dietary office?

23   A.    The dietary office, it was a small space where a desk was

24   located where the dietary workers charted.

25   Q.    Any idea of the sense of its square footage?

1    A.   4 feet by 12, approximately.

2    Q.   What was the soiled room?

3    A.   The soiled utility room is the place where the soiled

4    receptacle cans go to receive the soiled trash and the soiled

5    linens to be processed for laundry.

6    Q.   Can you -- what does it look like?  What's in it?

7    A.   There are trash cans and a soiled laundry hopper.

8    Q.   Were they like a garbage can that you see on the side the

9    of the road?

10   A.   No, sir.  They're commercial, industrial --

11   Q.   Are they like carts or something, wheeled carts?

12   A.   Yes, wheeled carts.

13   Q.   And who would take the soiled linens out to laundry?

14   A.   I believe the floor technicians.

15   Q.   Can you tell by looking at this document what Ms. Austin's

16   schedule was?

17   A.   No.

18   Q.   Who decided which tasks were done by each housekeeper?

19   A.   The housekeeping director.

20   Q.   At this time was it Mr. Lewis?

21   A.   Correct.

22   Q.   Mr. Lewis had the authority to change the schedule as he

23   saw fit?

24   A.   Correct.

25   Q.   Were you aware of any problems that Ms. Austin was having

1   with Mr. Lewis?

2   A.   No.

3   Q.   Do you ever recall a time Ms. Austin came to you and

4   complained about Mr. Lewis?

5   A.   No.

6   Q.   Do you ever remember a time when Mr. Lewis came and

7   complained to you about Ms. Austin?

8   A.   No.

9   Q.   Do you remember Plaintiff's last day of work?  Do you

10  remember Ms. Austin's last day of work?

11  A.   Yes.

12  Q.   Tell the jury what you can recall.

13  A.   I received a call at approximately 7:15 that morning.

14  Ms. Austin was upset regarding cleaning the dining room.  I

15  asked her to continue her work on the hall, and if we could

16  possibly discuss upon my arrival and after the morning meeting

17  with the managers.

18  Q.   What did she tell you?

19  A.   At what point?

20  Q.   On the phone call.

21  A.   She was upset about cleaning the dining room because she

22  was requesting assistance.

23  Q.   And did she tell you that she wasn't getting assistance?

24  A.   And I asked -- yes, she indicated that the person who was

25  assigned to help her was not available to help her.  I asked

1   her to ask Dwayne to help her because that would happen.

2   Q.   Ask who to help her?

3   A.   Dwayne Lewis.

4   Q.   Do you know if she asked Mr. Lewis to help her?

5   A.   I don't know.

6   Q.   So you show up to work around what time?

7   A.   9:00, 9:15.

8   Q.   And it's your understanding that Ms. Austin is still there

9   waiting for you?

10  A.   No.   It was my understanding that upon arrival that she had

11  left the facility.

12  Q.   So you think when you showed up Ms. Austin had left?

13  A.   Correct.

14  Q.   So did you speak to her that morning?

15  A.   Yes.

16  Q.   Do you recall approximately when it was that you spoke to

17  her?

18  A.   I spoke to her at 7:15 for the phone call.

19  Q.   You asked her to wait for you to show up?

20  A.   Yes.

21  Q.   You said you showed up for work and she wasn't there.   Did

22  you talk to her after the phone call?

23  A.   Yes, she presented to my office that morning.

24  Q.   Do you recall approximately when that was?

25  A.   10:15, 10:30.

*Nicole Partridge - Direct/Barlow*                                    57

1    Q.   Did you ask her where she had been?

2    A.   No.

3    Q.   How do you know that she wasn't at the facility?

4    A.   I believe Mr. Lewis indicated to me that she had departed.

5    Q.   Did you make any independent confirmation that Ms. Austin

6    had indeed left the building, facility?

7    A.   No.

8    Q.   So do you recall Ms. Austin coming to see you at your

9    office?

10   A.   Correct.

11   Q.   Was anyone else present?

12   A.   Mr. Lewis.

13   Q.   What did -- do you recall who started talking first?

14   A.   Excuse me?

15   Q.   Do you recall who started talking first?

16   A.   No.

17   Q.   Do you recall what Ms. Austin told you, if anything?

18   A.   That she was upset about cleaning the dining room, not

19   having help, and that she left her keys and radio and walked

20   out.

21   Q.   Did you say anything to Ms. Austin during this meeting?

22   A.   Yes.

23   Q.   Do you recall what you told her?

24   A.   I asked if the keys and radio being submitted was her

25   resignation.

1    Q.   What did she say?

2    A.   I believe "yes."

3    Q.   When did you come to this recollection?

4    A.   When did I come to --

5    Q.   That she gave you the information when you asked her if she

6    was resigning, when did you first recall that?

7    A.   When did I first recall that she indicated that she was

8    resigning?

9    Q.   Yes, ma'am.

10   A.   Probably upon inquiry.

11   Q.   So you asked her if she was resigning?

12   A.   Pardon?

13   Q.   You asked her if she was resigning?

14   A.   Correct.

15   Q.   Did she -- strike that.

16        Did you indicate to her that you were going to write her up

17   for being insubordinate?

18   A.   No.

19   Q.   And it's your understanding that Ms. Austin actually had

20   her keys and the radio?

21   A.   Yes.

22   Q.   I want to refer you to Plaintiff's Exhibit 2.  Do you know

23   how Ms. Gort's activities were changed?

24   A.   According to the document, Ms. Gort was assigned to A Hall.

25   Q.   Right, I understand that was her assignment.  What I'm

1    asking is what changed, do you know?

2    A.    No.

3    Q.    Looking at Ms. Austin's schedule for B Hall, do you know

4    what, if anything, changed?

5    A.    The addition of the dining room.

6    Q.    Anything else you can recall, any other changes for

7    Ms. Austin?

8    A.    No.

9    Q.    How about Ms. Borner, what changes were made to

10   Ms. Borner's work?

11   A.    No change indicated.

12   Q.    What about changes to D Hall Odd, what changes were made

13   for Ms. Tolliver?

14   A.    I believe it was consistent.

15   Q.    What do you mean it was consistent?  Does that mean no

16   changes?

17   A.    Correct.

18   Q.    So what about D Hall Even, what changes were made to

19   Ms. Visa Jones's work tasks?

20   A.    No change.

21   Q.    Okay.  So as we're sitting here today, the only one that

22   you can say definitively changed was Ms. Austin, B Hall; is

23   that correct?

24   A.    Correct.  And if I may --

25   Q.    Do you recall me taking your deposition previously,

1   Ms. Partridge?

2   A.   Yes.

3   Q.   Do you recall me asking you:  "Did she tell you she was

4   resigning?" page 24 of your deposition, line 7, you indicated,

5   "I can't recall"?  And then I followed up that question on the

6   same page paragraph -- or line 9:  "Did she tell you that she

7   quit?"  You said you don't recall the nature of that

8   conversation?

9            **MR. HARRELL:**  Objection, improper impeachment.

10           **THE COURT:**  Sustained.

11           Mr. Barlow, you'll need to please give her a copy of

12   her deposition and let her look at the question as you refresh

13   her memory.

14           **MR. BARLOW:**  May I approach the witness, Your Honor?

15           **THE COURT:**  Yes.

16   BY MR. BARLOW:

17   Q.   You see on page 24?

18   A.   Yes.

19   Q.   And we have there line 4, I asked you a question:

20           "**QUESTION:**  So after she left the keys in your office,

21   you considered her to have resigned?"

22           What was your answer?

23   A.   "Yes."

24   Q.   And then the next question, page 24, line 7:

25           "**QUESTION:**  Did she tell you she was resigning?"

1              What was your answer?

2    A.   Yes.

3    Q.   No.  What was your answer, ma'am?  Read your answer,

4    please.

5    A.   "I can't recall."

6    Q.   All right.  Then, the next, line 9, page 24:  "Did she tell

7    you that she quit?"  Can you read your answer, please?

8    A.   "I don't recall the nature of the conversation, sir."

9    Q.   And so I want to go back to my previous question:  When did

10   you get the recollection that she told you that she was

11   resigning?

12   A.   I would believe I recalled it after this occurred.

13   Q.   Did you do anything to refresh your recollection?

14   A.   No.

15   Q.   Just --

16            **MR. BARLOW:**  May I approach the witness, Your Honor?

17            **THE COURT:**  Yes.

18   **BY MR. BARLOW:**

19   Q.   You indicated you don't recall Ms. Austin making any

20   complaints about Mr. Lewis.  Is that correct?

21   A.   Correct.

22   Q.   Do you recall her making any complaints about the workload?

23   A.   Yes.

24   Q.   She complained to you about that?

25   A.   Yes.

1    Q.   And you didn't understand that that was a complaint about

2    Mr. Lewis?

3    A.   Correct.

4    Q.   What did you say to Ms. Austin?

5    A.   I indicated the intent is that the dining room needed to be

6    cleaned, and in order to do it there would be another person

7    that would assist, and it was a function that needed to be

8    performed.

9    Q.   Who is the other person that was supposed to assist?

10   A.   Typically the floor technician that also worked A and B

11   Hall.

12   Q.   Who is that, do you recall?

13   A.   Mr. Larry Bender.

14   Q.   What was Mr. Bender's typical job duties?

15   A.   As a floor technician, he was responsible for maintaining

16   the floors in the hallways, common areas, resident rooms,

17   dining rooms.  "Maintaining the floors" means cleaning,

18   stripping, waxing, buffing.

19   Q.   Did he have other duties?

20   A.   Yes.  They pulled the trash and removed it and took it to

21   the dumpster.

22   Q.   Mr. Bender's work isn't on this housekeeping record, is it,

23   his tasks?

24   A.   No, his tasks are not listed here.

25        **MR. BARLOW:**  Those are all the questions I have, Your

1    Honor.

2                    **THE COURT:**   Thank you.

3                    Mr. Harrell?

4                              **CROSS-EXAMINATION**

5    **BY MR. HARRELL:**

6    Q.   Good afternoon, Ms. Partridge.  Going back a little bit,

7    tell us a little bit more about what the facility administrator

8    role involves.  I think you described it broadly, but can you

9    tell us what on a day-to-day basis what the facility

10   administrator at Rosewood does?

11   A.   Sure.  As the administrator -- I was licensed as a nursing

12   home administrator by the State of Florida to operate a skilled

13   nursing facility or a nursing home.  That included billing for

14   Medicare and Medicaid patients, the licensure requirement.  I

15   also was responsible for the supervisors who managed each of

16   the departments within the nursing home.

17        Typically nursing -- and specifically at Rosewood, a

18   nursing department, food service, or dietary department,

19   housekeeping department with laundry, floors, and resident room

20   and facility upkeep, maintenance department, and activities

21   department, social services department, and all of those things

22   ensure that the patient care is given in accordance with the

23   regulations in order to provide the health care with all the

24   licensed professionals.

25   Q.   And Ms. Partridge, did you indicate earlier how many

1    employees are employed at Rosewood at one time?

2    A.   Approximately 180.

3    Q.   And as the facility administrator, are you the top person

4    located at the facility?

5    A.   Correct.

6    Q.   With that number of employees, do you rely on department

7    managers to help you in operating the facility?

8    A.   Most certainly.  They understand the needs of each

9    department.  They have the authority and the discretion to

10   ensure that the staffing is adequate, that the training and

11   education is adequate, that the work is satisfactory and

12   performed at a level that would ensure the patient's safety and

13   care was given.

14   Q.   And for the housekeeping department, during your employment

15   were there multiple housekeeping supervisors or director of

16   environmental services?

17   A.   Yes, there were two.

18   Q.   Who was the -- when you first began at Rosewood in, I

19   believe you said, June of 2012, who was the director of

20   environmental services?

21   A.   Richard Collins.

22   Q.   And ultimately did you have concerns about Mr. Collins's

23   effectiveness as a supervisor of that department?

24   A.   Yes.

25   Q.   And Mr. Collins, did his employment ultimately end during

1    your tenure at Rosewood?

2    A.   Yes.

3    Q.   Who replaced Mr. Collins?

4    A.   The position remained vacant during a search.  A vacancy

5    was posted and recruitment efforts, and then Dwayne Lewis was

6    hired.

7    Q.   Once Mr. Lewis was brought in, did he analyze whether there

8    were any changes that could be made to how the housekeeping

9    department operated?

10   A.   Yes.  He was responsible for ensuring the cleaning of all

11   the resident rooms, the common areas, the food areas.  The food

12   service areas varied across the whole building.  There was food

13   service that was in the main dining room.  There was also food

14   service in the restorative dining for folks who needed

15   additional assistance with specially trained CNAs to provide

16   feeding assistance.  There were dayrooms where residents were

17   able to take food and have lunch in a smaller group setting.

18   And then -- so not only did he have the regular upkeep to

19   maintain a clean facility, but also the removal of any said

20   food waste, soiled linen, and plus just the general

21   housekeeping that would have to occur for infection control

22   reasons and all of the things that go into a housekeeping

23   department.

24   Q.   Did Mr. Lewis ultimately -- I'm going to show you what was

25   previously marked as Plaintiff's Exhibit 1.  Did he ultimately

1    develop this system for the new housekeeping rounds?

2    A.   Yes.

3    Q.   And did he bring this to you to review prior to him

4    implementing that?

5    A.   Correct.

6              **THE COURT:**  For the record, this is Plaintiff's 2.

7              **MR. HARRELL:**  Plaintiff's 2.  I apologize.  It's also

8    Defendant's Exhibit 1.  We have some overlap.

9              **THE COURT:**  Okay.

10   **BY MR. HARRELL:**

11   Q.   And is it your recollection that this new assignments --

12   these new routes went into effect January 14, 2013?

13   A.   Correct.

14   Q.   Prior to these new housekeeping routes going into effect,

15   had Ms. Austin ever made any complaints to you about age

16   discrimination?

17   A.   No.

18   Q.   And prior to Mr. Lewis proposing these new routes, had you

19   ever had any conversation with Mr. Lewis about complaints from

20   Ms. Austin on age discrimination?

21   A.   No.

22   Q.   Now, let's talk a little bit about the breakdown of the new

23   housekeeping routes.  The assignments are done by hall; is that

24   correct?

25   A.   Correct.

1   Q.   So the assignments aren't based on individual employees,

2   they're based on what each hall will perform, correct?

3   A.   Correct, according to the location and essentially to the

4   square footage questions, can you find an equitable

5   distribution of the work that needs to be completed.  It was a

6   rather large physical plan.

7   Q.   With regards to B Hall, Ms. Austin wasn't the only

8   housekeeping employee that had to perform duties on B Hall; is

9   that correct?

10  A.   Correct.

11  Q.   As of January 14, 2013, Ms. Jones, Andrews, and Ms. Long

12  also performed B Hall duties, correct?

13  A.   Correct, and perhaps even a housekeeper from another area

14  might come and serve on B Hall in the event that assistance was

15  needed.

16  Q.   With regards to the facility, and specifically the

17  housekeeping department, was there oftentimes a team approach?

18  A.   Most certainly.  If for some reason there were multiple

19  changes, like room changes, or perhaps there was a call-in, and

20  the staffing was waiting to be completed, maybe somebody was

21  running behind or running late, somebody would come from

22  another hall and support the workers on said hall.

23  Q.   Now, at the Rosewood facility, do y'all have permanent

24  residents?

25  A.   Yes, there were long-term residents and short-term

1    residents.  A long-term resident is someone who -- their

2    nursing home becomes their place of home, their place of

3    residence.  A short-term resident is someone who would come

4    typically after an acute incident where a hospitalization was

5    required and they needed some skilled therapies and treatment,

6    and then the expectation is that they would return home or back

7    to the community.

8    Q.   With regards to the different halls at Rosewood, was there

9    any specific hall that had more long-term residents during your

10   tenure there?

11   A.   Yes.  A Hall was typically the short-term hall, and that's

12   where our short-term residents went, so the long-term residents

13   were typically found on A Hall and D Hall.

14   Q.   What about B Hall, did B Hall have permanent residents?

15   A.   Oh, excuse me, I mistakenly said -- the long-term residents

16   would be on B Hall because the short-term residents came on A

17   Hall.

18   Q.   And did A Hall have more larger rooms?

19   A.   There were more private rooms on A Hall, and again, those

20   were rooms that would transition because the short-term

21   resident was only there for a short stay.

22   Q.   Let's talk about what happens when a resident transitions

23   as far as how the housekeeping department has to deal with that

24   particular room.  Can you tell the jury a little bit about when

25   there's a turnover of a room what has to happen as opposed to

```
 1    typically cleaning a room for a permanent resident?
 2    A.    Yes.   The short-term residents would typically expect to
 3    stay maybe a few weeks or maybe up to six weeks, so they
 4    typically did not establish it as their bedroom.   Think of your
 5    own home, the things that -- like if you go to a hotel room you
 6    don't find all of the trinkets and treasures and things that
 7    you'd find in a bedroom.   But in a long-term room where that's
 8    your home, you're going to stay, the long-term residents would
 9    have many more things and just be settled in their room, as
10    opposed to a short-term resident who, upon exit, the room had
11    to be turned around and prepared for the new resident coming.
12    Q.    When a room turns over, is there something called a "deep
13    clean" that has to be performed?
14    A.    Yes.   So in order for safe care and nursing care to be
15    given, the room would have to be -- essentially all the linens
16    removed, the bed cleaned, the floor cleaned, the walls, any
17    soiled areas, the bathrooms that were there.   So those rooms,
18    it did require more work as the patients would depart.
19    Q.    So when a room turns over more frequently, that requires
20    more work for the housekeeper who has more of those rooms on
21    their hall?
22    A.    Correct, because they also -- the rooms have to be ready
23    for the new admits that were potentially coming, so it's time
24    sensitive.
25    Q.    Let's talk for a minute about the dining room, the main
```

1    dining room at Rosewood.  But let's start with -- I think you

2    mentioned there are multiple areas in which patients took

3    meals.  Can you kind of walk us through, looking at the

4    different halls, what areas patients took meals in?

5    A.    Yes.  On A Hall patients took meals in the dayroom, also in

6    restorative dining.  On B Hall the patients took meals in the

7    dining room.  And actually, the patients took meals in their

8    rooms sometimes, too.  So food service, again, were called --

9    the seated dining areas where there's tables where they come to

10   is basically congregate dining.

11        Or if for some reason a patient does not feel well, they

12   can eat privately in their own room or eat in a smaller setting

13   with their roommate just nearby.  So each assignment had an

14   area where food was being served, and food waste was generated,

15   and food waste had to be removed and the areas had to be

16   cleaned, tables, surfaces wiped, chairs wiped, and food service

17   items removed on a regular interval -- at every meal.

18        And so, similarly, on C Hall the dayroom, it would seat six

19   to eight residents, maybe eight to ten.  D Hall would --

20   included the dayroom.  D Even Hall included the dayroom.

21   Again, it had a congregate meal site where tables were pulled

22   and meals were served, and patients were seated there for

23   eating.

24   Q.    So is -- for each of the halls, A, B, C, and D, was there

25   some form of dining facility that had to be cleaned by the

1    housekeeper charged with cleaning that hall?

2    A.   Yes.  And actually, in A Hall, restorative dining, that's a

3    whole other dining room.  So it's not just a dayroom with some

4    tables, it's a specific room that was for restorative dining

5    purposes.

6    Q.   So A Hall actually had two rooms -- the dayroom and the

7    restorative dining room -- in which patients took meals?

8    A.   Correct.

9    Q.   Now, when the housekeeping person assigned to B Hall went

10   in the dining room, what were they tasked with doing as far as

11   cleaning the dining room?

12   A.   Removing the food waste typically from the table surfaces,

13   removing the food waste from the seated areas.  If the patients

14   actually used the chairs, which most typically did not because

15   most were not ambulatory, they came in their wheelchairs, so

16   the work was specific to cleaning the tables, cleaning any

17   chair services, and then the expectation was that the floor

18   techs would take care of the floor.

19   Q.   So the floor techs are in charge of cleaning the floor

20   areas, and the housekeepers are in charge of cleaning the

21   tables and chairs?

22   A.   Specific to food service, correct, around the meal areas,

23   yes, during the meal times -- after the meal times, excuse me.

24   Q.   Are dietary aides ever involved in cleaning the main dining

25   room area?

1    A.   Yes, the dietary aides assisted with the meal service in

2    the food preparation areas if there was -- not if, but there

3    was a food service area, the dietary staff were responsible for

4    maintenance of that area, removing any food waste and any

5    service that went on.

6    Q.   And in the main dining room approximately how many tables

7    are there?

8    A.   15.

9    Q.   And 40 people spread out among those 15 tables?

10   A.   Correct.

11   Q.   Looking back at the housekeeping routes, is it your opinion

12   that this is an equitable breakdown of assignments for the

13   various housekeepers?

14   A.   I do.

15   Q.   After Ms. Austin left employment with Rosewood, was there

16   ever any changes made to these housekeeping routes during your

17   employment?

18   A.   No.

19   Q.   So after Ms. Austin left, whoever was assigned to B Hall

20   continued to clean the dining room twice a day and continued to

21   clean the soiled room; is that correct?

22   A.   Correct.

23   Q.   Do you recall who initially was assigned primarily to B

24   Hall after Ms. Austin left?

25   A.   Ms. Trichelle Davis.

1    Q.    How old is Ms. Davis?

2    A.    I would believe her at that point to have been in her

3    forties.

4    Q.    You testified when Mr. Barlow asked you questions that

5    Ms. Austin made a complaint to you about the workload.  Is that

6    the only thing that she ever complained to you about?

7    A.    Yes.

8    Q.    And that was the B Hall assignments after they changed on

9    January 14th, 2013?

10   A.    Correct.

11   Q.    How many times did she come to you to complain?

12   A.    I recall one discussion about the dining room and then the

13   last discussion, the phone call the morning that she ended

14   employment.

15   Q.    During any of your discussions with Ms. Austin, did she

16   ever indicate in any way that she felt that her assignments

17   were based off some form of age discrimination?

18   A.    No.

19   Q.    During your discussions with Ms. Austin regarding her

20   complaints, did she ever tell you that Mr. Lewis had made any

21   negative comments to her about her age?

22   A.    No.

23   Q.    Did she ever tell you that Mr. Lewis was retaliating

24   against her for having -- anything related to comments about

25   her age?

1    A.    No.

2    Q.    And along the same lines, did you ever have any

3    conversation with Mr. Lewis telling him that Ms. Austin had

4    made complaints about him discriminating against her on the

5    basis of her age?

6    A.    No.

7    Q.    Her only reports were about the changes in her having to

8    clean the dining room, that's the only complaints she made?

9    A.    Correct.

10   Q.    And all of the changes to the housekeeping assignments

11   occurred as of January 14, 2013?

12   A.    Correct.

13   Q.    When Ms. Austin called you on her last day of employment,

14   did you tell her that she was suspended?

15   A.    No.

16   Q.    Did you tell her to clock out and go home?

17   A.    No.

18   Q.    What did you tell her to do?

19   A.    I asked her to go ahead and work in her patient rooms, and

20   then upon arrival we would have the opportunity to discuss.

21   Q.    Did she ever report to you that she was being told to clock

22   out?

23   A.    No.

24   Q.    During the final meeting with Ms. Austin, did she at any

25   point in time say anything to you about age discrimination?

1   A.   No.

2   Q.   Did she ever tell you that she thought she was being

3   retaliated against?

4   A.   No.

5   Q.   Just to be entirely clear, was there any point in time

6   during Ms. Austin's employment while you were the facility

7   administrator at Rosewood that she made any complaints of age

8   discrimination or retaliation?

9   A.   No.

10           **MR. HARRELL:**  One moment, Your Honor?

11           **THE COURT:**  All right.

12           *(Conference between Defense counsel.)*

13           **MR. HARRELL:**  One more, and I think it's just because

14   I haven't used the equipment correctly.  There we go.

15   **BY MR. HARRELL:**

16   Q.   If you'd look at the bottom, whose signature is that as to

17   who created these changes?

18   A.   Dwayne Lewis.

19           **MR. HARRELL:**  Tender the witness.

20           **THE COURT:**  Mr. Barlow?

21           **MR. BARLOW:**  Thank you, Your Honor.

22                     **REDIRECT EXAMINATION**

23   **BY MR. BARLOW:**

24   Q.   Hey, Ms. Partridge.  You say that you thought that was an

25   equitable schedule; is that correct?

1    A.    Yes.

2    Q.    And is that based upon your assumption that Ms. Austin

3    would actually have help?

4    A.    It is equitable as it is shown, correct.

5    Q.    But that doesn't show any help on it, does it?

6    A.    It's not descriptive of the floor technician's duties.

7    Q.    But you indicated that she was supposed to have help?

8    A.    The floor technicians would be assisting, correct.

9    Q.    And do you know if Ms. Austin was actually receiving that

10   assistance?

11   A.    Typically, yes.

12   Q.    You didn't show up to work until nine o'clock.  How were

13   you seeing if she was getting assistance since seven?

14   A.    When we spoke by phone, she said, "I don't have help."  I

15   said, "Ask Mr. Lewis to help you or just go to your rooms and

16   work on your rooms."  So the assumption would be that, if the

17   floor techs were on premise, they would be working.

18   Q.    That's a lot of assumptions, I agree with you.  But what

19   I'm asking you is, do you know if she had assistance that

20   you're basing your belief that this is equitable?

21          **MR. HARRELL:**  Objection, move to strike the portion

22   about the assumptions.

23          **THE COURT:**  Overruled.

24          **THE WITNESS:**  I'm sorry, repeat the question.

25   **BY MR. BARLOW:**

1    Q.   Sure.   What I'm asking you is -- you and I went through,

2    *Hey, you weren't there at seven o'clock, you were still at*

3    *home, you didn't get there until nine, so how did you know that*

4    *she had this help.*

5         And what I'm asking you is:  How can you be sure and tell

6    the jury that she did have this help, one, when you weren't

7    there, and your whole belief about equitability is based upon

8    having the help?

9    A.   The distribution of the work was equitable based on the

10   tasks that are assigned there.

11   Q.   So it's your opinion that cleaning the main dining room

12   twice a day by yourself is the same as cleaning the restorative

13   dining room once or twice?

14   A.   No.

15   Q.   So it would be harder, wouldn't it?  Cleaning the main

16   dining room by yourself would be harder than cleaning the

17   restorative dining room?

18   A.   Cleaning the main dining room would be harder than cleaning

19   the restorative dining room?

20   Q.   Yes, ma'am.

21   A.   By space and occupancy, there's more tables to tend to in

22   the dining room than there are in the restorative dining room.

23   But the restorative dining room also had higher incapacitated

24   people that could generate additional waste, so the surfaces

25   actually could be more soiled in the restorative dining area

1   than in the main dining area.

2   Q.   Could be.  But I'm asking you on common would you expect

3   the main dining room to take more work with one person as

4   opposed to the restorative dining room?

5   A.   No.

6   Q.   You don't think the main dining room was worse than the

7   restorative on average?

8   A.   No.

9   Q.   The folks in the restorative dining room, how many would

10  typically eat there at a meal?

11  A.   Eight to ten.

12  Q.   Per meal?

13  A.   Correct.

14  Q.   Do you recall telling me earlier that 30 to 40 people would

15  eat in the main dining room?

16  A.   Correct.

17  Q.   Do the folks who eat in the restorative dining room, don't

18  they have folks feeding them?

19  A.   They are receiving assistance with eating.

20  Q.   Would that be where the dietary aides come in and help them

21  eat and clean up after themselves?

22  A.   No, sir.  It was a restorative certified nursing assistant

23  who is specifically trained in that procedure.

24  Q.   You had indicated that Mr. Collins was replaced by

25  Mr. Lewis, correct?

1   A.   Correct.

2   Q.   How much time passed between Mr. Collins moving along and

3   Mr. Lewis being hired?

4   A.   Sixty days, approximately.

5   Q.   Who was doing all the housekeeping supervisor duties during

6   that time?

7   A.   I was.

8   Q.   You were doing the scheduling?

9   A.   With the assistance of the workers, yes.

10  Q.   Which workers?

11  A.   Henrietta helped with it.

12  Q.   Anybody else?

13  A.   Each of the staff members would -- reported what shifts

14  they typically worked in order to establish the schedule.  The

15  schedule was fairly repetitive as it was -- the workers worked

16  the same typical shifts and the same halls.

17  Q.   Before Mr. Collins left, was there anything not getting

18  cleaned?

19  A.   There were concerns, yes.

20  Q.   What were they?

21  A.   Staffing concerns and ensuring that the work was done.

22  Q.   What were the staffing concerns?

23  A.   Ensuring that there were adequate people on hand.

24  Q.   So was there just not enough people getting scheduled?

25  A.   If there were any vacancies on the roster or halls not

1    covered, yes, the work would have to be shared.

2    Q.   Can you think of any particular time that happened?

3    A.   Yes.

4    Q.   Please tell the jury.

5    A.   A particular date across the time that he was there and

6    that I was there?  I do not have a particular date.

7    Q.   Did you ever see the floor technicians help Ms. Austin

8    clean the dining room?

9    A.   Yes.

10   Q.   How many times?

11   A.   On occasion.  I know that I was typically there in the

12   lunch service hours, I was sometimes there in the breakfast

13   service hours, sometimes I was there in the evening service

14   hours.  Ms. Austin worked the dayshift.

15   Q.   And so it's your testimony that each time that you were

16   there during this time period that Ms. Austin had the dining

17   room twice by herself you saw the floor tech in there helping

18   her?

19   A.   Not each time, no, sir.

20   Q.   Wasn't there a team approach to cleaning the main dining

21   room before this change was made?

22   A.   The team approach existed before and after.

23   Q.   Was there a change in the team approach?

24   A.   A change in the team approach?

25   Q.   Yes, ma'am.  You said it happened before and it was there

1    after.  I'm asking you was there a change?

2    A.   Yes.  The housekeeping and the floor techs and the dietary

3    aides all worked together to clean the dining room.

4    Q.   How many short-term residents would A Hall actually have on

5    it at any one given time?

6    A.   There were typically 25 short-term patients.  And the 14

7    rooms on A Hall, some included single rooms, some included

8    double rooms.  Without looking at the floor plan to know, the

9    short-term residents typically went into a single room or a

10   double occupancy room.

11   Q.   How many single rooms were on A Hall?

12   A.   I don't know.

13   Q.   How many double rooms were on A Hall?

14   A.   I don't know.

15   Q.   How many private rooms were on A Hall?

16   A.   I don't know specifically.

17   Q.   Do you know what the capacity was of A Hall for residents?

18   A.   Not without referencing a floor plan, no.

19   Q.   So you don't know how many residents it would hold, but

20   you're pretty sure that there would be how many short-term

21   residents in A Hall?

22   A.   Based on the census of the facility, we typically had 95 to

23   98 percent occupancy of the 155 beds, and we typically had 20

24   to 25 short-term patients.  So those short-term patients would

25   be typically located on A Hall or in a few of the other private

1    rooms that were across the facility.

2    Q.   And do you know how many long-term residents A Hall had,

3    typically?

4    A.   If there were 14 rooms, and the majority of the 14 rooms

5    were occupied by short-term residents, a small portion of the

6    residents on A Hall would be long term.

7    Q.   So you think three to five maybe?

8    A.   Ask the question again, please.

9    Q.   Sure.   I'm asking you -- you said a small number.   And I'm

10   asking would it be three to five?

11   A.   A small number of long-term residents?

12   Q.   Yes, ma'am.

13   A.   Perhaps six to eight.

14   Q.   In A Hall?

15   A.   Correct.

16   Q.   So that leaves -- you said the beds turn over in short term

17   two weeks to six weeks?   Is that short term?

18   A.   Correct.

19   Q.   So there would be more turnover in short term, is that

20   your --

21   A.   Correct.

22   Q.   Who did you say took over B Hall after Ms. Austin left?

23   A.   Ms. Trichelle Davis.

24   Q.   Did you ever see Ms. Davis cleaning the dining room?

25   A.   Yes.

*Nicole Partridge - Redirect/Barlow*                                    83

1    Q.    How many times?

2    A.    Specifically I cannot say.

3    Q.    Did she have help?

4    A.    Yes.

5    Q.    Who was helping her?

6    A.    Per the team approach, the floor technicians, the

7    housekeepers, and the dietary aides were responsible for

8    cleaning the dining room.

9    Q.    You're assuming that those folks helped her?

10   A.    Per the approach, yes.

11   Q.    But you don't have any specific recollection, you just

12   assume that that happened since the approach was a team; is

13   that correct?

14   A.    I observed dietary personnel, environmental services

15   personnel, including housekeepers and floor techs, doing the

16   work in the dining room, yes.

17   Q.    The main dining room?

18   A.    All of the dining areas.

19   Q.    I'm asking you specifically about the main dining room.

20   A.    Yes.

21   Q.    Dietary aides, you said, were in there cleaning?

22   A.    Yes.  They would remove the food -- or any soiled areas

23   specific to the food service area.

24   Q.    Which means that they -- they're responsible for picking up

25   the food off the table, right?

1   A.   No, sir.  The food service area is a food preparation area

2   where the meals are in large serving dishes, and then the meals

3   are prepared and plated.  That is the food service area.

4   Q.   Is it kind of like a buffet?

5   A.   It is a holding center for quantity food meal service.

6   Q.   Buffet?

7           **MR. HARRELL:**  Objection, asked and answered.

8           **THE COURT:**  I'm not sure because I don't know if

9   they're saying the same thing.

10          Do you know what he means by "buffet"?

11  **BY MR. BARLOW:**

12  Q.   Do you know what a buffet is?

13  A.   A buffet for food service --

14  Q.   Yes, ma'am.

15  A.   It is a hot cart with a heating element underneath and the

16  food is stored in that, correct.

17  Q.   The food service area?

18  A.   Correct.

19  Q.   So it's got the big stainless steel, whatever they are,

20  maybe holds two or three gallons of food, heated on the bottom?

21  A.   Correct.

22  Q.   Who typically gives the food to the residents?

23  A.   The food is prepared on the plate by the food service or

24  the dietary staff, and then they are served to the patients by

25  the CNA staff.

1   Q.   Then what happens to the plate after the resident is done

2   eating?

3   A.   It is removed.

4   Q.   By whom?

5   A.   The person assigned to remove the plates.

6   Q.   Who would that be?  What position would they hold?

7   A.   Typically a CNA or a dietary aide.

8            **THE COURT:**  Mr. Barlow, we're going to need to take

9   our afternoon recess, so we'll just pick back up after our

10  recess.

11           Ladies and gentlemen, we're going to take 20 minutes

12  for our afternoon recess.  We'll be in recess until a quarter

13  to four.  Please don't discuss the case amongst yourselves

14  during the recess, and also please don't begin to form any

15  opinion yet about the merits of the case.  Enjoy your recess,

16  we'll see you back shortly.

17           *(Jury out.)*

18           Ms. Partridge, you may step down.  You'll be back on

19  the witness stand in 20 minutes.  Please don't discuss your

20  testimony with anyone during the recess, including the lawyers.

21           **THE WITNESS:**  Yes, ma'am.

22           **THE COURT:**  Thank you.

23           I'm sorry, I didn't want to interrupt you, but we've

24  been at it for over two hours, so I needed to take that recess.

25  We'll be in recess until 3:45.

1              (Recess taken 3:26 p.m. to 3:50 p.m.)

2                   **THE COURT:**  Ms. Partridge, you're still under oath.

3                   Mr. Barlow, you can continue with your redirect.

4                   **MR. BARLOW:**  Thank you, Your Honor.

5    **BY MR. BARLOW:**

6    Q.   Ms. Austin -- I apologize.  Ms. Partridge, we were talking

7    about Ms. Davis getting help after Ms. Austin had left.  Do you

8    recall that?

9    A.   Yes.

10   Q.   And you had indicated that you saw several folks in the

11   main dining hall helping out Ms. Davis; is that correct?  Do

12   you recall that?

13   A.   Yes.

14   Q.   Ms. Davis's name isn't on the new housekeeping routes; is

15   that correct?

16   A.   No.

17   Q.   Is her name on the list?

18   A.   No.

19   Q.   Do you recall when she was hired?

20   A.   No.

21   Q.   Do you know what her age is?

22   A.   I would estimate in the forties.

23   Q.   Did Mr. Lewis ever complain to you about Ms. Austin?

24   A.   About the unwillingness to complete the dining room.

25   Q.   What did he tell you?

*Nicole Partridge - Redirect/Barlow*                                    87

1    A.    That she did not want to clean the dining room.

2    Q.    Did he say anything about her age?

3    A.    No.

4    Q.    Did he say anything about her needing to retire?

5    A.    No.

6    Q.    How many times did Mr. Lewis talk to you about Ms. Austin

7    not wanting to complete the dining room?

8    A.    The initial discussion that we had where it was presented

9    and the intention was that the work needed to be done and then

10   on the end day of employment.

11   Q.    So Mr. Lewis didn't bring this up to you until the last day

12   of her employment?

13   A.    No.   It was earlier in the year.

14   Q.    Do you recall approximately when Ms. Austin left?

15   A.    April of 2013.

16   Q.    So how much time had passed after Mr. Lewis making the

17   first complaint to you was it that the Plaintiff left?

18   A.    Excuse me?

19   Q.    Sure.   What I'm trying to figure out is, we know Ms. Austin

20   left April 12th, right, 2013?

21   A.    Correct.

22   Q.    And you said Mr. Lewis had complained to you before

23   Ms. Austin's last day, right?   So what I'm trying to figure out

24   is how much time passed between Mr. Lewis telling you that

25   Ms. Austin didn't want to do the work and Ms. Austin actually

*Nicole Partridge - Redirect/Barlow*                                88

1    leaving?

2    A.   It was between 1/14 of '13 and 4/12 of '13.

3    Q.   So somewhere between the new housekeeping routes and

4    Ms. Austin leaving?

5    A.   Correct.

6    Q.   What did you do?  Did you talk to Ms. Austin?

7    A.   Yes.

8    Q.   What did you talk about?

9    A.   We indicated that the work needed to be completed.

10   Q.   Did you ask her why the work wasn't being done?

11   A.   Did I ask her why the work was not being done?

12   Q.   Mr. Lewis told you that Ms. Austin hadn't done the work,

13   was complaining about doing the work, you explained to

14   Ms. Austin that the work needed to be done.  I'm asking was the

15   work getting done?

16   A.   Yes, the work was getting done.

17   Q.   So why did Ms. Austin complain about it, do you know?

18   A.   It was just a point of contention.

19   Q.   It's your understanding that just because Ms. Austin had to

20   do the main dining room that it was a point of contention?

21   A.   Yes.

22   Q.   Were you not aware that Ms. Austin had been doing the

23   dining room for several years before Mr. Lewis ever arrived,

24   with help?

25   A.   If that was the case, then -- you indicated she had been

1    doing the dining room for years?

2    Q.   Yes, ma'am.

3    A.   Okay.  So then this new route would not have been a change.

4    Q.   No.  It was a change, because she had to do it by herself.

5            MR. BARLOW:  I apologize, Your Honor.

6            THE COURT:  Ladies and gentlemen, just remember that

7    the questions and anything that the lawyers say is not evidence

8    in the case.

9            So if you'll rephrase that, please, Mr. Barlow.

10           MR. HARRELL:  For the record, move to strike, Your

11   Honor.

12           THE COURT:  Overruled.  I just instructed the jury not

13   to consider it.

14   BY MR. BARLOW:

15   Q.   Ms. Partridge, I guess that's kind of the point, Ms. Austin

16   had been doing the dining room for a long time, and I'm asking

17   you, if that was the only contention, then why, if indeed she

18   had been doing the dining room for some time, why would that be

19   a problem for her now at that point?

20           MR. HARRELL:  Objection, speculation.

21           THE COURT:  Well, overruled, to the extent you know

22   based on your own personal observations.  If you don't know,

23   then you don't know.

24           THE WITNESS:  Okay.  The question one more time?

25   BY MR. BARLOW:

1    Q.   Sure.  What I'm trying to find out is, you've indicated

2    that your belief that Ms. Austin's point of contention was

3    having to do with the dining room?

4    A.   Right.

5    Q.   And I'm asking you, if Ms. Austin had been doing the dining

6    room for several years prior to that, why would that all of a

7    sudden become a point of contention?

8    A.   I don't know.

9         **MR. HARRELL:**  Objection, speculation.

10        **THE COURT:**  It's been asked and answered.  She doesn't

11   know.

12   **BY MR. BARLOW:**

13   Q.   On Ms. Austin's last day, did you walk her out to her car?

14   A.   No.

15   Q.   Did anybody walk Ms. Austin out to her car?

16   A.   No.

17   Q.   Do you know if Ms. Austin recovered her personal

18   belongings, if she had any, before she left?

19   A.   I would believe so.

20        **MR. BARLOW:**  Thank you.

21        **THE COURT:**  Ms. Partridge, you may step down.

22        **THE WITNESS:**  Thank you.

23        *(Witness excused.)*

24        **THE COURT:**  Mr. Barlow, your next witness?

25        **MR. BARLOW:**  The Plaintiff calls Henrietta Austin,

1    Your Honor.

2              **THE COURT:**  Ms. Austin, come up.

3         **HENRIETTA AUSTIN, PLAINTIFF WITNESS, DULY SWORN**

4              **MADAM CLERK:**  Be seated.  Please state your full name

5    and spell your last name for the record.

6              **THE WITNESS:**  Henrietta Austin, A-u-s-t-i-n.

7              **THE COURT:**  Ms. Austin, would you move up as close as

8    you can towards that red dot.  Thank you.

9              **THE WITNESS:**  Henrietta Austin, A-u-s-t-i-n.

10             **THE COURT:**  Thank you.

11             Go ahead, Mr. Barlow, when you're ready.

12                       **DIRECT EXAMINATION**

13   **BY MR. BARLOW:**

14   Q.   Ms. Austin, can you tell the jury a little bit about your

15   background.

16   A.   I had been working at Rosewood for 19 years, and I'm

17   married, and I have like --

18   Q.   Can you speak up, please.

19   A.   I had been working at Rosewood for 19 years, ever since

20   '94, and I'm married and I have six kids.

21   Q.   Are you originally from Pensacola?

22   A.   No.  I'm from Alabama.

23   Q.   When did you move to the Pensacola area?

24   A.   About 40 years ago, I think.

25   Q.   You indicated you were married?

1    A.    Yes.

2    Q.    How long have you been married?

3    A.    Fifty-something years.

4    Q.    Is most of your family here in Pensacola?

5    A.    All my family is here.

6    Q.    What is your profession?  What was your main profession in

7    your adult life?

8    A.    Henrietta White.

9    Q.    No.  What was your profession?  What did you do for a

10   living the last 40, 50 years?

11   A.    Oh.  Housekeeping I did mostly all my life.

12   Q.    What is your age currently?

13   A.    I'm 69.

14   Q.    And can you tell the jury a little bit about your

15   education.

16   A.    I went to PJC to get a GED, and I went to the eleventh

17   grade.

18   Q.    Did you graduate high school?

19   A.    No.

20   Q.    Have you ever done any public speaking before?

21   A.    No more than at Rosewood.  I did interview and I made a

22   video for Rosewood with -- when the people -- new residents

23   would come in, I was on the video speaking.  And then I would

24   always speak at inservice because I was housekeeping supervisor

25   standing in until they got a supervisor, and I always had to go

1    in there and speak to the new hire that they hired for

2    housekeeping.

3    Q.    You had indicated you had started working for Rosewood

4    when?

5    A.    In '94.

6    Q.    And how was your first part of employment with Rosewood?

7    A.    Oh, my employment was good.  I even got the Diamond award,

8    I got employee of the month.  I never had a problem but one

9    time and they fixed it.

10   Q.    What -- what's the Diamond award?

11   A.    The Diamond award is the highest award that you can get.

12   Q.    What does that mean?

13   A.    That sets a standard for excellence.

14   Q.    Do you recall when you received that?

15   A.    Yes.

16   Q.    Can you tell the jury?

17   A.    Yes.

18   Q.    No.  I said do you recall when you received it?

19   A.    Oh, no, I don't recall when I received it.

20   Q.    You had mentioned something about being -- you were

21   standing in for the housekeeper supervisor?

22   A.    I was standing in for the housekeeper supervisor.  Every

23   time the supervisor would quit or either the supervisor would

24   leave, however, they would fire them, I would always fill in.

25   I had been doing that for years.  So I even trained Mr. Lewis.

*Henrietta Austin - Direct/Barlow*

1    And on my training of Mr. Lewis I also did peer interviews.

2    Q.   Were you ever the housekeeping supervisor assistant?

3    A.   Yes.

4    Q.   Do you recall how long you had that title even if it was an

5    unofficial title?

6    A.   Ever since I had been at Rosewood when Blake Bell was

7    there, and that was in '90 -- I think he came in about '95, I

8    think.

9    Q.   You had said something about doing peer interviews.  Can

10   you tell the jury what that means?

11   A.   The peer interview, that's when we do the new hire, we hire

12   CNAs, we hire RNs, LPNs, dietary, we do the dietary,

13   housekeeping, maintenance, and floor techs.  And usually when

14   we do the interview I always -- when I'm there, I always sit in

15   on that interview.

16   Q.   How often would you do that, peer interviews?

17   A.   Sometimes we did it once a month, sometimes twice a month.

18   It all depends on how short we was for employees.

19   Q.   Did Rosewood have a high turnover?

20   A.   Yes, for CNAs.

21   Q.   What about housekeeping?

22   A.   For housekeeping, pretty regular.

23   Q.   Mostly the same for housekeeping?

24   A.   Yeah, because one time I remember when Charlene left and

25   went to Southern Oaks I was supervisor.  She carried a lot of

1  the housekeeping with her, and I had to replace a lot of

2  housekeepers, so I did it.

3  Q.   Do you recall when that was?

4  A.   I don't remember what year she left and went to Southern

5  Oaks, but I stood in and I got all new employees and filled the

6  slots and did the scheduling and everything.

7  Q.   What would you do when the housekeeping supervisor either

8  was not there -- on vacation or just not hired and there was a

9  lull in between?

10  A.   I always filled in.

11  Q.   What does that mean?

12  A.   I took over the job and I did the job.  I ordered the

13  supplies, I did the time schedule, I ran laundry, too.  If the

14  laundry would call in at night -- if I had worked in the

15  daytime, just say I went to work from seven to three and got

16  off at three, and if the laundry shift was slack and didn't

17  have nobody, I would go back and fill laundry, and sometimes I

18  would work until in the morning at six o'clock.

19  Q.   How often would that happen?

20  A.   Each time they couldn't get nobody to go in laundry, I

21  would go back in there and fill it for them.  They never went

22  without nobody, because they was always able to call me and I

23  would always come in and fill it, or either Tonette was good

24  about coming in and filling it for me.

25  Q.   Even when you were doing the interviews and the laundry and

1   even the scheduling, whatever the case may be, did you still

2   have to keep up with your other duties?

3   A.   I had to still do my hall.  I still had those 13 rooms to

4   do.

5   Q.   What hall were you on?

6   A.   On B Hall.

7   Q.   Do you recall --

8   A.   My workload never stopped; it increased.

9   Q.   Do you recall Mr. Lewis?

10  A.   Yes.

11  Q.   How old is Mr. Lewis?

12  A.   I think he's around about 50, in his fifties.

13  Q.   And did you say that you interviewed him?

14  A.   I interviewed him.

15  Q.   Did you have any input into his actually being hired other

16  than being part of that peer interview?

17  A.   No.  I just asked questions of him in there, and they go to

18  a test, like they -- Patsy always has the last say-so in it.

19  You know, she does their background check and urine test, and

20  if it comes back good, they say it's a yes, so they hire them.

21  Q.   And you recall that Ms. Partridge was the administrator

22  when Mr. Lewis was hired?

23  A.   Yes.

24  Q.   Is it your understanding that Mr. Lewis was actually hired

25  by Ms. Partridge?

*Henrietta Austin - Direct/Barlow*                                    97

1    A.   Yes.

2    Q.   What sort of things would you do as a housekeeper?  What

3    were your duties?

4    A.   I cleaned rooms.  I -- I made beds up.  And sometimes if

5    the CNAs were short, I would help feed the patients.  And then

6    sometimes I would go in in the morning time, and if dietary was

7    short, I would push the cart through the hall.  Like, say, they

8    had the big old metal cart that we would take the food up in,

9    and I would push those out there on the hall for them.

10        And then on Friday we had to do wheelchairs.  We did

11   wheelchairs at like five o'clock in the morning every Friday.

12   We'd do like A Hall, B Hall, C Hall -- we'd do one hall on

13   Fridays.

14   Q.   What does that mean that you'd have to do the wheelchairs?

15   A.   We washed the resident wheelchairs that they sit in.

16   Q.   So every Friday --

17   A.   They would push them out on the patio, and we would wash

18   them.  Larry would pressure them down and we would dry them

19   down -- we'd spray them down and Larry would shoot them with

20   the pressure washer, and we had to dry them and put them back

21   in the patient rooms.

22   Q.   Did you work a set schedule typically?

23   A.   Yes, I had a full schedule.

24   Q.   What was your schedule?

25   A.   My schedule was -- I had 13 rooms, I had two nurse's

 1    stations, I had three bathrooms, I had the dining room two

 2    times, and then plus I had the soiled utility room.  I had the

 3    biggest schedule by all because he kept adding.

 4    Q.    Hold on.  What I'm looking at is before Mr. Lewis becomes

 5    your supervisor.  That's what I'm kind of looking at right now.

 6    A.    Okay.  Before Mr. Lewis came the schedule was kind of

 7    evened out.  We had two people doing A Hall.  A and B would go

 8    in the morning time, then at lunchtime C and D would go.

 9    Q.    Let's take a look at the new housekeeping rounds,

10    Plaintiff's Exhibit 2.  You've seen this document before,

11    correct, Ms. Austin?

12    A.    This is not the schedule.

13    Q.    Okay.  Well, would you tell the jury how you believe this

14    schedule is different than the actual schedule?

15    A.    Okay.  On D Hall it's seven rooms on the odd side.  On

16    Kathy's hall it's only 12 rooms.  On mine, I have two nurse's

17    stations, I've got a charting room that they go and chart in,

18    and then I've got the big nurse's station that sits in the

19    middle of the floor, so none of that is on there.  And then

20    plus I have to also clean the dietary office, which was not on

21    my schedule.

22    Q.    So how exactly is what's shown on here different?  There's

23    another nursing room?

24    A.    I don't know where this schedule came from.  This is a

25    schedule that I think that they made up.  This is not the

1   schedule.

2   Q.   What I'm asking is -- that's fine.  I'm asking you how is

3   what's shown for your schedule different than what was actually

4   your schedule?

5   A.   They don't have activity on here.  I don't have the

6   charting rooms on here.

7   Q.   Any other --

8   A.   And then Kathy has 12 rooms, and she only have two

9   bathrooms up on C Hall, and she doesn't clean the soiled

10  utility room.

11  Q.   Who cleaned that?

12  A.   Derrick Baldwin.

13  Q.   Who is Mr. Baldwin?

14  A.   A floor tech for C and D Hall, when he was there, but he's

15  not there now.

16  Q.   Who was the floor tech for A Hall and B Hall?

17  A.   Larry Bender.

18  Q.   Did Mr. Bender clean the soiled utility room?

19  A.   Larry Bender always cleaned the soiled utility room until

20  he gave it to me.

21  Q.   Mr. Lewis did?

22  A.   Mr. Lewis did.

23  Q.   Prior to Mr. Lewis becoming the supervisor, was the

24  workload between the various housekeepers the same?  In other

25  words, did each housekeeper do the same thing over time?

```
1    A.   It was pretty near maintained as the same, you know, we did
2    the same hall every day.  And then just like on A Hall one time
3    a resident came in and brought a dog and he stayed there for
4    like two months, and Mr. Lewis had me to go over there every
5    day and clean that room.  It was 100.  And I said, "Could you
6    give Lakisha one of my rooms?" and he told me, "No."
7    Q.   What I'm asking you, though, is:  Before Mr. Lewis becomes
8    your supervisor, did you do the same thing for years?  Did your
9    schedule change any over the years from what you were supposed
10   to do?
11   A.   Before Mr. Lewis came?
12   Q.   Yes, ma'am.
13   A.   No.  My schedule never changed until Mr. Lewis got there.
14   Q.   Did anybody else's schedule change before Mr. Lewis got
15   there?
16   A.   He didn't change anybody's schedule but mine.
17   Q.   No.  I'm asking you before did anybody else's schedule
18   change?
19   A.   No.
20   Q.   So Mr. Lewis gets hired, and you said you trained him.  How
21   did you train him?
22   A.   When he came in, I taught him the chemistry [sic], what the
23   chemistry [sic] was.  I taught him how to order the pads.  I
24   taught him how to take and the run the machines.  I taught him
25   how to take and do the schedule.  And I taught him how many
```

1    people it took to run the laundry, because we had seven to

2    three, we had three to eleven, and eleven to seven.  We had

3    three shifts in the laundry, and I showed him how many people

4    it take to run that laundry, how many he had to put on the

5    dayshift and how many he had to put on the evening shift, and

6    how many was on the morning shift -- the nightshift.

7    Q.   Who was doing the scheduling before Mr. Lewis was hired?

8    A.   I was.

9    Q.   Was Ms. Partridge helping you?

10   A.   No, Ms. Partridge never did a schedule.  She didn't know

11   how.

12   Q.   Who had A Hall when Mr. Lewis was first hired?

13   A.   Lakisha.

14   Q.   And you had B Hall when Mr. Lewis was first hired?

15   A.   I had B Hall.

16   Q.   Who had C Hall?

17   A.   Kathy Borner.

18   Q.   Who had D Hall?

19   A.   Stacey had one side and Visa Jones had the other side.

20   Q.   And based upon what we have as Exhibit 2, for Lakisha,

21   Ms. Gort, is that her correct schedule and what she was doing

22   at the time Mr. Lewis was hired?

23   A.   Yeah, that's mostly her schedule.

24   Q.   What about B Hall?  You said yours was different, you said

25   that you didn't have the activity center in there?

1    A.   D Hall, there's only seven rooms on the odd side, on

2    Stacey's side.

3    Q.   But other than that, it's relatively correct?

4              **THE COURT:**  Excuse me, I'm sorry, Ms. Austin.

5              Are you asking her about B or D Hall?

6              **MR. BARLOW:**  D Hall.

7    **BY MR. BARLOW:**

8    Q.   You moved on to D Hall or C Hall?

9    A.   We're on D Hall.

10   Q.   D Hall, is that relatively correct, the odd?

11   A.   On C Hall, there's only 12 rooms on C Hall.  There's not 13

12   rooms on C Hall.  And we only have two bathrooms and they've

13   got the shower in there.

14   Q.   Where?

15   A.   On C Hall.  There's no two bathrooms and no two showers up

16   there.

17   Q.   What does C Hall have?

18   A.   It has two bathrooms with showers in them.

19   Q.   So it has two bathrooms with showers, not two separate

20   bathrooms and two separate showers?

21   A.   Uh-huh.

22   Q.   So how is D Hall?

23   A.   How is D Hall?

24   Q.   Yes, ma'am.

25   A.   Stacey's hall, she's got seven rooms, and she's got the

1    nurse's station, and she's got the women's restroom, and she's

2    got the front entry, and she's got two bathrooms.

3    Q.   I think it might be easier if you could just tell us what's

4    different in D Hall as opposed to telling us what she has.

5    Just tell us what is different in D Hall.  You said there were

6    seven rooms, right?

7    A.   Uh-huh.

8    Q.   Odd?

9    A.   Yes.

10   Q.   So how is D Hall Odd different than what's shown on

11   Exhibit 2.  Seven rooms?

12   A.   It's only seven rooms.

13   Q.   What else?  Anything else different about D Hall Odd?

14   A.   And international [sic] cafe -- there's not an

15   international [sic] cafe on that side.  It's a little bitty --

16   about two or three tables in the back, and Visa cleans that.

17   Q.   What's the Internet cafe?

18   A.   I don't know.  It's not one up there.  It's just a little

19   ole bitty -- it's about two tables in the back.

20   Q.   Does it have computers on it?

21   A.   Huh?

22   Q.   Does it have computers on it?

23   A.   No.  It's just where the residents sit out there when they

24   come out the room.  That's the Alzheimer's unit, and they push

25   the residents out the room and they sit out there and eat

1    instead of taking them to the dining room.  They don't take the

2    Alzheimer's patients to the dining room, they feeds them on the

3    hall.

4    Q.   So you think that the Internet cafe is where they take the

5    Alzheimer's patients?

6    A.   No.

7    Q.   Well, that's what I'm trying to figure out, what is

8    "Internet cafe," if you know?  Do you know?

9    A.   We don't have an Internet cafe.

10   Q.   No place where the residents can get a computer or use a

11   laptop to get on the Internet?

12   A.   No.

13   Q.   What about D Hall Even, is there anything shown on here

14   that wasn't actually done by Ms. Jones?

15   A.   All Visa do, she do the seven rooms, she doesn't do the

16   administrator's office, and she does social services, and

17   that's it.  The administrator's office -- she don't have an

18   administrator's office.

19   Q.   So you think that Even Hall has eight rooms or seven rooms?

20   A.   She got eight rooms.

21   Q.   Did she clean all eight rooms?

22   A.   Yes.

23   Q.   So your B Hall shows that you have the dining room twice a

24   day, right, on this list?

25   A.   Yes.

*Henrietta Austin - Direct/Barlow*

1  Q.  And do you dispute that you had the dining room twice a day

2  after Mr. Lewis got there?

3  A.  Pardon?

4  Q.  You don't have a dispute that you're actually doing the

5  dining room twice a day after Mr. Lewis had been there for a

6  while?

7  A.  Oh, no.

8  Q.  So you had indicated that there were -- there's one floor

9  tech for each two halls; is that correct?

10 A.  Yes.

11 Q.  So can you tell the jury who they were?

12 A.  It was Larry Bender and Derrick Baldwin was there, but he

13 left and they had Anthony.

14 Q.  And is Mr. Bender Larry Bender?

15 A.  Yes, Larry Bender.

16 Q.  And he was with A Hall and B Hall?

17 A.  He was A Hall and B Hall.

18 Q.  So how was Mr. Lewis as a supervisor initially?

19 A.  How was he as a supervisor?

20 Q.  Yes, ma'am, when he first started working there.

21 A.  When he first started working there and I was training him,

22 he was fine.  And then after I got him trained and everything,

23 that's when he started putting the work on me.

24 Q.  What do you mean?

25 A.  He would like -- if somebody called in, I would end up

```
 1    having to go pick up the hall.  And then if laundry was short,
 2    because I could do laundry, he would always put me in the
 3    laundry.  He would say, "Well, you can go in laundry and
 4    somebody else can do your hall."  Sometimes Larry would end up
 5    cleaning my hall while I went in the laundry and worked.
 6    Q.   Why would you go in the laundry?
 7    A.   Because they would be short in there, and we had to get the
 8    laundry for the residents to have pads and stuff.
 9    Q.   How often would that happen?
10    A.   It would just happen occasionally if someone called in.
11    Q.   How often would he have you go do things other than laundry
12    not on B Hall?
13    A.   Oh, if there was a spill, he would call me.  I'm way down
14    the hall, and he would call me, "Ms. Austin," and I would go
15    down there and mop it up.
16    Q.   Would you ever have to go clean up spills on other halls?
17    A.   Yes.
18    Q.   Would that be the same even if there was the housekeeper
19    assigned to that hall there?
20    A.   Yes, he always would ask me to go do it.
21    Q.   So how often would that happen?
22    A.   Pardon?
23    Q.   How often would that happen that he'd ask you to go clean
24    up a spill on somebody else's hall?
25    A.   Just whenever there was a spill, like a resident would go
```

1    down the hall, you know, and they would wet or something

2    another, he would come walking around there and I was down the

3    hall and he'd see me in the hall, "Hey, Ms. Austin," and I

4    would go get it.

5    Q.   Did you ever talk to him about it?  Did you ever talk to

6    Mr. Lewis about you getting all these assignments?

7    A.   Yeah, I talked to Mr. Lewis.  I asked him, I say, "Why

8    can't you take and even the workload out?"  And he got very

9    upset when I talked to him.  And then I had went and talk to

10   Ms. Partridge about it, and the next thing I know I was written

11   up for a box fan.

12   Q.   Hold on.  When you -- why did you go to talk to Mr. Lewis?

13   And I understand you went and talked to him.  But why?

14   A.   I went and talked to him and I told him that I didn't think

15   the workload was fair.

16   Q.   Did you tell him why you didn't think it was fair?

17   A.   Yes, I told him because the young ladies was getting away

18   -- "You had gave me more work and you was letting the young

19   ladies get away with nothing."

20   Q.   Did he respond to you?

21   A.   Yes.  He told me he was tired of me, I was just too old to

22   be complaining.

23             **MR. BRANNING:**  Objection, hearsay.

24             **THE COURT:**  Overruled.

25             **MR. BARLOW:**  Statement by a party.

1        **THE COURT:**  Overruled.

2    **BY MR. BARLOW:**

3    Q.    So what was Mr. Lewis saying?

4    A.    Dwayne Lewis.

5    Q.    Yes, ma'am.  What was he saying?  You told him --

6    A.    I told him that he needed to even out the workload, and he

7    said he was tired of me complaining, he said I was just too old

8    to be complaining.

9    Q.    What happened after that?

10   A.    After that he started giving me extra work, more and more

11   extra work.

12   Q.    You had mentioned something about getting written up?

13   A.    Yes, I had -- when I went and talked to him, he had written

14   me up about a box fan.  Now, we've got box fans all over the

15   nursing home, and nobody ever got written up for a box fan.

16   Usually Mason takes care of the box fan, or either if the

17   blades get nasty we throw them away.  The only thing I can do

18   is just wipe the outside, and that's what I did.  But he came

19   and written [sic] me up and said the fan was dirty.  That was

20   my first written up that I ever got in 19 years.

21   Q.    How long after your conversation with Mr. Lewis when he

22   tells you you're too old to be complaining was it that you were

23   actually written up?

24   A.    Pardon?

25   Q.    You had said, Hey, look, he told me I was too old to be

1    complaining, that I complained too much.  How long was it after

2    that conversation that he had with you was it that you were

3    written up?

4    A.   About a couple of days.

5    Q.   So a couple of days later?

6    A.   Yeah.

7         **MR. BARLOW:**  Your Honor, I would like to move Exhibit

8    5 into evidence.  This is the issue that you reserved a ruling

9    on regarding the write-up of the box fan.

10        **THE COURT:**  Can I see the document, please.

11        All right.  Given the testimony, the objection will be

12   overruled.  Plaintiff's 5 will be admitted.

13        **(Plaintiff's Exhibit 5 admitted into evidence.)**

14        **THE COURT:**  All right, Mr. Barlow, there it is.

15        **MR. BARLOW:**  Thank you.

16   BY MR. BARLOW:

17   Q.   Ms. Austin, is this the write-up that you recall receiving?

18   A.   Yes.

19   Q.   Who gave that to you?

20   A.   Dwayne Lewis and Cassandra Moody and Nicole Partridge, all

21   of them signed off on it.

22   Q.   That's Ms. Partridge?

23   A.   Yeah, she signed off on it.

24   Q.   And who is Ms. Moody?

25   A.   Risk manager.

1    Q.   She work with Rosewood?

2    A.   Yes.

3    Q.   And do you recognize this as being Mr. Lewis's handwriting?

4    A.   Yeah, Dwayne signed up under my name, and Cassandra Moody

5    signed on the side of it, and Nicole Partridge signed next to

6    Dwayne.

7    Q.   Can you explain what a box fan is to the jury.

8    A.   A box fan is a fan that you just go to Kmart or the dollar

9    store and you buy and you sit it in the room.  But the rooms

10   had air conditioning, so this box fan is not a part of the

11   room, so I don't know why I was written up for a box fan.

12   Q.   Were the box fans provided by Rosewood?

13   A.   Yeah, they would go out and buy box fans and put them in

14   some of the residents room if the air conditioner didn't work

15   that good to help cool the room.

16   Q.   Are they the fans that are about this tall?

17   A.   Yeah, it's just a box fan about this wide and about this

18   high, and it'd just sit up on the table or anywhere they could

19   sit it or on the floor.

20   Q.   How many of those did they have at Rosewood?

21   A.   They have them all over the building, on A Hall, B Hall, C

22   Hall, D Hall.  They're all over the building.

23   Q.   Do you recall signing this document, Plaintiff's Exhibit 5,

24   on January 10th?

25   A.   Yes.

```
 1   Q.   And was this before or after -- had your work changed at

 2   this point other than him sending you off to do laundry or

 3   other people's stuff, had it changed?

 4   A.   This is when everything started when I got this write-up in

 5   January.

 6   Q.   So you're written up.  Did you do anything?

 7   A.   Yeah, I talked to him about it, and that's when I got the

 8   dining room -- he took the girl on A Hall out of the dining

 9   room.

10   Q.   Did you talk to him right away about the box fan?

11   A.   No.  I waited a couple of days, and I went and had a talk

12   with him about it.

13   Q.   And what did you tell him?

14   A.   It didn't help.

15   Q.   No.  What did you tell him?

16   A.   I told him I didn't think it was fair to write me up for a

17   box fan.

18   Q.   What did he say, if anything?

19   A.   What did he say?

20   Q.   Yes, ma'am.

21   A.   He was just real nasty, and I went to Nicole and told

22   Nicole I didn't think it was fair.

23   Q.   Did you say anything else about the workload or other --

24   A.   Yeah, I told him the workload -- that he was just putting a

25   lot of excessive work on me.
```

*Henrietta Austin - Direct/Barlow*                                          112

1  Q.   Did you talk about any of the other housekeepers?

2  A.   Yeah.  I told him, I say, "You got younger housekeepers

3  around here," and I say that, "You put all the work on me and

4  I'm the oldest housekeeper around here."

5          **MR. BRANNING:**  Objection, hearsay.

6          **THE COURT:**  Overruled.  Overruled.  Approach the bench

7  for just a minute, please.

8          *(Bench conference between the Court and counsel:)*

9          **THE COURT:**  I'm going to go admit it for the effect

10  that it had on him and what happened next.  If you want me to,

11  I can instruct them that they can't consider it for the truth

12  of the matter asserted.  But the truth of the matter asserted

13  would be that she was the oldest worker there, so I don't know

14  that that's --

15          **MR. BRANNING:**  I'd prefer not to have the curative.

16          **THE COURT:**  I mean, it's not being offered for the

17  truth of the matter asserted.  The truth of the matter asserted

18  is that she's the oldest worker there.  I don't think that's

19  why he's admitting it or seeking to admit it.  But I'm happy to

20  give them the explanation.

21          **MR. BRANNING:**  Let's just see how it goes out from

22  here.

23          **THE COURT:**  All right.

24          *(Bench conference concluded.)*

25          **THE COURT:**  Mr. Barlow, go ahead.

1   **BY MR. BARLOW:**

2   Q.   Ms. Austin, we're talking about you talking to Mr. Lewis

3   after he wrote you up for the box fan.  And what did you tell

4   him?

5   A.   I told him that I was the oldest worker around there, and I

6   told him, I say that, "You got other young ladies around here

7   that you can take and even the workload out."  And the next

8   thing I know, hey, he done gave me more work, he add more work

9   onto it.  Every time I would go to him, I guess he would just

10  add more work.

11  Q.   What do you mean he added more work?

12  A.   He like gave me the -- he gave me the dining room.

13  Q.   Let's talk about the dining room.

14  A.   He took -- the lady that used to go in there with me was

15  Lakisha Gort.  And the morning I went in there and cleaned it I

16  waited on her to come.  So, then, when I finally seen her after

17  I got finished with the dining room, because I didn't think she

18  was there, but I finally seen her, and I say, "Hey," I say,

19  "you didn't come to the dining room."  She say he told her not

20  to come.

21  Q.   Okay.  But let's just talk about the dining room --

22  A.   And then I confronted him.

23  Q.   Let's talk about the dining room before we talk about any

24  conversation you had with Mr. Lewis.  Before Mr. Lewis got

25  there, how was the dining room -- the main dining room handled?

*Henrietta Austin - Direct/Barlow*                                    114

1    A.    A and B Hall did it in the morning, and then Larry would

2    come in there a lot of times and like sweep it and mop it for

3    us.

4    Q.    That's even when you had A Hall and B Hall housekeepers?

5    A.    Yeah.

6    Q.    What about the afternoon?

7    A.    Afternoon, C and D Hall handled it.  We didn't have to go

8    that way.

9    Q.    What do you mean you didn't have to go that way?

10   A.    We stayed on our hall.

11   Q.    So it was split between four housekeepers?

12   A.    Four housekeepers did it.

13   Q.    So how long had that process been in place before Mr. Lewis

14   was hired?

15   A.    That's been there ever since I've been there, like 19

16   years.

17   Q.    So it had been that way for a long time; is that right?

18   A.    Yeah, like 19 years, when we first started.  Neal Bullard

19   was the supervisor when it was like that, Neal.

20   Q.    And how long had Mr. Lewis been your supervisor before that

21   change was made when he gave you the dining room in the

22   morning?

23   A.    I don't recall how long Mr. Lewis had been there.

24   Q.    Okay.  You indicated it was after the box fan write-up?

25   A.    Yes.

1   Q.   Do you recall what day that was?

2   A.   The box fan write-up was in January.

3   Q.   Of?

4   A.   Of 2000 --

5          **THE COURT:**  2013 was the date on the exhibit.

6   **BY MR. BARLOW:**

7   Q.   Does that help you, January 2013?

8   A.   Uh-huh.

9   Q.   Is that right?

10  A.   Yes.

11  Q.   All right.  So you've talked to Mr. Lewis, he's changed the

12  workload, gave you the dining room.  You said you went to talk

13  to him.  What did you tell him?

14  A.   I just told him he was unfair about the workload.

15  Q.   Did you tell him anything else about the workload?

16  A.   Yeah.

17         **MR. BRANNING:**  Objection, leading.

18         **THE COURT:**  It was leading, but I'm not sure how else

19  you would ask the question, I mean, in terms of just the

20  open-ended "What did you tell him?"  So I'm going to allow it.

21  Overruled.

22         What else did you tell him about the workload?

23  **BY MR. BARLOW:**

24  Q.   Did you tell him anything else about the workload?

25  A.   I told him that he could take and share the workload by

*Henrietta Austin - Direct/Barlow*                                116

1    giving the workload to some of the other housekeepers, because

2    you had like -- there's four more housekeepers around here, and

3    you can take and share the work equally.

4    Q.   Were you the oldest housekeeper?

5    A.   I was the oldest housekeeper there.

6    Q.   At the time that Mr. Lewis gave you the dining room in the

7    morning, did anybody else's schedule change?

8    A.   No.

9    Q.   So you've talked to Mr. Lewis.  Did he take you out of the

10   dining room or did he give you any help in the dining room?

11   A.   No.

12   Q.   Did Mr. Lewis ever give you any help in the dining room

13   after he put you there in the morning by yourself?

14   A.   No.

15   Q.   Did Mr. Bender ever come by and help you?

16   A.   No, because he was taking the smoke cart out.  When I'd be

17   doing the dining room he had to take the smoke cart out.

18   Q.   What is the smoke cart?

19   A.   The smoke cart is where the residents go outside to smoke

20   cigarettes.  And the cigarettes is in a little box and it's

21   locked, and someone has to stay out there the whole time with

22   them while they smoke.  If they don't, one of the residents

23   could either get burned or whatever.  And some of them you had

24   to put a smoking apron on so if they dropped the cigarette they

25   wouldn't get burned.

1    Q.   And who typically takes out the smoking residents?

2    A.   Different ones.  Sometimes the CNA takes it out, sometimes

3    the floor techs take it out.

4    Q.   So how long -- how long did you continue to have the dining

5    room in the morning by yourself?

6    A.   Until I left.

7    Q.   Did you talk to anyone else besides Mr. Lewis about the

8    dining room in the morning?

9    A.   I talked to Nicole.  I went to Nicole several times and

10   complained.

11   Q.   What did you talk to Ms. Partridge about?

12   A.   I told her, I say, "Ms. Partridge," I say, "Mr. Lewis keep

13   putting all this work on me," and told her, I say, that, "Look,

14   I'm the oldest person around here," and I told her, I say,

15   "Mr. Lewis always hollering about my age, I need to retire."

16   Q.   What did she say?

17   A.   She said, "I'm going to have a talk with Mr. Lewis."  And

18   the next day when I came in to work, Mr. Lewis told me I

19   shouldn't have went to Nicole.

20   Q.   What happened after he told you that?

21   A.   After he told me I shouldn't have went to Nicole, that's

22   when he added the dining room again the second time.

23   Q.   So what does that mean, a second time?

24   A.   I got it two times.  Now I've got to go in the evening

25   time.  He pulled Kathy Borner and Visa Jones out of it, they

1    didn't have to come anymore.

2    Q.   Well, how long had you been doing the dining room in the

3    morning by yourself at this point?

4    A.   I guess about a month.

5    Q.   So who was doing the dining room in the afternoon while you

6    were doing it in the morning?

7    A.   C and D Hall.

8    Q.   They had -- was it the two housekeepers from C and D Hall?

9    A.   The two housekeepers was doing it, Visa and Kathy, C Hall

10   and D Hall.

11   Q.   Now, at this point had anybody's schedule changed other

12   than yours?

13   A.   No.

14   Q.   And we've looked at Exhibit 2.  Do you need to look at

15   Exhibit 2 again to be sure that nobody else's changed?

16   A.   The only schedule change, they got out of the dining room

17   and I got, you know, the work.  That's the onliest thing that

18   was changed about them, they didn't have to come to the dining

19   room.

20   Q.   You don't believe that Mr. Bender or Mr. Lewis or anyone

21   else helped you clean the dining room in the morning?

22   A.   No.

23   Q.   So now you've got the dining room in the morning and the

24   dining room in the afternoon.  What do you do?

25   A.   *(No response.)*

1    Q.    You've had your schedule changed?

2    A.    Yes.

3    Q.    What do you do?

4    A.    My schedule changed.

5    Q.    You got your schedule changed twice.  What do you do?

6    A.    I'm still trying to do the dining room.

7    Q.    Do you complain to anybody?

8    A.    Yeah, I kept going to Nicole.

9    Q.    Did you ever go back to Mr. Lewis?

10   A.    Yeah, I went back to him again and I told him it was a

11   little bit too much, but he didn't do anything.  Nicole didn't

12   do nothing.

13   Q.    What did you tell Mr. Lewis?

14   A.    I told Mr. Lewis that I thought that he was being unfair to

15   me.

16   Q.    Did you tell him why you thought he was being unfair?

17   A.    Yeah.  And he told me, he said, "All you do is complain and

18   you just whine, you just whines all the time."

19   Q.    What did you tell him?

20   A.    I told him, I say, "Mr. Lewis," I say, "look like you would

21   even out the work, let somebody else come in the dining room in

22   the morning and somebody come in in the eveningtime with me."

23   And he told me, he said that was my schedule.

24   Q.    Okay.  Did you get any help after you talked to him?

25   A.    No, I never got help.

1    Q.   So then what did you do?

2    A.   I just kept on working until that day I came in and that's

3    the day I left because I couldn't get any help.

4    Q.   Did he make any changes to your schedule after he gave you

5    the dining room in the afternoon?

6    A.   Yeah, he gave me the soiled utility room.

7    Q.   Why do you think that happened?

8    A.   Because I had went back to him and complained again and

9    then I had went to Nicole.  Every time I would go to Nicole, he

10   kept adding work on me because he kept telling me I shouldn't

11   have went to Nicole, I shouldn't have went to Nicole.

12   Q.   So just so we're clear, because you talk a little fast

13   sometimes, but just so we're clear, you went to Mr. Lewis and

14   talked to him, and he didn't get you any help.  And then you

15   went and talked to Ms. Partridge.  What did you tell

16   Ms. Partridge?

17            MR. BRANNING:  Objection, leading.

18            THE WITNESS:  I told Ms. Partridge the same thing --

19            THE COURT:  Let's don't -- sustained.  Let's don't

20   summarize her testimony.  The jury is paying attention and

21   listening carefully.

22   BY MR. BARLOW:

23   Q.   After you spoke with Mr. Lewis, did you go speak with

24   Ms. Partridge?

25   A.   Yes.

1    Q.   What did you tell Ms. Partridge?

2    A.   I told her the same thing about the workload, you know, and

3    that he hadn't changed nobody's schedule but mine, and she said

4    -- she always would say "I'm going to talk to Mr. Lewis."

5    Q.   Did you tell her anything else?

6    A.   Huh?

7    Q.   Did you tell her what Mr. Lewis was telling you?

8    A.   Oh, yeah, I told her about what he was saying about I'm

9    just too old to be complaining, that's what he would say all

10   the time.

11   Q.   And Ms. Partridge told you that she would talk to

12   Mr. Lewis?

13   A.   Yeah, she would say she would talk to him.

14   Q.   Do you know if she ever spoke with Mr. Lewis about your

15   complaint with her?

16   A.   Yeah, she would say something to him, but I don't know what

17   she was saying to him, because when he'd come and see me he

18   would always give me more work, and it never stopped.

19   Q.   Well, after this last time you went and talked to

20   Ms. Partridge, did Mr. Lewis change your work?

21   A.   No.  When I called Ms. Partridge on the phone -- the

22   morning that I left, I called Ms. Partridge and told her what

23   was happening.  She said, "I'll be there," and to wait for her.

24   I waited.  I went outside and I called Mr. Triplett, and when I

25   called Mr. Triplett I didn't get an answer.

1          Ken from the maintenance department that go around and

2    oversee the building, when I left that morning, he was there.

3    But, anyway, when I talked to Ms. Partridge, Ms. Partridge came

4    around to the time clock -- I never left the building.  She

5    came around to the clock and she told me to come go to the

6    office.

7          When I got to the office, Ms. Partridge say that Mr. Dwayne

8    Lewis had told her that I had throwed the keys and the radio at

9    him, and she was going to write me up for insubordination.

10   Q.   Hold on just a second.  You said that you didn't have any

11   changes to your work.  I want to go back and show you

12   Plaintiff's Exhibit 2.  And you see there where it says "soiled

13   room" under B Hall?

14   A.   Yeah.

15   Q.   Where you ever assigned that?

16   A.   Soiled utility room?

17   Q.   Yes, ma'am.

18   A.   Yeah, I did the soiled utility room.

19   Q.   When did you get assigned that?

20   A.   After I went up there and complained to Ms. Partridge.  I

21   don't know what day it was, but he put that on me.  He took

22   that off of Larry and gave it to me.

23   Q.   And what I'm trying to get at is, did you already tell the

24   jury what you told her before Mr. Lewis assigned you the soiled

25   utility room?

1    A.   *(No response.)*

2    Q.   You complained to Mr. Lewis about getting the dining room

3    the second time, correct?

4    A.   Uh-huh.

5    Q.   Remember that?

6    A.   Yeah.

7    Q.   And did you ever complain to Ms. Partridge about you

8    getting the dining room the second time?

9    A.   Uh-huh.

10   Q.   Is that a yes?

11   A.   Yes.

12   Q.   What did you tell Ms. Partridge?

13   A.   I told Ms. Partridge, I say, "Mr. Lewis just keep adding

14   work on to me, and the workload that he keep giving me, he's

15   not giving equal work to people."  And I told her, I say, "He

16   keeps saying that I'm just too old to be around here whining

17   and complaining."

18   Q.   And what did Ms. Partridge tell you?

19   A.   She said, "Well, I'm going to have a talk with Mr. Lewis."

20   Q.   And do you know if she had a talk with Mr. Lewis?

21   A.   Yeah, she talked to Mr. Lewis.

22   Q.   How do you know?

23   A.   Because he said I shouldn't have went to Partridge.

24   Q.   What did he mean by that, do you know?

25   A.   He say "Because she wasn't going to do anything."  Them his

*Henrietta Austin - Direct/Barlow*                              124

1    words.

2    Q.   So Mr. Lewis told you that Ms. Partridge wasn't going to do

3    anything?

4    A.   Yeah, he said she wasn't going to do anything.

5    Q.   Did Mr. Lewis make any other changes to your schedule?

6    A.   Yeah.  He gave me the soiled utility room after that.

7    Q.   And how long was that after you complained to

8    Ms. Partridge?

9    A.   I guess it was about two or three weeks.

10   Q.   Okay.  So how long was it after Mr. Lewis told you that you

11   shouldn't have went to Ms. Partridge, that she wasn't going to

12   do anything, was it that he gave you the soiled utility room?

13   A.   I don't remember how long it was.

14   Q.   Well, do you know how long it was after the time you had

15   your conversation with Ms. Partridge until it was that

16   Mr. Lewis told you that?

17   A.   About two or three weeks apart.

18   Q.   So when you got the soiled utility room, did anybody else's

19   schedule change?

20   A.   No.

21   Q.   How long would it normally take you and another housekeeper

22   to clean the main dining room?

23   A.   About 45 minutes or an hour.

24   Q.   How long did it take you to do it by yourself?

25   A.   Sometimes about an hour and something.

*Henrietta Austin - Direct/Barlow*                                    125

1    Q.   What's an hour and something?

2    A.   About an hour and 30 minutes.

3    Q.   So about twice as long?

4    A.   Twice as long.

5    Q.   Was that the same for the morning shift as well as the

6    afternoon shift?

7    A.   Yes.  Because I also had to do the window ledges and do

8    other stuff in the dining room, too, and I always had to go in

9    there and clean the bathroom and do that in there, too.

10   Q.   So how are you finishing?

11   A.   Sometimes I had to clock out and then go back and finish.

12   Like we had an inservice at two o'clock and the inservice last

13   -- like if we go in the inservice, it let out at three o'clock,

14   and that was every month.  So a lot of times we had that

15   inservice -- I had to take my inservice, you know, to keep my

16   job, you had a lot -- to take so many inservice.  So what I had

17   to do, I would have to get off the clock at three o'clock and

18   then go back and finish up my hall.

19   Q.   How often did you have to do that?

20   A.   Because I had to take the inservice.

21   Q.   What I'm asking is, how often would you have to do that?

22   A.   Once a month because we had inservice every month.

23   Q.   Were you also still doing the peer interviews?

24   A.   Yes, I was still doing peer interviews.

25   Q.   How long did it take you to the soiled utility room?

1    A.    Thirty minutes.

2    Q.    How big is the --

3    A.    I had to pull the cans out and mop it, and then if there

4    was like a spot -- like they throw something in it and a spot

5    got on the wall, I had to wipe the wall down, and do the floor

6    and wipe the sink out where they pour Ensure and stuff in there

7    and empty the bed pans sometimes, I had to wipe that out.

8    Q.    Do you recall how much you were making an hour?

9    A.    No.  About 17 or 18, something like that, 16.  I don't

10   know.

11   Q.    Do you recall your last day at Rosewood?

12   A.    Yes.

13   Q.    Can you tell the jury about your last day.

14   A.    Okay, the last day.  The morning I got to work -- it was

15   April 12th.  I arrived about 6:55 and I got my cart out.  First

16   I had to go get the keys from Mr. Lewis, so then I went to the

17   cart room and I got my cart out and set my cart up.  Then I

18   went in the dining room.  When I got in the dining room, the

19   residents had finished eating breakfast.  So I asked Mr. Lewis

20   for some help, and he says, "Oh, Larry going to help you."

21        So I went and asked Larry, I say, "Are you going to help

22   clean the dining room?"  Larry said, "No," he said, "because

23   I've got to take the smoke cart outside."

24        So then I went back to Mr. Lewis, and I say, "Mr. Lewis," I

25   say, "I don't have any help in the dining room."  He say,

*Henrietta Austin - Direct/Barlow*                                        127

1   "Well, I'm just tired of all that whining and complaining.  You

2   just go in there and do the dining room.  If you can't do the

3   dining room, you can clock out."

4        So I clocked out, and I handed him the keys and the radio.

5   And then I called Ms. Partridge and then I called Gene

6   Triplett, but I didn't get an answer from Gene.  But

7   Ms. Partridge came and when she talked to me -- she came around

8   to the time clock and got me and she carried me in her office.

9        When I got there, she already had talked to Mr. Lewis, and

10  Mr. Lewis told her that I had throwed the keys and the radio to

11  him.  But I never throwed no keys or radio to him.  I took the

12  time -- the keys was on a round ring.  I put the keys on the

13  antenna, and I handed it to him -- I passed it to him.  But

14  when he got back to her, that's what he had said I had did.

15  And she said that she was going to have to write me up for

16  insubordination, and there's no way I was going to take another

17  write-up.

18  Q.   Ms. Austin, you said it was April 12th, 2013, right, your

19  last day?

20  A.   Uh-huh.

21  Q.   Who assigns Mr. Lewis to go out with the smoking cart --

22  I'm sorry.  Who assigns Mr. Bender to go out with the smoking

23  cart?

24  A.   I think Mr. Lewis.

25  Q.   And you asked Mr. Bender for help and he declined?

1    A.    Yes.

2    Q.    And then you went back to Mr. Lewis and what did he tell

3    you?

4    A.    He told me he was tired of me whining.

5    Q.    Did he say anything else to you?

6    A.    He told me I should clock out if I didn't want to do the

7    work.

8    Q.    Did he -- what prompted you to give him the radio and the

9    keys?

10   A.    He asked for them.  He told me to clock out, so what am I

11   supposed to do?  I can't take it home.  So I had to give it

12   back.

13   Q.    I'd ask you to take a look at Plaintiff's Exhibit 3.  You

14   see the last date, January -- I'm sorry -- April 12th, 2013, is

15   that when you clocked in?

16   A.    I clocked in at 6:56 and I clocked out at 7:34 and I stayed

17   around there until after ten o'clock waiting on Nicole

18   Partridge to come and talk to me.

19   Q.    Well, we'll come back to your conversation with

20   Ms. Partridge.  So as of right now you've clocked out at 7:30?

21   A.    Yeah.

22   Q.    And where do you make the phone calls?

23   A.    I went outside because we can't use the cell phone in the

24   building on account of the residents may ask to use the phone,

25   and that's a no-no, so I had to walk outside.  I went out the

1    back.  There's a laundry door, and I went out there.  And when

2    I called Mr. Gene Triplett and when I called Nicole I was

3    outside.

4    Q.   Do you recall who you called first?

5    A.   I called Nicole and then I called Gene.

6    Q.   So did you leave a message?

7    A.   I left a message for Gene.  I told Gene to call me because

8    I needed to talk to him concerning Rosewood about

9    Ms. Partridge.

10   Q.   Okay.  And did he ever call you back?

11   A.   No, he never called back.

12   Q.   Do you recall if you made the telephone call to

13   Mr. Triplett shortly after you left the building?

14   A.   No.  I called Mr. Triplett before I left the building.  It

15   was in the morning.

16   Q.   What I'm asking is -- because you said you went out through

17   the laundry -- a back room door?

18   A.   I never left the building.

19   Q.   Did you step outside of the building?

20   A.   I just stepped outside right out the laundry door to make a

21   phone call because we can't make a phone call on our cell phone

22   in the building.

23   Q.   And what I'm asking is, did you make that call to

24   Mr. Triplett soon after you actually clocked out?

25   A.   Yes.

1   Q.   And you left a message asking him to call you back?

2   A.   Yes.

3   Q.   Did you ever receive a return call from Mr. Triplett?

4   A.   No, I never got a call.  I got a letter from Ms. Partridge,

5   though, saying that my resignation -- and I didn't have a job.

6   Q.   So after you called Mr. Triplett, you called Ms. Partridge.

7   Did you get in touch with Ms. Partridge?

8   A.   No, I called Ms. Partridge first before I called Gene,

9   because you know you have to go through the chain of command,

10  so Ms. Partridge, I go to her first, so after I -- she say

11  she's going to come and talk to me, so then I called Gene

12  Triplett to let him know what was going on, but he never called

13  back.

14  Q.   So tell the jury what you told Ms. Partridge in your

15  telephone call.

16  A.   I told Ms. Partridge that I needed to talk to her

17  concerning Mr. Lewis.  So she told me to wait until she gets

18  there, which I did.  And she can tell you I stayed right there

19  until she got there.

20  Q.   Did you tell her anything else?

21  A.   No.  When she came in is when I talked to her, when she

22  came in.

23  Q.   Do you know what time she came in?

24  A.   Around nine or ten o'clock.

25  Q.   What were you doing from 7:30 to nine or ten o'clock?

*Henrietta Austin - Direct/Barlow*

```
1    A.   Well, I went back to the dining room because there was

2    paper all over the floor and things, so I went back to the

3    dining room and started picking up little stuff in the dining

4    room, you know, trying to get the dining room straightened up

5    because they were going to have activity in there.

6    Q.   Where was Mr. Lewis during all this time?

7    A.   Walking around.

8    Q.   Does he help you?

9    A.   No.

10   Q.   Did he get Mr. Bender to help you?

11   A.   No.

12   Q.   Did Mr. Lewis know that you had clocked out?

13   A.   Yeah.  He had his radio and his keys.

14   Q.   What does that mean, he had the radio and the keys?

15   A.   He had asked for the radio and the keys at the -- he's the

16   one told -- asked me to clock out.

17   Q.   Right.  But what I'm saying is, what does that mean to you

18   when he has your keys and your radio?  It doesn't mean anything

19   to us.

20   A.   Oh, he wanted me to clock out and go home.

21   Q.   What I'm saying is, he's got the -- can you do your work

22   without the keys?

23   A.   Yes.

24   Q.   How?

25   A.   Because all I'm doing is just around there, you know, you
```

1  had to clean off the tables and pick up the paper and put them

2  in the trash can.  So my cart has got a sack on it so, you

3  know, like if they leave a napkin and stuff on the table,

4  you've got to get all that off the table and put it in the

5  thing.  Like they have paper mats and stuff, you've got to ball

6  them up and put them in the trash can.

7  Q.  So what are the keys for?

8  A.  Huh?

9  Q.  What do you need keys for?

10 A.  I need the keys to get the chemicals to wipe everything

11 down.

12 Q.  Chemicals?

13 A.  Yeah, to wipe the tables and stuff down.

14 Q.  So you're waiting for Ms. Partridge to come back to work.

15 What do you do?  You're cleaning?

16 A.  Yeah, I'm still -- uh-huh.

17 Q.  So do you have a meeting with Ms. Partridge?

18 A.  Yeah, that's where she came and got me from, around there.

19 Q.  She came and got you where?

20 A.  By the dining room.

21 Q.  So you believe she came to get you while you were still

22 working in the dining room?

23 A.  No.  When she came I was just walking out the dining room,

24 and she told me to come -- because I could see her coming

25 because you know the dining room is -- I could see her from in

*Henrietta Austin - Direct/Barlow*                                    133

```
1    there, so she told me to come and go to the office with her.
2    So when I went to the office with her, that's when she --
3    Q.   Who is there?
4    A.   Ms. Partridge, she carried me to the office.
5    Q.   Anybody else there in the office?
6    A.   Dwayne Lewis was already in there sitting down.  She had
7    talked to Dwayne first.
8    Q.   Did Mr. Lewis say anything?
9    A.   No, I don't think he did.  He was just sitting there.
10   Q.   Did Ms. Partridge say anything?
11   A.   Yeah, she said that I had throw him -- she say Mr. Lewis
12   had told her that I had throwed the keys to him.
13   Q.   Did you say anything?
14   A.   Huh?
15   Q.   Did you say anything?
16   A.   Yeah, I was trying to explain to her what had happened, and
17   she didn't want to hear what I had to say, so I never got a
18   chance to tell her my side of the story.
19   Q.   What makes you think she didn't want to hear your side of
20   the story?
21   A.   Because she kept saying, "Mr. Lewis said you throwed the
22   keys, you throwed the stuff to him, and I'm going to have to
23   write you up for insubordination."
24   Q.   Did you make any further complaints about the workload?
25   A.   No.  She walked me out to my car.
```

*Henrietta Austin - Direct/Barlow*

1    Q.   Did you ever see a write-up?

2    A.   No.

3    Q.   Did you have any personal belongings still at Rosewood?

4    A.   Nothing but like pencils and stuff I kept in my locker and,

5    you know, like sometimes little food and everything, that was

6    all, you know, like a little food I kept in there, like chips

7    and cookies and stuff, you know, to munch on.

8    Q.   So when you left you didn't have to pick anything up?

9    A.   I didn't pick up anything because she walked me out that

10   morning.

11   Q.   So you left Rosewood.  What do you do?  Did you ever see

12   this in the mail?

13   A.   Yeah, she sent me that.  I guess she did it the same day I

14   left because it came in the mail -- I think the next day I got

15   it.

16   Q.   Do you recall what time you left on April 12th?

17   A.   She got there about ten, I guess, and I guess I left

18   directly after that.  Because when I went in her office, I just

19   sat down, I briefly sat down, and she started telling me what

20   Mr. Lewis had said, and I was telling her, "Nicole, that ain't

21   the way it happened."

22   Q.   And this letter is showing Cassandra Moody is a risk

23   manager, is that correct?  Do you see that right here?

24   A.   Yes.

25   Q.   So what was your understanding of Ms. Moody's position in

1   the company?

2   A.   What was whose position?

3   Q.   Ms. Moody, what was her position?

4   A.   Risk manager.

5   Q.   What does that mean to you, though?

6   A.   She's just there to -- okay, just, say, if like an accident

7   or something happened, she's there to take and give inservice

8   on an accident and, you know, to keep from having an accident,

9   you know, tell the nurses how to take and do lifts and stuff

10  like that.  And like if she sees a wet floor, she likes to

11  prevent, you know, falls and all that, she likes to, you know,

12  give an inservice on telling us how, you know, we've got to

13  keep the "Wet Floor" sign out.

14  Q.   Was she one of the ones that signed your write-up?

15  A.   My write-up, yes.

16  Q.   Now, prior to April 12, and discounting your issues with

17  Mr. Lewis, did you have any other problems at Rosewood?

18  A.   Just before -- when I first started there in 1994, I had a

19  problem, but it was soon solved.

20  Q.   Let me ask you to take a look at this document.  Have you

21  ever seen this?  Do you know what that document is, Ms. Austin?

22  A.   Yes, that's my evaluation, I think.

23  Q.   Does it look like your evaluation?

24  A.   Yes.

25  Q.   Do you know who signed it for you?

*Henrietta Austin - Direct/Barlow*                                    136

```
 1    A.    I think Dwayne Lewis.  Oh, Richard Collins.  That was in

 2    2011.

 3    Q.    Do you recall seeing this document in 2011?

 4    A.    Uh-huh.

 5    Q.    Look at the date on there.

 6    A.    The 1st, the 26th, and 2011.

 7    Q.    Do you think you would have signed this document on that

 8    date?

 9    A.    Did I do what?

10    Q.    Do you think you signed it on that day?

11    A.    On 2011?

12    Q.    If you read the date -- that's your signature, right, right

13    here?

14    A.    Yes.

15    Q.    All right, that's your signature.  This date, do you think

16    that's the date you signed it?

17    A.    Oh, I don't remember what date I signed it on.

18    Q.    You don't recall signing this document?

19    A.    Yeah, I recall the document, but I don't remember what day

20    it was on.  I signed it on 11 and 26th, that was Richard

21    Collins.

22    Q.    And he was before Mr. --

23    A.    Yeah, that was in 2011.

24    Q.    2011?

25    A.    Uh-huh.
```

1   Q.   Is that a yes?

2   A.   Yes, 2011.  Richard Collins was there.

3   Q.   And what was your overall rating?

4   A.   What was my what?

5   Q.   Overall rating.

6   A.   Excellent.

7   Q.   Can you --

8   A.   A 4.

9   Q.   And that's a 4 out of how many?

10  A.   Out of 5.

11  Q.   I'm going to show you another document.  Have you ever seen

12  this document before?

13  A.   Yes.

14  Q.   Can you tell the jury what it is?

15  A.   It's the evaluation.

16  Q.   For what time period?

17  A.   It's the 1st, the 21st, and '11.

18  Q.   January 21st, 2011?

19  A.   Yes.

20  Q.   And it covers through when?

21  A.   To January 21st and 2012.

22  Q.   2012?

23  A.   Yeah.

24  Q.   What was your overall rating?

25  A.   3.9.

*Henrietta Austin - Direct/Barlow*                                    138

1    Q.   And who was the supervisor?

2    A.   Richard Collins.

3    Q.   Same fellow as last time?

4    A.   Huh?

5    Q.   Same supervisor you had the year before?

6    A.   Yes.

7    Q.   Take a look at this document.

8    A.   The 1st, the 21st, and '12 to the 1st, the 21st, and '13.

9    Q.   2013?

10   A.   Yes.

11   Q.   Did you get an overall rating?

12   A.   Yes -- I didn't get an overall rating.

13   Q.   You did or you did not?

14   A.   I did not.  He did not give me an overall rating.

15   Q.   Do you know what the lowest --

16   A.   That was Dwayne that was evaluating me.

17   Q.   Do you recall signing it around that date?

18   A.   The 1st, the 13th, and the '13.

19   Q.   Do you recall signing it on that date?

20   A.   Yes.  That's my last evaluation.

21   Q.   How close was this to getting written up for the box fan?

22   Was it before it or after it?

23   A.   That was before.  I did the box fan on the 10th and this

24   was on the 13th.

25   Q.   Do you know if you ever finished cleaning the dining room

1   on your last day?

2   A.   Did I do what?

3   Q.   Did you finish cleaning the dining room on your last day?

4   A.   No.

5   Q.   Did you ever get any help in the dining room on your last

6   day?

7   A.   No.

8   Q.   How old were you on your last day?

9   A.   About 65.

10  Q.   What was going through your mind as you were walking out

11  with Ms. Partridge?

12  A.   Well, really, I didn't want to leave Rosewood because I had

13  been there so long.  And like I had told Mr. Triplett when we

14  was at the "Dog for Bark" [sic], I had told him I was going to

15  stay there and retire.  I wasn't fixing to leave Rosewood.

16  Q.   So you told Mr. Triplett that you were not going to retire?

17  A.   Yeah.

18  Q.   But you're walking out?

19  A.   No.  This was -- I had seen him -- we had went to a thing

20  at the park, "Bark" -- for the dogs, and the people had carried

21  the dogs.  And Nicole was down there, and we was all down

22  there, you know, like helping.

23  Q.   What I'm talking about is, your last day you said you don't

24  want to leave but you're walking out.  So what's going through

25  your mind as you're walking out?  You're 65 years old.  What

*Henrietta Austin - Direct/Barlow*

1  are you thinking about?

2  A.   Man, I felt bad, you know, because I couldn't get nobody to

3  listen at me and nobody would help me, you know, and you've

4  been on the job 19 years, you know.

5  Q.   At that point how many times had you complained to

6  Mr. Lewis about what you considered to be unfair treatment?

7  A.   I complained to Mr. Lewis I don't know how many times, and

8  I complained to Nicole, too.

9  Q.   So you're unemployed, don't have a job.  What are you

10  doing?  You left after April 12th, 2013.  How did it affect

11  you, leaving Rosewood?

12  A.   It affected me real bad, you know.  I was sick about this

13  job, you know.

14  Q.   What do you mean you were sick about the job?

15  A.   I'm just saying I started having stomach problems and

16  everything, you know.  This was about the best job I ever had.

17  And I loved the residents and I loved Rosewood and I got along

18  with everybody out there and everybody loved me.

19  Q.   What was wrong with your stomach?

20  A.   I guess it was just nervous, you know.

21  Q.   Were you having any other problems at the time?

22  A.   No.  I ended up taking high blood pills.

23  Q.   You didn't have high blood pressure before you left

24  Rosewood?

25  A.   No.

*Henrietta Austin - Direct/Barlow*                                    141

1    Q.   Did any doctor say, *Hey, look, it's because of the stuff*
2    *you're doing at Rosewood?*
3    A.   And then me and my husband separated a whole year because I
4    just had a bad attitude, you know.
5    Q.   You weren't getting along with your husband?
6    A.   No.
7    Q.   What did you do?
8    A.   I moved in with my daughter.
9    Q.   How long?
10   A.   About a year.
11   Q.   Did you and your husband get back together?
12   A.   Yeah.
13   Q.   How long ago was it that you got back together?
14   A.   Last year, I think, last year.
15   Q.   So you guys have stayed together for a little while and
16   then you left?  Did you leave or he leave?
17   A.   Huh?
18   Q.   Did you leave or did he leave?
19   A.   I left.  I left.  We just weren't getting along, you know.
20   I guess me being home every day was just -- I'm so used to
21   working, you know, and I guess I was a grouch and the least
22   little thing got on my nerves, I guess.
23   Q.   So the entire time that you were at Rosewood while
24   Mr. Lewis was your supervisor, did anybody else have their jobs
25   changed?

1   A.   No.

2   Q.   And -- but you do understand that some folks did have their

3   jobs changed?  The lady that was cleaning A, she didn't have to

4   go to the dining hall no more, right?

5   A.   That's the onliest change they had, him just taking the

6   dining room off of them and put it on me.  They just didn't

7   have to go to the dining room, that was the only change.

8   Q.   Did you see -- for the folks that you took part of their

9   job, either the soiled utility room or the dining room, did you

10  see the folks --

11  A.   It was Lakisha Gort, her job became easy because she didn't

12  have to go to the dining room.  And then C and D Hall didn't

13  have to go to the dining room at all, and Larry didn't have to

14  do the soiled utility room.

15  Q.   But what I'm asking is, were there any changes made to

16  their schedule to reflect that they were no longer doing either

17  the soiled utility room or the dining hall?

18  A.   No.

19        **MR. BARLOW:**  No further questions, Your Honor.

20        **THE COURT:**  Mr. Branning?

21        **MR. BRANNING:**  Your Honor, it's going to be -- I mean,

22  it's 5:10.

23        **THE COURT:**  We have 20 more minutes.

24        **MR. BRANNING:**  All right, we'll begin.

25        **THE COURT:**  I recognize you won't finish before 5 :30.

1          **MR. BRANNING:**  Your Honor, I'm sorry?

2          **THE COURT:**  I said I recognize you won't finish before

3    5:30, but we'll just reconvene with Ms. Austin in the morning,

4    but we'll go ahead and let's get 20 minutes in.

5          **MR. BRANNING:**  Yes, Your Honor.

6                          **CROSS-EXAMINATION**

7    BY MR. BRANNING:

8    Q.   Good afternoon, Ms. Austin.

9    A.   Good afternoon.

10   Q.   You pretty much got along with everybody at Rosewood during

11   most of your time there, didn't you?

12   A.   Yes.

13   Q.   You got along with the administrators that were there?

14   A.   Yes.

15   Q.   You had gotten along with your prior supervisor, Richard

16   Collins?

17   A.   I got along with all of them.

18   Q.   Dwayne Lewis is the first supervisor that you had a problem

19   with, isn't he?

20   A.   No, not really.  Because I -- one time I had a problem with

21   Joyce Williams, but I called Adam Taylor, and Adam Taylor

22   straightened it out.

23   Q.   And apart from that once instance, you had gotten along

24   with your administrators up until Dwayne Lewis started in the

25   fall of 2012?

1    A.   Yes.

2    Q.   Now, the changes to the housekeeping assignments, the

3    housekeeping assignments were by hall, correct?

4    A.   Yes.

5    Q.   To make sure we're clear, you have always -- you had done

6    the dining room for years, hadn't you?

7    A.   Yes.

8    Q.   The change occurred when you took on the dining room by

9    yourself, right?

10   A.   Yes.

11   Q.   And you complained right away, didn't you?  You didn't like

12   that change?

13   A.   No.  I had did the dining room for while.  I was doing it

14   by myself, and then he added the two -- the evening -- I mean,

15   C and D workload on me.  That's when I really started

16   complaining.

17   Q.   Let's talk about -- when did Mr. Lewis start at Rosewood?

18   A.   I don't remember when Mr. Lewis started.

19   Q.   Does the fall of 2012 sound about right?

20   A.   I don't remember.  I really don't remember.  I didn't keep

21   up with when he came there.

22   Q.   Well, the housekeeping assignments we saw change was

23   January 14, 2013, correct?

24   A.   Yes.

25   Q.   How long before that had Mr. Lewis started?

1   A.   I don't remember how long he had been there.

2   Q.   Six months?

3   A.   I really don't know.

4   Q.   Three months?

5   A.   I really don't know.

6   Q.   Two months?

7   A.   No, he had been there longer than that.  I just don't

8   recall when Mr. Lewis came there, the month when he came there.

9   All I know is I did his peer interview, and I don't recall.

10  Q.   What's your best estimate?

11          **THE COURT:**  No, I don't want her to guess.  Is there

12  something in the record that reflects when he started?

13          **MR. BRANNING:**  I don't know that there is right now,

14  Your Honor.  I can move on from this.

15          **THE COURT:**  You've asked her several different

16  timeframes, and she said she doesn't know.  And I just don't

17  think it's right that she guesses.

18          **MR. BRANNING:**  Understood.  I'll move on.

19  **BY MR. BRANNING:**

20  Q.   Ms. Austin, you told us that you made a complaint about

21  Mr. Lewis putting the --

22          **MR. BRANNING:**  I'm sorry?  Oh, I thought I heard you

23  say something.  I'm sorry.

24          **THE COURT:**  No.

25  **BY MR. BRANNING:**

1    Q.   Ms. Austin, you told us that you complained to Mr. Lewis

2    after he had taken the employees, I guess, that used to do C

3    and D Hall, helping with the dining room off the dining room

4    duty?

5    A.   Yes.

6    Q.   Now, let's start talking about when you first complained to

7    Mr. Lewis about the changes.  When did you first complain to

8    him about the change he made to your work assignments

9    concerning cleaning the dining room?

10   A.   I started complaining just before he wrote me up for the

11   fan, because I had been doing the dining room.

12        **MR. BRANNING:**  Your Honor, I'm going to take leave of

13   the podium for just a moment and grab the exhibits.

14        **THE COURT:**  That's fine.

15        *(Conference between counsel.)*

16   **BY MR. BRANNING:**

17   Q.   Ms. Austin, you said you first complained about the

18   assignment -- about the dining room change shortly before this

19   write-up for the box fan?

20   A.   Uh-huh.

21   Q.   Is that right?

22   A.   I think so.  I don't remember when I started complaining to

23   Mr. Lewis, but --

24   Q.   How long before you got this write-up did you complain to

25   Mr. Lewis about the change in the assignments for you to clean

1    the dining room?

2    A.   I don't recall.  I'd say about three weeks or so.  I don't

3    recall exactly when it was.

4    Q.   Where did you meet with him?

5    A.   Where did I meet with Mr. Lewis?

6    Q.   Where did you meet with him when you made the complaint

7    three weeks before this write-up about --

8    A.   In his office.  I used to go to his office -- his office

9    was right here.  I seen Mr. Lewis all day long when I'm working

10   down B Hall.  I cleaned his office every day.

11   Q.   And what was your complaint to Mr. Lewis?

12   A.   I just told him I didn't think the workload was fair, you

13   know.

14   Q.   And you said you think it was about three weeks before this

15   write-up in January of 2013?

16   A.   Yeah.  I don't remember.  I don't recall.  I'm just saying

17   it was about three weeks.

18   Q.   You know it was three weeks or you really -- you're just

19   guessing?

20   A.   I'm just guessing.  I don't recall.

21   Q.   So you don't know?

22   A.   No.

23   Q.   Can you even tell us whether or not you actually complained

24   to Mr. Lewis about the change in the dining room before you got

25   this write-up?

*Henrietta Austin - Cross/Branning*

1   A.   Yes, I know I was complaining to Mr. Lewis.

2   Q.   But you don't know when?

3   A.   I'd say after I had got -- I guess, I don't know, I think

4   it was before the write-up.  I don't remember.

5   Q.   You're not sure?

6   A.   No.

7   Q.   Okay.  So you can't tell us whether you ever complained to

8   him before you got this write-up or whether your complaints

9   started after you got this write-up, right?

10  A.   Let me think -- think back.  No, I was -- I already was

11  complaining to him, that's why I got the write-up because I was

12  complaining.  And he just had to find -- I guess he had to find

13  something to write me up for, because I never did anything, so

14  I guess he just wrote me up for a box fan, I don't know.

15  Q.   That's your opinion, isn't it?

16  A.   Yes.

17  Q.   You don't know that for a fact, do you?

18  A.   I don't know that for a fact.

19  Q.   You've never heard him tell you that?

20  A.   But nobody has never been wrote up for a box fan.  A box

21  fan is not even part of a room.  That's something you put in

22  and take out.

23  Q.   Mr. Lewis never told you that, did he?

24  A.   He never told me what?

25  Q.   That he wrote you up for the box fan because you had

1    complained about the change in the dining room?

2    A.   No, he never said, he just called me in there and wrote me

3    up, and Nicole had signed it, and Moody was in there when he

4    was written [sic] me up.  And I'm like saying nobody ever got

5    written up for a box fan.  A box fan is not even part of a

6    room.  And he said my work was not accepted as work

7    performance, so that's not even part of the room.  The room was

8    clean.  I don't see what the problem was with the box fan.

9    Q.   Ms. Austin, you stand up for yourself when you see a wrong

10   occurring?

11   A.   Huh?

12   Q.   Do you stand up for yourself when you feel like a wrong has

13   occurred?

14   A.   Yeah, and I think that was wrong.

15   Q.   And did you express to the people in the meeting that you

16   felt the write-up was wrong?

17   A.   Yes.  I cried the same day I got it.  I told Moody it was

18   wrong.  I cried.  Tonette can tell you, she seen me crying.  I

19   cried like a baby when I got that write-up.  I had never got a

20   write-up.

21   Q.   Ms. Austin, on this write-up there's a section right here

22   where my pen is for associate comments, and you didn't write

23   anything.

24   A.   Why would I write something when I got three against me,

25   one?  I'm trying to keep my job.  Just go ahead and sign and

1   come on up out of there.

2   Q.   You didn't write anything in the associate comments

3   section?

4   A.   No.  I wasn't going to write anything, because this was not

5   part of a room.  And this is something another that could have

6   been removed out of my file, stay in there for so long and they

7   take it out of there.  That was not a part of a room.  That's

8   just a box fan that somebody put in there.

9   Q.   You didn't write that on the associate write-up?

10  A.   I didn't need to.

11  Q.   Are you --

12  A.   I was --

13  Q.   Are you just telling us that for the first time today?

14  A.   No.  I was a housekeeping assistant supervisor, I know what

15  to do.  When something goes in your file, it stays in there for

16  so long.  So this box fan is not something going to stick in my

17  file to follow me around.  That's not a -- if I had left a

18  dirty room, then I can say, *Well, you know, they wrote me up*

19  *because the room wasn't clean.*  But my work was perfect.

20  Nobody never had a problem with me working.

21  Q.   Ms. Austin, how long had you worked with the assignment of

22  having someone help you with the dining room before Mr. Lewis

23  made the change?

24  A.   Ever since I've been there, 19 years, Neal Bullard.  And

25  two was going in the morning and two in the evening, 19 years,

1    ever since I had been there we had been doing the dining room.

2    Q.   And you were upset when he made that change?

3    A.   Was I upset?

4    Q.   Yes, ma'am.

5    A.   Yes, I was upset because he was not changing anybody's

6    schedule but mines.

7    Q.   Ms. Austin, with the posting of the housekeeping

8    assignments -- I have a feeling we're all going to see this a

9    thousand times.  The posting of the new housekeeping

10   assignments, you see it says "Effective January 14, 2013"?

11   A.   Yes.

12           **THE COURT:**  Can I go ahead and identify this as

13   Plaintiff's 2?

14           **MR. BRANNING:**  Your Honor, I apologize.

15           **THE COURT:**  That's fine.  Just for the record.

16           **MR. BRANNING:**  Yes, Plaintiff's 2, and we've got it

17   labeled as Defendant's Exhibit 1 right there.  It's a duplicate

18   of what's on the Plaintiff's exhibit list.

19           **THE COURT:**  Okay, thank you.

20   **BY MR. BRANNING:**

21   Q.   Do you see there where the handwriting is, "Effective

22   January 14, 2013"?  Do you see that?

23   A.   Do I see?

24   Q.   The handwriting right in there.

25   A.   Yeah, January 14.

1    Q.   Yes, ma'am.  2013?

2    A.   Yes.

3    Q.   And that's literally four days after you were written up

4    for the box fan, right?

5    A.   Yes.

6    Q.   Now, on this assignment of new housekeeping routes, it has

7    you cleaning the dining room twice a day?

8    A.   This was not the schedule when I left Rosewood, and this is

9    not the schedule now.  It's only 12 rooms on C Hall, and I was

10   doing the chat-and-chew room -- I mean, for the nurses station,

11   I was doing the nurses station and everything.  This is not the

12   schedule that was out there when I worked at Rosewood.  This is

13   a schedule that they fixed.  This is not the schedule.  13

14   rooms only on C Hall.  Now, go out there and count, just count

15   the spaces.

16   Q.   Ms. Austin, do you see where it says "Effective January 14,

17   2013"?

18   A.   I'm telling you this was not the schedule.

19   Q.   Do you see --

20   A.   This was not the schedule.

21   Q.   Do you see where it says "Effective January 14, 2013"?

22   A.   Okay, well, if this was the schedule they got, Tara Jones,

23   that's Visa Jones, okay, Tara name, Anderson, and Judy Long.

24        So how could Visa be working on A Hall, B Hall when she had

25   a hall of her own?  This is not the schedule.  I'm telling you

1   this is a schedule that they put together.  This is not the

2   schedule.  My schedule had my name on it, Visa's schedule had

3   her name on it, and Kathy's had her name on it.

4        This is not my work assignment here.  I did 13 rooms, I did

5   two bathrooms and a shower room, and then plus I did the nurses

6   station that's in the middle of the hall around on B Hall, and

7   then we got a chat room right on the side, and then I did the

8   activity office.  So this is not my schedule.  My schedule had

9   everything on it that I was supposed to have been did, and I

10  had a map of my schedule.  This is not the schedule.  All of

11  them was mapped out.

12  Q.   Ms. Austin, I was asking you if you can see where it says

13  "Effective January 14, 2013"?

14  A.   Yes.

15  Q.   And that would literally be four days after you received

16  the write-up for the box fan?

17  A.   This schedule -- I have never seen this schedule until now.

18  This is not the right schedule.

19  Q.   It's one of your exhibits --

20  A.   When Mr. Barlow showed me this schedule, he can tell you I

21  told him that this was not my schedule.

22  Q.   It's one of your exhibits.

23  A.   No.

24  Q.   You brought it to trial.

25  A.   No.  That's the schedule that they had.  This is not my

 1   schedule.  This is a schedule that they made after I was gone

 2   so I gave it to Mr. Barlow.

 3   Q.   You were still working there in January of --

 4   A.   I know I was, but this was not my schedule.  Go and count

 5   the rooms.  Kathy don't have 13 rooms.  I was doing the

 6   activity office and chat-and-chew.  So if it's not on this

 7   schedule here, that means I wasn't cleaning it, and I was

 8   cleaning it.

 9   Q.   You were working there in January 2013?

10   A.   I sure was.

11   Q.   And you were cleaning the dining room in January 2013 by

12   yourself after breakfast?

13   A.   Yes.

14   Q.   And were you also cleaning it after lunch?

15   A.   Yes.

16   Q.   By yourself?

17   A.   Yes.

18   Q.   In January 2013?

19   A.   No, I wasn't doing it two times in January.  That had just

20   started just before I left there.

21   Q.   So how long before you left did you take on, I guess,

22   cleaning it by yourself after lunch?

23   A.   I don't know how long it had started, but it wasn't in

24   January, I don't think.  I don't think it was in January.

25   Q.   You don't think it was, or it could have been and you just

1   don't remember?

2   A.   I don't think it was in January.

3   Q.   The days that you did not work, like the two days that you

4   were off each week, who covered the B Hall assignments that you

5   covered every day when you worked?

6   A.   Different ones.  Sometimes nobody was on the hall, and

7   sometimes Larry would do it.  And then, when I'd come back to

8   work, if they did it -- like, if they had a move or something

9   another, they would leave clothes in the room, they would leave

10  half of the resident's stuff.  And you can go out there and ask

11  anybody when I'd bring the stuff up there later on when I'd

12  come back to work.  And like the bed, they didn't even bother

13  about cleaning the bed, because Mr. Lewis didn't even check

14  behind them.

15  Q.   Ms. Austin, on the days that you weren't working who worked

16  the B Hall?

17  A.   Different ones.  Sometimes it was Tara, sometimes it was

18  Judy Long, sometimes it was Ms. Newberry.  It was just

19  different people worked it.

20  Q.   Was it Ms. Jones, Andrews, and Ms. Judy Long like it says

21  here on --

22  A.   No.  Ms. Jones worked on D Hall.  I keep telling you this

23  is not the schedule.  Ms. Jones is strictly D Hall.  We didn't

24  have nobody -- Tara's name was Tara Andrews, and Judy's name is

25  Judy Long, and Quaniqua Newberry.

 1             **THE COURT:**  I need a clarification, please.  Is Tara

 2    Jones the same person as Visa Jones or are they different

 3    people?

 4             **THE WITNESS:**  They're different people.  We only had

 5    one Jones, and that's Visa Jones.

 6             **THE COURT:**  You don't know a Tara Jones?

 7             **THE WITNESS:**  No.  Tara's name is Tara Andrews.

 8             **THE COURT:**  Oh, I see.

 9             **THE WITNESS:**  And Visa Jones and Quaniqua Newberry.

10             **THE COURT:**  Thank you.

11    **BY MR. BRANNING:**

12    Q.   Let's go to January 2013.  Were you cleaning the dining

13    room by yourself at least once a day in January of 2013?

14    A.   Yes.

15    Q.   And then you did not take on cleaning it by yourself twice

16    a day until just before you left employment in April of 2013?

17    A.   No, I was doing it before then, before I left.  I don't

18    know how long I had been doing it, but I had been doing it a

19    minute before I left, and that's when I asked for some more

20    help because it was getting to be too much.

21    Q.   How long before you left was it that you took on the

22    responsibility of cleaning the dining room by yourself twice a

23    day?

24    A.   I didn't take on nothing.  He gave it to me.

25    Q.   What time frame?

1   A.   I don't know what kind of time frame it was.  All I know he

2   just gave it to me.

3        **THE COURT:**  Mr. Branning, when you reach a point that

4   is comfortable for you to break, we'll recess.

5        **MR. BRANNING:**  Let's do that now, Your Honor.

6        **THE COURT:**  All right, thank you.

7        Ms. Austin, you may step down.  You'll be back on the

8   witness stand tomorrow morning at 8:30.  You can go ahead and

9   step down now.

10       *(Witness excused.)*

11       **THE COURT:**  Ladies and gentlemen of the jury, I want

12  to thank you for what I know has been a very long day.  When we

13  start trial on the same day as jury selection, it's extra long

14  and tedious.  And I know you all are not accustomed to just

15  sitting quietly listening as people just provide information to

16  you hour after hour.  I know that's unusual for most people.

17  But you all have done very admirably this afternoon.  I think

18  you've all stayed awake, which is a wonderful thing.  I know

19  sometimes that's hard certainly when we start right after

20  lunch, so thank you very much.

21       I'm going to excuse you now for the evening.  I'm

22  going to ask you to return -- before I give you a

23  time, Ms. XXXXXXX, you have the longest distance to travel.

24  What would be comfortable for you in terms of getting here

25  tomorrow?  Normally we start at 8:30, but if staring at 9:00

1   would be better for you, I'm fine doing that.

2           **MS. XXXXXXX:**  I'm fine.

3           **THE COURT:**  Well, let's just call it 8:45, I'll make

4   it 8:45.

5           So tonight during the evening recess, please keep my

6   instructions close in mind.  Don't discuss the case with

7   anyone, not amongst yourselves nor with anyone at home or

8   elsewhere, orally or in writing; please don't conduct any

9   research on your own into the matters that have been discussed

10  here during the trial; and very importantly, please don't form

11  any opinions yet about the merits of the case.  Just put the

12  trial out of your mind this evening, enjoy yourself, and get a

13  good night's sleep.

14          Also, should there be any news reports of the trial,

15  you would need to avoid those as well, as I mentioned earlier.

16          Any questions about our schedule?

17          *(No response.)*

18          I cannot predict right now if we're going to be giving

19  you the case tomorrow for deliberations.  I just don't know.

20  It's a little bit too early for me to tell.  There's a

21  possibility of that, so I would suggest that maybe you go ahead

22  and let your loved ones know that you might be a little bit

23  later tomorrow evening.  I won't keep you too late.  And it may

24  be that we're back here, in any event, on Wednesday.  But just

25  on the chance of that, you might let them know that it could be

1   a little bit later tomorrow night.

2           Please, get a good night's sleep and maybe some orange

3   juice on the way in tomorrow morning, please do drive safely,

4   and we'll see you at 8:45.  Please leave your pads there on

5   your chairs, they'll be waiting for you tomorrow morning.

6           Have a good evening, and thank you again.

7           (Jury out.)

8           Be seated, please.  Ms. Jacobs is coming in with jury

9   instructions.  The trial is going to, I'm sure, move fairly

10  quickly tomorrow.  I'd like to go ahead and start taking a look

11  at these.  The way that I handle jury instructions is I review

12  everything you all have submitted, and Ms. Jacobs and I have

13  put together a proposed packet.

14          And what we'll do is tomorrow morning we'll meet at

15  eight and we will walk through the jury instructions one page

16  at a time.  This is preliminary.  This is hot off the presses.

17  I've been trying to do some editing up here at the bench of the

18  jury instructions, but they're going to require, I know, some

19  more work.

20          One thing that has come up during the testimony today

21  that I'm not yet sure how we're going to deal with it is in

22  relation to the write-up for the box fan.

23          I don't know your position, Mr. Barlow, on that issue.

24  I do know that the exhibit was attached as an exhibit to the

25  deposition.  It wasn't specifically really argued at the

1    summary judgment, as best I can tell.  And I've had my law

2    clerks looking at that this afternoon.  It may still be an open

3    issue for trial purposes.  But it has come in.

4              There aren't any tangible monetary lost wages, that

5    sort of thing, in connection with it.  But on the other hand, I

6    think I would agree that -- I think I would be of a mind that

7    the jury should be able to decide if a write-up would dissuade

8    someone from making a complaint of discrimination.

9              But I'll leave that open, and you can argue that to me

10   tomorrow.  That's just sort of how it impresses me at this

11   point, but I'll hear from you tomorrow.  Nothing is set in

12   stone right now, but it is in evidence, and we'll need to

13   decide how to deal with it in the instructions.

14             And it may be that we end up deciding not to -- in the

15   instructions specify the separate adverse employment actions --

16   or maybe we do.  But, again, that's something we need to talk

17   about tomorrow, whether we do and whether we identify them in

18   the verdict form.  Right now I don't believe they're separated

19   out in the verdict form.  I think it just asks whether they

20   find that Ms. Austin has proven an adverse employment action.

21   I don't think we specifically identify the factual matters

22   pertaining to that.

23             The punitive damages was one area of dispute between

24   the parties.  The Plaintiffs submitted it, the Defendants did

25   not.

1      Mr. Branning, I think it goes to the jury.  You can

2  argue this tomorrow morning or sometime tomorrow if you need

3  more time.  But I think if the jury finds retaliation, I don't

4  see how they could find retaliation without finding it to be

5  willful and intentional.  And under Florida law, that would

6  support a claim of punitive damages.

7      So give that some thought.  If you have some case law

8  that's to the contrary where you think under the FCRA it

9  doesn't come in unless there's a higher standard met -- now,

10  the standard of proof is higher, clear and convincing as

11  opposed to preponderance.  But in terms of the level of conduct

12  by the defendant, I don't know in a retaliation case that it

13  wouldn't be inherent in that type of --

14      Do you know, Mr. Harrell?

15      **MR. HARRELL:**  Well, Your Honor, one issue I would

16  address is we did not include it in part because at our

17  attorney conference Mr. Barlow indicated that he was not going

18  to go down that road and would let us know otherwise.

19      If there is going to be the possibility for punitive

20  damages on the verdict form, I don't see an instruction here

21  regarding punitive damages, so I do think that --

22      **THE COURT:**  There is an instruction on punitive

23  damages, yes, sir, there is.  I mean, it's not -- it's open for

24  discussion, but there is a proposed instruction for punitive

25  damages, and it's the Florida instruction.  But again, this is

1    something that we can talk about, and we can talk about it

2    tomorrow morning at eight o'clock, and then to the extent, you

3    know, if you all need more time to do some research, just --

4    it's going to have to be decided, though, you know, when you

5    all -- when the evidence is all in, we don't have the luxury at

6    closing arguments for me to do more research.  I'm going to

7    need to be ready to instruct the jury as soon as you all rest

8    your case.

9          **MR. HARRELL:**  We will make an argument under *Kolstad*

10   that the standard isn't met for punitive damages under these

11   type of cases, *Kolstad* being the concept of good faith ability

12   to rely on policies and procedures, and then *Dudley* the idea of

13   the hierarchy, not being high enough in the hierarchal chain.

14         **THE COURT:**  But just make sure both of those are

15   retaliation cases.

16         **MR. HARRELL:**  Yes, they are.

17         **THE COURT:**  Give me the name of those again, please.

18         **MR. HARRELL:**  *Kolstad* and *Dudley*.  And let me step

19   back before I say something wrong.  Those deal with punitive

20   damages in the employment context.

21         **THE COURT:**  What do you mean by "employment context"?

22         **MR. HARRELL:**  In either discrimination or potentially

23   retaliation cases.  Let me look and make sure that we bring you

24   case law that deals with having a retaliation claim.

25         **THE COURT:**  Yeah, because I --

1      **MR. HARRELL:**  Based off of those cases, I think that

2   that would apply.

3      **THE COURT:**  I see a distinction with retaliation, but

4   I may be wrong, so this is, again, open for discussion.

5      Mr. Barlow, obviously, you're welcome to join the

6   debate on this.

7      Anything else then before we recess?  I know it's been

8   a long day for you all as well.  I thank you very much for your

9   presentations, and I'll see you tomorrow morning, and we'll

10   start at eight.

11      The parties are excused from being here at eight,

12   don't have to be here until 8:45, but it would be by your

13   choice.  You're free to waive your right to be here, but just

14   know you have every right to be here.  I just won't require it,

15   unless you want to be here at eight.  But we will be discussing

16   jury instructions, so just keep that in mind.

17      I'll see you all tomorrow morning at eight o'clock.

18      *(Whereupon, proceedings adjourned for the day at 5:39 p.m.*

19   *and continued on May 16, 2017, located in DAY TWO.)*

20                     --------------------

21   *I certify that the foregoing is a correct transcript from the*
     *record of proceedings in the above-entitled matter.  Any*
22   *redaction of personal data identifiers pursuant to the Judicial*
     *Conference Policy on Privacy are noted within the transcript.*

23

24   *Donna L Boland*                          *5-28-2017*
     *Donna L. Boland, RPR, FCRR*              *Date*
25   *Official Court Reporter*

<u>**INDEX**</u>

                                                                    <u>PAGE</u>

Attorney Conference                                                    2

(Jury Selection filed separately under seal.)

Preliminary Instructions                                               8

**OPENING STATEMENTS**
     By Mr. Barlow                                                    27
     By Mr. Branning                                                 31


<u>**WITNESSES FOR THE PLAINTIFF:**</u>

*GENE TRIPLETT*
     Direct Examination by Mr. Barlow                                41
     Cross-Examination by Mr. Branning                              44

*NICOLE PARTRIDGE*
     Direct Examination by Mr. Barlow                                47
     Cross-Examination by Mr. Harrell                               63
     Redirect Examination by Mr. Barlow                             75

*HENRIETTA AUSTIN*
     Direct Examination by Mr. Barlow                                91
     Cross-Examination by Mr. Branning                             143


**CERTIFICATE OF REPORTER**                                         **163**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

HENRIETTA AUSTIN,                        )
                                         )
          Plaintiff,                     )
                                         )
                                         )     Case No. 3:15cv40/MCR
                                         )
vs.                                      )     Pensacola, Florida
                                         )     May 16, 2017
                                         )     8:08 a.m.
                                         )
FL HUD ROSEWOOD, LLC,                    )
                                         )
          Defendant.                     )
_____  )

DAY TWO

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.
(Pages 1-229)

**APPEARANCES**

FOR THE PLAINTIFF:        *RICHARD D. BARLOW, ESQUIRE*
                          Odom & Barlow, PA
                          1800 North "E" Street
                          Pensacola, Florida  32501

FOR THE DEFENDANT:        *JEREMY C. BRANNING, ESQUIRE*
                          *DANIEL E. HARRELL, ESQUIRE*
                          Clark, Partington, Hart, Larry
                            Bond & Stackhouse
                          125 West Romana Street, Suite 800
                          Pensacola, Florida  32502

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*100 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

1                  *P R O C E E D I N G S*

2            (Court called to order at 8:08 a.m.; Parties

07:59    3   present with counsel.)

08:08    4            **THE COURT:**  Good morning Mr. Barlow.

08:08    5   Ms. Austin has waived her right to be here this

08:08    6   morning?

08:08    7            **MR. BARLOW:**  Yes, Your Honor.  She'll be here

08:08    8   when the jury gets here this morning.

08:08    9            **THE COURT:**  By 8:45, right?

08:08   10            **MR. BARLOW:**  Yes.

08:08   11            **THE COURT:**  Okay.  Where we left off last

08:08   12   evening is the need to discuss jury instructions, and

08:09   13   there was some brief discussion about punitive

08:09   14   damages.  But let's talk about the jury instructions,

08:09   15   and then that will lead us into, I'm sure, a

08:09   16   discussion on punitive damages.

08:09   17            As I said yesterday or explained, my practice

08:09   18   is to walk through the instructions with you one page

08:09   19   at a time.  Many of these instructions are standard

08:09   20   pattern instructions that I don't expect there to be

08:09   21   any dispute about, but I like to get that confirmed on

08:09   22   the record.

08:09   23            So let's start with the first page.

08:09   24   Obviously, standard.  I don't expect there to be any

08:09   25   dispute.

08:09   1          Page No. 2 -- and I'm going to refer to page

08:09   2   number, not instruction number.  So page 2 is duty to

08:09   3   follow instructions when a corporate party is

08:09   4   involved, which we have here.

08:09   5          So if you all have a comment, just go ahead

08:09   6   and interrupt me as we're going through these.

08:10   7          Page 3, standard instruction.

08:10   8          Page 4 is standard on credibility.

08:10   9          **MR. BARLOW:**  Your Honor, just for the record,

08:10   10  I don't really have any objection to the instructions

08:10   11  as they are, so it may be quicker just to talk to the

08:10   12  Defense about what they --

08:10   13         **THE COURT:**  Okay, that would short circuit

08:10   14  things.

08:10   15         **MR. BARLOW:**  There are a couple of typos that

08:10   16  the Court may want to address.

08:10   17         **THE COURT:**  Well, I do want the typos.  Like

08:10   18  I said, this was put together very quickly yesterday.

08:10   19  So if you want to identify those typos for us

08:10   20  Mr. Barlow, then I'll just turn over to Mr. Branning

08:10   21  and Mr. Harrell.

08:10   22         **MR. BARLOW:**  I believe they're typos.  Page

08:10   23  9, third line up from the bottom.  "Her believe"

08:10   24  should be "belief" in this regard.

08:10   25         **THE COURT:**  Yes, thank you, that was a typo.

08:10   1          **MR. BARLOW:**  And then on page 22, second full

08:11   2    paragraph, first line, says, "and when you have reach"

08:11   3    -- and I suppose it should be "reached."

08:11   4          **THE COURT:**  I see that.  That's a typo.  And

08:11   5    that's probably in all the instructions because I

08:11   6    assume we just took this straight from other

08:11   7    instructions.  So thank you for that.  We'll make that

08:11   8    correction.  Anything else?

08:11   9          **MR. BARLOW:**  No, ma'am.

08:11   10         **THE COURT:**  Mr. Branning or Mr. Harrell, who

08:11   11   is handling instructions?

08:11   12         **MR. HARRELL:**  I am, Your Honor.

08:11   13         **THE COURT:**  Mr. Harrell, okay.  Then,

08:11   14   Mr. Barlow has helped short circuit this process and

08:11   15   speed it up.  What do you all have to discuss?

08:11   16         **MR. HARRELL:**  A couple of things, Your Honor.

08:12   17   Starting on page 10, in the second paragraph, the last

08:12   18   clause says "Rosewood denies Ms. Austin's retaliation

08:12   19   claim and asserts that it modified the work schedules

08:12   20   of all members of the housekeeping staff and it

08:12   21   maintains comparable obligations for all employees" --

08:12   22   excuse me, Your Honor.

08:12   23         **THE COURT:**  You don't have to stand for

08:12   24   purposes of this morning.

08:12   25         **MR. HARRELL:**  I just wanted to make sure I

08:12   1    was doing the right thing.

08:12   2            THE COURT:  And I appreciate that.

08:12   3            MR. HARRELL:  The last clause says, "in that

08:12   4    it never instructed Ms. Austin to clock out."  I

08:12   5    believe that should read that it instructed Ms. Austin

08:12   6    to clock out only if she did not want to work" or "not

08:12   7    want to perform her job duties."

08:12   8            THE COURT:  Who have we heard that from?

08:12   9            MR. HARRELL:  Ms. Austin.  Ms. Austin

08:12   10   testified yesterday that Mr. Lewis told her to clock

08:12   11   out if she didn't want to clean the dining room, and

08:13   12   that's also in her complaint.

08:13   13           THE COURT:  So your suggested language is, is

08:13   14   that he instructed Ms. Austin to clock out if she did

08:13   15   not want to clean the dining room?

08:13   16           MR. HARRELL:  If she did not want to perform

08:13   17   her job duties.

08:13   18           THE COURT:  Any objection, Mr. Barlow?

08:13   19           MR. BARLOW:  Can you just tell me clearly

08:13   20   what you intend to change it to?

08:13   21           THE COURT:  Are you on page ten?

08:13   22           MR. BARLOW:  Yes, ma'am.

08:13   23           THE COURT:  Second full paragraph, second to

08:13   24   last line of that paragraph says, "Comparable

08:13   25   obligations for all employees and" -- and here is

08:13    1    where the change starts -- "that it instructed

08:13    2    Ms. Austin to clock out if she did not want to perform

08:13    3    her job."

08:13    4             **MR. BARLOW:**  That's fine, Your Honor.

08:13    5             **THE COURT:**  Is that what you want,

08:13    6    Mr. Harrell?

08:13    7             **MR. HARRELL:**  Yes, Your Honor.

08:14    8             And I believe that probably needs to be

08:14    9    carried over in a couple of other spots.

08:14   10             **THE COURT:**  Thank you, we'll do that.  Where

08:14   11    it needs to be plugged in, we will.

08:14   12             **MR. HARRELL:**  On the next page, page 11, with

08:14   13    regards to the second element, which is the second

08:14   14    paragraph on this page, we take issue with the idea

08:14   15    that -- where it says "and on one occasion indicated

08:14   16    that she would be written up for insubordination."

08:14   17             It's our position that that is not an adverse

08:14   18    employment action according to the law, and there's

08:14   19    some case law to support that.

08:14   20             **THE COURT:**  Are they in the retaliation

08:14   21    context in the Eleventh Circuit?

08:14   22             **MR. HARRELL:**  They're not in the Eleventh

08:14   23    Circuit, they are in the retaliation context.  It's a

08:14   24    Seventh Circuit case, which is *Poullard vs. McDonald*.

08:14   25    The citation is 829 F.3d 844.

08:14   1          **THE COURT:**  Can I just see the case, please,

08:15   2    if you have a copy of it.

08:15   3          **MR. HARRELL:**  I've highlighted it.

08:15   4          **THE COURT:**  Okay, thank you.

08:15   5          Now, this is different than -- I'm not

08:15   6    familiar with the Seventh Circuit's law on

08:15   7    retaliation, but just reading this highlighted

08:15   8    section, it doesn't seem consistent at all with the

08:15   9    *Burlington* standard in *Crawford*, which is whether the

08:15   10   action would dissuade a reasonable employee from

08:15   11   exercising their protected rights.

08:15   12         **MR. HARRELL:**  Your Honor, may I see the case

08:15   13   back?

08:15   14         **THE COURT:**  Right, I mean, the case says --

08:15   15   and I'll give it right back to you, but it says there

08:15   16   must be an injury, and the threats here of

08:16   17   disciplinary action had no effect on this person's

08:16   18   compensation or career prospects.

08:16   19         I don't see any reference to -- well, let me

08:16   20   continue down the next paragraph.  It says,

08:16   21   "Admittedly, there is a tension between this outcome

08:16   22   and the purposes underlying Title VII retaliation

08:16   23   claims."  Just a moment.

08:17   24         So, Mr. Barlow, what this case basically

08:17   25   holds is that an unfulfilled threat of discipline is

08:17  1    not an adverse employment action or an actionable

08:17  2    adverse employment action.  They reference *Burlington*

08:18  3    but they really don't discuss that standard.  But

08:18  4    basically the point is, is that it was not fulfilled,

08:18  5    it was a threat, not an actual action that the

08:18  6    employer took.

08:18  7         However, the Seventh Circuit stresses that

08:18  8    "An unfulfilled threat of discipline for protected

08:18  9    activity, even if not actionable itself, may be

08:18  10   relevant evidence of retaliatory intent behind a more

08:18  11   concrete adverse action."

08:18  12        **MR. BARLOW:**  Well, Judge, I would say, one, I

08:18  13   am not familiar with that case, I haven't read it.  I

08:18  14   don't know how the unfulfilled action came to be.  It

08:18  15   could be "If you do that again, we'll write you up."

08:18  16        But in this case, Ms. Austin had already been

08:18  17   told to clock out.  She waits around for the

08:18  18   administrator to show up.  The administrator shows up

08:18  19   and says "I'm going to write you up for

08:18  20   insubordination."  And the only reason that she wasn't

08:19  21   written up for insubordination is because she left.

08:19  22   So there's no evidence that she was going to get

08:19  23   written up for insubordination because she left.

08:19  24        And when you take all of that together,

08:19  25   calling her to the carpet in the administrative room

08:19  1  after several complaints of retaliation and you get

08:19  2  threatened with insubordination, I don't know how one

08:19  3  could conclude that wasn't an attempt to dissuade

08:19  4  them.   And *Burlington* said, hey, anything,

08:19  5  work-related or not, that is reasonably calculated to

08:19  6  dissuade a reasonable person from engaging in

08:19  7  protected activity is protected, it's an adverse

08:19  8  employment action.

08:19  9       THE COURT:  I'm going to continue to consider

08:19  10  this.  I'm going to do some research on my own.  I'll

08:19  11  give you your case back, though, Mr. Harrell.  Do you

08:19  12  have another case that you want to cite?

08:19  13       MR. HARRELL:  For the record, there's a

08:19  14  District Court case out of the Southern District of

08:19  15  Texas, *Brooks vs. Houston Independent School*, "Threats

08:20  16  of retaliation that do not significantly alter

08:20  17  conditions of employment are generally not enough for

08:20  18  a prima facie case."

08:20  19       It cites *Mills vs. Southern Connecticut State*

08:20  20  *University*, which is a Second Circuit 2013 case for

08:20  21  the proposition of, "Verbal threats are not actionable

08:20  22  retaliation," and another Second Circuit case from

08:20  23  2011 which states, "Schedule changes and verbal

08:20  24  threats are not materially adverse employment actions

08:20  25  supporting a Title VII retaliation claim."

08:20    1          So I bring those to the Court's attention.  I

08:20    2    would also point out that this is -- it seems to be an

08:20    3    effort to circumvent the Court's previous ruling on

08:20    4    constructive discharge, "The reason that this didn't

08:20    5    happen is because Ms. Austin resigned."  And the Court

08:20    6    has already found that Ms. Austin was not subjected to

08:20    7    a constructive discharge.

08:20    8          So what we have here is a simple verbal

08:20    9    indication, if you accept her version of the facts,

08:20   10    which we deny, but if you accept her version of the

08:20   11    facts, you have a verbal indication that there may be

08:20   12    some sort of discipline for insubordination.  There's

08:21   13    no indication as to what would have happened, how it

08:21   14    would have impacted her, if it would have impacted her

08:21   15    in any way.

08:21   16          Ultimately, based off the case law we cited,

08:21   17    we think that verbal threat alone is not enough, and

08:21   18    it's simply a way to circumvent that the discharge

08:21   19    claim has now been set aside.

08:21   20          **THE COURT:**  Okay.  Let me continue to take

08:21   21    that under advisement.

08:21   22          **MR. HARRELL:**  Ultimately that carries forward

08:21   23    on the next several pages like the previous

08:21   24    indication, there's a number of places that, if the

08:21   25    Court determines the change is necessary, that will

08:22  1    need to be made between pages 11 and 14.

08:22  2            THE COURT:  Okay.

08:22  3            MR. HARRELL:  In our proposed jury

08:22  4    instructions we requested that the instructions

08:22  5    clarify what an adverse employment action is pursuant

08:22  6    to various case law in the Eleventh Circuit, and it

08:22  7    appears that the Court has decided not to --

08:22  8            THE COURT:  Yeah, I'm just going to use the

08:22  9    pattern instruction.

08:22  10           MR. HARRELL:  Sure.  And for the record, we

08:22  11   just wanted to point that out and say that we have

08:22  12   asked the Court for that, and still are asking for

08:22  13   that, understanding that you've already made your

08:22  14   decision on that.

08:22  15           THE COURT:  Okay.

08:22  16           MR. HARRELL:  Then, ultimately, I guess the

08:22  17   final issue is punitive damages, is the issue on

08:22  18   whether the jury should be instructed and how they

08:22  19   should be instructed.

08:22  20           THE COURT:  Right.  Well, what the law

08:22  21   appears to me to be is that in Title VII there's a

08:22  22   heightened standard.  It requires a showing of malice.

08:23  23   And under the FCRA it's an open question.  And the

08:23  24   Florida Supreme Court, as best we can tell, has

08:23  25   declined -- or has not addressed this issue yet; has

08:23   1   acknowledged that it exists, but has not addressed it

08:23   2   in terms of what standard applies for purposes of the

08:23   3   FCRA and punitive damages.

08:23   4        So do you have any case law that maybe we

08:23   5   haven't uncovered or found that would shed more light

08:23   6   on this?

08:23   7        **MR. HARRELL:**  No, Your Honor.  I do think

08:23   8   that that's a potential -- I mean, I think that's a

08:23   9   correct summation of where the law currently stands.

08:23   10  That being said, I do think that the law also very

08:23   11  clearly says that the FCRA has been modeled after

08:23   12  Title VII.  And if you take that to its logical

08:23   13  conclusion, I think it would incorporate the

08:23   14  guidelines set forth by the case law on Title VII.

08:23   15       **THE COURT:**  But wouldn't the -- let me ask

08:24   16  this:  Does Title VII itself contain the standard for

08:24   17  punitive damages?

08:24   18       **MR. HARRELL:**  There is a pattern instruction

08:24   19  in the Eleventh Circuit which is different from what

08:24   20  is included.  To be frank, we would have included it

08:24   21  in our proposed jury instructions but for the

08:24   22  conversation that I mentioned yesterday dealing with

08:24   23  Mr. Barlow, we were not aware that he was still

08:24   24  pursuing punitive damages at the time the jury

08:24   25  instructions were set forth.

*Charge Conference*                                                    13

08:24   1          I've got a copy of the pattern jury

08:24   2   instruction regarding -- it's pattern instruction 4.5,

08:24   3   which is discrimination discharge Title VII, but it

08:24   4   does go into the punitive damage piece of it.  I can

08:24   5   bring this to you, if you'd like.

08:24   6          **THE COURT:**  That's okay, I don't need that,

08:24   7   thank you.  Do you have any case law under Title VII

08:24   8   in the retaliation context where punitive damages are

08:24   9   discussed?

08:24   10         **MR. HARRELL:**  Yes.  There's a number of

08:24   11  cases, and it stems out of two different cases.  The

08:25   12  broad based cases, there's *Kolstad* and there's *Dudley*.

08:25   13  And those are the two defenses that we've raised that

08:25   14  we believe are pertinent in this case.

08:25   15         And there's several Eleventh Circuit cases

08:25   16  that address those two.  The *Dudley* case was a 1999

08:25   17  case.  And the *Dudley* concept ultimately is the idea

08:25   18  that you have to be in a significant position of

08:25   19  managerial capacity in order for punitive damages to

08:25   20  be imputed to the employer.

08:25   21         In other words, a low-level manager doesn't

08:25   22  automatically -- the acts of a low-level manager don't

08:25   23  automatically hit the employer with punitive damages.

08:25   24  There has to be somewhat of a significant managerial

08:25   25  capacity involved in the purported discrimination or

08:25  1    retaliation in order for that to apply.

08:25  2         THE COURT:  Well, wouldn't Ms. Partridge meet

08:25  3    that definition as the administrator of the facility?

08:25  4         MR. HARRELL:  Well, you ultimately have to

08:26  5    look at -- the case law is instructive of where you

08:26  6    stand.  And Rosewood is part of the -- as you heard

08:26  7    yesterday, it's part of the Gulf Coast Health Care

08:26  8    family of 45 different -- or 44 different facilities,

08:26  9    so there's ultimately a greater hierarchy that goes up

08:26  10   much further than just the facility administrators.

08:26  11        The *Dudley* case was -- Walmart was on the

08:26  12   other side, and the issue was whether a store manager

08:26  13   at an individual Walmart was high enough up the

08:26  14   corporate chain.

08:26  15        THE COURT:  Let me stop you for just a

08:26  16   minute.  I apologize.  But this is an issue that

08:26  17   obviously has a lot of tentacles to it in this

08:26  18   particular case.  It should have been addressed in

08:26  19   your pretrial stipulation.

08:26  20        It should have been addressed in the

08:26  21   Plaintiff's pretrial briefing, which you all didn't

08:26  22   file, Mr. Barlow.  I'm going to look back at your

08:26  23   pretrial stipulation and see if this is identified as

08:26  24   an outstanding legal issue.  And frankly, if it's not,

08:27  25   I may not send it to the jury.

08:27  1          This is the second day of a two-day trial,

08:27  2    and there is a great deal of research to be had here

08:27  3    on my part, and frankly, I'm annoyed that I didn't

08:27  4    have the opportunity to do this before the trial so I

08:27  5    could come to the correct decision and have the time

08:27  6    that I needed to decide it.

08:27  7          **MR. BARLOW:**  Judge, when we filed our request

08:27  8    for instructions we requested that -- or proposed

08:27  9    instructions, we requested that instruction, the

08:27  10   Eleventh Circuit instruction.  Also in our verdict

08:27  11   form that we filed we had --

08:27  12         **THE COURT:**  I know, but is it identified in

08:27  13   the pretrial stipulation as an outstanding legal

08:27  14   issue?

08:27  15         **MR. BARLOW:**  I don't believe it is, Judge.

08:27  16         **THE COURT:**  Well, that's what I look at.

08:27  17   That's my roadmap for what I need to do pretrial.

08:27  18         **MR. BARLOW:**  Well, then, I suppose the

08:27  19   Defendant should have raised that as an issue to be

08:27  20   decided.

08:27  21         **MR. HARRELL:**  And at our attorney conference

08:27  22   we did discuss the issue, and I was informed at that

08:28  23   point in time that the belief was that the standard

08:28  24   would not be met and we didn't need to address it any

08:28  25   further.

08:28    1          THE COURT:  Mr. Barlow, did you make that

08:28    2    representation to him?

08:28    3          MR. BARLOW:  I told him I wasn't sure, Your

08:28    4    Honor.  If he wants to characterize it that way, I

08:28    5    won't say that he's wrong.  I really don't recall what

08:28    6    I said, but I did say, "Hey, I'm not sure.  But if

08:28    7    anything comes up I'll let you know."  That's what I

08:28    8    believe I said.  And if you want to believe

08:28    9    Mr. Harrell, that's fine.  I'm not really -- I'm not

08:28   10    going to disparage him or say that he's lying.  I

08:28   11    don't recall making that exact statement, but if the

08:28   12    Court finds otherwise, that's -- I understand.

08:28   13          THE COURT:  Well, what I'm trying to decide

08:28   14    is whether you all had an understanding that this

08:28   15    would not be an issue and that's why it was not framed

08:28   16    as an issue for me.

08:28   17          So I'm going to look at your pretrial

08:28   18    submissions again.  I'm sorry, I don't have that

08:28   19    notebook in here with me.  So I'll take a look at

08:28   20    that, and I'll decide whether or not I need to expend

08:29   21    more time on this punitive damages issue that frankly

08:29   22    wasn't framed for the Court.

08:29   23          Go ahead, Mr. Harrell.

08:29   24          MR. HARRELL:  Your Honor, if that's your

08:29   25    position, I believe it's probably a waste of time for

08:29    1    me to spend more effort discussing what else I want to

08:29    2    discuss unless you come back and tell us that --

08:29    3           **THE COURT:** Well, no, go ahead, because we

08:29    4    may run out of time. So what is else is it you want

08:29    5    to point out to me?

08:29    6           **MR. HARRELL:** Well, to move forward with that

08:29    7    argument --

08:29    8           **THE COURT:** And is this -- Mr. Harrell, is

08:29    9    this why -- I don't believe your briefing addressed

08:29    10    this either.

08:29    11           **MR. HARRELL:** No, Your Honor. And if you

08:29    12    look at the pretrial stipulation, there's nothing in

08:29    13    there suggesting that this was an issue. And we

08:29    14    drafted the pretrial based off the attorney conference

08:29    15    where, frankly, until we saw the jury instructions

08:29    16    which were submitted on the same day, we had no idea

08:29    17    that there was still a request to move forward with

08:29    18    punitive damages. There's nothing in the pretrial

08:29    19    about it. We drafted the initial draft and sent it

08:29    20    over, nothing came back to us with that issue. And

08:30    21    until the jury instructions came out, we didn't

08:30    22    realize that that was still an issue in the case.

08:30    23           **THE COURT:** But why not bring that up at the

08:30    24    pretrial conference?

08:30    25           **MR. HARRELL:** Well, Your Honor, at that point

08:30  1     in time we didn't discuss the jury instructions, and I

08:30  2     didn't realize that that was going to -- this has

08:30  3     always been an issue since that came out.  Perhaps we

08:30  4     should have brought it up at the pretrial conference

08:30  5     but --

08:30  6          **THE COURT:**  Yeah, it definitely should have

08:30  7     been brought up at the pretrial conference.  If you

08:30  8     felt like you had an understanding or an agreement

08:30  9     with Mr. Barlow that punitive damages wouldn't be

08:30  10    pursued and then you see punitive damages being

08:30  11    pursued in the jury instructions, yeah, I mean, it

08:30  12    certainly would have been better to have raised that

08:30  13    it at the pretrial conference.

08:30  14          But I don't know that I can make a decision

08:30  15    right here and now as to whether you all had an

08:30  16    agreement or not.  It sounds like you say you did, and

08:30  17    Mr. Barlow says he doesn't remember whether you did.

08:30  18    And it sounds like he acted thinking you didn't have

08:30  19    an agreement because he submitted the punitive

08:31  20    instructions.

08:31  21          **MR. HARRELL:**  But as we drafted the pretrial

08:31  22    stipulation there was never any sort of communication

08:31  23    to that effect.

08:31  24          **THE COURT:**  Mr. Barlow, I have very little

08:31  25    doubt, if any doubt, that the Defendants would have

08:31  1    raised this as an issue if they had thought it was an

08:31  2    issue.

08:31  3         MR. BARLOW:  Judge, they had plenty of time

08:31  4    to raise it in the Motion in Limine after all this

08:31  5    stuff was filed.  I don't recall how long after the

08:31  6    pretrial stip was filed --

08:31  7         THE COURT:  No, they didn't.  Motions are due

08:31  8    prior to the pretrial conference.

08:31  9         MR. BARLOW:  Right.  What I'm saying is,

08:31  10   after the pretrial stip was filed with the jury

08:31  11   instructions and the verdict form, they had time to

08:31  12   address it in a Motion in Limine which was filed maybe

08:31  13   a week or two, if I recall.

08:31  14        MR. HARRELL:  Your Honor, I don't believe

08:31  15   that's correct.  I believe the pretrial stip was filed

08:31  16   on the 28th.  We had to file 14 days before the

08:31  17   pretrial conference, which was the 10th, so we had

08:32  18   passed our point in time to file any Motion in Limine

08:32  19   at that stage.

08:32  20        THE COURT:  When did you all have your

08:32  21   attorney conference?  When was that held?

08:32  22        MR. HARRELL:  A good month before the

08:32  23   pretrial stipulation, at least, back in, I'd say, mid

08:32  24   March we exchanged a number of proposals back and

08:32  25   forth on pretrial stipulation, negotiating it up

08:32  1    until, frankly, a few minutes before it was filed.

08:32  2         **THE COURT:**  Okay.  I'm going to give it some

08:32  3    further consideration, and I'll let you all know what

08:32  4    I've decided as to whether we're going to go forward

08:32  5    with it.

08:32  6         I'm inclined not to, Mr. Barlow.  I mean, I

08:32  7    don't have any pretrial briefing from you, conclusions

08:32  8    of law, you know, where this should have been

08:32  9    presented.  I mean, I feel like you would -- you know,

08:33  10   you've been practicing a long time, you would know

08:33  11   that if you had raised this with these gentlemen and

08:33  12   properly framed it, that it would have been framed for

08:33  13   me, in turn.  And it just wasn't.

08:33  14        I mean, I didn't have any opportunity to

08:33  15   consider this at all.  And it's a significant legal

08:33  16   issue as far as the Florida Civil Rights Act, not so

08:33  17   much the Title VII, but it -- well, all right, I'm

08:33  18   going to take it under advisement.

08:33  19        What else do you have?

08:33  20        **MR. HARRELL:**  With regards to -- putting that

08:33  21   issue aside, Your Honor, other than what we've

08:33  22   previously raised, I think that covers our issues with

08:33  23   the jury instructions.

08:33  24        **THE COURT:**  I do have a verdict form as well.

08:33  25   You all don't have it.  We were continuing to work on

08:33  1    that yesterday evening.  I'll get it to you.  But it

08:33  2    doesn't contain any specific facts, like factual

08:33  3    questions in terms of, you know, being written up for

08:34  4    insubordination, work being piled on Ms. Austin, being

08:34  5    instructed to clock out.  It doesn't get into that

08:34  6    kind of interrogatory detail.

08:34  7         It just says -- I think the questions are,

08:34  8    "Did she engage in protected activity?  Has she proven

08:34  9    an adverse employment action?  Has she proven that

08:34  10   that adverse employment action caused her damage?"

08:34  11   But I'll get it to you.

08:34  12        **MR. BARLOW:**  I believe our verdict form is

08:34  13   about the same.

08:34  14        **THE COURT:**  You weren't that far off, right.

08:34  15        **MR. HARRELL:**  Other than the punitive damages

08:34  16   issues, we were pretty close.

08:34  17        **THE COURT:**  Right.  Let me address one other

08:34  18   matter.  When does the Defense intend to introduce the

08:34  19   EEOC -- the determination?

08:34  20        **MR. BRANNING:**  With Ms. Austin.

08:34  21        **THE COURT:**  So I have an instruction that I

08:34  22   intend to give to the jury, and I'm going to read it

08:34  23   to you now, and then I can also give you a copy if you

08:34  24   want to read it yourself.  This is what I've proposed

08:34  25   to say to them when that's admitted:

08:35  1             "The Equal Employment Opportunity

08:35  2   Commission's dismissal and notice of rights is not an

08:35  3   adjudication of the legal rights and liabilities of

08:35  4   either party, and it is not conclusive of any factual

08:35  5   issue in a federal case.  It is not reviewable in

08:35  6   court, and it is not binding on the employer, the

08:35  7   employee, or you, the jury.  This document has been

08:35  8   admitted by the Court for the limited purpose of

08:35  9   providing background and contextual information.  You

08:35  10  may not consider the evidence for any other purpose."

08:35  11            That's consistent with Eleventh Circuit case

08:35  12  law, unless you all know different.  No?

08:35  13            **MR. BRANNING:**  Accurate.

08:35  14            **THE COURT:**  Mr. Barlow?

08:35  15            **MR. BARLOW:**  No, Your Honor.

08:35  16            **THE COURT:**  Mr. Barlow, can you give me an

08:35  17  idea or estimate of time here, where you are in your

08:35  18  case?

08:35  19            **MR. BARLOW:**  Your Honor, I have perhaps two

08:35  20  more witnesses, five to ten minutes apiece.

08:35  21            **THE COURT:**  Very well.

08:35  22            What do you all anticipate today after the

08:36  23  Plaintiff rests?

08:36  24            **MR. HARRELL:**  It largely depends on what

08:36  25  happens.  We potentially have four to five witnesses.

08:36 1  We don't expect that they'll be long witnesses.  A lot

08:36 2  of work is being done, as happens in these cases, in

08:36 3  the Plaintiff's case.

08:36 4        THE COURT:  Is Mr. Lewis being called?

08:36 5        MR. HARRELL:  He is not.

08:36 6        THE COURT:  So four or five witnesses is what

08:36 7  you're estimating?

08:36 8        MR. BRANNING:  Correct.

08:36 9        THE COURT:  Let me bring up another matter.

08:36 10  At the close of the Plaintiff's case, you may -- it is

08:37 11  rather customary to make your Rule 50 motion.  What I

08:37 12  do in my practice is, if the jury is in the courtroom

08:37 13  at that time, is if you would just ask to approach the

08:37 14  bench, make your motion in ten words or less, I mean,

08:37 15  just make the motion, and don't make any argument with

08:37 16  it, just, you know, "We move on claim X for judgment

08:37 17  as a matter of law."  I'll take it under advisement,

08:37 18  and then I'll hear argument from you when the jury is

08:37 19  -- when we're on a lunch recess or something I'll hear

08:37 20  argument from you.  But it seems like it always

08:37 21  happens that the jury has just come back in the

08:37 22  courtroom and maybe five or ten minutes later then the

08:37 23  plaintiff or the government, if it's a criminal case,

08:37 24  rests, and then, of course, the defense wants to make

08:37 25  a motion.  And I just don't like sending the jury

08:37　　1　right back out, so that's the way we'll handle it.

08:38　　2　　　　　Anything else from either side?

08:38　　3　　　　　*(No response.)*

08:38　　4　　　　　We'll be in recess until 8:45 when the jury

08:38　　5　is seated.

08:38　　6　　　　　Ms. Austin, you'll be back on the witness

08:38　　7　stand.  And you're in cross-examination with

08:38　　8　Mr. Branning, and just for your information purposes,

08:38　　9　I will have you resworn, even though you're still in

08:38　　10　your testimony.  It's a new trial day, and I always

08:38　　11　have witnesses resworn on a new trial day.

08:38　　12　　　　　We'll be in recess until the jury is seated.

08:38　　13　Thank you.

08:38　　14　　　　　*(Recess taken 8:38 a.m. to 8:53 a.m.)*

08:53　　15　　　　　*(Jury in the box.)*

08:53　　16　　**THE COURT:**  Good morning, ladies and

08:53　　17　gentlemen.  Welcome back.  I appreciate you all being

08:53　　18　here on time.  We are ready to proceed now with the

08:53　　19　trial that we started yesterday.  This is the case of

08:53　　20　Henrietta Austin versus Rosewood, LLC.

08:53　　21　　　　　If you'll recall, when we stopped yesterday

08:53　　22　afternoon Ms. Austin was on the witness stand and

08:53　　23　Mr. Branning was in his cross-examination.  And that's

08:53　　24　where we will start this morning.

08:53　　25　　　　　Ms. Austin, if you would rise, please, and

08:53   1   raise your right hand to be resworn, as this is a new

08:53   2   trial day.

08:53   3        **HENRIETTA AUSTIN, PLAINTIFF WITNESS, DULY SWORN**

08:53   4             **MADAM CLERK SIMMS:**  Be seated.

08:53   5        **THE COURT:**  Mr. Branning, when you're ready.

08:54   6        **MR. BRANNING:**  Yes, Your Honor.

08:54   7                  **CROSS-EXAMINATION**  (Cont'd.)

08:54   8   **BY MR. BRANNING:**

08:54   9   Q.   Ms. Austin, good morning.

08:54   10  A.   Good morning.

08:54   11  Q.   Ms. Austin, before you came to trial or filed this

08:54   12  lawsuit, you filed a charge of discrimination against

08:54   13  Rosewood with the Equal Employment Opportunity

08:54   14  Commission, didn't you?

08:54   15  A.   Yes, I did.

08:54   16        **MR. BRANNING:**  Your Honor, may I have leave

08:54   17  from the podium to retrieve an exhibit?

08:54   18        **THE COURT:**  Yes.

08:54   19        **MR. BRANNING:**  For the record, I am going to

08:54   20  publish Defendant's Exhibit 8.

08:54   21  **BY MR. BRANNING:**

08:54   22  Q.   Ms. Austin, I'm going to put on the screen

08:54   23  Defendant's Exhibit 8 and ask if you would to take a

08:54   24  moment and let me know when you've had a chance to

08:55   25  review that.

*Henrietta Austin - Cross/Branning*                                    26

08:55   1    A.   Yes.

08:55   2    Q.   Do you see that Exhibit 8 appears to have been

08:55   3    sent to you right there in that section that I've

08:55   4    boxed-in in green?

08:55   5    A.   Uh-huh.

08:55   6    Q.   Yes, ma'am, you do see that?

08:55   7    A.   Yes.

08:55   8    Q.   Do you recall receiving this document from the

08:55   9    EEOC?

08:55   10   A.   No.

08:55   11   Q.   As you sit here today, do you recall what the EEOC

08:56   12   found in response to -- let me start over.

08:56   13        Sitting here today, do you recall the EEOC's

08:56   14   conclusion in response to your charge of

08:56   15   discrimination against Rosewood?

08:56   16   A.   No, I don't.

08:56   17   Q.   I'll draw your attention to the area that is

08:56   18   checked, and I'm going to box that in green as well,

08:56   19   and I'm doing a fairly poor job of it.

08:56   20        Ms. Austin, I'm going to draw your attention to

08:56   21   start with in the section that I've just blocked in

08:56   22   green that says, "The EEOC is closing its file on this

08:56   23   charge for the following reason:"  And then down to

08:56   24   the lower section, the section that's checked with a

08:56   25   checkmark or an X, do you see that it says, "The EEOC

08:56  1    issues the following determination:  Based on its

08:57  2    investigation, the EEOC is unable to conclude that the

08:57  3    information obtained establishes violation of the

08:57  4    statutes"?  Do you see that?

08:57  5    A.   Yes.

08:57  6    Q.   And do you recall -- after having a chance to

08:57  7    review it and walking through it, do you recall

08:57  8    receiving this from the EEOC?

08:57  9    A.   Yes, I did, I received it, yeah, I received it.

08:57  10   That's when I first filed.

08:57  11   Q.   Yes, ma'am.

08:57  12        **MR. BRANNING:**  Your Honor, that's really all

08:57  13   the questions I have for this.  And now is the time,

08:57  14   if the Court wanted to --

08:57  15        **THE COURT:**  Yes, thank you.

08:57  16        Ladies and gentlemen, I have a limiting

08:57  17   instruction for you.  I told you earlier yesterday

08:57  18   when I gave you your preliminary instructions that

08:57  19   there might be a situation where I would admit

08:57  20   evidence but I would admit it for a limited purpose,

08:57  21   and then I told you that if I did that that I would

08:57  22   give you an instruction in which I defined the limited

08:57  23   for which you can consider that piece of evidence.

08:57  24        So that is the case with Defendant's

08:57  25   Exhibit 8, and I give you now the instruction:

08:57  1      The Equal Employment Opportunity Commission's

08:58  2  dismissal and notice of rights in Ms. Austin's

08:58  3  administrative complaint is not an adjudication of the

08:58  4  legal rights and liabilities of either party in this

08:58  5  case, and it is not conclusive of any factual issues

08:58  6  in a federal case.  It is not reviewable in court, and

08:58  7  it is not binding on the employer, the employee, or

08:58  8  you, the jury.  The document has been admitted by the

08:58  9  Court for the limited purpose of providing background

08:58  10  and contextual information, the historic facts of this

08:58  11  case.  You may not consider the evidence for any other

08:58  12  purpose."

08:58  13      Go ahead.

08:58  14      **MR. BRANNING:**  Your Honor, may I have leave

08:58  15  from the podium to retrieve another exhibit?

08:58  16      **THE COURT:**  Yes, sir.

08:58  17  **BY MR. BRANNING:**

08:58  18  Q.  Ms. Austin, yesterday when we were talking about

08:58  19  the new housekeeping assignments, do you recall us

08:59  20  discussing whether -- when you were not there at

08:59  21  Rosewood on certain days whether other people

08:59  22  performed the same duties that you performed on B Hall

08:59  23  and the other areas of Rosewood that you typically

08:59  24  clean when you were at work?  Do you recall us

08:59  25  discussing that line of questioning?

*Henrietta Austin - Cross/Branning*                              29

08:59    1    A.   Yes.

08:59    2    Q.   And when you weren't -- just to kind of go back

08:59    3    and revisit it to make sure we're clear:   If you

08:59    4    weren't working on Rosewood, let's say, on a Thursday,

08:59    5    somebody else was working and performing the duties

08:59    6    that you would typically perform that day, correct?

08:59    7    A.   Yes.

08:59    8    Q.   In 2013, after the first dining room assignment

08:59    9    change where you were cleaning it yourself after

09:00   10    breakfast, if you weren't there on Thursday, whoever

09:00   11    was working that area -- that assignment on that day,

09:00   12    that person also had to clean the dining room by

09:00   13    themselves after breakfast that day?

09:00   14    A.   Yes.

09:00   15    Q.   And then when the assignment was changed so that

09:00   16    you cleaned the dining room after lunch, if you

09:00   17    weren't there, let's say, on a Tuesday, whoever had

09:00   18    that assignment who was working there that Tuesday,

09:00   19    that housekeeper also cleaned the dining room by

09:00   20    themselves after lunch?

09:00   21    A.   Yes, but I wasn't there to see, I really can't

09:00   22    say, but, you know, they was supposed to, but I don't

09:00   23    really know.   If I'm not there, I can't testify to

09:00   24    saying, yes, that they cleaned it by theirselves.

09:00   25    Q.   Ms. Austin, have you ever testified differently on

09:00   1   this issue?

09:00   2   A.   No.

09:00   3   Q.   You're sure?

09:00   4   A.   Not as I can recall, because I don't -- you know,

09:01   5   I don't remember being asked this.

09:01   6   Q.   If I was to give you a copy of your deposition

09:01   7   transcript, would that help refresh your recollection

09:01   8   of whether you've testified about this issue

09:01   9   differently?  Would it help?

09:01   10   A.   Yes.

09:01   11        **MR. BRANNING:**  Your Honor, may I approach to

09:01   12   show her her deposition transcript?

09:01   13        **THE COURT:**  Yes.

09:01   14        **MR. BRANNING:**  Counsel, I'm going to be

09:01   15   referring to pages 158 and 159.

09:01   16   **BY MR. BRANNING:**

09:01   17   Q.   Ms. Austin, I'm going to hand you a copy of your

09:01   18   deposition transcript.  And I have it turned to page

09:01   19   158.  And I'm going to turn your attention to, I

09:01   20   believe it's line 22.

09:01   21        Do you see how the lines are numbered there on the

09:01   22   left-hand side?

09:01   23   A.   Uh-huh.

09:01   24   Q.   If you will, I'm going to draw your attention to

09:02   25   that section of -- actually, I'm sorry, it was line 17

| | | |
|---|---|---|
| 09:02 | 1 | I'd like to start with.  And then, Ms. Austin, if you |
| 09:02 | 2 | would, turn over to page 159 and read down from lines |
| 09:02 | 3 | 1 through 6. |
| 09:02 | 4 | A.  It changes that they had the same duties for the |
| 09:02 | 5 | soiled utility room, correct. |
| 09:02 | 6 | Q.  I'm sorry, Ms. Austin.  I just want you to read it |
| 09:02 | 7 | to yourself real quick and I'll ask you some |
| 09:02 | 8 | questions. |
| 09:02 | 9 | A.  Oh, okay. |
| 09:03 | 10 | Q.  Ms. Austin, are you still on page 159? |
| 09:03 | 11 | A.  Yes. |
| 09:03 | 12 | Q.  Have you had a chance to review it? |
| 09:03 | 13 | A.  Yes. |
| 09:03 | 14 | Q.  Are you sure?  I don't want to -- you've had a |
| 09:03 | 15 | chance to review it? |
| 09:03 | 16 | A.  (Nodding head in the affirmative.) |
| 09:03 | 17 | Q.  All right.  Do you recall giving a deposition in |
| 09:03 | 18 | this case? |
| 09:03 | 19 | A.  Yes. |
| 09:03 | 20 | Q.  And do you recall that Mr. Harrell was there? |
| 09:03 | 21 | A.  Yes. |
| 09:03 | 22 | Q.  Do you recall that your lawyer, Mr. Barlow, was |
| 09:04 | 23 | there? |
| 09:04 | 24 | A.  Yes. |
| 09:04 | 25 | Q.  Do you recall being sworn under oath -- |

09:04  1   A.   Yes.

09:04  2   Q.   -- before you testified?

09:04  3   A.   Yes.

09:04  4   Q.   Do you recall a court reporter like Ms. Boland

09:04  5   being there --

09:04  6   A.   Yes.

09:04  7   Q.   -- who was taking down everything everybody said?

09:04  8   A.   Yes.

09:04  9   Q.   Now, having a chance to review the deposition

09:04  10  transcript that I've just handed you, does that

09:04  11  refresh your recollection of whether or not you have

09:04  12  ever testified differently as to whether the people

09:04  13  who worked on the days that you were not at Rosewood

09:04  14  performed the very same duties that you did, including

09:04  15  cleaning the dining room?

09:04  16  A.   Yes, just the same statement that I just gave.

09:04  17        **THE COURT:**  Just a minute.  I think we have

09:04  18  an objection.

09:04  19        **MR. BARLOW:**  May I approach briefly, Your

09:04  20  Honor?

09:04  21        **THE COURT:**  Okay.

09:04  22        *(Bench conference between the Court and*

09:04  23  *counsel:)*

09:04  24        **MR. BARLOW:**  As I understood Mr. Branning's

09:04  25  question, he asked did they do the work.  And what he

09:05   1   referred her to was did they have the same duties, and

09:05   2   I believe that she said they had the same duties.  So

09:05   3   I don't think there's -- I think what he was trying to

09:05   4   do is set up some sort of impeachment, but I don't

09:05   5   believe that it was impeachable because she answered

09:05   6   his question correctly that she hadn't testified about

09:05   7   the other people actually doing the work.

09:05   8            THE COURT:  Yeah, that's what the question --

09:05   9   the initial question had to do with whether they did

09:05   10   the work.

09:05   11            MR. BRANNING:  She had qualified the answer

09:05   12   and said "I don't know what they do there.  I wasn't

09:05   13   there."

09:05   14            THE COURT:  Yeah, but in the deposition you

09:05   15   didn't ask about work, you asked about duties.

09:05   16            MR. BRANNING:  We haven't --

09:05   17            THE COURT:  I mean, that's what I'm hearing

09:05   18   from Mr. Barlow.

09:05   19            MR. BRANNING:  Let me make sure I understand

09:05   20   you.  That in the deposition transcript we asked

09:05   21   whether they performed the same duties?

09:05   22            MR. BARLOW:  I think you asked whether they

09:05   23   had the same duties, and I believe she answered that,

09:05   24   yes, they did.

09:05   25            THE COURT:  I don't have the deposition, so

09:05  1    if you're going to impeach, you have to ask the same

09:05  2    question.

09:05  3              **MR. BRANNING:**  Absolutely.  And so I'll -- I

09:05  4    will make sure that -- let me frame it exactly like

09:06  5    that.

09:06  6              **THE COURT:**  Okay.  And then on redirect, if

09:06  7    you feel it hasn't been, you can, obviously, clarify.

09:06  8              *(Bench conference concluded.)*

09:06  9              **THE COURT:**  Okay, Mr. Branning, go ahead.

09:06  10   **BY MR. BRANNING:**

09:06  11   Q.   Now, having had the opportunity to review your

09:06  12   deposition transcript, I'd like to ask you:  When

09:06  13   other people covered the B Hall assignment and related

09:06  14   rooms, they had the same duties that you had with

09:06  15   regard to the dining room, correct?

09:06  16   A.   Yes.

09:06  17   Q.   And as far as you know, sitting here today, they

09:06  18   had to clean the dining room by themselves just like

09:06  19   you did?

09:06  20   A.   Yes.

09:06  21   Q.   And with regard to the soiled room, whoever was

09:06  22   working the B Hall assignment when you weren't at

09:06  23   Rosewood also cleaned the soiled room just like you

09:06  24   did?

09:06  25   A.   No.  The ladies would not clean the soiled utility

| 09:07 | 1 | room, and they said they wasn't going to clean it. |

Q.   Have you ever testified differently, Ms. Austin?

A.   Yes, I told them I was the only housekeeper that did the soiled utility room.

Q.   Do you know whether the housekeepers that worked on the days that you weren't working at Rosewood had the same duty to clean the soiled utility room that you did?

A.   Yes, I know.  They did not clean the soiled utility room.

Q.   The question is:  Do you know whether the housekeepers that worked on the days that you did not work at Rosewood that covered the B Hall assignment had the same duty to clean the soiled utility room that you did?

A.   They had the duty, but they was not doing it.

Q.   So your contention is, *Yes, they had the duty, but they weren't doing it*?

A.   Right.

Q.   Before coming to trial today, what witnesses have you identified that cleaned the B Hall assignment like you did but did not clean the soiled utility room even though it was their duty?

A.   Most all the housekeepers, they never finished the hall.  Everybody can tell you, they worked like they

09:08   1   wanted to work.   Those ladies that came in there that

09:08   2   was part time, they was young, and they would take

09:08   3   long breaks, and Mr. Lewis would have to go and find

09:08   4   them, they'd be all outside smoking or sitting around.

09:08   5   They'd take -- like if they had a 30-minute break,

09:08   6   they'd take 45 minutes; if they had a 15-minute break,

09:08   7   they'd take 25 minutes.

09:08   8   Q.   Did you ever complain to Ms. Partridge that the

09:08   9   housekeepers that were cleaning the B Hall assignment

09:09   10  weren't covering the same duties that you were

09:09   11  covering?

09:09   12  A.   No, I never told her, but I told Mr. Lewis.   When

09:09   13  I'd come back, I'd say, "My hall be filthy when I come

09:09   14  back."

09:09   15  Q.   Did you ever call Gene Triplett to tell

09:09   16  Mr. Triplett that the housekeepers that were covering

09:09   17  the B Hall assignments on the days you were not at

09:09   18  Rosewood were not performing the duties that were

09:09   19  assigned to them?

09:09   20  A.   No, because I'm not supposed to call Mr. Triplett.

09:09   21  I'm supposed to go to my supervisor, which was Dwayne

09:09   22  Lewis.   I'm not even supposed to go to Nicole about

09:09   23  the issues about the cleaning on the hall.

09:09   24  Q.   Do you know whether Mr. Lewis ever disciplined any

09:09   25  of the housekeepers that were assigned to B Hall for

09:09  1   not performing the job duties that you testified

09:09  2   about?

09:09  3   A.   No, he -- I never seen a write-up on nobody but

09:09  4   me.  I ain't never seen him write up anybody.

09:09  5   Q.   Well, you weren't -- you never saw him write

09:10  6   people up, but that doesn't mean he didn't do it?

09:10  7   A.   Well, I never seen a write-up.

09:10  8   Q.   Well, you don't attend all the write-up meetings,

09:10  9   do you?

09:10  10  A.   No.

09:10  11  Q.   And in fact, only, really, supervisors and

09:10  12  managers were in attendance when you got written up

09:10  13  for that box fan, right?

09:10  14  A.   If you get a write-up, they're going to talk about

09:10  15  it out there.  If Mr. Lewis wrote up anybody, they're

09:10  16  going to talk about it.

09:10  17  Q.   You weren't there -- if other people got written

09:10  18  up, that was not part of your job function was to

09:10  19  attend the meetings where others got written up?

09:10  20  A.   No.

09:10  21  Q.   So the fact you didn't see it or don't know about

09:10  22  it doesn't mean it didn't happen?

09:10  23  A.   No.

09:10  24  Q.   Now, I'm going to put up Defendant's Exhibit 1,

09:10  25  which is the new housekeeping routes.  And yesterday

09:10  1    near the end of the day we were talking about whether

09:10  2    or not this new housekeeping routes assignments became

09:11  3    effective January 14, 2013.  Do you remember us

09:11  4    talking about that?

09:11  5    A.   Yes.

09:11  6    Q.   And I recall you telling us that this was not the

09:11  7    schedule.

09:11  8    A.   Yes.

09:11  9    Q.   And is it your contention that -- well, why isn't

09:11  10   this the schedule?  Let's get clear on that idea.

09:11  11   A.   Because B Hall had activity in the charting room

09:11  12   on it.  C Hall had 12 rooms on it.  And this schedule

09:11  13   here is not the schedule that I was doing.

09:11  14   Q.   When is the first time you saw this document?

09:11  15   A.   I'm the one gave it to Mr. Barlow.

09:11  16   Q.   So did you get this document while you were

09:11  17   working at Rosewood?

09:11  18   A.   No.

09:11  19   Q.   Did you get this document after you were working

09:11  20   at Rosewood?

09:11  21   A.   Yes.

09:11  22   Q.   When is the first time you saw it?

09:11  23   A.   When I gave it to Mr. Barlow and I told him

09:12  24   that --

09:12  25   Q.   No, let me stop you.  I don't want you to tell us

*Henrietta Austin - Cross/Branning*                                    39

09:12   1    what you told Mr. Barlow.  That's confidential.

09:12   2    That's between you and Mr. Barlow, and that's

09:12   3    privileged.

09:12   4         So the question is:  When is the first time you

09:12   5    saw Defendant's Exhibit 1, the new housekeeping

09:12   6    routes?

09:12   7    A.   When it was gave to me.

09:12   8    Q.   At Rosewood?

09:12   9    A.   No, no.  Somebody gave it to me.

09:12   10   Q.   Somebody that worked at Rosewood gave it to you

09:12   11   after you left?

09:12   12   A.   Yes.

09:12   13   Q.   Who gave it to you?

09:12   14   A.   I can't tell you that.  That's confidential.

09:12   15   Q.   Ms. Austin, I'm going to ask you again, who gave

09:12   16   you this document?

09:12   17        **THE COURT:**  Ms. Austin, you'll have to answer

09:12   18   the question.

09:12   19        **THE WITNESS:**  (No response.)

09:12   20        **THE COURT:**  Ms. Austin, you have to answer

09:12   21   the question.

09:12   22        **THE WITNESS:**  Huh?

09:12   23        **THE COURT:**  You have to answer the question.

09:13   24   You're under oath, and you do have to answer the

09:13   25   question.  This is your lawsuit.

09:13   1         **THE WITNESS:**  Well --

09:13   2         **THE COURT:**  Ms. Austin, this is your lawsuit

09:13   3   and you produced this document.  You have to disclose

09:13   4   where you got it.

09:13   5         **THE WITNESS:**  Well, I had went to Rosewood

09:14   6   one day --

09:14   7         **THE COURT:**  Okay.

09:14   8         **THE WITNESS:**  -- and the schedule was there,

09:14   9   and I picked the schedule up.  I went through the

09:14   10   laundry room to see Betty Black, and I seen the

09:14   11   schedule, and I picked the schedule up, and I gave it

09:14   12   to Barlow.  That's how I got the schedule.

09:14   13         **THE COURT:**  Okay.

09:14   14   BY MR. BRANNING:

09:14   15   Q.  Did you return to Rosewood after --

09:14   16   A.  Yeah, I carried Betty Black some pantyhose out

09:14   17   there, and I went through the laundry room and the

09:14   18   schedule was taped on the wall, and I pulled the

09:14   19   schedule down myself.  That's how I got the schedule.

09:14   20   So the girl that was in the laundry room, she didn't

09:14   21   tell me that I couldn't get it.  And I forget -- it

09:14   22   was -- she's dead now, she passed away, she let me get

09:14   23   the schedule.

09:14   24   Q.  When did you go to Rosewood and take this schedule

09:14   25   out of the laundry room?

| | | |
|---|---|---|
| 09:14 | 1 | A.   It was during -- I got the schedule out the |
| 09:15 | 2 | laundry room, I think it was directly after I stopped |
| 09:15 | 3 | working there, and he had hired Trichelle, but her |
| 09:15 | 4 | name wasn't on the schedule.  Because when I got the |
| 09:15 | 5 | schedule, Judy's name -- she wasn't even working there |
| 09:15 | 6 | anymore. |
| 09:15 | 7 | Q.   If you left Rosewood's employment in April of |
| 09:15 | 8 | 2013, when did you go get this document? |
| 09:15 | 9 | A.   I think I got it in February, because I had |
| 09:15 | 10 | carried Betty Black some pantyhose, she had called me |
| 09:15 | 11 | and asked me to bring her some pantyhose, and I went |
| 09:15 | 12 | and got the pantyhose because she was going to church |
| 09:15 | 13 | that Sunday, and I came in through the laundry, and I |
| 09:15 | 14 | just got the schedule. |
| 09:15 | 15 | Q.   February of what year? |
| 09:15 | 16 | A.   I think it was 2013 when I went out there. |
| 09:16 | 17 | Q.   Were you still working at Rosewood? |
| 09:16 | 18 | A.   No. |
| 09:16 | 19 | Q.   So if you left in April of 2013, and you think you |
| 09:16 | 20 | got it in February, it would have had to have been |
| 09:16 | 21 | February 2014, right? |
| 09:16 | 22 | A.   Uh-uh.  I went back out there -- you know, I used |
| 09:16 | 23 | to go back out there -- after I stopped working there, |
| 09:16 | 24 | I used to go back out there and visit the residents. |
| 09:16 | 25 | I constantly used to go out there and visit the |

09:16   1    residents.  And my sister-in-law was even in that

09:16   2    nursing home, and my brother was in that nursing home,

09:16   3    and he passed away out there.  I had family members in

09:16   4    Rosewood, so I used to constantly visit Rosewood, and

09:16   5    they can tell you.

09:16   6    Q.  Did you always go through the laundry room door

09:16   7    when --

09:16   8    A.  I always went in the laundry room because the

09:16   9    laundry room stayed open.

09:16   10   Q.  Even after you were no longer working there?

09:16   11   A.  Yes, I always went through the, what you call --

09:16   12   Q.  You didn't go through the front door and the lobby

09:16   13   and check in?

09:16   14   A.  No.  I always parked in the back.  When I was

09:16   15   working there I always parked in the back.

09:16   16   Q.  And everybody knew you there, so nobody, to your

09:17   17   knowledge, complained about you coming in the back

09:17   18   door?

09:17   19   A.  No, nobody never complained about me coming in

09:17   20   there.

09:17   21   Q.  Because everybody knew you, you had been there a

09:17   22   long time?

09:17   23   A.  Yeah.

09:17   24   Q.  So let's go back to when you picked up this

09:17   25   document from the laundry room in Rosewood.

09:17  1    A.   I got it off the wall at Rosewood.

09:17  2    Q.   When?

09:17  3    A.   It'd be taped on the laundry cabinet.  They'd put

09:17  4    the schedule on the laundry cabinet.  The schedules

09:17  5    would be everywhere.

09:17  6    Q.   And you said you think you got it in the month of

09:17  7    February?

09:17  8    A.   I believe it was so.

09:17  9    Q.   February of what year?

09:17  10   A.   '13.

09:17  11   Q.   So you got it while you were working at Rosewood?

09:17  12   A.   Huh?

09:17  13   Q.   You picked up this schedule from the laundry room

09:17  14   while you were still employed at Rosewood?

09:17  15   A.   No, no, no.  I got the schedule after I wasn't

09:17  16   working there.  I had quit working there.  I'm sorry.

09:17  17   I had quit working there in April.  So I went back out

09:18  18   there to visit Betty.  When I went back out there to

09:18  19   visit Betty, I don't know what month it was, but it

09:18  20   might have been in March or sometime after I was no

09:18  21   longer working there.  I went through the laundry

09:18  22   room, and I see this new schedule up here, and I say,

09:18  23   "Well, hey, this is not the schedule," and I said,

09:18  24   "They done changed everything."  So that's when I

09:18  25   picked up the schedule.

*Henrietta Austin - Cross/Branning*                                    44

09:18    1    Q.   Ms. Austin, you have told us you think you got it

09:18    2    maybe in February or you think you got it in March,

09:18    3    but you quit in --

09:18    4    A.   I don't know what month exactly when I got it,

09:18    5    it's been so long.

09:18    6    Q.   Well, then, let's start with about how long after

09:18    7    you left Rosewood was it when you got this schedule

09:18    8    out of the laundry room?

09:18    9    A.   It was after I had left Rosewood, because this

09:18    10   schedule here, I didn't have this schedule.

09:18    11   Q.   This schedule has your name on it, yes?

09:18    12   A.   Uh-huh, yes, it's got my name on it.

09:18    13   Q.   And it's got that you cleaned the dining room

09:18    14   twice a day?

09:18    15   A.   Yes.

09:18    16   Q.   So do you recall how long it was from when you

09:19    17   left Rosewood until you went into the laundry room and

09:19    18   took this schedule out?

09:19    19   A.   I'd say it had to be in March sometime.

09:19    20   Q.   Do you recall March of what year?

09:19    21   A.   Of '13.

09:19    22   Q.   So you would have still been working at Rosewood

09:19    23   in March of '13, right?

09:19    24   A.   No, I left after.

09:19    25   Q.   You left in April of '13?

09:19    1    A.    Yeah, April or March, yeah, yeah, it was -- I

09:19    2    don't -- I don't recall, but I used to go out there

09:19    3    quite often.  I don't recall what day it was.  But I

09:19    4    used to go out there and visit quite often.  And they

09:19    5    can tell you I used to be at Rosewood all the time,

09:19    6    even though I had stopped working out there I used to

09:19    7    be out there.

09:19    8    Q.    Did you take any documents from Rosewood after you

09:19    9    left working there?

09:20   10    A.    No.  I only gave Visa the key to my locker so she

09:20   11    could clean the locker out.  I gave her the key.  I

09:20   12    went out there and gave her the key to the locker

09:20   13    because Rosewood told her to take the lock off and

09:20   14    that wasn't Rosewood's things.

09:20   15    Q.    So the testimony is Defendant's Exhibit 1 is the

09:20   16    only document you took from Rosewood after you stopped

09:20   17    working there?

09:20   18    A.    Yeah, just the schedule.

09:20   19            MR. BRANNING:  Your Honor, may I have leave

09:20   20    to return the exhibit?

09:20   21            THE COURT:  Yes.

09:20   22    BY MR. BRANNING:

09:20   23    Q.    You didn't tell anyone in management that you were

09:20   24    taking documents from Rosewood after you left there,

09:20   25    did you?

09:20  1   A.   No.

09:20  2   Q.   That's a company document, isn't it?

09:20  3   A.   What, a schedule?  It was a schedule.  They all be

09:21  4   all over the tables, laying in the dining room.

09:21  5   Schedules be left everywhere.

09:21  6   Q.   It's a company document, isn't it?

09:21  7   A.   It's a what?

09:21  8   Q.   The schedule was a company document of Rosewood's?

09:21  9   A.   Yes.

09:21  10  Q.   And you took it, right?

09:21  11  A.   Yes.

09:21  12  Q.   And you didn't ask anybody for permission to take

09:21  13  it, right?

09:21  14  A.   No.

09:21  15  Q.   Did you take any other documents from Rosewood

09:21  16  that you never asked for permission to take?

09:21  17  A.   No.

09:21  18  Q.   Ms. Austin, moving to another issue, and that is

09:21  19  discussions about your retirement.  When you were

09:21  20  working at Rosewood, you considered retiring years

09:21  21  before you left in April of 2013, didn't you?

09:21  22  A.   Yes, I had considered retiring, but I changed my

09:21  23  mind about retiring and I had --

09:22  24  Q.   And you -- I'm sorry, I didn't mean to interrupt

09:22  25  you.

09:22  1    A.   I had talked to Mr. Triplett and told Mr. Triplett

09:22  2    I was not going to retire.  I had told several people

09:22  3    I was not going to retire, I was going to continue to

09:22  4    work.

09:22  5    Q.   And you -- specifically you even went to a

09:22  6    charitable function for -- and you were referring to

09:22  7    it yesterday, it's called "Bark in the Park" and it's

09:22  8    put on down at the Maritime Park, and Rosewood is a

09:22  9    big part of that event, isn't it?

09:22  10   A.   Yes.

09:22  11   Q.   And you went and you helped volunteer at that

09:22  12   event?

09:22  13   A.   Yes.

09:22  14   Q.   And at that event Gene Triplett was there, right?

09:22  15   A.   Yeah.

09:22  16   Q.   And you and Mr. Triplett even talked about that

09:22  17   y'all were both getting up there, but you told

09:22  18   Mr. Triplett that you had decided not to retire?

09:22  19   A.   Yes, I did.

09:22  20   Q.   And Mr. Triplett said, "Okay," right?

09:22  21   A.   *(No response.)*

09:22  22   Q.   Right?

09:22  23   A.   Yes.  It was -- I'm sorry, we was in -- we was at

09:23  24   the -- it wasn't the dog thing, it was at the gumbo

09:23  25   fest that I seen Mr. Triplett at.  I'm sorry.

09:23   1    Q.   No problem.  So there was a gumbo fest --

09:23   2    A.   It was in Gulf Breeze where I seen -- me,

09:23   3    Francine, and Kathy Borner was there.

09:23   4    Q.   And Rosewood was one of the participants in the

09:23   5    gumbo fest?

09:23   6    A.   Yeah, and they was cooking, Jason and Kim and all

09:23   7    of them, they had a booth set up.

09:23   8    Q.   And so you saw Mr. Triplett there?

09:23   9    A.   Mr. Triplett was there.

09:23   10   Q.   And y'all had a discussion, and you told him you

09:23   11   were not going to retire?

09:23   12   A.   Yes.

09:23   13   Q.   And he said, "Okay"?

09:23   14   A.   Yes, I really did.

09:23   15   Q.   And you kept working, kept going?

09:23   16   A.   Yes, and I had no intention of retiring from

09:23   17   Rosewood.

09:23   18   Q.   Now, you spoke with Mr. Triplett about it,

09:23   19   correct?

09:23   20   A.   Yes.

09:23   21   Q.   And you spoke with Georgette, the hair stylist,

09:23   22   about retiring?

09:23   23   A.   Yes.

09:23   24   Q.   You spoke with Larry Bender about retiring?

09:23   25   A.   Yes.

09:23 1    Q.   Now, Mr. Bender, he's one of the floor techs that
09:24 2    we talked about yesterday, right?
09:24 3    A.   Yes.
09:24 4    Q.   And he was the floor tech that would cover the
09:24 5    floors on A Hall and B Hall, right?
09:24 6    A.   Yes.
09:24 7    Q.   And Mr. Bender would also help you out in the
09:24 8    dining room, wouldn't he?
09:24 9    A.   Yes, when he had a chance to.
09:24 10   Q.   Now, you also spoke with Cassandra Witherspoon
09:24 11   about the fact that you were thinking about retiring?
09:24 12   A.   Yes.
09:24 13   Q.   And then you also spoke with Patsy Williamson
09:24 14   about retiring?
09:24 15   A.   Yes.
09:24 16   Q.   And we saw Cassandra Witherspoon's name yesterday.
09:24 17   And I don't think we've gotten into Patsy Williamson
09:24 18   yet.  Who is Ms. Williamson?
09:24 19   A.   Ms. Williamson was HR.  And I used to always talk
09:24 20   to Patsy.  Patsy would always call me to do like the
09:24 21   peer interviews and things for her.  So, you know,
09:24 22   like she'll hire CNAs, LPNs, RNs, and, you know, she
09:24 23   would always call me to come do the peer interview for
09:25 24   her, and for dietary, different things like that.
09:25 25   Q.   And like you, Ms. Williamson had worked at

09:25   1   Rosewood for a long, long time, hadn't she?

09:25   2   A.   Yes.

09:25   3   Q.   And you told Ms. Williamson that you were thinking

09:25   4   of retiring because you were tired of Dwayne Lewis?

09:25   5   A.   Yes.

09:25   6   Q.   Now, going to Dwayne Lewis.   The problems you had

09:25   7   with Rosewood stemmed from your relationship with

09:25   8   Dwayne Lewis?

09:25   9   A.   Yes.

09:25   10   Q.   Mr. Lewis, he started -- I know we talked about

09:25   11   this yesterday, maybe having a night's rest on it.

09:25   12   But Mr. Lewis started at Rosewood around September of

09:25   13   2012, didn't he?

09:25   14   A.   I can't remember when Mr. Lewis started.

09:25   15   Q.   If -- do you recall whether or not the date that

09:25   16   Mr. Lewis started at Rosewood was addressed in your

09:25   17   deposition?

09:25   18   A.   No.

09:25   19   Q.   Would it refresh your recollection to review your

09:26   20   deposition to see if the date that Mr. Lewis started

09:26   21   at Rosewood was discussed during your deposition

09:26   22   testimony?

09:26   23   A.   I never gave a date about Mr. Lewis starting

09:26   24   because I don't remember.   I can't remember when

09:26   25   Mr. Lewis started.

09:26  1   Q.   Well, then, if I can turn your attention to a

09:26  2   section of your deposition transcript to see if it

09:26  3   helps refresh your recollection.

09:26  4   A.   Okay.

09:26  5         MR. BRANNING:   Your Honor, may I approach?

09:26  6         THE COURT:   Yes.

09:26  7         MR. BRANNING:   Your Honor, could I get that

09:26  8   and turn it to the back page.

09:26  9         THE COURT:   Yes.

09:26  10        MR. BRANNING:   I believe it's 83, 83,

09:26  11  line 24.

09:26  12  BY MR. BRANNING:

09:26  13  Q.   Ms. Austin, I'm going to hand you back your

09:26  14  deposition transcript and ask if you would to read

09:26  15  lines 1 through 4 of page 83, and let us know when

09:27  16  you've had a chance to review it.

09:27  17        (Witness complies.)

09:27  18        Having had a chance to review that deposition

09:27  19  testimony, does that refresh your recollection of when

09:27  20  Mr. Lewis started at Rosewood?

09:27  21  A.   Yes, but I still said I did not know.   In the

09:27  22  deposition I still said I did not know.

09:27  23  Q.   And you also -- okay.

09:27  24  A.   And somebody said "In 2012?" and I say, "Yes, I

09:27  25  don't really know."   That's in my deposition, I didn't

09:27   1   know.

09:27   2   Q.   Okay.  Sitting here today, does that sound about

09:28   3   right, September of 2012, compared to when you left in

09:28   4   April of 2013?

09:28   5   A.   I don't really know when he started, you know.

09:28   6   Q.   Moving on from that issue, Ms. Quida Simms did the

09:28   7   scheduling at Rosewood from the time that Mr. Lewis

09:28   8   started until you left, didn't she, Ms. Simms?

09:28   9   A.   No.  When he first came there, I was helping

09:28   10  Mr. Lewis.  Like Nicole said yesterday, I was helping

09:28   11  Mr. Lewis.

09:28   12  Q.   You were helping actually train him on actually a

09:28   13  lot of things on how the building operated?

09:28   14  A.   Yes.  And then when we starting having problems,

09:28   15  that's when he demoted me and took on Quida Simms.

09:28   16  Q.   He didn't demote you, did he?

09:28   17  A.   He demoted me.

09:28   18  Q.   You were never demoted from your position as

09:28   19  housekeeper at Rosewood, were you?

09:28   20  A.   No.  I was his assistant, and Nicole and him both

09:29   21  asked for the key back.

09:29   22  Q.   And Mr. Lewis actually recovered the keys from

09:29   23  most of the associates at Rosewood that has keys,

09:29   24  didn't he?

09:29   25  A.   No.  I had the key to the housekeeping office.

| | | |
|---|---|---|
| 09:29 | 1 | And if Mr. Lewis had to go to the doctor or if |
| 09:29 | 2 | Mr. Lewis didn't come in, I went in the housekeeping |
| 09:29 | 3 | office and did what needed to be did.  If someone |
| 09:29 | 4 | wanted to put in vacation or whatever they needed to |
| 09:29 | 5 | did, or they missed the clock-in, I would always put |
| 09:29 | 6 | the slip in there and take it up there to the front |
| 09:29 | 7 | and get them to sign it and clock them back in and |
| 09:29 | 8 | take it up to the front.  So after me and Mr. Lewis |
| 09:29 | 9 | started having problems, Mr. Lewis and Nicole called |
| 09:29 | 10 | me to the office and asked for the key back. |
| 09:29 | 11 | Q.  You and Mr. Lewis started having problems |
| 09:29 | 12 | particularly when you started criticizing the way that |
| 09:29 | 13 | Mr. Lewis was running the housekeeping? |
| 09:29 | 14 | A.  No, I never criticized Mr. Lewis. |
| 09:29 | 15 | Q.  You criticized the way that he was performing the |
| 09:29 | 16 | job different than the way that you had worked in |
| 09:29 | 17 | housekeeping for many years? |
| 09:29 | 18 | A.  No, I never criticized Mr. Lewis.  I never |
| 09:30 | 19 | criticized Mr. Lewis.  I had most respect for |
| 09:30 | 20 | Mr. Lewis. |
| 09:30 | 21 | Q.  Now, do you recall going through some of the |
| 09:30 | 22 | evaluations yesterday with Mr. Barlow, the annual |
| 09:30 | 23 | evaluations that you would have at Rosewood? |
| 09:30 | 24 | A.  Yes. |
| 09:30 | 25 | **MR. BRANNING:**  Your Honor, permission to |

09:30    1    retrieve an exhibit?

09:30    2              **THE COURT:**  Yes.

09:30    3              **MR. BRANNING:**   I'm going to publish

09:30    4    Defendant's Exhibit 5.

09:30    5    **BY MR. BRANNING:**

09:30    6    Q.   Ms. Austin, this is going to be the "Hourly

09:30    7    Nonclinical Performance Appraisal" of you for the

09:30    8    period of January 21, 2012, to January 21, 2013.   Do

09:30    9    you remember going over this document with your lawyer

09:31   10    yesterday?

09:31   11    A.   Yes.

09:31   12    Q.   And I'm going to turn your attention to page 2 of

09:31   13    the document, and specifically down at the bottom, and

09:31   14    ask if you would -- if that's your signature right

09:31   15    there?

09:31   16    A.   Yes.

09:31   17    Q.   And it's dated January 13, 2013, you see that?

09:31   18    A.   Yes.

09:31   19    Q.   Now, it appears somebody has signed it as

09:31   20    supervisor.   Is that Mr. Lewis's signature?

09:31   21    A.   Yes.

09:31   22    Q.   And it appears he's dated it January 31, 2013,

09:31   23    correct?

09:31   24    A.   Yes.

09:31   25    Q.   Now, I'm going to turn you back to the date of the

09:31  1   appraisal, and that's going to be January 21, 2012, to

09:31  2   January 21, 2013.  You see that?

09:31  3   A.   Yes.

09:31  4   Q.   So, then, if we go back to the date that you put

09:31  5   next to your signature, which says January 13, that's

09:32  6   probably a mistake, isn't it, because that's before

09:32  7   the end of the appraisal period?

09:32  8   A.   Yes, it might have been a mistake.  I don't recall

09:32  9   what date it was.

09:32  10  Q.   Well, then, I'm going to show you also an

09:32  11  additional page that is not on the exhibit that y'all

09:32  12  talked about yesterday, and that's a document called

09:32  13  the Associate Blueprint.  Do you recognize that

09:32  14  document?

09:32  15  A.   Yes.

09:32  16  Q.   And that's a document that you filled out, isn't

09:32  17  it, Ms. Austin?

09:32  18  A.   Yes.

09:32  19  Q.   And in that document you signed it right there,

09:32  20  the associate's signature?

09:32  21  A.   Uh-huh.

09:32  22  Q.   Is that a yes?

09:32  23  A.   Yes.

09:32  24  Q.   I'm just getting a yes for the record, I'm not

09:32  25  being rude.

09:32    1    A.   Yes.

09:32    2    Q.   And then you dated it January 31, 2013; isn't that

09:32    3    correct?

09:32    4    A.   Yes.

09:32    5    Q.   So that's probably the date you meant to put on

09:32    6    the page we just looked at, right?

09:32    7    A.   Yes.

09:32    8    Q.   It just had the numbers wrong.   That happens.

09:32    9         I'm going to turn your attention to question No.

09:33   10    3, and I'm going to box it in and ask, if you would,

09:33   11    as of January 31, 2013, when you filled out this form

09:33   12    -- first of all, did you fill out this form?

09:33   13    A.   Yes.

09:33   14    Q.   Is that your handwriting in the answers to the

09:33   15    questions?

09:33   16    A.   Yes.

09:33   17    Q.   In response to question No. 3, which asks, "What

09:33   18    do you need from me as a supervisor?" what did you

09:33   19    write?

09:33   20    A.   I just said that he's good, he's rewarded me for

09:33   21    the work, and he get lunch.   That's all I said about

09:33   22    it.   And I wasn't going to say anything bad because I

09:33   23    didn't want to make no wave with Mr. Lewis.   Like I

09:33   24    said, I didn't have no beef with Mr. Lewis.

09:33   25    Q.   Not only did you not say anything bad, but you

09:33 1    said he's good?

09:33 2    A.   Yeah, that's what I said about him.

09:33 3    Q.   And to reflect briefly back on the content of the

09:34 4    evaluation, is this Mr. Lewis's handwriting over here

09:34 5    on the comments section?  Is that Mr. Lewis's

09:34 6    handwriting?

09:34 7    A.   Yes.

09:34 8    Q.   And he's writing -- essential job functions, he

09:34 9    gives you a 5.  Is that the best rating?

09:34 10   A.   Yes.

09:34 11   Q.   And he writes "Outstanding" next to that, doesn't

09:34 12   he?

09:34 13   A.   Yes.

09:34 14   Q.   And then, for the next section down, "Teamwork

09:34 15   Functions," he writes, "highly effective, highly

09:34 16   effective," I mean, positive remarks about you, right?

09:34 17   A.   Yes.

09:34 18   Q.   And then down to "Residents Rights Function," you

09:34 19   get the highest score, a 5, correct?

09:34 20   A.   Yes.

09:34 21   Q.   And continuing on with the next page, you get

09:35 22   another 5 at "Understands, promotes, and complies with

09:35 23   residents rights.  Outstanding."

09:35 24        And then, "Safety Work Environment Functions,"

09:35 25   that's particularly critical or relevant to your work

09:35  1    as a housekeeper, right?

09:35  2    A.   Yes.

09:35  3    Q.   And in that section you get nothing but 4s and 5s

09:35  4    from Mr. Lewis, right?

09:35  5    A.   Yes.

09:35  6    Q.   Then going down, you have a section for "Associate

09:35  7    Comments," do you see that?

09:35  8    A.   Yes.

09:35  9    Q.   And that's going to be right here, you see that?

09:35  10   A.   Yes.

09:35  11   Q.   You left that blank?

09:35  12   A.   I didn't have anything to say.

09:35  13   Q.   But what you did have to say on the next page was

09:35  14   "He is good," right?

09:35  15   A.   That wasn't the same day.  We didn't do those the

09:35  16   same day.

09:35  17   Q.   Well, it's dated the same day.

09:35  18   A.   I know, but I probably made a mistake on the date

09:36  19   when I signed it.  It wasn't the same date.

09:36  20   Q.   It's your testimony that you dated it on a date

09:36  21   different than what you filled it out?

09:36  22   A.   Yes, I believe so, because when I would go in

09:36  23   there Mr. Lewis would always be talking, and I would

09:36  24   get sidetracked, you know, when I would go in there.

09:36  25        **MR. BRANNING:**  Permission to return exhibit?

09:36   1          THE COURT:  Yes.

09:36   2   BY MR. BRANNING:

09:36   3   Q.   When the assignment for cleaning the dining room

09:36   4   that was allocated to B Hall was changed by Mr. Lewis,

09:36   5   you confronted him about that change, didn't you?

09:36   6   A.   Yes.

09:36   7   Q.   Now, you also spoke with Ms. Partridge, who we

09:36   8   heard from yesterday --

09:36   9   A.   Yes.

09:36   10  Q.   -- about the change to clean the dining room by

09:36   11  yourself in the morning?

09:36   12  A.   Yes.

09:36   13  Q.   You had no problems with Mr. Lewis until he made

09:37   14  that change to the housekeeping assignments, did you?

09:37   15  A.   No.  I had a problem with Mr. Lewis when Mr. Lewis

09:37   16  wrote me up for the fan.

09:37   17  Q.   All right.  So --

09:37   18  A.   That's when the problems started.

09:37   19  Q.   Okay.  So have you ever testified differently,

09:37   20  Ms. Austin?

09:37   21  A.   I might have did because I got the days mixed up,

09:37   22  but he had wrote me up first, that's when the problems

09:37   23  started, when I got the write-up.

09:37   24  Q.   The question is:  Have you ever testified

09:37   25  differently?

09:37  1   A.   Yes, I probably did, because I get the days

09:37  2   confused.

09:37  3   Q.   So your problems with Mr. Lewis really occurred

09:37  4   between when he reassigned the duties for the

09:37  5   assignments to B Hall and when you left Rosewood,

09:37  6   right?  It occurred during that time period?

09:37  7   A.   No.   My problem began when Mr. Lewis first gave me

09:38  8   my first write-up.  That's when it first began.

09:38  9   Q.   Have you ever told us differently under oath?

09:38  10  A.   I don't know.  I don't recall.  But that's when my

09:38  11  problems began, when I got my first write-up, because

09:38  12  I never had gotten a write-up.

09:38  13  Q.   So you don't know if you've told us differently in

09:38  14  prior testimony than what you're telling us today as

09:38  15  to when your problems with Mr. Lewis started?

09:38  16  A.   No.

09:38  17  Q.   I'm going to refresh your recollection.  And if

09:38  18  you would, turn to page --

09:38  19       **MR. BRANNING:**  Your Honor, I can assist with

09:38  20  getting her to the right page if -- may I approach?

09:38  21       **THE COURT:**  You can approach, yes.

09:38  22       **MR. BRANNING:**  Counsel, I'm going to turn to

09:38  23  page 105.

09:38  24  **BY MR. BRANNING:**

09:39  25  Q.   May I retrieve that from you?  I don't want to --

*Henrietta Austin - Cross/Branning*                                    61

09:39   1    A.   That's okay.

09:39   2    Q.   Ms. Austin, I'm going to turn in the deposition

09:39   3    transcript to page 105, and ask you, if you would, to

09:39   4    read lines 1 through 10.

09:39   5         *(Witness complies.)*

09:39   6         Have you had a chance to read lines 1 through 10?

09:40   7    A.   Yes.

09:40   8    Q.   And if you'll keep that there, we're going to walk

09:40   9    through some other sections.

09:40   10   A.   Okay.

09:40   11   Q.   Now, having had the opportunity to refresh your

09:40   12   memory on your prior testimony, I'll ask again:  You

09:40   13   had no problems with Mr. Lewis until the duties

09:40   14   assigned to the B Hall changed, correct?

09:40   15   A.   No.  I had a problem when I first got wrote up,

09:40   16   and then after he starts changing my schedule and then

09:40   17   we had -- continued to have more problems.

09:40   18   Q.   Have you ever testified differently?

09:40   19   A.   I don't know.  I might not even said about the

09:40   20   write-up, you know, in my testimony here.  I might not

09:40   21   have even mentioned the write-up.

09:40   22   Q.   And you didn't mention the write-up in your prior

09:40   23   testimony, did you?

09:40   24   A.   That's what I'm saying.

09:40   25   Q.   And so that's what changed from your deposition

09:40    1    transcript until today, right?

09:40    2    A.   Uh-huh.

09:40    3    Q.   And in fact, that write-up we saw about the box

09:40    4    fan was never a part of your EEOC charge, was it?

09:40    5    A.   What, the box fan?

09:40    6    Q.   The box fan write-up.

09:40    7    A.   Yeah, I gave that to him the first starting off,

09:41    8    to my lawyer.

09:41    9    Q.   It was not a part of your EEOC charge, was it?

09:41   10    A.   No.

09:41   11    Q.   And it was never alleged in your lawsuit, was it?

09:41   12    A.   No.

09:41   13    Q.   The first time we heard that as a part of your

09:41   14    retaliation evidence for the first time in this case

09:41   15    was yesterday, right?

09:41   16    A.   But I already had gave that --

09:41   17             MR. BARLOW:   Your Honor, objection.

09:41   18             THE COURT:   Excuse me --

09:41   19             THE WITNESS:   -- to Mr. Barlow --

09:41   20             THE COURT:   Excuse me --

09:41   21             THE WITNESS:   I already had gave him --

09:41   22             THE COURT:   Ms. Austin, stop just a minute,

09:41   23    please.

09:41   24             MR. BARLOW:   I object to the line of

09:41   25    questioning.

09:41  1      THE COURT:  Approach for just a minute,

09:41  2  please.

09:41  3          *(Bench conference between the Court and*

09:41  4  *counsel:)*

09:41  5      THE COURT:  Was that attached to a

09:41  6  deposition, the write-up?

09:41  7      MR. BRANNING:  I don't know.  I don't know.

09:41  8  But it's never been alleged that that was part of the

09:41  9  retaliation until yesterday.

09:41  10     THE COURT:  What's the objection?

09:41  11     MR. BARLOW:  If anything, it's legal argument

09:41  12  for you, Your Honor, as opposed to asking her whether

09:41  13  it was part of the charge or part of the allegations.

09:42  14  She's answering the question, *Hey, that's when my*

09:42  15  *problems began.*

09:42  16     MR. BRANNING:  May I be heard?

09:42  17     THE COURT:  Yeah, because I've already

09:42  18  admitted it, so it's relevant.

09:42  19     MR. BRANNING:  Understood that the Court

09:42  20  ruled that it's relevant, but we didn't know about it

09:42  21  until yesterday as being part of this claim that

09:42  22  that's when the thing started, because she told us in

09:42  23  her depo it only started when he changed the

09:42  24  assignments to B Hall.

09:42  25     THE COURT:  Is that document attached to her

09:42  1    deposition?

09:42  2         **MR. BARLOW:**  I believe it is.

09:42  3         **MR. BRANNING:**  I can check.

09:42  4         **THE COURT:**  So you would have known about it

09:42  5    before yesterday.

09:42  6         **MR. BRANNING:**  We knew about it, but we never

09:42  7    knew it was a linchpin that that's when things

09:42  8    started, because she had told us differently during

09:42  9    her deposition.

09:42  10        **THE COURT:**  I'm hearing two different things.

09:42  11   You asked her when her problems with Mr. Lewis

09:42  12   started?

09:42  13        **MR. BRANNING:**  Correct.

09:42  14        **THE COURT:**  I'm not sure that's the same as

09:42  15   saying is that the basis for your retaliation claim.

09:42  16   We've been over the jury instructions and it's not a

09:42  17   part of the jury instructions so --

09:43  18        **MR. BRANNING:**  She told us actually the

09:43  19   problems started when the assignments to B Hall

09:43  20   changed.

09:43  21        **THE COURT:**  Right, but are we talking about

09:43  22   personality problems they had, conflicts of work they

09:43  23   had, or age discrimination?  So, I mean, I think she's

09:43  24   saying she had a problem with him, but what the

09:43  25   definition of that problem is, I'm not sure that's

09:43   1    been established.

09:43   2         MR. BRANNING:  Maybe I'm not following, then,

09:43   3    because it was my understanding of our argument

09:43   4    yesterday and her position now was that that box fan

09:43   5    write-up was when it started because she told us in

09:43   6    her deposition --

09:43   7         THE COURT:  Well, I think you should ask her

09:43   8    if she believes that that write-up was based on -- age

09:43   9    is not really the issue, we don't have a

09:43   10   discrimination claim if that write-up was in

09:43   11   retaliation for her making further complaints.

09:44   12        MR. BRANNING:  May I be heard?

09:44   13        THE COURT:  Yes.

09:44   14        MR. BRANNING:  I did yesterday, and she

09:44   15   couldn't tell us.

09:44   16        THE COURT:  Well, then, maybe don't bring it

09:44   17   up again.

09:44   18        MR. BRANNING:  She said she didn't know.

09:44   19        THE COURT:  Maybe leave it alone.

09:44   20        MR. BRANNING:  I'll move on.

09:44   21        THE COURT:  Okay.

09:44   22        *(Bench conference concluded.)*

09:44   23        THE COURT:  All right, Mr. Branning, you can

09:44   24   proceed.

09:44   25        MR. BRANNING:  Thank you, Your Honor.

**BY MR. BRANNING:**

Q.   Ms. Austin, you had no issue with Mr. Lewis when your duties for the B Hall assignment remained the same, right?

A.   Yes.

Q.   You spoke with Mr. Lewis literally nearly every day you worked, didn't you?

A.   Yes.

Q.   I mean, y'all were in regular communication, right?

A.   Yes.

Q.   And you spoke with him about your workload when the housekeeping assignments were changed, didn't you?

A.   Yes.

Q.   Now, you would regularly ask Mr. Lewis to assign someone to help you if you needed?

A.   Yes.

Q.   And you did that regularly?  You would regularly ask him to assign somebody to help you with your job duties?

A.   Yes.

Q.   And he would assign someone to work with you, right?

A.   No.

Q.   Okay.  Now, he would get frustrated with you for

09:45   1   asking a lot, right?

09:45   2   A.   I didn't ask that much.

09:45   3   Q.   The question is:  He would get frustrated when you

09:45   4   would ask him at times, right?

09:45   5   A.   Yes, but I didn't ask that much, like I said.

09:45   6   Q.   He would say something to you to the effect of

09:45   7   that you're too old to be coming to him whining every

09:45   8   day, right?

09:45   9   A.   Yes.

09:45  10   Q.   He told you that he wanted the whining to stop,

09:45  11   right?

09:45  12   A.   He just told me I needed to stop whining and

09:45  13   complaining, that's what he said.  No, he didn't tell

09:45  14   me he wanted it to stop.

09:45  15   Q.   Now, Mr. Lewis would get frustrated with other

09:46  16   associates that worked at Rosewood, too, wouldn't he?

09:46  17   A.   Yes.

09:46  18   Q.   It wasn't just you he would get frustrated with,

09:46  19   right?

09:46  20   A.   Yes.

09:46  21   Q.   He would get frustrated when people would question

09:46  22   the work assignments he gave them, wouldn't he?

09:46  23   A.   Yes.

09:46  24   Q.   He would get frustrated with people younger than

09:46  25   you when they questioned the work assignments that he



09:46  1   gave?

09:46  2   A.   They never had to question the work assignments.

09:46  3   Q.   He would get frustrated with people younger than

09:46  4   you when they questioned the work assignments he gave

09:46  5   them, wouldn't he?

09:46  6   A.   No.   Their work assignments stayed the same.   And

09:46  7   like I said, he was taking their schedule -- he was

09:46  8   cutting their schedule down.   So why could they get

09:46  9   mad with him when he's cutting their schedule down?

09:46  10  Q.   Is your answer today definitively that people

09:47  11  younger than you never questioned the work assignments

09:47  12  Mr. Lewis gave them so that he would never get

09:47  13  frustrated with them?

09:47  14  A.   No, not that I recall, not that I recall, he

09:47  15  didn't get frustrated with them.

09:47  16  Q.   I'm sorry, Ms. Austin, you said -- I didn't catch

09:47  17  the very end.   You say he would never get frustrated

09:47  18  with other people?

09:47  19  A.   He got frustrated with them, but it wasn't about

09:47  20  the work thing, you know.

09:47  21  Q.   What was it about?

09:47  22  A.   Because they used to take long breaks, you know,

09:47  23  and he would have to go find them.   Like they'd be

09:47  24  calling the housekeeper for A Hall and there wasn't no

09:47  25  housekeeper to be found, and they'd be calling the

| | | |
|---|---|---|
| 09:47 | 1 | housekeeper for D Hall and there wasn't no housekeeper |
| 09:47 | 2 | to be found.  So he would have to go look for the |
| 09:47 | 3 | housekeepers, and he got frustrated with them. |
| 09:47 | 4 | Q.  And some of those housekeepers were younger than |
| 09:47 | 5 | you, and he would get on to them? |
| 09:47 | 6 | A.  Yeah, about leaving their hall. |
| 09:47 | 7 | Q.  And he would get on to you for repeatedly asking |
| 09:47 | 8 | for help doing your job, right? |
| 09:48 | 9 | A.  Yes. |
| 09:48 | 10 | Q.  You spoke with Ms. Partridge how many times -- I |
| 09:48 | 11 | started that question terribly.  Let me start over. |
| 09:48 | 12 | How many times did you speak with Ms. Partridge |
| 09:48 | 13 | about the work assignments that Mr. Lewis was giving |
| 09:48 | 14 | you before you left Rosewood in April of 2013? |
| 09:48 | 15 | A.  I went in and talked to Ms. Partridge about three |
| 09:48 | 16 | times about the work assignments. |
| 09:48 | 17 | Q.  So let's work on when you spoke with Ms. Partridge |
| 09:48 | 18 | about the work assignments given to you by Mr. Lewis. |
| 09:48 | 19 | Do you recall when you first complained or talked with |
| 09:48 | 20 | Ms. Partridge about the work assignments that |
| 09:49 | 21 | Mr. Lewis had given you? |
| 09:49 | 22 | A.  No, I don't recall. |
| 09:49 | 23 | Q.  Do you recall when you spoke with Ms. Partridge |
| 09:49 | 24 | the second time? |
| 09:49 | 25 | A.  No. |

| | | |
|---|---|---|
| 09:49 | 1 | Q.   Do you recall when you spoke with Ms. Partridge |
| 09:49 | 2 | the third time? |
| 09:49 | 3 | A.   No. |
| 09:49 | 4 | Q.   So you don't know when any of them were? |
| 09:49 | 5 | A.   No.  I don't even remember when he started giving |
| 09:49 | 6 | -- I don't remember the date when he changed the |
| 09:49 | 7 | schedule.  I'm going to be honest, I don't remember |
| 09:49 | 8 | today when he started changing the schedule. |
| 09:49 | 9 | Q.   You never called Gene Triplett about the work |
| 09:49 | 10 | assignments given to you by Dwayne Lewis until the day |
| 09:49 | 11 | you quit, right? |
| 09:49 | 12 | A.   I went through the chain of command.  I went to |
| 09:49 | 13 | Nicole, and when I would go to Nicole, she was the |
| 09:49 | 14 | administrator, she was supposed to have fixed it.  And |
| 09:49 | 15 | then, she never fixed it, so that's when -- the day |
| 09:49 | 16 | when I had all the workload, I went to -- I called |
| 09:50 | 17 | Gene Triplett the day I left, and I told Nicole.  And |
| 09:50 | 18 | Nicole walked me out, like I said. |
| 09:50 | 19 | Q.   So going back to the question:  You never called |
| 09:50 | 20 | Mr. Triplett about these work assignments until the |
| 09:50 | 21 | day you quit? |
| 09:50 | 22 | A.   No. |
| 09:50 | 23 | Q.   Now, you regularly saw Mr. Triplett when he |
| 09:50 | 24 | visited Rosewood, didn't you? |
| 09:50 | 25 | A.   No, I didn't see him every time he came to |

09:50   1   Rosewood, and he can vouch for that.  A lot of times

09:50   2   he came in and I never seen him.  I would be down the

09:50   3   hall in a room working, and Mr. Triplett can vouch for

09:50   4   that.  He never seen me every time he came to

09:50   5   Rosewood.  And a lot of days I probably wasn't even

09:50   6   there when he came in.

09:50   7   Q.   The question is:  You regularly saw him when he

09:50   8   would visit Rosewood, right?

09:50   9   A.   No, not really.

09:50  10   Q.   You had Mr. Triplett's cell phone number, didn't

09:50  11   you?

09:50  12   A.   Yes.

09:50  13   Q.   And Mr. Triplett had always represented to you

09:51  14   that if you had a problem you could always call him

09:51  15   and his office was open to you?

09:51  16   A.   Yes.

09:51  17   Q.   And he gave you his cell phone number to call him?

09:51  18   A.   Yes.

09:51  19   Q.   And that's the number you called on the day you

09:51  20   quit?

09:51  21   A.   Yes, I called him that morning.

09:51  22   Q.   Your schedule.  You worked generally at Rosewood

09:51  23   five days a week, right?

09:51  24   A.   Yes.

09:51  25   Q.   But those days would fluctuate?  In other words,

09:51   1   it wasn't a set Monday through Friday?   Sometimes you

09:51   2   had to have a weekday off, and you would work on the

09:51   3   weekends?

09:51   4   A.   I worked every other weekend.

09:51   5   Q.   So your schedule being set was, you would work

09:51   6   Monday through Friday, and then every other weekend

09:51   7   you'd work either a weekend day or the entire weekend?

09:51   8   A.   Yes.

09:51   9   Q.   But 40 hours a week?

09:51   10  A.   Yes.

09:51   11  Q.   On the days that you were not there, somebody else

09:51   12  worked your assignments, right?

09:52   13  A.   Yes.

09:52   14  Q.   You told us earlier -- and to be fair and candid

09:52   15  with you, you said you just felt that they didn't do

09:52   16  the job that you did when you were there?

09:52   17  A.   They didn't.

09:52   18  Q.   Now, you told us yesterday near the end of your

09:52   19  deposition -- I'm sorry -- your examination that you

09:52   20  had visited a doctor after you left Rosewood.   Do you

09:52   21  recall that?

09:52   22  A.   Yes, I had to go see --

09:52   23  Q.   You had went to what was your primary care

09:52   24  physician, right?

09:52   25  A.   Yes.

09:52   1   Q.   And that was about six months after you left
09:52   2   Rosewood, right?
09:52   3   A.   Yeah, I don't recall but I -- yeah.
09:52   4   Q.   By then -- well, you had said that your doctor had
09:52   5   prescribed you something for an upset stomach?
09:52   6   A.   Yeah.
09:52   7   Q.   Your doctor prescribed you with some acid reflux
09:53   8   medication, right?
09:53   9   A.   Yeah.
09:53   10  Q.   By that point you had already been working
09:53   11  somewhere else for about five months, hadn't you?
09:53   12  A.   Oh, yeah, I had got a job.
09:53   13  Q.   And about that time, you had also been involved in
09:53   14  a separation from your husband, right?
09:53   15  A.   No.
09:53   16  Q.   Your testimony is you had not been dealing with a
09:53   17  separation from your husband?
09:53   18  A.   I had separated from him -- I was still working
09:53   19  but I wasn't working, you know, regular hours, I was
09:53   20  just working a little bit part time, you know, like
09:53   21  two or three days up to Kay's Fashion, because, you
09:53   22  know, after she had sold the store -- I had worked
09:53   23  like two months, and then she sold the store to this
09:53   24  lady named Joyce, and then after Kay got it back then
09:53   25  I went back to work for her.  So it was like -- I

09:53  1    don't know, I guess it was like two or three months,

09:54  2    two or three months.  I don't recall when we

09:54  3    separated, but I know I was gone like a year.

09:54  4    Q.   Other than seeing your doctor and getting some

09:54  5    acid reflux medication -- which you stopped taking

09:54  6    after a while, didn't you?

09:54  7    A.   I took those pills for like a year, I think.

09:54  8    Q.   Now, you didn't speak with any other physician or

09:54  9    mental health counselor or even a pastor about

09:54  10   separating from Rosewood, did you?

09:54  11   A.   Yeah, I talked to my sister.  She's like a

09:54  12   minister.  She's spiritual, and I always talked to my

09:54  13   sister about -- you know, I call her every day and I

09:54  14   talk to her every day.

09:54  15   Q.   But she's not a -- well, you said she's like a

09:54  16   spiritual --

09:54  17   A.   Yeah, she's --

09:54  18   Q.   Like a pastor?

09:54  19   A.   Yeah, she's like -- teaches bible class and stuff

09:54  20   like that at the church.  They are Holiness.

09:54  21   Q.   On your last day of work, Ms. Austin, you spoke

09:55  22   with Mr. Lewis?

09:55  23   A.   Yes.

09:55  24   Q.   You spoke with Mr. Lewis about your work

09:55  25   assignments?

09:55    1    A.   Yes.

09:55    2    Q.   Y'all got into a confrontation?

09:55    3    A.   No.

09:55    4    Q.   Y'all didn't get into any disagreement or

09:55    5    confrontation about you complaining about the work

09:55    6    assignments?

09:55    7    A.   Yeah, but it wasn't a confrontation.  I just told

09:55    8    him about, you know, I needed help in the dining room,

09:55    9    and Mr. Lewis is the one started yelling and going on,

09:55   10    you know, to clock out and this and that.  No, I

09:55   11    didn't get loud or nothing with him, and we was right

09:55   12    there by the dining room.

09:55   13    Q.   Mr. Lewis told you to clock out if you weren't

09:55   14    going to do your job, didn't he?

09:55   15    A.   Yes.

09:55   16    Q.   And then he also claimed that you threw the keys

09:55   17    at him?

09:55   18    A.   Yes.

09:55   19    Q.   You met with Ms. Partridge after that event,

09:55   20    didn't you?

09:55   21    A.   Yes.

09:55   22    Q.   You left Rosewood, right?

09:55   23    A.   Yes.

09:55   24    Q.   You never called Ms. Partridge later to try to

09:56   25    smooth things over, did you?

| | | |
|---|---|---|
| 09:56 | 1 | A.   No.   She sent me a letter in the mail. |
| 09:56 | 2 | **MR. BRANNING:**   Your Honor, may I take leave |
| 09:56 | 3 | to retrieve an exhibit? |
| 09:56 | 4 | **THE COURT:**   Yes, you may. |
| 09:56 | 5 | **MR. BRANNING:**   I'm going to publish |
| 09:56 | 6 | Defendant's Exhibit 7. |
| 09:56 | 7 | **BY MR. BRANNING:** |
| 09:56 | 8 | Q.   Ms. Austin, is this the letter that you were just |
| 09:56 | 9 | referring to when you said that Ms. Partridge sent you |
| 09:56 | 10 | a letter? |
| 09:56 | 11 | A.   Yes. |
| 09:56 | 12 | Q.   That's the letter saying that Rosewood accepted |
| 09:56 | 13 | your resignation? |
| 09:56 | 14 | A.   Yes. |
| 09:56 | 15 | Q.   After getting this letter, did you ever call |
| 09:56 | 16 | Ms. Partridge and try to smooth things over? |
| 09:57 | 17 | A.   No.   I tried to talk to Ms. Partridge the day I |
| 09:57 | 18 | left.   I'm not getting anywhere with Ms. Partridge. |
| 09:57 | 19 | Q.   So after getting this letter, did you ever call |
| 09:57 | 20 | Gene Triplett -- |
| 09:57 | 21 | A.   No. |
| 09:57 | 22 | Q.   -- and try to smooth things over? |
| 09:57 | 23 | A.   No, because I already had left a voicemail on his |
| 09:57 | 24 | phone for him to call me. |
| 09:57 | 25 | Q.   And after getting this letter, you certainly |

09:57  1    didn't call Dwayne Lewis to smooth things over, right?

09:57  2    A.  No.

09:57  3           MR. BRANNING:  Your Honor, may I take leave?

09:57  4    I'm going to run through a couple more exhibits and I

09:57  5    think I'm winding down.

09:57  6           THE COURT:  All right.

09:57  7    BY MR. BRANNING:

09:57  8    Q.  Ms. Austin, Rosewood had in place like an employee

09:57  9    handbook, an associate handbook -- hold on, let me

09:57  10   start over.

09:57  11       I've been using the term "associate" regularly

09:57  12   when referring to the people that work at Rosewood.

09:58  13   Is that what Rosewood refers to when referring to like

09:58  14   its employees, calls them associates?

09:58  15   A.  Yes.

09:58  16   Q.  So I'm going to show you what is Defendant's

09:58  17   Exhibit 2, and then I'll show the exhibit number

09:58  18   there.  And then that is the front page, and at the

09:58  19   top that says "Gulf Coast Health Care Associate

09:58  20   Handbook."  Do you see that?

09:58  21   A.  Yes.

09:58  22   Q.  Do you recognize that this is a handbook that you

09:58  23   were provided when you were working at Rosewood?

09:58  24   A.  Yes.

09:58  25   Q.  So I'm going to turn your attention to page 10.

*Henrietta Austin - Cross/Branning*                78

| | |
|---|---|
| 09:58 | 1 |

09:58  1  And in the bottom part of that I'm going to block off

09:58  2  the section that says "Sexual and other unlawful

09:59  3  harassment."  Do you see that?

09:59  4  A.  Yes.

09:59  5  Q.  Now, you mentioned earlier the chain of command.

09:59  6  Is this what you're referring to as the -- like the

09:59  7  reporting procedure if you have an issue with

09:59  8  something going on at Rosewood or felt like you were

09:59  9  being harassed, is this what you were referring to as

09:59  10  the chain of command?

09:59  11  A.  Yeah, I'm supposed to go to the administrator

09:59  12  before I go outside the --

09:59  13  Q.  Now, this policy tells you to immediately report

09:59  14  the problem, right?

09:59  15  A.  Yes.

09:59  16  Q.  And you're supposed to immediately report it to

09:59  17  the supervisor, correct?  You see that?

09:59  18  A.  Yes.

09:59  19  Q.  But then it also says, if the supervisor is the

09:59  20  source of the problem or if you believe the supervisor

09:59  21  cannot be approached, go to the following people in

09:59  22  this order, one and then two.  Do you see that?

09:59  23  A.  Yes.

09:59  24  Q.  And then you went to the administrator, right?

10:00  25  A.  Yeah.

10:00  1    Q.   And you told us you went to her at least three

10:00  2    times, right?

10:00  3    A.   Yes, I did.

10:00  4    Q.   And your issue wasn't resolved?

10:00  5    A.   No.

10:00  6    Q.   You never went to Gene Triplett, did you, until

10:00  7    the day you quit?

10:00  8    A.   No, I had already -- I had called Gene a while

10:00  9    back about a problem and he had solved it, you know,

10:00  10   so --

10:00  11   Q.   So you knew Gene was capable -- Mr. Triplett was

10:00  12   capable of solving problems for you because you had

10:00  13   called him in the past?

10:00  14   A.   Yeah, that's why I called him that morning.

10:00  15   Q.   And you never called him ever until the day you

10:00  16   quit, right?

10:00  17   A.   Yes.

10:00  18   Q.   Now, the policy also provides that any supervisor

10:00  19   who fails to report sexual harassment will be subject

10:00  20   to discipline, right?   You see that?

10:00  21   A.   Yes.

10:00  22   Q.   Now, you weren't reporting any sort of sexual

10:00  23   harassment, you were just reporting that the workload

10:00  24   being put on you was -- you disagreed with it?

10:00  25   A.   Yes.

| | | |
|---|---|---|
| 10:00 | 1 | Q.   Now, do you see here at the bottom that it forbids |
| 10:01 | 2 | retaliation for the reporting of sexual harassment or |
| 10:01 | 3 | other unlawful harassment, the penalty for violating |
| 10:01 | 4 | the company's harassment policy is disciplined up to |
| 10:01 | 5 | and including discharge.  Do you see that? |
| 10:01 | 6 | A.   Yes. |
| 10:01 | 7 | Q.   You agree that you've got to report it in order to |
| 10:01 | 8 | be retaliated for it? |
| 10:01 | 9 | A.   Well, they did get rid of Mr. Lewis and Nicole. |
| 10:01 | 10 | Q.   You don't know if that had anything to do with |
| 10:01 | 11 | harassment, though, do you? |
| 10:01 | 12 | A.   No, but they was gone right after I left.  They |
| 10:01 | 13 | got rid of them, both of them. |
| 10:01 | 14 | Q.   Rosewood let go of Mr. Lewis? |
| 10:01 | 15 | A.   Mr. Lewis and Ms. Partridge. |
| 10:01 | 16 | Q.   And do you know that Rosewood let go of Mr. Lewis |
| 10:01 | 17 | for any particular reason? |
| 10:01 | 18 | A.   No.  I just heard that he was gone and |
| 10:01 | 19 | Ms. Partridge was gone. |
| 10:01 | 20 | Q.   So you don't know if it had anything to do with -- |
| 10:02 | 21 | A.   I don't know what the problem was, but they left |
| 10:02 | 22 | right after I did, both of them. |
| 10:02 | 23 | Q.   I am going to publish what is Defendant's |
| 10:02 | 24 | Exhibit 4.  And, Ms. Austin, let us know when you've |
| 10:02 | 25 | had a chance to review that.  You don't have to read |

10:02  1    it word for word, just see if you recognize it and let

10:02  2    us know when you've had a chance to review it.

10:02  3    A.   Yes, I recognize that.

10:02  4    Q.   Do you recognize that to be a "Sexual and Other

10:02  5    Unlawful Harassment Policy Statement"?  Do you see

10:02  6    that?

10:02  7    A.   Yes.

10:02  8    Q.   And do you see here at the bottom where you signed

10:02  9    it and dated it August 22, 2011?  Do you see that?

10:02  10   A.   Yes.

10:02  11   Q.   Now, in addition to the chain of command we were

10:02  12   talking about, Rosewood also had a phone number that

10:02  13   you could call, right?

10:02  14   A.   Yes.

10:02  15   Q.   An eight-hundred number, do you see that?

10:03  16   A.   Yes.

10:03  17   Q.   You never called that eight-hundred number, did

10:03  18   you?

10:03  19   A.   No.

10:03  20        **MR. BRANNING:**  Your Honor, permission just to

10:03  21   return the exhibits and then a moment to confer?

10:03  22        **THE COURT:**  That's fine.

10:04  23        *(Conference between Defense counsel.)*

10:04  24        **MR. BRANNING:**  Tender the witness, Your

10:05  25   Honor.

| | | |
|---|---|---|
| 10:05 | 1 | **THE COURT:** Mr. Barlow, redirect? |
| 10:05 | 2 | **MR. BRANNING:** May I retrieve the deposition |
| 10:05 | 3 | transcript? |
| 10:05 | 4 | **THE COURT:** Yes. |
| 10:05 | 5 | **MR. BRANNING:** Unless you need it? |
| 10:05 | 6 | **MR. BARLOW:** You can leave it. |
| 10:05 | 7 | **MR. BRANNING:** Sure. |
| 10:05 | 8 | **REDIRECT EXAMINATION** |
| 10:05 | 9 | **BY MR. BARLOW:** |
| 10:05 | 10 | Q. Ms. Austin, you were asked a number of questions |
| 10:05 | 11 | by Mr. Branning, and I just want to go back over a few |
| 10:05 | 12 | of those briefly. |
| 10:05 | 13 | A. Okay. |
| 10:05 | 14 | Q. You were talking about the housekeeping schedules, |
| 10:05 | 15 | the new routes? |
| 10:05 | 16 | A. Yes. |
| 10:05 | 17 | Q. Did you draft that document? |
| 10:05 | 18 | A. Huh? |
| 10:05 | 19 | Q. Did you write it? Did you create it? |
| 10:05 | 20 | A. Did I create it? |
| 10:05 | 21 | Q. Yes, ma'am. |
| 10:05 | 22 | A. No. |
| 10:05 | 23 | Q. You didn't type it up? |
| 10:05 | 24 | A. No. |
| 10:05 | 25 | Q. You indicated there were a few errors on the -- on |

*Henrietta Austin - Redirect/Barlow*

83

10:05  1    that document.  Is that why you believe that's not the

10:05  2    real schedule?

10:05  3    A.    Yes.

10:05  4    Q.    So do you believe that the schedule as it was

10:06  5    shown was actually effective as of the date of January

10:06  6    14, 2013?

10:06  7    A.    No, that's not the schedule.

10:06  8    Q.    So what I'm asking you is:  At this time, January

10:06  9    2013, do you believe that you were doing the dining

10:06  10   room twice?

10:06  11   A.    Yes, I was doing the dining room twice.

10:06  12   Q.    You believe at this time?

10:06  13   A.    Yes.

10:06  14   Q.    You had previously testified that there was an

10:06  15   issue with the box fan and you were written up for

10:06  16   that.  Do you remember?

10:06  17   A.    Yes.

10:06  18   Q.    This is Exhibit 5 for the Plaintiff.  And you see

10:06  19   the date on it, Ms. Austin?

10:06  20   A.    Yes.

10:06  21   Q.    What date is that that you signed?

10:06  22   A.    The 1st, 10, and '13.

10:06  23   Q.    And at this time, without regard to the Exhibit 2,

10:07  24   which had the effective date on it, were you doing the

10:07  25   dining room in the morning and the afternoon when you

10:07  1  received this write-up?

10:07  2  A.  No, I don't -- yes -- I don't know.  I don't

10:07  3  remember.  I don't remember.  I believe I was, though,

10:07  4  doing the dining room.

10:07  5  Q.  You believe you were doing the dining room at the

10:07  6  time?

10:07  7  A.  Yeah, I'm not sure.

10:07  8  Q.  There was some discussion about you talking to

10:07  9  Mr. Lewis about the workload before you were written

10:07  10  up.  Do you remember that?

10:07  11  A.  Yes.

10:07  12  Q.  During this time, do you believe you were doing

10:07  13  the dining room in the morning and in the afternoon by

10:07  14  yourself?

10:07  15  A.  No, I wasn't doing it in the afternoon.

10:08  16  Q.  You were doing it in the morning at this time?

10:08  17  A.  No.  I was written up first -- I don't know.  I

10:08  18  was written up, and then after I was written up, then

10:08  19  he started adding extra work on me, you know, he

10:08  20  started taking the work off the other people and

10:08  21  putting it on my schedule.

10:08  22  Q.  Did you talk to him after he wrote you up?

10:08  23  A.  Yes.

10:08  24  Q.  Do you know if at that point you were doing the

10:08  25  dining room in the morning?

10:08   1   A.   Yeah, and then, after I got written up, then I got

10:08   2   the dining room, he'd taken the girl out the dining

10:08   3   room.   And then it went from there until I got the

10:08   4   dining room two times, and then I got the soiled

10:08   5   utility room.

10:08   6   Q.   Do you know if all of this occurred after you got

10:08   7   the write-up?

10:08   8   A.   Yes, I think it did.

10:08   9   Q.   I want to show you this, it's Plaintiff's

10:08   10  Exhibit 8.   It's the same write-up that you are -- or

10:08   11  evaluation that you had seen before.

10:08   12       When was this document drafted, can you tell?

10:09   13  A.   The 1st, the 12th, and -- it's supposed to have

10:09   14  been to 2013, but it was on the 12th and the 29th, I

10:09   15  think -- the 27th of 2012.

10:09   16  Q.   Did you sign this document with Mr. Lewis present?

10:09   17  A.   Yes.

10:09   18  Q.   So you believe that you and he signed it on the

10:09   19  same day?

10:09   20  A.   On the same day.

10:09   21  Q.   Did he discuss anything with you?

10:09   22  A.   Did he discuss anything with me?

10:09   23  Q.   Yes, ma'am.

10:09   24  A.   No.   He knew I did excellent.   He couldn't say

10:09   25  anything bad about me.   I did my work.

10:09   1   Q.   So at the time you got this evaluation, do you

10:09   2   know if you were doing the dining room in the morning

10:09   3   and the afternoon?

10:09   4   A.   No, I wasn't --

10:09   5   Q.   You don't recall?

10:09   6   A.   No, I don't recall.

10:10   7   Q.   How many days -- strike that.

10:10   8        After you were doing the dining room in the

10:10   9   morning and the afternoon by yourself, how many days a

10:10   10   week were you actually scheduled to work?

10:10   11   A.   Five.

10:10   12   Q.   The folks who would replace you on your two days

10:10   13   off, how many times out of those two days would the

10:10   14   same person have the same schedule?

10:10   15   A.   They wouldn't -- like Judy would work it like a

10:10   16   day and the next day Tara might work it or the next

10:10   17   day -- what's she named? -- she might work it --

10:10   18   Newberry might work it.  They never worked it two days

10:10   19   in a row.  It was always a different person on there.

10:10   20   And then some days it wasn't anybody on there and

10:10   21   Larry would pick it up.

10:11   22   Q.   And Mr. Branning had asked you questions about the

10:11   23   duties that these women would have when you weren't

10:11   24   there.  Do you recall that testimony?

10:11   25   A.   Yes.

10:11   1   Q.   Did the duties change for these other

10:11   2   housekeepers?

10:11   3   A.   No.  Because, see, I was doing like peer

10:11   4   interviews.  And like I said, on Friday I came in in

10:11   5   the morning like five o'clock and did wheelchairs.

10:11   6   Like it was -- I just picked like me, Visa, and Miriam

10:11   7   Clark, you know, there was only just three of us, and

10:11   8   then Larry would pressure wash, so it would be like,

10:11   9   you know, us three would do the wheelchairs in the

10:11   10  morning, so they didn't never have to come in.

10:11   11      The part-time help never came in to do the

10:11   12  wheelchairs.  I would always get the old housekeepers

10:11   13  to come in and help do the wheelchairs.  And sometimes

10:11   14  it would just be Visa come in and do them, and Larry

10:11   15  would pressure wash them.  So I never bothered the new

10:11   16  people about doing them, but I always would set it up

10:11   17  and get it did.

10:11   18  Q.   You said the people who did your job when you

10:12   19  weren't there didn't do, in essence, as good of a job.

10:12   20  Do you recall that testimony?

10:12   21  A.   Yes, I did.

10:12   22  Q.   How would you know that?

10:12   23  A.   Because like on days like that we would have a lot

10:12   24  of moves to be did, like when I'd come to work -- like

10:12   25  Vickie sometimes would give me like five moves to did,

10:12  1   they would be on different halls.  She wouldn't go to

10:12  2   Mr. Lewis, she would bring them and put them in my

10:12  3   hand and I would get them did.

10:12  4        And the new people, they never did like five and

10:12  5   six moves.  I would always do my job and I would

10:12  6   always help out still around there.  When Mr. Lewis

10:12  7   was there, they would always call on me still to do

10:12  8   stuff, and they never called on other people to do it.

10:12  9   Q.  Who is Betty Black?

10:12  10  A.  Who is Betty Black?  She's a resident on B Hall.

10:12  11  Q.  Why would you bring her pantyhose?

10:12  12  A.  Because I always bought stuff for the residents.

10:12  13  I used to go get food for them and everything.  On my

10:12  14  lunch hour, if they wanted chicken, I would take my

10:12  15  money and go buy it for them.

10:12  16  Q.  Mr. Branning also asked you about talking to folks

10:12  17  about retiring.  Did you ever tell anybody you were

10:13  18  going to retire?

10:13  19  A.  I did mention retiring, and then I changed my

10:13  20  mind, I sure did.

10:13  21  Q.  Did you change your mind before or after Mr. Lewis

10:13  22  became your supervisor?

10:13  23  A.  I changed my mind when Mr. Lewis was the

10:13  24  supervisor.  When I found out that he was trying to

10:13  25  force me out, that's when I said I'm not leaving.

*Henrietta Austin - Redirect/Barlow*                    89

10:13   1   Q.   What I'm getting at is, was it before he showed up

10:13   2   or after?

10:13   3   A.   It was after he showed up I had said I was going

10:13   4   to retire.   And then after he started giving me a hard

10:13   5   time, I said I'm not going nowhere.

10:13   6   Q.   So you decided to try to stick it out?

10:13   7   A.   Yeah, I tried to stick it out, I said I'm not

10:13   8   going nowhere.

10:13   9        MR. BRANNING:   May we approach?

10:13  10        THE COURT:   Yes.

10:13  11        *(Bench conference between the Court and*

10:13  12   *counsel:)*

10:13  13        MR. BRANNING:   The order in limine prohibited

10:13  14   her from using the term "constructive discharge" or

10:13  15   "forced resignation."   And she just testified that

10:14  16   Dwayne Lewis was trying to force her out.

10:14  17        THE COURT:   She's not -- I'm going to

10:14  18   instruct the jury, but she's not going to have any

10:14  19   claim of constructive discharge.   So I'll tell the

10:14  20   jury that.

10:14  21        MR. BRANNING:   Yes, Your Honor.

10:14  22        **(Bench conference concluded.)**

10:14  23        THE COURT:   Ladies and gentlemen, I want to

10:14  24   advise you all of something you'll certainly learn

10:14  25   about at the time of jury instructions, but based on

10:14  1   the testimony just now of Ms. Austin that Mr. Lewis

10:14  2   was trying for force her out, you're advised that

10:14  3   Ms. Austin does not have a claim in this case for

10:14  4   constructive discharge.  She does not have a claim for

10:14  5   constructive discharge or that she was forced out.

10:14  6   That's not a part of her claim in this case.

10:14  7          **MR. BARLOW:**  Thank you, Your Honor.

10:14  8   **BY MR. BARLOW:**

10:14  9   Q.   How many folks your age do you know?

10:14  10  A.   In housekeeping?

10:15  11  Q.   No.  At your age, how many folks do you know your

10:15  12  age, in general, your friends now?

10:15  13  A.   How many -- my friends and family?

10:15  14  Q.   Yeah.  How many folks are about your age,

10:15  15  retirement age?

10:15  16  A.   I don't really know.

10:15  17  Q.   Any?

10:15  18  A.   That's working at Rosewood?

10:15  19  Q.   No, ma'am.  Just in your own personal life?

10:15  20  A.   Oh, in my own personal life?

10:15  21  Q.   Yes.

10:15  22  A.   Oh, about seven or eight.

10:15  23  Q.   Is retirement something that you think about at

10:15  24  your age?

10:15  25  A.   No.  I still work.

10:15   1   Q.   You work today?  You have a job today?

10:15   2   A.   I work with my daughter.  She's got her own

10:15   3   business.

10:15   4   Q.   How many days a week do you work in this business?

10:15   5   A.   How many days do I work?

10:15   6   Q.   Yes, ma'am.

10:15   7   A.   Five.

10:16   8   Q.   You were also asked some questions about Mr. Lewis

10:16   9   being mean to folks or being aggressive, abrasive,

10:16   10  whatever the case may be.  Do you recall talking to

10:16   11  Mr. Branning about that?

10:16   12  A.   Yes.

10:16   13  Q.   Did he ever make -- did Mr. Lewis ever make any

10:16   14  mention of these folks' age to them when he was being

10:16   15  less than pleasant to them?

10:16   16  A.   I can't hear you.

10:16   17  Q.   Sure.  What I'm asking is:  Did Mr. Lewis, when he

10:16   18  was talking to these younger people, did he ever make

10:16   19  any references to their age?

10:16   20  A.   No.

10:16   21          MR. BRANNING:  Objection, speculation.

10:16   22          THE COURT:  Overruled, to the extent she was

10:16   23  present and could hear.

10:16   24          THE WITNESS:  Not as I know of.

10:16   25          THE COURT:  Overruled.

**BY MR. BARLOW:**

Q.   You were asked about, hey, you didn't call
Mr. Triplett, you didn't talk to Ms. -- HR, whomever.
     The -- what was your understanding of Rosewood's
policy?  If you had a problem, what were you supposed
to do?

A.   Rosewood had a policy that they used to always say
go to your supervisor before you go outside.  I just
can't take and call Mr. Triplett and not go through
Nicole.  And I can't call Mr. Triplett for every
problem that's going on.  I have to go and see can
Nicole solve it.  If Nicole can't solve it, then
that's when I took another step to Gene Triplett, and
I called Gene Triplett and he never called back.

Q.   I show you what's Plaintiff's Exhibit 4.  Did you
ever talk to anybody else at Rosewood about
Mr. Triplett -- I'm sorry -- Mr. Lewis?

A.   Yes.

Q.   Who did you talk to?

A.   I talked to Patsy Williamson the morning I left.

Q.   What was Ms. Williamson's position in the company?

A.   She asked me not to leave, and I told her that
they're not going to fix the problem, and I told her,
I said, "If I keep letting him writing me up and put
stuff in my folder, if I wanted to go and get another

10:18  1   job I'm not going to be able to get employed because

10:18  2   they're going to say that they fired me after they get

10:18  3   enough stuff wrote up in my file.

10:18  4   Q.   What I'm asking you is:   What was Ms. Williamson's

10:18  5   position in the company?

10:18  6   A.   She was HR, and she did scheduling for the nurses,

10:18  7   and she did the peer interviews, she'd always get the

10:18  8   peer interviews set up.

10:18  9   Q.   You were asked questions about when your problems

10:18  10  with Mr. Lewis started.   When did you consider it to

10:18  11  be a problem?   When did you first begin to consider it

10:19  12  a problem?

10:19  13  A.   When he started writing me up, when he wrote me up

10:19  14  for the fan and then he started putting the work on

10:19  15  me.   I never had a problem with Mr. Lewis.   I would

10:19  16  still go to work every day and try to do everything I

10:19  17  could to get along with him.   And anybody can tell you

10:19  18  I never disrespected Mr. Lewis.   And as he was saying

10:19  19  that I was saying things about him, nobody could say

10:19  20  that I talked bad about Mr. Lewis.

10:19  21  Q.   Well, after he first changed your schedule for the

10:19  22  dining room, did you complain to Ms. Partridge?

10:19  23  A.   Yeah.

10:19  24  Q.   And when you had your -- the second shift -- the

10:19  25  second afternoon shift of cleaning the dining room,

10:19    1    did you go again and complain to Ms. Partridge?

10:19    2    A.    Yes.

10:19    3    Q.    Did Mr. Lewis assign you any work after that?

10:19    4    A.    Yeah.    Every time I would go up there and

10:19    5    complain, that's when he kept adding work on, because

10:20    6    he kept saying I shouldn't have went to her, I

10:20    7    shouldn't have went to her, I shouldn't have did this.

10:20    8    Q.    So what do you think of the policy that

10:20    9    Mr. Branning showed you that said, 'Hey, if we get a

10:20    10   complaint of retaliation we'll fix it even up to

10:20    11   termination'?    Did they do that in your case?

10:20    12   A.    No, they didn't try to fix anything.

10:20    13          **MR. BARLOW:**    I have no further questions,

10:20    14   Your Honor.

10:20    15          **THE COURT:**    Ms. Austin, you may step down.

10:20    16          *(Witness excused.)*

10:20    17          We're going to take our morning recess at

10:20    18   this time, ladies and gentlemen.    We'll be in recess

10:20    19   for 20 minutes.    Please don't discuss the case amongst

10:20    20   yourselves nor with anyone else during the recess.

10:20    21   And also, please don't begin to form any opinion yet

10:20    22   about the merits of the case.    We'll see you back in

10:20    23   20 minutes.    Thank you.

10:20    24          *(Jury out.)*

10:21    25          Anything we need to discuss?

*Patsy Williamson - Direct/Barlow*                                95

| 10:21 | 1 | (*No response.*) |

10:21    1    (*No response.*)

10:21    2    We'll be in recess until 10:40.

10:21    3    (*Recess taken 10:21 a.m. to 10:43 a.m.*)

10:43    4    (*Jury in the box.*)

10:43    5    **THE COURT:**  Ma'am, if you would, please raise

10:43    6    your right hand to be sworn.

10:43    7    **PATSY WILLIAMSON, PLAINTIFF WITNESS, DULY SWORN.**

10:43    8    **MADAM CLERK:**  Be seated.  Please state your

10:43    9    full name and spell your last name for the record.

10:44    10   **THE WITNESS:**  Patsy Williamson,

10:44    11   W-i-l-l-i-a-m-s-o-n.

10:44    12   **THE COURT:**  Mr. Barlow, go ahead when you're

10:44    13   ready.

10:44    14   **MR. BARLOW:**  Thank you, Your Honor.

10:44    15   **DIRECT EXAMINATION**

10:44    16   BY MR. BARLOW:

10:44    17   Q.  Good morning, Ms. Williamson.

10:44    18   A.  Good morning.

10:44    19   Q.  Are you currently employed?

10:44    20   A.  I'm retired.

10:44    21   Q.  When did you retire?

10:44    22   A.  September of 2015.

10:44    23   Q.  And where did you retire from?

10:44    24   A.  Rosewood Health Care.

10:44    25   Q.  How long did you work at Rosewood?

10:44  1   A.   I started August of 1973.

10:44  2   Q.   What was your final position at Rosewood?

10:44  3   A.   Staff development.

10:44  4   Q.   Can you tell the jury what that means, staff

10:44  5   development?

10:44  6   A.   Orientation with new employees, drug screens,

10:44  7   paperwork for new hires, staffing nurses and CNAs with

10:44  8   their schedules.

10:44  9   Q.   Did you -- you said you started, I believe, in

10:45  10  1973; is that correct?

10:45  11  A.   Yes.

10:45  12  Q.   Were you always at Rosewood?

10:45  13  A.   Yes.

10:45  14  Q.   Did you consider yourself to be part of HR?

10:45  15  A.   Yes.

10:45  16  Q.   Do you know Ms. Austin?

10:45  17  A.   Yes.

10:45  18  Q.   How do you know Ms. Austin?

10:45  19  A.   She was an employee at Rosewood.

10:45  20  Q.   Do you recall her position?

10:45  21  A.   Environmental services.

10:45  22  Q.   Was she a housekeeper?

10:45  23  A.   Housekeeping, yes.

10:45  24  Q.   You understand Ms. Austin doesn't work for

10:45  25  Rosewood anymore, correct?

10:45   1   A.   Yes.

10:45   2   Q.   Did you have any conversations with her before she

10:45   3   left?

10:45   4   A.   Yes, I did.

10:45   5   Q.   Can you tell the jury what that was.

10:45   6   A.   On the last day that she was at work, she came to

10:45   7   the office because she was upset about her job

10:45   8   assignment had been changed.

10:45   9   Q.   Did you say anything to her?

10:45   10   A.   She told me she was going to leave, and I asked

10:45   11   her to please not leave, to not walk out of the

10:45   12   building, that she needed to talk with her supervisor

10:46   13   and the administrator.

10:46   14   Q.   Do you know if Ms. Austin ultimately spoke with

10:46   15   her supervisor?

10:46   16   A.   I don't know.

10:46   17   Q.   Do you know if Ms. Austin ultimately spoke with

10:46   18   the administrator?

10:46   19   A.   I don't know.

10:46   20   Q.   And do you recall the administrator at that time

10:46   21   being Ms. Partridge?

10:46   22   A.   Yes.

10:46   23   Q.   Did you ask Ms. Austin why she thought that -- or

10:46   24   did you ask her why she was having problems with her

10:46   25   work assignment?

*Patsy Williamson - Direct/Barlow*                                    98

10:46   1    A.   I don't recall that.

10:46   2         MR. BARLOW:   No further questions, Your

10:46   3    Honor.

10:46   4         THE COURT:   Any cross?

10:46   5         MR. BRANNING:   Briefly, Your Honor.

10:46   6              **CROSS-EXAMINATION**

10:46   7    BY MR. BRANNING:

10:46   8    Q.   Hey, Ms. Williamson.

10:46   9    A.   Hi.

10:46   10   Q.   On the day that Ms. Austin left, where did you

10:46   11   have this discussion with her?

10:46   12   A.   It was in my office.

10:46   13   Q.   Did you bring her to your office or did she

10:46   14   present to your office?

10:46   15   A.   She came to the office.

10:46   16   Q.   And she told you when she came there to your

10:47   17   office that she was leaving?

10:47   18   A.   She told me that she -- well, she was upset, she

10:47   19   said she was upset because her supervisor had changed

10:47   20   her work assignment and that she was going to leave.

10:47   21   Q.   Did she say anything to you, Ms. Williamson, that

10:47   22   she thought or perceived her change in work assignment

10:47   23   was in retaliation for making any sort of complaint

10:47   24   about the way Rosewood was treating her or the way

10:47   25   Mr. Lewis was treating her based on her age?

*Patsy Williamson - Cross/Branning*                                    99

10:47   1   A.   No.

10:47   2   Q.   Sitting here today, did Ms. Austin ever share with

10:47   3   you that she felt Rosewood, or particularly Dwayne

10:47   4   Lewis, was giving her any work assignments in

10:47   5   retaliation for reporting that she felt like she was

10:47   6   being discriminated against based on age?

10:47   7   A.   No.

10:47   8   Q.   Did you have a good, friendly relationship with

10:48   9   Ms. Austin?

10:48   10   A.   Yes.

10:48   11   Q.   Is that one of the reasons you asked her "Don't

10:48   12   clock out, Ms. Austin, wait and talk to your

10:48   13   supervisor"?

10:48   14   A.   Yes.

10:48   15   Q.   And she didn't take your advice, did she?

10:48   16   A.   No.

10:48   17   Q.   Do you know whether Ms. Austin left the building

10:48   18   after talking with you on the day that she quit?

10:48   19   A.   I don't know.

10:48   20           **MR. BRANNING:**  No further questions.  Thank

10:48   21   you.

10:48   22           **THE COURT:**  Redirect?  Anything?

10:48   23           **MR. BARLOW:**  No, Your Honor.

10:48   24           **THE COURT:**  Ma'am, you may step down.

10:48   25           *(Witness excused.)*

| | | |
|---|---|---|
| 10:48 | 1 | Mr. Barlow?  Who is the witness, Mr. Barlow? |
| 10:49 | 2 | **MR. BARLOW:**  Larry Bender, Your Honor. |
| 10:49 | 3 | **LARRY BENDER, PLAINTIFF WITNESS, DULY SWORN** |
| 10:49 | 4 | **MADAM CLERK:**  Be seated.  Please state your |
| 10:49 | 5 | full name and spell your last name for the record. |
| 10:49 | 6 | **THE WITNESS:**  Larry Earl Bender, B-e-n-d-e-r. |
| 10:50 | 7 | **THE COURT:**  Okay, Mr. Barlow, go ahead. |
| 10:50 | 8 | **DIRECT EXAMINATION** |
| 10:50 | 9 | **BY MR. BARLOW:** |
| 10:50 | 10 | Q.  Good morning, Mr. Bender. |
| 10:50 | 11 | A.  Good morning. |
| 10:50 | 12 | Q.  I'll be asking you questions from over here, if |
| 10:50 | 13 | you can see over the monitor. |
| 10:50 | 14 | Are you currently employed? |
| 10:50 | 15 | A.  Yes, I am. |
| 10:50 | 16 | Q.  Can you tell the jury who you work for? |
| 10:50 | 17 | A.  Gulf Coast Health Care. |
| 10:50 | 18 | **THE COURT:**  Mr. Bender, could you move closer |
| 10:50 | 19 | towards that device with the red light on it.  That's |
| 10:50 | 20 | your the microphone.  Thank you. |
| 10:50 | 21 | **BY MR. BARLOW:** |
| 10:50 | 22 | Q.  Is that -- can you tell the jury what Gulf Coast |
| 10:50 | 23 | Health Care is? |
| 10:50 | 24 | A.  It's a health facility. |
| 10:50 | 25 | Q.  Is it Rosewood? |

*Larry Bender - Direct/Barlow*                                        101

10:50  1    A.   Yes, Rosewood.

10:50  2    Q.   You currently work at Rosewood?

10:50  3    A.   Yes, I do.

10:50  4    Q.   What's your position?

10:50  5    A.   Like right now I'm an activity assistant.

10:50  6    Q.   What do you do as an activity assistant?

10:50  7    A.   Assist the residents in games and so forth.

10:51  8    Q.   Entertainment?

10:51  9    A.   Entertainment.

10:51  10   Q.   How long have you been an activity assistant for

10:51  11   Gulf Coast Health Care?

10:51  12   A.   Probably about a month or three weeks.

10:51  13   Q.   Why did you take that position?

10:51  14   A.   I got tired of what I was doing.

10:51  15   Q.   What were you doing before?

10:51  16   A.   I was floor technician.

10:51  17   Q.   How long were you a floor technician?

10:51  18   A.   Right at 19 years.

10:51  19   Q.   What were your duties as floor technician?

10:51  20   A.   Stripping, waxing, buffing, taking trash out.

10:51  21   Q.   What does stripping and waxing mean?

10:51  22   A.   You basically got a floor that's in bad condition

10:51  23   and you take all the old wax and dirt and stuff up and

10:52  24   replace it with fresh wax.

10:52  25   Q.   So you make the floor shiny?

10:52    1    A.   Yes.

10:52    2    Q.   Did you have to clean up -- are you familiar with

10:52    3    the soiled utility room?

10:52    4    A.   Yes.

10:52    5    Q.   What is that?

10:52    6    A.   The soiled utility room is where they keep the

10:52    7    trash and the dirty linen.

10:52    8    Q.   Trash and dirty linen?

10:52    9    A.   Yes.

10:52    10    Q.   Were you responsible for doing the soiled utility

10:52    11    room?

10:52    12    A.   Yes.

10:52    13    Q.   Were you always responsible for the soiled utility

10:52    14    room as a floor tech?

10:52    15    A.   No.

10:52    16    Q.   When would that change?  Or when did it change?

10:52    17    A.   I don't know exactly when it changed, but they had

10:52    18    the housekeeper to go in and do the mopping and

10:52    19    cleaning the sinks in there, and I was only to take

10:52    20    the trash out.

10:52    21    Q.   So you would have to do that before they changed

10:52    22    the housekeepers?  In other words, you were in charge

10:53    23    of cleaning up the whole thing, taking the trash out,

10:53    24    mopping, sweeping it up, cleaning up the sinks?

10:53    25    A.   No.

| | | |
|---|---|---|
| 10:53 | 1 | Q.   You never did that? |
| 10:53 | 2 | A.   No. |
| 10:53 | 3 | Q.   So who would? |
| 10:53 | 4 | A.   The housekeeper. |
| 10:53 | 5 | Q.   So the only thing you were responsible for in the |
| 10:53 | 6 | soiled utility room is taking out the trash? |
| 10:53 | 7 | A.   Bringing the trash out. |
| 10:53 | 8 | Q.   And it was that way the entire time you were at |
| 10:53 | 9 | Rosewood? |
| 10:53 | 10 | A.   Yes. |
| 10:53 | 11 | Q.   Do you know Ms. Austin? |
| 10:53 | 12 | A.   Yes, I do. |
| 10:53 | 13 | Q.   Do you recall that she was a housekeeper at |
| 10:53 | 14 | Rosewood for a little bit of time? |
| 10:53 | 15 | A.   Yes, I do. |
| 10:53 | 16 | Q.   Do you know who was hired first, her or you? |
| 10:53 | 17 | A.   Repeat that again. |
| 10:53 | 18 | Q.   Sure.  Do you know who was hired first by |
| 10:53 | 19 | Rosewood, was it you or Ms. Austin? |
| 10:53 | 20 | A.   Ms. Austin. |
| 10:53 | 21 | Q.   Did you work with Ms. Austin? |
| 10:53 | 22 | A.   Yes, I did. |
| 10:53 | 23 | Q.   The jury has heard about A Hall, B Hall, C Hall, D |
| 10:53 | 24 | Hall.  Did you work any particular halls? |
| 10:53 | 25 | A.   A and B Hall. |

*Larry Bender - Direct/Barlow*                                    104

| | | |
|---|---|---|
| 10:54 | 1 | Q.   Who was the housekeeper for A Hall? |
| 10:54 | 2 | A.   It's been a while, we done had three or four |
| 10:54 | 3 | people over there.  The young lady called Kiki. |
| 10:54 | 4 | Q.   Is that Ms. Gort, Lakisha Gort? |
| 10:54 | 5 | A.   Yes. |
| 10:54 | 6 | Q.   Who is the housekeeper for B Hall? |
| 10:54 | 7 | A.   Ms. Austin. |
| 10:54 | 8 | Q.   Do you recall who the housekeeper for C Hall was? |
| 10:54 | 9 | A.   Kathy Borner. |
| 10:54 | 10 | Q.   And what about the housekeeper for D Hall? |
| 10:54 | 11 | A.   Visa Jones and -- I can't recall the other |
| 10:54 | 12 | housekeeper on the other side of D Hall. |
| 10:54 | 13 | Q.   Do you know Dwayne Lewis? |
| 10:54 | 14 | A.   Yes. |
| 10:54 | 15 | Q.   How do you know Mr. Lewis? |
| 10:54 | 16 | A.   He came there as a housekeeper supervisor, but I |
| 10:54 | 17 | knew him before, you know, he lived in the |
| 10:55 | 18 | neighborhood I lived in. |
| 10:55 | 19 | Q.   Was he from your neighborhood? |
| 10:55 | 20 | A.   Yes. |
| 10:55 | 21 | Q.   Do you recall approximately when Mr. Lewis became |
| 10:55 | 22 | the housekeeping supervisor? |
| 10:55 | 23 | A.   I want to say it was '11. |
| 10:55 | 24 | Q.   Do you recall what the housekeeping schedule was |
| 10:55 | 25 | before Mr. Lewis became the housekeeping supervisor? |

10:55   1   A.   Most of it.

10:55   2   Q.   And I'm not asking you to tell me.  I just want to

10:55   3   make sure you're sort of familiar with it.

10:55   4   A.   Yes.

10:55   5   Q.   Who was -- well, there are various eating areas at

10:55   6   the facility, correct, where the residents could go

10:55   7   eat?

10:55   8   A.   Right.

10:55   9   Q.   How many areas were there where residents would

10:55   10  actually eat?

10:55   11  A.   We had the main dining room, we had the dayroom

10:55   12  on A-B Hall, we had a dayroom on C Hall, and also a

10:56   13  dayroom on D Hall where the residents would eat.

10:56   14  Q.   What are the dayrooms?

10:56   15  A.   That's where they lounge at and they've got a TV

10:56   16  in there, couches and stuff, you know.

10:56   17  Q.   Is it about the size of a resident room?

10:56   18  A.   A little bit larger.

10:56   19  Q.   Can you tell me how many square feet it is?

10:56   20  A.   Probably about 150 square feet.

10:56   21  Q.   So about a 10 by 50 room?

10:56   22  A.   Yes.

10:56   23  Q.   Or 10 by 15 room?  I'm sorry.

10:56   24  A.   Yes.

10:56   25  Q.   Were each of the dayrooms the same?

10:56   1    A.   Close.

10:56   2    Q.   They were pretty similar in size?

10:56   3    A.   Yes.

10:56   4    Q.   How large was the main dining room?

10:57   5    A.   I want to say that the main dining room was 3200

10:57   6    square foot.  I might be mistaken, but I think it was

10:57   7    about 3200 square foot.

10:57   8    Q.   Was the main dining room larger than three

10:57   9    dayrooms combined?

10:57   10   A.   Yes.

10:57   11   Q.   So when Mr. Lewis -- strike that.

10:57   12        Before Mr. Lewis became the housekeeping

10:57   13   supervisor, who cleaned the main dining room in the

10:57   14   morning?

10:57   15   A.   The housekeepers that was on A and B Hall.

10:57   16   Q.   Both housekeepers?

10:57   17   A.   Both housekeepers.

10:57   18   Q.   Who cleaned it in the afternoon?

10:57   19   A.   I think dietary was responsible for it in the

10:57   20   afternoon because no housekeeper was there, all the

10:58   21   housekeepers got off at three.

10:58   22   Q.   I appreciate that.  Who cleaned it after lunch?

10:58   23   A.   After lunch, A and B Hall housekeepers.

10:58   24   Q.   So A Hall and B Hall had the dining room in the

10:58   25   morning and at lunch?

*Larry Bender - Direct/Barlow*                                    107

10:58   1   A.   Right.

10:58   2   Q.   Again, two people after lunch?

10:58   3   A.   Right.

10:58   4   Q.   Did that change at some point after Mr. Lewis

10:58   5   became the supervisor of housekeeping?

10:58   6   A.   Yes, it did.

10:58   7   Q.   What change did you notice?

10:58   8   A.   Well, the housekeeper on A Hall was taken out of

10:58   9   the dining room, and the housekeeper on B Hall had the

10:58   10  dining room, you know, by theirself.

10:58   11  Q.   And you believe that housekeeper on B Hall was

10:59   12  Ms. Austin at the time?

10:59   13  A.   Repeat that.

10:59   14  Q.   You believe that the housekeeper on B Hall at the

10:59   15  time of this change was Ms. Austin?

10:59   16  A.   Yes.

10:59   17  Q.   Who cleaned it after lunch?

10:59   18  A.   Ms. Austin.

10:59   19  Q.   Did she have any help after lunch?

10:59   20  A.   I was -- I was the floor tech in there.

10:59   21  Q.   What does that mean?

10:59   22  A.   She would do all the tables, and I would sweep and

10:59   23  do the floors.

10:59   24  Q.   Did you do that in the morning and in the

10:59   25  afternoon?

*Larry Bender - Direct/Barlow*                                                108

10:59   1    A.   Yes.

10:59   2    Q.   Breakfast and lunch?

10:59   3    A.   Yes, breakfast and lunch.

10:59   4    Q.   Were any other -- at the time this change was made

10:59   5    to clean up the main dining room, were there any other

10:59   6    changes made to other housekeepers' schedules that you

10:59   7    were aware of?

10:59   8    A.   No.

10:59   9    Q.   Would you say that it's harder to do the main

10:59   10   dining room with one person as opposed to two?

11:00   11   A.   Yes.

11:00   12   Q.   Did Mr. Lewis ever complain to you about

11:00   13   Ms. Austin?

11:00   14   A.   One time he did.

11:00   15   Q.   What did he say?

11:00   16   A.   He said he got tired of her complaining, she

11:00   17   needed to go ahead on and retire.

11:00   18   Q.   Do you know what time frame this was?

11:00   19   A.   Time frame?

11:00   20   Q.   Yeah.  Was it -- well, do you recall Ms. Austin

11:00   21   doesn't work there anymore, right?

11:00   22   A.   Right.

11:00   23   Q.   And do you recall how long it was he told you that

11:00   24   before Ms. Austin left?

11:00   25   A.   Might have been probably a few weeks.

11:00  1   Q.  And did he tell you -- you may have said this, and
11:00  2   I apologize.  Did he tell you he was tired of her
11:00  3   complaining -- Ms. Austin complaining?
11:00  4   A.  Repeat that again.
11:00  5   Q.  Sure.  Did Mr. Lewis tell you that he was tired of
11:00  6   Ms. Austin complaining?
11:00  7   A.  Yes.
11:00  8           **MR. HARRELL:**  Objection, asked and answered.
11:00  9           **THE COURT:**  Overruled.  It's in.
11:00  10          Anything else?
11:00  11          **MR. BARLOW:**  No, ma'am.
11:01  12          **THE COURT:**  Cross?
11:01  13          **MR. HARRELL:**  Briefly, Your Honor.
11:01  14                     **CROSS-EXAMINATION**
11:01  15  **BY MR. HARRELL:**
11:01  16  Q.  Good morning, Mr. Bender.
11:01  17  A.  Good morning.
11:01  18  Q.  Let's talk a minute about the dining room, the
11:01  19  main dining room.  As a floor technician, it was your
11:01  20  job responsibility to clean the floors in there after
11:01  21  breakfast and after lunch; is that correct?
11:01  22  A.  Right.
11:01  23  Q.  And you did that on a daily basis?
11:01  24  A.  Daily basis.
11:01  25  Q.  So the only job that the B Hall people had after

*Larry Bender - Cross/Harrell*                                    110

11:01  1    the assignments were changed was to clean the tables;

11:01  2    is that correct?

11:01  3    A.   Yes.

11:01  4    Q.   And there's approximately 15 tables in that room?

11:01  5    A.   In the main dining room?   It was 20.

11:01  6    Q.   20 tables?

11:01  7    A.   Yes.

11:01  8    Q.   And the floor duties were handled entirely by the

11:01  9    floor technician, which was you?

11:01  10   A.   Yes.

11:01  11   Q.   After Ms. Austin stopped working at Rosewood, did

11:02  12   the assignment for the B Hall housekeeper to clean the

11:02  13   dining room after breakfast and after lunch, did that

11:02  14   change?

11:02  15   A.   No, it didn't.

11:02  16   Q.   Who was -- who took over as the primary

11:02  17   housekeeper for the B Hall duties after Ms. Austin

11:02  18   left?

11:02  19   A.   Trichelle Davis.

11:02  20   Q.   And is Ms. Davis approximately 30 years old?

11:02  21   A.   Yes.

11:02  22   Q.   And she continued to perform the duties after --

11:02  23   of cleaning the dining room after breakfast and after

11:02  24   lunch, correct?

11:02  25   A.   Yes.

*Larry Bender - Cross/Harrell*                                    111

| | | |
|---|---|---|
| 11:02 | 1 | Q.   And she continued to do that even -- to this day, |
| 11:02 | 2 | as far as we know, she's continued to do that? |
| 11:02 | 3 | A.   Correct. |
| 11:02 | 4 | Q.   So once that change was made to the B Hall duties, |
| 11:02 | 5 | those B Hall duties remained constant from the time |
| 11:02 | 6 | the change was made up until the present? |
| 11:03 | 7 | A.   Yes. |
| 11:03 | 8 | Q.   You and Ms. Austin worked together for a long |
| 11:03 | 9 | time, correct? |
| 11:03 | 10 | A.   Correct. |
| 11:03 | 11 | Q.   And y'all developed a friendship? |
| 11:03 | 12 | A.   Yes. |
| 11:03 | 13 | Q.   She talked about retiring over the last several |
| 11:03 | 14 | years she worked at Rosewood, correct? |
| 11:03 | 15 | A.   Yes. |
| 11:03 | 16 | Q.   And she talked about it with you, correct? |
| 11:03 | 17 | A.   Yes, on occasion. |
| 11:03 | 18 | Q.   And you know she talked about it with her |
| 11:03 | 19 | coworkers, correct? |
| 11:03 | 20 | A.   Yes. |
| 11:03 | 21 | Q.   And is it fair to say that she made it common |
| 11:03 | 22 | knowledge for the people who worked at Rosewood that |
| 11:03 | 23 | she was thinking about retiring the last several years |
| 11:03 | 24 | of her employment? |
| 11:03 | 25 | A.   Yes. |

*Larry Bender - Cross/Harrell*                                    112

11:03  1    Q.   During the last several months of Ms. Austin's

11:03  2    employment, you worked with her on a daily basis,

11:03  3    correct?

11:03  4    A.   Yes.

11:03  5    Q.   And Ms. Austin never once made any sort of

11:04  6    comments to you about Dwayne Lewis treating her badly

11:04  7    because of her age, did she?

11:04  8    A.   No.

11:04  9    Q.   And she never once made any comments to you that

11:04  10   she felt Dwayne Lewis was retaliating against her

11:04  11   because she had made complaints about age

11:04  12   discrimination, did she?

11:04  13   A.   No.

11:04  14            MR. HARRELL:   Nothing further at this time.

11:04  15            THE COURT:   Redirect?

11:04  16                     REDIRECT EXAMINATION

11:04  17   BY MR. BARLOW:

11:04  18   Q.   Mr. Bender, are you in HR?

11:04  19   A.   *(No response.)*

11:04  20   Q.   Are you in HR, human resources?

11:04  21   A.   HR?

11:04  22   Q.   Yes, sir, for Rosewood?

11:04  23   A.   Yes.

11:04  24   Q.   You're in HR for Rosewood?   Do you understand my

11:04  25   question?

*Larry Bender - Redirect/Barlow*                              113

| | | |
|---|---|---|
| 11:04 | 1 | A.  No.  You're saying HR.  What is HR? |
| 11:04 | 2 | Q.  Human resources.  Are you part of the Rosewood |
| 11:04 | 3 | human resources team? |
| 11:04 | 4 | A.  Yes, I am. |
| 11:04 | 5 | Q.  And how so? |
| 11:04 | 6 | A.  I'm employed there. |
| 11:04 | 7 | Q.  Okay.  Do you recall Ms. Austin's last day? |
| 11:05 | 8 | A.  Yes. |
| 11:05 | 9 | Q.  Where were you? |
| 11:05 | 10 | A.  In the hallway. |
| 11:05 | 11 | Q.  Where was Ms. Austin? |
| 11:05 | 12 | **MR. HARRELL:**  Objection, beyond the scope. |
| 11:05 | 13 | **THE WITNESS:**  Headed to the time clock. |
| 11:05 | 14 | **THE COURT:**  Excuse me.  I'll allow you to |
| 11:05 | 15 | recross. |
| 11:05 | 16 | Go ahead. |
| 11:05 | 17 | **BY MR. BARLOW:** |
| 11:05 | 18 | Q.  What I'm asking is:  Where was Ms. Austin on her |
| 11:05 | 19 | last day? |
| 11:05 | 20 | A.  She was actually upset as she was leaving. |
| 11:05 | 21 | Q.  But where was she physically? |
| 11:05 | 22 | A.  Close to -- around by the time clock. |
| 11:05 | 23 | Q.  Were you helping her that morning? |
| 11:05 | 24 | A.  Yes. |
| 11:05 | 25 | Q.  By being in the hall? |

11:05  1    A.   In the dining room, yeah.

11:05  2    Q.   Were you in the dining room or were you in the

11:05  3    hall?

11:05  4    A.   I was on the hall.

11:05  5    Q.   And so how were you helping Ms. Austin with the

11:05  6    dining room?

11:05  7    A.   I thought you were asking did I help her with the

11:06  8    dining room that morning.

11:06  9    Q.   Did you?

11:06  10   A.   Yes, I did.

11:06  11              MR. BARLOW:   Thanks.

11:06  12              THE COURT:   Recross?

11:06  13                   RECROSS-EXAMINATION

11:06  14   BY MR. HARRELL:

11:06  15   Q.   On Ms. Austin's last day of employment, you saw

11:06  16   her leaving, correct?

11:06  17   A.   Yes.

11:06  18   Q.   Did you try to stop her?

11:06  19   A.   I tried to stop her.  I was trying to talk to her,

11:06  20   telling her don't, you know, don't go.

11:06  21   Q.   Did you tell her to wait and not leave the

11:06  22   facility?

11:06  23   A.   No, I didn't tell her to wait and not leave the

11:06  24   facility.  I was just trying to talk her out of

11:06  25   leaving.

| | | |
|---|---|---|
| 11:06 | 1 | Q.  Did you tell her that she shouldn't clock out? |
| 11:06 | 2 | A.  No, I didn't. |
| 11:06 | 3 | Q.  Did you see Ms. Austin clock out? |
| 11:07 | 4 | A.  I don't recall. |
| 11:07 | 5 | Q.  Do you recall your deposition was taken in this |
| 11:07 | 6 | case? |
| 11:07 | 7 | A.  Repeat that again. |
| 11:07 | 8 | Q.  Do you recall when your deposition was taken in |
| 11:07 | 9 | this case? |
| 11:07 | 10 | A.  Yes. |
| 11:07 | 11 | Q.  Do you recall discussing whether you saw her clock |
| 11:07 | 12 | out or not? |
| 11:07 | 13 | A.  Uh-huh. |
| 11:07 | 14 | Q.  If you saw your deposition, would that help |
| 11:07 | 15 | refresh your recollection as to what you said |
| 11:07 | 16 | regarding whether you saw her clock out? |
| 11:07 | 17 | A.  It probably would. |
| 11:07 | 18 | **MR. HARRELL:**  May I approach, Your Honor? |
| 11:07 | 19 | **THE COURT:**  Yes, you may. |
| 11:07 | 20 | **BY MR. HARRELL:** |
| 11:07 | 21 | Q.  Mr. Bender, please take a look at page 25, and |
| 11:07 | 22 | I'll ask you a couple of quick questions after you |
| 11:08 | 23 | have a chance to read that. |
| 11:08 | 24 | *(Witness complies.)* |
| 11:09 | 25 | Have you had a chance to take a look at that, |

*Larry Bender - Recross/Harrell*                                116

| 11:09 | 1 | Mr. Bender?  Have you had a chance to read page 25 of |
|---|---|---|

11:09   1   Mr. Bender?  Have you had a chance to read page 25 of

11:09   2   your deposition, Mr. Bender?

11:09   3   A.   Yes, I did.

11:09   4   Q.   Having read that, do you recall now whether you

11:09   5   saw Ms. Austin clock out?

11:09   6   A.   I still don't recall her clocking out.

11:09   7   Q.   Do you recall telling me in your deposition --

11:09   8   having read your deposition, do you recall telling us

11:09   9   in your deposition that you saw her clock out?

11:09   10   A.   No.

11:09   11   Q.   Do you recall seeing Ms. Austin leave the facility

11:09   12   that morning?

11:09   13   A.   Yes.

11:09   14   Q.   So after you talked to her, she left the facility?

11:10   15   A.   She went through the laundry.

11:10   16   Q.   And she went out the back and, as far as you know,

11:10   17   she left the facility?

11:10   18   A.   I didn't go no further behind her.

11:10   19   Q.   But is it your recollection that she actually did

11:10   20   leave the facility that morning?

11:10   21   A.   Yes.

11:10   22   Q.   But you don't know whether she clocked out or not?

11:10   23   A.   No, I just can't recall that.

11:10   24   Q.   Fair enough.

11:10   25        **MR. HARRELL:**   One second, Your Honor.

11:10   1   **BY MR. HARRELL:**

11:10   2   Q.   Last question.   And I hate to put you on the spot

11:10   3   but, Mr. Bender, how old are you?

11:10   4   A.   63.

11:10   5   Q.   63?

11:10   6   A.   Uh-huh.

11:10   7             **MR. HARRELL:**   No further questions.

11:10   8             **THE COURT:**   Redirect?

11:10   9             **MR. BARLOW:**   No, Your Honor.

11:10   10            **THE COURT:**   Sir, you may step down.

11:10   11            *(Witness excused.)*

11:11   12            Mr. Barlow?

11:11   13            **MR. BARLOW:**   The Plaintiff rests, Your Honor.

11:11   14            **MR. HARRELL:**   May we approach, Your Honor?

11:11   15            **THE COURT:**   Yes.

11:11   16            *(Bench conference between the Court and*

11:11   17   *counsel:)*

11:11   18            **MR. HARRELL:**   As we discussed this morning,

11:11   19   we'll make the Motion for Judgment as a Matter of Law,

11:11   20   and we'll make our arguments to you at your

11:11   21   convenience outside of the presence of the jury.

11:11   22            **THE COURT:**   And that's on the retaliation

11:11   23   claim pending?

11:11   24            **MR. HARRELL:**   Yes.

11:11   25            **THE COURT:**   I'll hear your response to that

11:11    1    at the time I hear the argument.  I'll take it under

11:11    2    advisement.  It's preserved.

11:11    3              MR. HARRELL:  Thank you, Your Honor.

11:11    4              (Bench conference concluded.)

11:11    5              THE COURT:  Ladies and gentlemen, you've now

11:11    6    heard all of the evidence that Ms. Austin intends to

11:11    7    present in her case.  So now would be the time for the

11:11    8    Defendant, Rosewood, to present a case to you, if they

11:11    9    choose to do so.

11:11   10              Your first witness?

11:12   11              MR. BRANNING:  Gene Triplett.

11:12   12          **GENE TRIPLETT, DEFENSE WITNESS, DULY SWORN**

11:12   13              MADAM CLERK:  Be seated.  Please state your

11:12   14    full name.

11:12   15              THE WITNESS:  Gene Thomas Triplett.

11:12   16              THE COURT:  Go ahead, Mr. Branning, when

11:12   17    you're ready.

11:12   18              MR. BRANNING:  Yes, Your Honor.

11:12   19                        **DIRECT EXAMINATION**

11:12   20    BY MR. BRANNING:

11:13   21    Q.  Are you familiar with Dwayne Lewis?

11:13   22    A.  Yes, sir.

11:13   23    Q.  Did he work at Rosewood?

11:13   24    A.  Yes, sir.

11:13   25    Q.  How long did he work at Rosewood?

11:13  1   A.   I can't be exact.   Probably a year-and-a-half.

11:13  2   Q.   What was his job?

11:13  3   A.   He was housekeeping supervisor.

11:13  4   Q.   Directing now the line of questioning to

11:13  5   Ms. Austin.   Did Ms. Austin ever contact you by phone,

11:13  6   by email, in any way in the spring of 2013 to report

11:13  7   that either Mr. Lewis was discriminating against her

11:13  8   based on her age, or that he was retaliating against

11:14  9   her for complaining that he did?

11:14  10  A.   She did call me on my cell phone early one

11:14  11  morning, I talked with her, and my comment was "Talk

11:14  12  with your supervisor and talk with the administrator.

11:14  13  If you don't get satisfaction, then call me back."

11:14  14      She -- at no time did she ever say she was being

11:14  15  harassed.

11:14  16  Q.   For any reason?

11:14  17  A.   No, no.

11:14  18  Q.   Did she ever mention that she thought Mr. Lewis

11:14  19  was putting more work on her because she had

11:14  20  complained that he was putting more work on her

11:14  21  because of her age?

11:14  22  A.   No, sir.

11:14  23  Q.   Did she ever claim or tell you that Mr. Lewis was

11:14  24  putting more work on her because she went to the

11:14  25  administrator, Nicole Partridge, and complained about

*Gene Triplett - Direct/Branning*                                    120

| | | |
|---|---|---|
| 11:14 | 1 | Mr. Lewis? |
| 11:14 | 2 | A.   No, sir. |
| 11:14 | 3 | Q.   Did she ever say that anything that Mr. Lewis was |
| 11:14 | 4 | doing was connected in any way to her age? |
| 11:15 | 5 | A.   No, sir. |
| 11:15 | 6 | Q.   If an employee at Rosewood makes a complaint about |
| 11:15 | 7 | harassment or retaliation, are you notified? |
| 11:15 | 8 | A.   Yes, sir. |
| 11:15 | 9 | Q.   Did Ms. Austin ever make a complaint to human |
| 11:15 | 10 | resources that either she was being the subject of |
| 11:15 | 11 | discrimination based on her age or retaliation for |
| 11:15 | 12 | reporting it? |
| 11:15 | 13 | A.   No, sir. |
| 11:15 | 14 | Q.   As the director of operations, are you familiar |
| 11:15 | 15 | with the policies and procedures that are in place at |
| 11:15 | 16 | Rosewood for reporting harassment? |
| 11:16 | 17 | A.   Yes, sir. |
| 11:16 | 18 | Q.   I think we've talked about it already some and I |
| 11:16 | 19 | don't want to beat it to death, but is the first line |
| 11:16 | 20 | of reporting it to go to a supervisor? |
| 11:16 | 21 | A.   Correct. |
| 11:16 | 22 | Q.   What happens if the supervisor is the problem? |
| 11:16 | 23 | A.   They go to the administrator. |
| 11:16 | 24 | Q.   What happens if they don't get the relief that |
| 11:16 | 25 | they need from the administrator? |

*Gene Triplett - Direct/Branning*                                    121

11:16   1    A.   They call me, I get involved, and then I get HR

11:16   2    involved if it's harassment.

11:16   3    Q.   You told us yesterday that you've been associated

11:16   4    with working at Rosewood since, I believe, the early

11:16   5    '90s?

11:16   6    A.   That's correct.

11:16   7    Q.   And would you see -- how regularly do you visit

11:16   8    Rosewood?

11:16   9    A.   Every two weeks or once a month.  There again, it

11:16   10   depends on if they need my help or if there's

11:16   11   something I can -- you know, I just go by periodically

11:17   12   and just check on things, make rounds.

11:17   13   Q.   When Ms. Austin worked there, would you see

11:17   14   Ms. Austin when you visited the building?

11:17   15   A.   I did, on occasion, see Ms. Austin.  We always

11:17   16   spoke and talked so, I mean, we had an employee

11:17   17   relationship.

11:17   18   Q.   Were y'all on a first-name basis?

11:17   19   A.   Yeah.

11:17   20   Q.   Did she call you Gene?

11:17   21   A.   Yes, sir.

11:17   22   Q.   When she called you and y'all spoke that one day,

11:17   23   did she call you on your cell phone?

11:17   24   A.   Yes, sir.

11:17   25   Q.   Do you know how the associates at Rosewood have

11:17  1    your cell phone number?

11:17  2    A.   We have a brochure and it's posted.   It also has

11:17  3    the director of operations's number, it has our 1-800

11:17  4    number for HR, and we also have a recorder that

11:17  5    records any complaints after hours.

11:18  6    Q.   How about anybody that's concerned and wants to

11:18  7    make a complaint anonymously, can that be done?

11:18  8    A.   That can be done.

11:18  9    Q.   How do they do that?

11:18  10   A.   Well, they can send -- they could call.   We have

11:18  11   them call the facility or the eight-hundred number and

11:18  12   they say, you know, *I work at Rosewood Manor and I've*

11:18  13   *got a problem with a supervisor and I need somebody to*

11:18  14   *come and investigate it,* and they'd give us the

11:18  15   complaint.

11:18  16        And we follow through with those every time.

11:18  17   Because even though it's anonymous and it's hard to

11:18  18   track that down, but if we don't follow through with

11:18  19   it and at least investigate it, then we're putting

11:18  20   ourselves in liability because there may be an issue.

11:18  21   Q.   You've been in the courtroom and been listening to

11:18  22   the witnesses, and you heard Ms. Austin say that she

11:18  23   had called you before and that you had handled a

11:19  24   matter to her satisfaction.

11:19  25        Do you recall that?

*Gene Triplett - Direct/Branning*                                      123

| | | |
|---|---|---|
| 11:19 | 1 | A.   I remember -- it's been years, so I don't exactly |
| 11:19 | 2 | remember the actual complaint.  But it's not uncommon, |
| 11:19 | 3 | because of the longevity at Rosewood, for those |
| 11:19 | 4 | employees to call me if they don't feel like that |
| 11:19 | 5 | they're being treated fairly.  So that's, you know, a |
| 11:19 | 6 | lot more common from Rosewood than from any other |
| 11:19 | 7 | building. |
| 11:19 | 8 | Q.   Do you encourage that? |
| 11:19 | 9 | A.   Yes, sir. |
| 11:19 | 10 | Q.   Do other associates at Rosewood or have other |
| 11:19 | 11 | associates at Rosewood reached out to you and called |
| 11:19 | 12 | you on your cell phone and said, *I'd like you to help* |
| 11:19 | 13 | *me out with something*? |
| 11:19 | 14 | A.   Yes, sir. |
| 11:19 | 15 | Q.   While none of us are perfect, do you do your best |
| 11:19 | 16 | to respond to each and every one of them? |
| 11:19 | 17 | A.   Yes, sir. |
| 11:19 | 18 | **MR. BRANNING:**  A moment to confer? |
| 11:19 | 19 | **THE COURT:**  Okay. |
| 11:20 | 20 | *(Conference between defense counsel.)* |
| 11:20 | 21 | **MR. BRANNING:**  Tender the witness, Your |
| 11:20 | 22 | Honor. |
| 11:20 | 23 | **THE COURT:**  Thank you. |
| 11:20 | 24 | Mr. Barlow? |
| 11:20 | 25 | **MR. BARLOW:**  Thank you, Your Honor. |

11:20  1          **CROSS-EXAMINATION**

11:20  2  **BY MR. BARLOW:**

11:20  3  Q.   Good morning, Mr. Triplett.  You were talking with

11:20  4  Mr. Branning about the policies.  Do you recall that?

11:20  5  A.   Yes, sir.

11:20  6  Q.   Assuming that Ms. Austin spoke with her

11:20  7  supervisor, that's part of the chain of command,

11:20  8  right?

11:20  9  A.   Right.

11:20  10  Q.   And assuming that Ms. Austin complained to

11:20  11  Ms. Partridge about Mr. Lewis's treatment of her, that

11:20  12  would comply with the policy, correct?

11:20  13  A.   That's correct.

11:20  14  Q.   And did you hear Ms. Williamson's testimony where

11:20  15  Ms. Austin showed up one morning -- on her last day

11:20  16  and said, "Hey, I can't take it anymore, he's giving

11:20  17  me all the hard assignments"?

11:20  18  A.   Correct.

11:20  19  Q.   Is Ms. Williamson part of HR?

11:21  20  A.   I'm sorry?

11:21  21  Q.   Is Ms. Williamson part of HR?

11:21  22  A.   No.  Did you say HR?

11:21  23  Q.   Yes, human resources.

11:21  24  A.   No, she is not.

11:21  25  Q.   Why do you say that?

11:21  1   A.   Well, HR is handled by the administrator and their

11:21  2   supervisor.  And then, if we need to get our corporate

11:21  3   office human resources involved, then they would get

11:21  4   them involved and myself.

11:21  5   Q.   Let me show you what's Exhibit 4 for the

11:21  6   Plaintiff.

11:21  7           **THE COURT:**  What number did you say, 4?

11:21  8           **MR. BARLOW:**   Exhibit 4, Your Honor.

11:21  9   **BY MR. BARLOW:**

11:22  10  Q.   Can you read this area right here?  Is that

11:22  11  Ms. Williamson?  You see the screen, sir?

11:22  12  A.   Yeah.

11:22  13  Q.   You see the green circle?

11:22  14  A.   Yes.

11:22  15  Q.   And does that indicate that Ms. Williamson was

11:22  16  staff development/HR?

11:22  17  A.   The staff development.  The "HR" means she is the

11:22  18  person they go to if they want to know policies or

11:22  19  they want to know something specific as it relates to

11:22  20  their benefits and stuff.

11:22  21  Q.   Is that in your handbook and policies?

11:22  22  A.   I'm sorry?

11:22  23  Q.   Is that in the handbook that you have today?

11:22  24  Because you say go to HR?

11:22  25  A.   I don't know if it specifically says that.  Quite

*Gene Triplett - Cross/Barlow* 126

11:22  1   honestly, I don't know why they have HR after her

11:22  2   name.

11:22  3   Q.   I'm sorry?

11:22  4   A.   I say, quite honestly, I don't know why they have

11:22  5   HR after her name.

11:22  6   Q.   I don't either.  Would you agree this is a

11:23  7   document from Rosewood?

11:23  8   A.   I see that.

11:23  9   Q.   Is that Rosewood letterhead?

11:23  10  A.   Yes, it is.

11:23  11  Q.   Is everything else on here correct?  Ms. Partridge

11:23  12  was the administrator, Ms. Figgins was the director of

11:23  13  nursing.  Anything on here incorrect other than

11:23  14  Ms. Williamson's name?

11:23  15  A.   Do I see anybody I recognize?

11:23  16  Q.   No.  Do you see anybody else that is mismarked, in

11:23  17  your opinion, on this letterhead?

11:23  18  A.   I don't think so, no.

11:23  19  Q.   So would you agree with me, then, that Ms. Austin

11:23  20  had complied with the policy when she talked to the

11:23  21  supervisor, the administrator, and called you?

11:23  22  A.   Yes.  And if it had been harassment, we would have

11:23  23  had a harassment form and our department of HR and

11:24  24  myself would have been over there and did a thorough

11:24  25  investigation.

11:24  1    Q.   Did Ms. Williamson ever go to you and say, *Hey,*

11:24  2    *Ms. Austin is complaining about Mr. Lewis*?

11:24  3    A.   No.

11:24  4    Q.   Did Ms. Partridge ever talk to you and say that

11:24  5    Ms. Austin was complaining about Mr. Lewis?

11:24  6    A.   No.

11:24  7    Q.   But they were supposed to, weren't they?

11:24  8    A.   They were.

11:24  9         **MR. BARLOW:**   No further questions, Your

11:24  10   Honor.

11:24  11        **THE COURT:**   Redirect?

11:24  12              **REDIRECT EXAMINATION**

11:24  13   **BY MR. BRANNING:**

11:24  14   Q.   They were supposed to contact you if she reported

11:24  15   being discriminated against?

11:24  16   A.   And harassment.

11:24  17   Q.   Or harassed?

11:24  18   A.   Yes.

11:24  19   Q.   Just because somebody complains about their

11:24  20   supervisor doesn't mean there's discrimination or

11:24  21   harassment?

11:24  22   A.   No.

11:24  23   Q.   She just may not have liked the guy?

11:24  24   A.   Right.

11:24  25   Q.   Now, turning to Defendant's Exhibit 3, I'm going

11:25   1    to show you the second page.  The first page is --

11:25   2    it's a page taken from the human resources policies

11:25   3    and procedures manual.  And I'm going to put the

11:25   4    second page on the screen and ask you if you would,

11:25   5    Mr. Triplett, to look at subsection E.

11:25   6    A.   Okay.

11:25   7    Q.   Before we dive into that, just because somebody

11:25   8    complains about a supervisor doesn't mean that

11:25   9    something is wrong, does it?

11:25   10   A.   No, not always.

11:25   11   Q.   Could that be related to things like a personality

11:25   12   disagreement?

11:25   13   A.   Yes.

11:25   14   Q.   Have you ever had to deal with those?

11:25   15   A.   Yes.  We do a resolution form where we sit down

11:26   16   with the person making the allegation and the

11:26   17   supervisor, sometimes it's two supervisors, and we

11:26   18   would go through the resolution and address it.

11:26   19   Q.   In your role as director of operations, have you

11:26   20   ever discovered any evidence that Ms. Austin reported

11:26   21   to Ms. Partridge, the administrator, that Mr. Lewis

11:26   22   was retaliating against her?

11:26   23   A.   No, sir.

11:26   24   Q.   In your role as director of operations, have you

11:26   25   ever learned any evidence that Ms. Austin complained

*Gene Triplett - Redirect/Branning*                              129

11:26  1   that the work assignments given to her were either,

11:26  2   one, based on her age, or two, in retaliation for

11:26  3   complaining to Ms. Partridge?

11:26  4   A.   No, sir.

11:26  5   Q.   Now, going to this form, Mr. Triplett, what I've

11:27  6   just boxed in right there, is that the chain of

11:27  7   command after the person has gone to the supervisor --

11:27  8   or actually, I'm sorry -- if the person believes the

11:27  9   supervisor is the problem?

11:27  10  A.   Yes, sir.

11:27  11  Q.   You would be director of operations?

11:27  12  A.   Right.

11:27  13  Q.   Who is the director of human resources, or who was

11:27  14  when Ms. Austin was last working at Rosewood?

11:27  15  A.   Dana Sherman, was Dana Wood.

11:27  16  Q.   That was her maiden name, she's been since

11:27  17  married?

11:27  18  A.   Married, yes.

11:27  19  Q.   In your role as director of operations, have you

11:27  20  ever learned that Ms. Austin called the director of

11:27  21  human resources, Ms. Sherman?

11:28  22  A.   No.

11:28  23  Q.   Now, Mr. Barlow was asking you questions --

11:28  24        **MR. BRANNING:**  Your Honor, may I have leave

11:28  25  to retrieve an exhibit?

11:28    1         **THE COURT:**  Yes, you may.

11:28    2    **BY MR. BRANNING:**

11:28    3    Q.   Mr. Barlow asked you questions about

11:28    4    Ms. Williamson and her title that's put on this letter

11:28    5    being human resources, HR.  Do you recall that line of

11:28    6    questioning by Mr. Barlow?

11:28    7    A.   Yes, sir.

11:28    8    Q.   And you said you weren't sure why HR is on there,

11:29    9    right?

11:29   10    A.   That's correct.

11:29   11    Q.   Now, did Ms. Williamson handle benefits and

11:29   12    paperwork for associates?

11:29   13    A.   Sure.

11:29   14    Q.   And if an associate at Rosewood needed to take

11:29   15    family medical leave, who would they go to to get the

11:29   16    paperwork?

11:29   17    A.   They would go to Patsy.

11:29   18    Q.   Patsy Williamson?

11:29   19    A.   Williamson, yes.

11:29   20    Q.   And Ms. Williamson -- you were here -- she told us

11:29   21    that she had been working at Rosewood since the early

11:29   22    '70s.  Was she somebody that just kind of everybody in

11:29   23    the building knew and was a friend with?

11:29   24    A.   That's correct.

11:29   25         **MR. BRANNING:**  A moment to confer, Your

11:29   1  Honor?

11:29   2             THE COURT:  All right.

11:29   3             (*Conference between Defense counsel.*)

11:29   4             MR. BRANNING:  I'm completed with the

11:29   5  examination, Your Honor.

11:30   6             THE COURT:  Okay.  Sir, you may step down.

11:30   7             (*Witness excused.*)

11:30   8             And your next witness?

11:30   9             MR. HARRELL:  Your Honor, we call Nicole

11:30  10  Partridge.

11:30  11             Your Honor, I want to make sure I didn't take

11:30  12  one of the exhibits.

11:30  13             THE COURT:  That's fine.

11:31  14        **NICOLE PARTRIDGE, DEFENSE WITNESS, DULY SWORN**

11:31  15             MADAM CLERK:  Be seated.  Please state your

11:31  16  full name.

11:31  17             THE WITNESS:  Nicole Partridge.

11:31  18             THE COURT:  Go ahead, Mr. Harrell, when

11:31  19  you're ready.

11:31  20                    **DIRECT EXAMINATION**

11:31  21  BY MR. HARRELL:

11:31  22  Q.  Good morning, Ms. Partridge.  Welcome back.  I'll

11:31  23  try to be brief since you've already been with us, but

11:31  24  I want to turn your attention back to these new

11:31  25  housekeeping routes.

11:31  1        Is this a document that was created prior to

11:31  2  January 14, 2013?

11:31  3  A.    Yes.

11:31  4  Q.    Did you all put these new housekeeping routes into

11:31  5  effect prior to January 14, 2013?

11:31  6  A.    No.

11:31  7  Q.    It went into effect on January 14, 2013?

11:32  8  A.    Correct.

11:32  9  Q.    And this is not something that you all created

11:32  10  after the fact; this was something that was posted at

11:32  11  the facility before these new routes went into effect?

11:32  12        MR. BARLOW:    Leading, Your Honor.

11:32  13        THE COURT:    Sustained.

11:32  14  BY MR. HARRELL:

11:32  15  Q.    Ms. Partridge, when did you create this -- when

11:32  16  did you and Mr. Lewis create this document?

11:32  17  A.    We would have reviewed it before the effective

11:32  18  date and worked on it and then posted it as effective

11:32  19  1/14 of '13.

11:32  20  Q.    You didn't create it after Ms. Austin left

11:32  21  employment, did you?

11:32  22  A.    No.

11:32  23  Q.    And do you recall about how long prior to the

11:32  24  effective date you all would have been working on this

11:32  25  document?

*Nicole Partridge - Direct/Harrell*                    133

11:32   1   A.   Given it's the middle part of January, we would

11:32   2   have been working on it the first few weeks of the

11:33   3   year in January.

11:33   4   Q.   So you all put some time into it before it was

11:33   5   made effective?

11:33   6   A.   Correct.

11:33   7   Q.   And so it wasn't something that just came into

11:33   8   being on January 14th, was it?

11:33   9   A.   No.

11:33  10   Q.   For a few weeks beforehand you all worked on it?

11:33  11   A.   Correct.

11:33  12   Q.   After Ms. Austin left, the B Hall assignments did

11:33  13   not change, did they?

11:33  14   A.   No.

11:33  15   Q.   Do you recall who took over the B Hall assignments

11:33  16   primarily?

11:33  17   A.   Ms. Trichelle Davis.

11:33  18   Q.   And was Ms. Jones Andrews and Ms. Long still

11:33  19   performing B Hall duties from time to time?

11:33  20   A.   Correct.  The employees would work a portion of

11:33  21   the seven-day week but you had to schedule 24

11:33  22   hours/seven days a week, not necessarily in

11:33  23   environmental services, but the facility operated

11:34  24   24/7.  So they would work their typically five days

11:34  25   per week and have two days off, and so that is the

11:34   1    alternates who would serve on the days off in their

11:34   2    part of their five-day week.

11:34   3    Q.   Besides Ms. Austin, did any of the other

11:34   4    housekeepers who worked the B Hall duties, including

11:34   5    Ms. Jones Andrews, Ms. Long, and Ms. Trichelle Davis,

11:34   6    did any of them ever raise any complaints about the

11:34   7    workload?

11:34   8    A.   No.

11:34   9    Q.   Did -- can you tell us approximately the age of

11:34   10   the other housekeepers?

11:34   11   A.   Ms. Tara Jones Andrews is probably in her twenties

11:34   12   or thirties.  She had small children.  Ms. Judy Long I

11:34   13   would estimate to be in her fifties.

11:34   14   Q.   What about Ms. Davis, Ms. Trichelle Davis?

11:35   15   A.   Trichelle Davis was probably in her twenties.

11:35   16   Q.   What about the remainder of people in the

11:35   17   housekeeping department?

11:35   18   A.   There were several that were known as older.  They

11:35   19   reported having grandchildren, so there were several

11:35   20   that would have been in their fifties or sixties.  And

11:35   21   there were also those who -- Ms. Quaniqua Newberry,

11:35   22   she was fairly young, twenties.  Others like Ms.

11:35   23   Andrews -- Tara Jones Andrews had small children, they

11:35   24   were not at the grandparenting stage.

11:36   25   Q.   Is it fair to say there was a broad range of ages

*Nicole Partridge - Direct/Harrell*                    135

11:36   1    among the housekeeping staff during your employment at

11:36   2    Rosewood?

11:36   3    A.   Most certainly.

11:36   4    Q.   Regarding time-keeping policies, was it against

11:36   5    policy to work off the clock?

11:36   6    A.   Yes.

11:36   7    Q.   Was that a terminable offense?

11:36   8    A.   Yes.

11:36   9    Q.   Did Rosewood take efforts to make sure that it did

11:36   10   not have any issue with people working off the clock?

11:36   11   A.   Yes.

11:36   12   Q.   Did Ms. Austin ever report to you that she was

11:36   13   having to perform work off the clock in order to

11:36   14   complete her duties on B Hall?

11:36   15   A.   No.

11:36   16   Q.   Did she ever report to you that she was unable to

11:36   17   complete her duties on B Hall?

11:36   18   A.   No.

11:36   19        **MR. HARRELL:**  One moment, Your Honor.

11:36   20        **THE COURT:**  All right.

11:36   21        **MR. HARRELL:**  Tender the witness.

11:36   22        **THE COURT:**  Cross, Mr. Barlow?

11:36   23                    **CROSS-EXAMINATION**

11:36   24   BY MR. BARLOW:

11:37   25   Q.   Good morning, Ms. Partridge.  You were talking a

11:37  1    little bit about who took over the dining room or

11:37  2    Ms. Austin's duties in B Hall when she wasn't there a

11:37  3    couple of days during the week.  Do you recall that?

11:37  4    A.   Yes.

11:37  5    Q.   Do you know if those folks were getting help from

11:37  6    anyone else?

11:37  7    A.   As per the expectation, they would be getting

11:37  8    help.

11:37  9    Q.   You would expect them to get help, right?

11:37  10   A.   Correct.

11:37  11   Q.   How many times would these other women --

11:37  12   supposedly women, that might be a little sexist of me.

11:37  13   How many times were these other housekeepers actually

11:37  14   doing Ms. Austin's job?  Say, take Ms. Newberry, how

11:37  15   many times would she do B Hall?

11:37  16   A.   If she was picking up the days that Ms. Austin was

11:37  17   off, she would be doing it two to three days per week.

11:38  18   Perhaps if Ms. Austin was on vacation, she did it for

11:38  19   five days of that assigned week.

11:38  20   Q.   Do you have any recollection of Ms. Austin ever

11:38  21   taking a vacation while you were the administrator?

11:38  22   A.   Yes.

11:38  23   Q.   How long was she on vacation?

11:38  24   A.   She would typically go on a week vacation, as

11:38  25   would be normal.

*Nicole Partridge - Cross/Barlow*                    137

11:38    1    Q.   Do the other folks just get plugged in, the other

11:38    2    housekeepers, they just go right in for Ms. Austin?

11:38    3    A.   The environmental services director would have to

11:38    4    ensure that the staffing was covered during any

11:38    5    vacation on any hall.

11:38    6    Q.   Would you expect them to do, on average --

11:38    7    assuming Ms. Austin wasn't on vacation, that each

11:38    8    woman or each housekeeper would do Ms. Austin's hall

11:38    9    once a week?

11:38   10    A.   If she worked five days a week and it was staffed

11:39   11    seven days a week, then there would be remaining two

11:39   12    days a week that would have to be worked by someone

11:39   13    else.   If she worked three days that week, then four

11:39   14    days would be covered by someone else.   If she worked

11:39   15    four days that week, three days would be covered by

11:39   16    someone else.

11:39   17    Q.   And I understand that.   What I'm asking is, for

11:39   18    the folks who filled in for her for her days off,

11:39   19    would they all get that part of the week or would they

11:39   20    be separated?   Could it be one or two people taking

11:39   21    over the same two days?

11:39   22    A.   If they covered the two days off, it could be the

11:39   23    one single day, or it could include both days, yes.

11:39   24    Q.   Other than Ms. Austin, who are the other

11:39   25    housekeepers in their sixties?

| | | |
|---|---|---|
| 11:39 | 1 | A.   The other housekeepers in their sixties I would |
| 11:40 | 2 | believe to be Ms. Visa Jones, Ms. Kathy Borner.   There |
| 11:40 | 3 | were also floor technicians and laundry personnel who |
| 11:40 | 4 | were in that age cohort. |
| 11:40 | 5 | Q.   Ms. Austin was the oldest housekeeper; is that |
| 11:40 | 6 | correct? |
| 11:40 | 7 | A.   Pardon? |
| 11:40 | 8 | Q.   Ms. Austin was oldest housekeeper; is that |
| 11:40 | 9 | correct? |
| 11:40 | 10 | A.   By age or by tenure? |
| 11:40 | 11 | Q.   Age? |
| 11:40 | 12 | A.   The oldest housekeeper?   I would say either her or |
| 11:40 | 13 | Ms. Jones or Ms. Borner. |
| 11:40 | 14 | Q.   So you don't know? |
| 11:40 | 15 | A.   They are comparable in age. |
| 11:40 | 16 | **MR. BARLOW:**  Thanks. |
| 11:40 | 17 | **THE COURT:**  Redirect? |
| 11:40 | 18 | **MR. HARRELL:**  Briefly. |
| 11:40 | 19 | **REDIRECT EXAMINATION** |
| 11:41 | 20 | **BY MR. HARRELL:** |
| 11:41 | 21 | Q.   Was it your understanding that Larry Bender, as |
| 11:41 | 22 | the floor tech, would handle the floors in the dining |
| 11:41 | 23 | room when it was cleaned twice a day? |
| 11:41 | 24 | A.   Correct. |
| 11:41 | 25 | Q.   And that was provided regardless of who the B Hall |

11:41   1   housekeeper was?

11:41   2   A.   Correct.  Or if Larry was not on B Hall that day

11:41   3   because he happened to be on a day off, the floor tech

11:41   4   who was assigned to B Hall would be assigned

11:41   5   similarly.

11:41   6   Q.   Fair enough, and thank you for correcting me on

11:41   7   that.  So the floor tech assigned to A and B Hall,

11:41   8   regardless of who it was, had the responsibility of

11:41   9   coming in and helping with the floors in the dining

11:41   10  room twice a day?

11:41   11  A.   Correct.

11:41   12  Q.   And did you ever receive any complaints from

11:41   13  Ms. Austin that Mr. Bender or whoever else was the

11:41   14  floor tech on A and B was not providing her help?

11:41   15  A.   That morning at 7:15 when she rang, she indicated

11:41   16  "I don't have help."

11:41   17  Q.   And that's the same day that she resigned?

11:41   18  A.   Correct.

11:41   19  Q.   And at no point in time during that day did she

11:42   20  ever mention to you that she felt like she was being

11:42   21  discriminated against on the basis of age?

11:42   22            **MR. BARLOW:**  Leading, Your Honor.

11:42   23            **THE COURT:**  Sustained.

11:42   24  **BY MR. HARRELL:**

11:42   25  Q.   Did she ever say anything in those conversations

11:42    1    on her last day of employment about age

11:42    2    discrimination?

11:42    3    A.   No.

11:42    4    Q.   Did she ever say anything during those

11:42    5    conversations on her last day of employment about

11:42    6    retaliation for making a complaint of age

11:42    7    discrimination?

11:42    8    A.   No.

11:42    9         **MR. HARRELL:**  Nothing further.

11:42   10         **THE COURT:**  You may step down, ma'am.

11:42   11         *(Witness excused.)*

11:42   12         Your next witness?

11:42   13         **MR. HARRELL:**   The Defense calls Miriam Clark.

11:43   14         **MR. BRANNING:**  For purposes of scheduling,

11:43   15    Your Honor, we've got two witnesses left.  Both should

11:43   16    be very short.  And so we may be able to -- of course,

11:43   17    whatever the Court directs, but just wanted the Court

11:43   18    to know that, that that's all we've got left with

11:43   19    regard to the witnesses.

11:44   20         **THE COURT:**  All right, thank you.

11:44   21      **MIRIAM CLARK, DEFENSE WITNESS, DULY SWORN**

11:44   22         **MADAM CLERK:**  Be seated.  Please state your

11:44   23    full name and spell your last name for the record.

11:44   24         **THE WITNESS:**  Miriam Clark, C-l-a-r-k.

11:44   25         **THE COURT:**  Ms. Clark, that device in front

| 11:44 | 1 | of you that's flat looking and has got a red light on |

11:44   1   of you that's flat looking and has got a red light on

11:44   2   the front of it, that's your microphone.  Would you

11:44   3   mind scooting your chair up close to that.  Thank you

11:44   4   very much.

11:44   5           Mr. Harrell, go ahead.

11:44   6                   **DIRECT EXAMINATION**

11:44   7   **BY MR. HARRELL:**

11:44   8   Q.   Good morning, Ms. Clark.

11:44   9   A.   Good morning.

11:44   10  Q.   Are you an employee of Rosewood?

11:45   11  A.   Yes.

11:45   12  Q.   How long have you been employed at Rosewood?

11:45   13  A.   Eight years.

11:45   14  Q.   And what's your position?

11:45   15  A.   Dietary aide.

11:45   16  Q.   Do you know Ms. Austin?

11:45   17  A.   Yes.

11:45   18  Q.   When Ms. Austin worked there, what was your

11:45   19  position?

11:45   20  A.   I worked in the laundry.

11:45   21  Q.   And what was your shift?

11:45   22  A.   One of them was seven to three, and then it

11:45   23  switched to eleven to seven.

11:45   24  Q.   I want to talk for a minute about your

11:45   25  relationship with Ms. Austin.  How long did y'all work

11:45   1   together at Rosewood?

11:45   2   A.   Been there eight years.  I would say about four,

11:45   3   four or five.

11:45   4   Q.   And was she a good friend of yours at the time

11:45   5   that you all worked together at Rosewood?

11:45   6   A.   Yes.

11:45   7   Q.   In fact, during that time would you say that she

11:45   8   was your best friend?

11:45   9   A.   Yes.

11:45   10   Q.   And you all spent time together outside of

11:46   11   Rosewood?

11:46   12   A.   Yes.

11:46   13   Q.   Did you talk on the phone regularly?

11:46   14   A.   Yes.

11:46   15   Q.   Did you visit one another's house regularly?

11:46   16   A.   Yes.

11:46   17   Q.   You even had holiday meals together, correct?

11:46   18   A.   Yes.

11:46   19   Q.   And you confided in one another about problems

11:46   20   that you had, right?

11:46   21   A.   Yes.

11:46   22   Q.   Now, towards the end of Ms. Austin's employment

11:46   23   with Rosewood, did Ms. Austin ever complain to you

11:46   24   about age discrimination?

11:46   25   A.   No.

*Miriam Clark - Direct/Harrell*                                        143

11:46   1   Q.   Did Ms. Austin ever complain to you that she felt
11:46   2   like she was being retaliated against because she had
11:46   3   complained to someone about age discrimination?
11:46   4   A.   No.
11:46   5   Q.   And based on your friendship with Ms. Austin, is
11:46   6   that the sort of thing that, if it was happening, you
11:46   7   would expect her to tell you about?
11:47   8   A.   Yes.
11:47   9   Q.   After Ms. Austin resigned her employment with
11:47  10   Rosewood, where did she go?
11:47  11   A.   She came to my home.
11:47  12   Q.   And when she came to your house to tell you that
11:47  13   she had resigned her employment with Rosewood, at that
11:47  14   point in time did she ever say anything to you about
11:47  15   age discrimination or being retaliated against because
11:47  16   she had complained of age discrimination?
11:47  17   A.   No.
11:47  18   Q.   Did she ever say anything about being written up
11:47  19   for insubordination?
11:47  20   A.   No.
11:47  21   Q.   What did she tell you?
11:47  22   A.   She told me that she no longer worked for
11:47  23   Rosewood.
11:47  24   Q.   Did she tell you why?
11:47  25   A.   It was concerning Dwayne.

11:47    1    Q.   But she didn't tell you anything about him making

11:47    2    any comments to her about age discrimination?

11:47    3    A.   No.

11:47    4    Q.   She didn't tell you that it was because he was

11:47    5    retaliating against her because she had complained of

11:47    6    age discrimination?

11:47    7    A.   No.

11:47    8    Q.   Was it just about the workload?

11:48    9    A.   Yes.

11:48   10          **MR. HARRELL:**  Tender the witness.

11:48   11          **THE COURT:**  All right, thank you.

11:48   12          Mr. Barlow, when you're ready.

11:48   13             **CROSS-EXAMINATION**

11:48   14   **BY MR. BARLOW:**

11:48   15    Q.   Good morning, Ms. Clark.

11:48   16    A.   Good morning.

11:48   17    Q.   It's still morning.  How long were you a tray

11:48   18    aide?

11:48   19    A.   I've been a tray aide about -- I want to say about

11:48   20    three, maybe going on four years.

11:48   21    Q.   I'm sorry?

11:48   22    A.   Three going on four years, I think.

11:48   23    Q.   And I don't want to -- you think it's been four

11:49   24    years yet?

11:49   25    A.   I think November will make four, so I want to say

*Miriam Clark - Direct/Harrell*                    145

| | | |
|---|---|---|
| 11:49 | 1 | about three. |
| 11:49 | 2 | Q.  So you think you moved over in 2014, 2013? |
| 11:49 | 3 | A.  Something like that. |
| 11:49 | 4 | Q.  Do you know if you were a tray aide when |
| 11:49 | 5 | Ms. Austin was still working there? |
| 11:49 | 6 | A.  No, I wasn't a tray aide then. |
| 11:49 | 7 | Q.  What were you doing? |
| 11:49 | 8 | A.  I was working the -- when she left, I was working |
| 11:49 | 9 | the 11-to-7 shift. |
| 11:49 | 10 | Q.  The 11-to-7 shift? |
| 11:49 | 11 | A.  Yes, sir. |
| 11:49 | 12 | Q.  Is that 11 a.m. to 7 p.m. or vice versa? |
| 11:49 | 13 | A.  11 p.m. to 7 a.m. |
| 11:49 | 14 | Q.  So did you see -- strike that.  You claimed that |
| 11:49 | 15 | Ms. Austin went to your house on the day that she was |
| 11:49 | 16 | terminated -- or I'm sorry -- on the day that she |
| 11:49 | 17 | left? |
| 11:49 | 18 | A.  Yes. |
| 11:49 | 19 | Q.  What time did she show up? |
| 11:49 | 20 | A.  Well, it was morning. |
| 11:50 | 21 | Q.  What time in the morning? |
| 11:50 | 22 | A.  Well, I can't -- I don't know exactly what time, |
| 11:50 | 23 | but I know it was morning time because I was still |
| 11:50 | 24 | awake.  I hadn't went to bed yet. |
| 11:50 | 25 | Q.  What time do you normally go to sleep? |

11:50    1    A.   Well, it would be about 9:30, ten o'clock, you

11:50    2    know.

11:50    3    Q.   At this time you were working basically the

11:50    4    nightshift at Rosewood?

11:50    5    A.   Correct.

11:50    6    Q.   And then you got off in the morning at seven

11:50    7    o'clock?

11:50    8    A.   Yes.

11:50    9    Q.   And then you drove home?   How far did you live

11:50   10    from Rosewood?

11:50   11    A.   About five or six minutes.

11:50   12    Q.   So you live pretty close?

11:50   13    A.   Yes.

11:50   14    Q.   And you indicated that Ms. Austin came to your

11:50   15    house?

11:50   16    A.   Yes.

11:50   17    Q.   Did she go inside?

11:50   18    A.   No.

11:50   19    Q.   What, did you guys talk on the porch?

11:50   20    A.   Out in -- by her car.

11:50   21    Q.   How did you know she was there?

11:50   22    A.   She blowed her horn.

11:50   23    Q.   And you looked outside and saw that it was her?

11:50   24    A.   Yes, and I came out.

11:50   25    Q.   Were you still dressed at this time or were you

11:51  1   getting ready for bed?

11:51  2   A.   I can't recall whether I was dressed for bed yet

11:51  3   or was I still in my uniform.

11:51  4   Q.   How many times have you ever been to Ms. Austin's

11:51  5   house?

11:51  6   A.   Several times.

11:51  7   Q.   Did you ever go inside?

11:51  8   A.   Yes.

11:51  9   Q.   Did you guys ever go out anywhere for lunch,

11:51  10  dinner?

11:51  11  A.   Yes, we have.

11:51  12  Q.   Where did you go?

11:51  13  A.   I know we have went to several Christmas parties

11:51  14  that the company have, you know.

11:51  15  Q.   So usually when you saw Ms. Austin it was

11:51  16  work-related, right?

11:51  17  A.   The majority of the time.

11:51  18  Q.   And you didn't really associate with her that much

11:51  19  outside of work, did you?

11:51  20  A.   Several times we have went places.

11:51  21  Q.   Okay.  And that's over a period of eight years?

11:52  22  A.   Yes.

11:52  23        **MR. BARLOW:**   I have no further questions,

11:52  24  Your Honor.

11:52  25        **THE COURT:**   Redirect?

11:52    1                    **REDIRECT EXAMINATION**

11:52    2   **BY MR. HARRELL:**

11:52    3   Q.  Ms. Clark, did you ever have Christmas dinner with

11:52    4   Ms. Austin?

11:52    5   A.  It was during -- I don't know if it was Christmas

11:52    6   but it was the holiday season that I had went by her

11:52    7   home.

11:52    8   Q.  And y'all had a holiday meal together?

11:52    9   A.  Yes.

11:52   10   Q.  And it's your position that y'all were very good

11:52   11   friends during the time that y'all worked together?

11:52   12   A.  Yes.

11:52   13            MR. HARRELL:  Nothing further.

11:52   14            THE COURT:  Ma'am, you may step down.

11:52   15            *(Witness excused.)*

11:52   16            Your next witness?

11:52   17            MR. HARRELL:  Defense calls Tonette Arnold.

11:54   18       **TONETTE ARNOLD, DEFENSE WITNESS, DULY SWORN**

11:54   19            **MADAM CLERK:**  Be seated.  Please state your

11:54   20   full name and spell your last name for the record.

11:54   21            THE WITNESS:  Tonette Arnold, A-r-n-o-l-d.

11:54   22            THE COURT:  All right, go ahead, Mr. Harrell.

11:54   23                    **DIRECT EXAMINATION**

11:54   24   **BY MR. HARRELL:**

11:55   25   Q.  Good morning, Ms. Arnold.

11:55    1    A.    Hi.

11:55    2    Q.    Where are you employed?

11:55    3    A.    Rosewood Manor nursing home.

11:55    4    Q.    And how long have you been employed at Rosewood?

11:55    5    A.    Thirty years.

11:55    6    Q.    Were you employed during the entire tenure of

11:55    7    Ms. Austin's employment?

11:55    8    A.    Yes.

11:55    9    Q.    And she was there for approximately 19 years?

11:55   10    A.    Yes, I guess, probably.

11:55   11    Q.    So y'all worked together almost 20 years?

11:55   12    A.    Yes.

11:55   13    Q.    During that time did y'all become friends?

11:55   14    A.    Yes.

11:55   15    Q.    Would you say she's a good friend of yours?

11:55   16    A.    Yeah, she's a good friend.   I mean, we was more

11:55   17    closer at work.

11:55   18    Q.    So when you worked together y'all were closer than

11:55   19    you are now?

11:55   20    A.    Yes.

11:55   21    Q.    And y'all talked to one another on the phone

11:55   22    regularly during that time?

11:55   23    A.    You mean when we was working together or now?

11:55   24    Q.    When y'all were working together did you talk on

11:55   25    the phone regularly?

11:55  1   A.   We talked.   Not just like an everyday basis thing,

11:55  2   you know, but we did talk.   Mostly our talking was at

11:55  3   work.

11:55  4   Q.   Have you ever spent time with her outside of work?

11:56  5   A.   Yes.

11:56  6   Q.   Frequently?

11:56  7   A.   I mean, we used to have outings, family outings,

11:56  8   you know.   If I had something, she would come over,

11:56  9   and she would invite me to her house.

11:56 10   Q.   And during the course of this friendship, did

11:56 11   y'all confide in one another when y'all had problems?

11:56 12   A.   Well, you know, it wasn't like -- let me see how

11:56 13   could I put this.   You know, if something happened

11:56 14   with her on the job or something at work, she might

11:56 15   say something.   But as far as just discussing a

11:56 16   problem, no.

11:56 17   Q.   So if something happened at work, she would tell

11:56 18   you what was going on?

11:56 19   A.   When I'd come in she would, yes.

11:56 20   Q.   During the last few months of her employment, did

11:56 21   Ms. Austin ever say anything to you about believing

11:56 22   that she was being discriminated against on the basis

11:56 23   of her age?

11:56 24   A.   No.

11:56 25   Q.   Did she ever mention age at all?

| 11:56 | 1 | A.   No. |
| 11:56 | 2 | Q.   Did she ever indicate to you that she believed she |
| 11:56 | 3 | was being retaliated against because she had made |
| 11:56 | 4 | complaints about age discrimination? |
| 11:56 | 5 | A.   No, uh-uh. |
| 11:57 | 6 | **MR. HARRELL:**  Tender the witness. |
| 11:57 | 7 | **THE COURT:**  Mr. Barlow? |
| 11:57 | 8 | **CROSS-EXAMINATION** |
| 11:57 | 9 | **BY MR. BARLOW:** |
| 11:57 | 10 | Q.   Good morning, Ms. Arnold. |
| 11:57 | 11 | A.   Good morning. |
| 11:57 | 12 | Q.   You were asked a very particular -- a set of very |
| 11:57 | 13 | particular questions about any complaints that |
| 11:57 | 14 | Ms. Austin may have made to you. |
| 11:57 | 15 | A.   Uh-huh. |
| 11:57 | 16 | Q.   Are you part of HR?  Are you part of Rosewood's HR |
| 11:57 | 17 | department? |
| 11:57 | 18 | A.   HR?  What you mean? |
| 11:57 | 19 | Q.   Human resources, yes, ma'am. |
| 11:57 | 20 | A.   Yes, I mean -- |
| 11:57 | 21 | Q.   You think you're part of the human resources |
| 11:57 | 22 | department? |
| 11:57 | 23 | A.   I don't get -- |
| 11:57 | 24 | Q.   It's not a trick question, ma'am.  Are you |
| 11:57 | 25 | familiar with the -- |

11:57  1   A.   Well, if you need help or to go somewhere, is that

11:57  2   what you're talking about?

11:57  3   Q.   Yeah, if you've got a problem.

11:57  4   A.   If you've got a problem, yes.

11:57  5   Q.   You think you're still part of HR?

11:58  6   A.   Yeah, if I needed to go to them, I would.

11:58  7   Q.   No.  What I'm asking is, were you part of HR?

11:58  8   A.   I really don't understand what you're saying.  Am

11:58  9   I a part of them?

11:58  10          **THE COURT:**  Did you or do you -- at the time

11:58  11  that Ms. Austin was employed at Rosewood, did you work

11:58  12  in the HR department?

11:58  13          **THE WITNESS:**  No, ma'am.

11:58  14          **THE COURT:**  I think that was the question.

11:58  15  Thank you.

11:58  16          **MR. BARLOW:**  Thank you, Your Honor.

11:58  17  **BY MR. BARLOW:**

11:58  18  Q.   You had indicated that you and Ms. Austin were

11:58  19  good friends; is that right?

11:58  20  A.   Yes, we were.

11:58  21  Q.   How many times would you guys have family outings?

11:58  22  A.   I mean, if my kids would have a birthday party or

11:58  23  something -- they was young then, so this has been

11:58  24  through the years -- she would come over.

11:58  25  Q.   So how many outings do you think you guys had over

11:58   1   those 20 years?

11:58   2   A.   Oh, I can't recall that.

11:58   3   Q.   Was it four or five times a year?

11:58   4   A.   No, not -- no.

11:58   5   Q.   Do you think it was more or less than five times a

11:58   6   year?

11:58   7   A.   If they had a birthday party or if she had

11:58   8   something and she would invite me or whatever,

11:59   9   sometimes I would make it and sometimes I wouldn't.

11:59   10   Q.   You don't really -- is it fair to say you don't

11:59   11   really recall how many times that you guys --

11:59   12   A.   No, I don't recall over all that time, no, I

11:59   13   don't.

11:59   14   Q.   Now, did Ms. Austin ever complain to you about

11:59   15   Mr. Lewis, without regard to retaliation or

11:59   16   discrimination?

11:59   17   A.   She never talked to me about no discrimination.

11:59   18   What she would tell me is that -- when I'd come in to

11:59   19   work, she would say he did this or he did that, but it

11:59   20   was never about no discrimination.   I never heard of

11:59   21   no discrimination.

11:59   22   Q.   So did you notice anything at work that she was

11:59   23   complaining about?

11:59   24   A.   Just what she'd tell me.   The only thing I can go

11:59   25   by is whatever she would tell me when I would come in.

11:59   1   I worked in the evening, I never worked in the

11:59   2   mornings.

11:59   3   Q.   So you wouldn't have been there when Mr. Lewis and

11:59   4   Ms. Austin were interacting?

11:59   5   A.   No.   She would tell me whatever be said.

11:59   6   Q.   And what time did Ms. Austin get off work?

11:59   7   A.   I couldn't -- I don't know, three o'clock or

11:59   8   whatever.

12:00   9   Q.   Were you leaving work when Ms. Austin was getting

12:00   10   to work?

12:00   11   A.   Was I leaving work?

12:00   12   Q.   Yes, ma'am.

12:00   13   A.   I would come in -- I worked in the evening time.

12:00   14   Q.   But do you recall --

12:00   15   A.   Sometimes I worked at night.   I don't recall

12:00   16   whether I was doing the 11-to-7 then or the 3-to-11

12:00   17   because it's been a while.   But whenever I came to

12:00   18   work and whatever was told to me, it came from

12:00   19   Henrietta.

12:00   20   Q.   What I'm asking is, how long were you on the

12:00   21   11-to-7 shift before Ms. Austin --

12:00   22   A.   How long was I on it?

12:00   23   Q.   Yes, ma'am.

12:00   24   A.   I can't recall.

12:00   25   Q.   Is it -- was it a period of years that you were on

12:00  1   the 11-to-7 shift?

12:00  2   A.   No, it wasn't no years, because sometimes I would

12:00  3   do a 3-to-11 or I would work at night, so I really

12:00  4   can't recall.

12:00  5   Q.   But you recall when Ms. Austin was actually

12:00  6   leaving on her last day that you were working the

12:00  7   eleven p.m. to seven a.m. shift?

12:01  8   A.   On her last day she left?

12:01  9   Q.   Yes.

12:01  10  A.   The last day she left I didn't even know she had

12:01  11  left until I got to work and some of the other

12:01  12  employees said she had walked off the job that day.

12:01  13  Q.   So what I'm asking is, were you on the eleven p.m.

12:01  14  to seven a.m. shift?

12:01  15  A.   I don't think I was.  I think I was doing the

12:01  16  evening shift.  I can't recall.

12:01  17  Q.   So do you have any personal knowledge of what

12:01  18  Ms. Austin said or may not have said on her last day

12:01  19  at work?

12:01  20  A.   I was just told she walked off that day.

12:01  21  Q.   Who told you that?

12:01  22  A.   Somebody at work.  There was just the rumor going

12:01  23  around that Henrietta had left work.

12:01  24        **MR. BARLOW:**  Thank you.

12:01  25        **THE WITNESS:**  You're welcome.

*Tonette Arnold - Redirect/Harrell*                    156

12:01   1          **THE COURT:**  Redirect?

12:01   2                   **REDIRECT EXAMINATION**

12:01   3   **BY MR. HARRELL:**

12:01   4   Q.   Ms. Arnold, with regards to the issues that

12:01   5   Ms. Austin brought to your attention about Mr. Lewis,

12:01   6   were those all related to the workload?

12:01   7   A.   She would -- she would say that he's putting --

12:01   8   you know, have her doing more than the others.

12:01   9   Q.   So it was all related to workload, and it had

12:02  10   nothing to do with her believing that he was doing

12:02  11   something because of her age?

12:02  12   A.   No.

12:02  13          **MR. HARRELL:**  Nothing further.

12:02  14          **THE COURT:**  Ma'am, you may step down.

12:02  15          *(Witness excused.)*

12:02  16          **MR. HARRELL:**  The Defense rests.

12:02  17          **THE COURT:**  Thank you.

12:02  18          Mr. Barlow, do you all have anything in

12:02  19   rebuttal?

12:02  20          **MR. BARLOW:**  No, Your Honor.

12:02  21          **THE COURT:**  All right, ladies and gentlemen,

12:02  22   we're going -- you've now heard all the evidence to be

12:02  23   presented in the trial.  The next phase of the trial

12:02  24   will be your instructions on the law and then the

12:02  25   closing arguments of counsel and then you'll retire to

12:02  1    consider the verdict in the case.

12:02  2         We're going to go ahead and take a lunch

12:02  3    recess now.  I need to work with the attorneys in

12:02  4    finalizing the jury instructions, because when you

12:02  5    come back from lunch, then that will be the next thing

12:03  6    we do is you'll be instructed on the law.

12:03  7         So I'm going to take an hour-and-a-half, so

12:03  8    I'm going to ask you to come back at 1:30.  You may

12:03  9    want to make a phone call to your loved ones, let them

12:03  10   know that you may be a little bit later tonight.  And

12:03  11   you may not be, I don't know.  We never know how long

12:03  12   a jury will require for its deliberations, but you'll

12:03  13   definitely get the case today for deliberation.

12:03  14        Very important during your lunch recess, do

12:03  15   not discuss the case at all, not amongst yourselves

12:03  16   nor with anyone else.  Even though you have now heard

12:03  17   all the evidence, you haven't received your

12:03  18   instructions on the law, nor have you heard the

12:03  19   closing arguments of counsel.

12:03  20        The time for you all to discuss the case is

12:03  21   coming soon, but we're not quite there yet, so please

12:03  22   no discussions about it.  Also, avoid any news reports

12:03  23   of the trial, should there be any; and please don't

12:03  24   begin to form any opinion yet about the merits.

12:03  25   Again, that time is coming soon, but we're not quite

12:03   1   there yet.

12:03   2          Enjoy your lunch.  Thank you for your service

12:03   3   this morning, and we'll see you back at 1:30.  Please

12:04   4   leave your pads on your chairs.

12:04   5          *(Jury out.)*

12:04   6          I'd like to go ahead and -- first I'd like to

12:04   7   hear the Rule 50 motion, please.

12:04   8          **MR. HARRELL:**  Can I have one moment, Your

12:04   9   Honor, to prepare?

12:04  10          **THE COURT:**  All right.

12:04  11          Go ahead, Mr. Harrell.  I'm going to ask you

12:06  12   to come up to the lectern, please, so I can hear you.

12:06  13          **MR. HARRELL:**  There's a couple of issues that

12:06  14   I'd like to address in this motion, Your Honor.  First

12:06  15   regarding the mini suspension.  The evidence on that

12:06  16   has been somewhat expanded.  And I think in this case

12:06  17   there's -- the evidence shows that there was no actual

12:06  18   suspension, there was no mini suspension whatsoever.

12:06  19          Ms. Austin's own testimony -- and I wrote it

12:06  20   down to quote her -- was that Mr. Lewis told her "If

12:06  21   you won't do the dining room then go clock out."  So

12:06  22   he's telling her, *If you're refusing to do your job*

12:06  23   *duties then at that point you should clock out.*  She's

12:06  24   left with a choice, and she chooses to clock out.

12:07  25   She's not told she has to clock out.

12:07  1      In fact, we heard additional evidence that

12:07  2  when she called Ms. Partridge, that Ms. Partridge told

12:07  3  her to wait, don't leave the facility, wait, don't

12:07  4  clock out, stay there.  Ms. Williamson additionally

12:07  5  tells her don't leave the facility.

12:07  6      So in order for this mini suspension issue to

12:07  7  get to the jury, you have to show that she was in fact

12:07  8  subjected to an adverse employment action.  She claims

12:07  9  that that was when Mr. Lewis told her to clock out.

12:07  10  And if he just said "Clock out and leave," that would

12:07  11  be different.  But her own testimony is that he said

12:07  12  "If you won't do your job, clock out."  And for that

12:07  13  reason we don't think that there is a triable issue on

12:07  14  whether there was an actual suspension or mini

12:07  15  suspension in this case.

12:07  16      **THE COURT:**  Okay.

12:07  17      **MR. HARRELL:**  Secondly, in order -- the case

12:07  18  law in the Eleventh Circuit is very clear that an

12:08  19  employee has to establish that a decisionmaker knows

12:08  20  of complaints of discrimination in order to be able to

12:08  21  retaliate.  If a decisionmaker is unaware, he can't

12:08  22  retaliate.

12:08  23      Now, Ms. Partridge was very clear in her

12:08  24  testimony, and it's uncontroverted, that she never

12:08  25  told, one, that Ms. Austin never complained to her

12:08  1   about age discrimination, but more importantly --

12:08  2        THE COURT:  Well, that -- there's no Rule 50

12:08  3   on there -- or motion --

12:08  4        MR. HARRELL:  Sure, there's issues of fact on

12:08  5   that, but more importantly to the issue is she said

12:08  6   she never had any discussion with Dwayne Lewis

12:08  7   regarding any complaints of age discrimination.

12:08  8        THE COURT:  Right, but Ms. Austin's testimony

12:08  9   was -- and nobody called Mr. Lewis, so he's kind of

12:08  10  the elephant in the room right now.  So what you have

12:08  11  from Ms. Austin is her conversations with Mr. Lewis

12:09  12  that are uncontroverted, and that Mr. Lewis told her

12:09  13  that he was aware that she had been to Ms. Partridge

12:09  14  and that she shouldn't have gone to Ms. Partridge and

12:09  15  complained, and then, according to Ms. Austin, then of

12:09  16  course she says he piled work on her.  But that's in

12:09  17  the record and it's uncontroverted.

12:09  18        MR. HARRELL:  Well, I believe that the

12:09  19  testimony, though, is the discussion was about the

12:09  20  workload.

12:09  21        THE COURT:  No, I disagree.  I think it's for

12:09  22  the jury -- I mean, I think you have an argument, but

12:09  23  I think it's for the jury to decide what was

12:09  24  discussed, because what I have in my notes is that she

12:09  25  complained to Ms. Partridge, she said on several

12:09  1    occasions, that Mr. Lewis was piling work on her and

12:09  2    saying that she needs to retire.

12:09  3          Now, that's subject to argument in terms of

12:09  4    what the jury might infer from that.  It might infer

12:10  5    that he thought she was too old to be working there.

12:10  6    It might also infer that she was telling everybody

12:10  7    else she was looking to retire and that's what it was

12:10  8    based on.

12:10  9          She also said she told Ms. Partridge that

12:10  10   Mr. Lewis was always telling her she's too old to be

12:10  11   complaining.

12:10  12         Mr. Lewis, according to Ms. Austin, said she

12:10  13   shouldn't have complained to Ms. Partridge.  I mean,

12:10  14   that's what's in the record.  Now, Ms. Partridge

12:10  15   disputes that, and I think you certainly have an

12:10  16   argument for the jury about it.

12:10  17         **MR. HARRELL:**  Fair enough, Your Honor.

12:10  18         **THE COURT:**  But Mr. Lewis is not here, and so

12:10  19   those facts about what Mr. Lewis said are the only

12:10  20   thing in the record about what Mr. Lewis said.

12:11  21         I do want, though, to ask you to address --

12:11  22   and I suspect this is part of your motion, but I'm

12:11  23   going to ask you to get to it and then I'll let you

12:11  24   get back to whatever else you have.  But on the box

12:11  25   fan write-up, you all objected to that as an exhibit,

12:11  1   and I allowed it in.  Ms. Austin's testimony was very

12:11  2   -- probably the clearest in regards to the box fan

12:11  3   write-up in terms of the timing and sort of the

12:11  4   sequence of how that came about.

12:11  5        Mr. Branning made the point, I think, in his

12:11  6   cross-examination of Ms. Austin that she had -- you

12:11  7   know, this was the first time in her direct that you

12:11  8   all had heard anything about the box fan write-up

12:11  9   being related to her claim.

12:11  10       But in her deposition -- and I had mentioned

12:11  11  up here at the bench -- I don't think, Mr. Harrell,

12:12  12  you were up here, I think it was just Mr. Branning and

12:12  13  Mr. Barlow.  But when they were up here at the bench

12:12  14  and we were discussing this, I mentioned that the

12:12  15  write-up was attached to the deposition of Ms. Austin

12:12  16  as an exhibit.

12:12  17       And so I asked Mr. Jacobs to go and look at

12:12  18  that.  And I don't know if, Mr. Branning, you were at

12:12  19  the depo or not, I don't know, it might have just been

12:12  20  Mr. Harrell.  But someone specifically asked

12:12  21  Ms. Austin on page 166 of the deposition when talking

12:12  22  about this fan write-up, line 18, the question is:

12:12  23       "Did you believe you got this write-up

12:12  24  because of your age?"  And she says, "I sure do."  And

12:12  25  then it goes on and you ask her why.

12:12  1          So the box fan never came up.  This write-up

12:13  2    was never argued in the summary judgment by anybody.

12:13  3    It just wasn't.  But it's evidence in this trial.  So

12:13  4    I'd like to hear your, I guess, your position on the

12:13  5    box fan write-up as an adverse employment action.

12:13  6          Because the testimony that we have right now

12:13  7    from Ms. Austin is that she complained to Ms.

12:13  8    Partridge, referenced Mr. Lewis, you know, piling work

12:13  9    on her, telling her she needed to retire, Mr. Lewis

12:13 10    then tells her she shouldn't have complained, and then

12:13 11    she gets the box fan write-up, all in sequence.  That

12:13 12    was the testimony.

12:13 13          **MR HARRELL:**  Well, Your Honor, for purposes

12:13 14    of our motion, I don't know that we -- I think there's

12:13 15    -- I think that's an issue that probably has to be

12:14 16    argued.  Can I have one second to confer?

12:14 17          **THE COURT:**  Sure, certainly.

12:14 18          *(Conference between Defense counsel.)*

12:14 19          **MR. HARRELL:**  I mean, based off the testimony

12:14 20    at trial, I think there's an issue with -- there's a

12:14 21    jury issue on that.

12:14 22          **THE COURT:**  Okay.  So then we have the box

12:14 23    fan write-up as an adverse employment action for the

12:14 24    jury.  We have the extra work, the dining room.  I

12:14 25    think that that -- the time frame of that, from the

12:14    1    best that I can glean, that all was in the January

12:14    2    time frame, and so I think that, too, is a jury

12:14    3    question.

12:15    4         But now turning to the last day of -- and

12:15    5    this may be more of a -- I don't want to make your

12:15    6    argument for you, but just to cut to what's important

12:15    7    in my mind right now, this may be more of a question

12:15    8    -- or will be for Mr. Barlow.  This last day I have

12:15    9    trouble finding a jury question as far there being any

12:15   10    adverse employment action.

12:15   11         The testimony was unclear at best, and maybe

12:15   12    a little confusing at worst, as far as the dates and

12:15   13    how things unfolded before that date on April 12th,

12:15   14    2013, of her last day of employment.

12:15   15         I can't find in my notes any specific day

12:15   16    that she says she complained to Ms. Partridge about

12:16   17    being treated differently because of her age in close

12:16   18    relation to that date.  I mean, the only -- we're back

12:16   19    to January.  I mean, that's -- and that's giving

12:16   20    Ms. Austin the benefit of all reasonable inferences

12:16   21    that can be drawn from the evidence, and that's the

12:16   22    standard on this Rule 50 I'm going to apply.  I don't

12:16   23    see anything after January.

12:16   24         **MR. BARLOW:**  I'm sorry, you don't see any

12:16   25    what after January?

12:16   1          **THE COURT:**  Complaints to Ms. Partridge.  I

12:16   2    don't have a date.  And I have to find that there's a

12:16   3    causal connection that's sufficient to send this to

12:16   4    the jury, and I don't see it.

12:16   5          **MR. BARLOW:**  What part don't you -- you're

12:16   6    talking about the last day?

12:16   7          **THE COURT:**  I'm talking about the last day in

12:16   8    terms of an adverse employment action.  We have -- let

12:17   9    me back up.  We have the box fan write-up, which was

12:17   10   in January.  We have the additional duties from the

12:17   11   dining room that sounds like January time frame again.

12:17   12          I think Ms. Austin's testimony was after the

12:17   13   box fan write-up, it was two to three weeks that she

12:17   14   got the second -- the add-on of the afternoon for the

12:17   15   dining room, I believe.  So I'm not sure, I think the

12:17   16   soiled utility room was around the same time frame,

12:17   17   but in any event --

12:17   18          **MR. BARLOW:**  I believe that she testified

12:17   19   that after the first where she got the first -- we'll

12:17   20   call it job change in the morning, that was shortly

12:17   21   after she got written up for the box fan.  And then I

12:17   22   believe she testified it was maybe two or three weeks

12:18   23   later that she went to Ms. Partridge and talked about

12:18   24   getting that morning --

12:18   25          **THE COURT:**  I think you're -- that's fine, I

12:18    1    don't dispute that.  But I still think we're in the

12:18    2    January time frame, if not, maybe very early February.

12:18    3    And she just never said.  I mean, and she may not

12:18    4    remember.  And believe me, I empathize, because I have

12:18    5    more and more trouble with dates myself.  But I have

12:18    6    to look at the record.  And I can't allow her to -- we

12:18    7    certainly can't make up a date.  When I'm looking at a

12:18    8    causal connection, I have to see what's specific in

12:18    9    the record, and it can't just be this, well, you know,

12:18   10    somewhere between January and April.

12:18   11         MR. BARLOW:  I believe that she -- if the

12:18   12    jury finds from the write-up, which I believe was

12:18   13    January 10, Ms. Austin said, hey, it took me about two

12:19   14    weeks that I went and talked to Mr. Lewis and I told

12:19   15    him, yeah, I don't think it's fair, you're not doing

12:19   16    this stuff right, and shortly after that -- so right

12:19   17    now we're already into January two weeks later.  So

12:19   18    that puts us at the end of January, January, I guess,

12:19   19    24th or 25th, and then she gets the dining room in the

12:19   20    morning and so we're --

12:19   21         THE COURT:  No, but what you're missing is,

12:19   22    where are the complaints to Ms. Partridge and the

12:19   23    dates of those complaints?

12:19   24         MR. BARLOW:  Three weeks after she got that

12:19   25    morning shift she went to Ms. Partridge.

12:19    1           **THE COURT:**  I don't think she said that.

12:19    2           **MR. BARLOW:**  Okay.

12:19    3           **THE COURT:**  I don't think she said that, but

12:19    4    I'll look at it again.  But in the Eleventh Circuit

12:19    5    the best case for Ms. Austin is maybe two months on

12:19    6    the outside between a complaint and an adverse

12:19    7    employment action or protected conduct, exercise of

12:19    8    protected rights in an adverse employment action for a

12:19    9    causal connection.

12:19   10           And it's -- I just don't see anything

12:20   11    specific enough.  But I'll let you -- I'll give you

12:20   12    time during the remaining lunch hour to look at this.

12:20   13    I can't do the whole lunch hour.  I'll give you 15

12:20   14    minutes or so and come back in, because we have to

12:20   15    finalize the jury instructions, is the point here.

12:20   16           But right now I'm not seeing it as far as --

12:20   17    we're not talking about discrimination.  There's no

12:20   18    discrimination claim here, there's no constructive

12:20   19    discharge claim.

12:20   20           So we're looking really at this was she told

12:20   21    to clock out.  And there's an issue here with the

12:20   22    timing in my mind.  And then, as Mr. Harrell just

12:20   23    argued, even her own testimony was she wasn't told to

12:20   24    clock out, she was told to clock out if she didn't

12:20   25    want to do her job.

12:20   1          **MR. BARLOW:**  I believe Ms. Austin testified

12:20   2    that she understood what she was told by Mr. Lewis was

12:21   3    to, in effect, clock out.

12:21   4          **THE COURT:**  I guess I thought the testimony

12:21   5    was that she was told to clock out if she wasn't going

12:21   6    to do her job.

12:21   7          **MR. BARLOW:**  Well, I think that's what a lot

12:21   8    of folks would say, hey, if you don't want to do the

12:21   9    job that I've ascribed you that you believe is

12:21   10   retaliatory without any help, then, yeah, just clock

12:21   11   out.  That's how I took her testimony and that's how I

12:21   12   would argue it to the jury.

12:21   13         **THE COURT:**  I guess, first and foremost,

12:21   14   there has to be a causal connection in order for me to

12:21   15   find that a jury could conclude that there was a

12:21   16   connection between a complaint or an exercise of

12:21   17   protected rights and this statement by Mr. Lewis to

12:21   18   clock out.

12:21   19         As far as the adverse employment action in

12:21   20   relation to the, quote/unquote, "threat of a write-up

12:21   21   for insubordination," I'm going to grant the motion on

12:22   22   that.  The jury can -- well, depending on what I

12:22   23   decide as far as the adverse employment action on the

12:22   24   issue of being told to clock out, if I find that that

12:22   25   could be considered an adverse employment action, then

12:22   1   I'll let the jury at least consider it for context.

12:22   2   But otherwise, I don't think that the threat of it

12:22   3   just alone is enough.

12:22   4            So where I think I'm going to end up on the

12:22   5   Rule 50 Motion is that there is a jury question on the

12:22   6   write-up for the box fan and the additional duties.

12:22   7            But, Mr. Barlow, like I said, I'll give you a

12:22   8   few minutes if you want to look back at your notes, if

12:22   9   you think that Ms. Austin sufficiently identified a

12:22   10  date close enough in time where she complained to

12:22   11  Ms. Partridge about age discrimination or treatment by

12:23   12  Mr. Lewis.

12:23   13           **MR. BARLOW:**  Just so I'm clear on what the

12:23   14  Court is ruling, you're talking about the last day?

12:23   15           **THE COURT:**  I'm talking about the last day.

12:23   16  I mean, the jury has heard it, and I'm not going to

12:23   17  tell the jury to disregard what they heard.  I mean,

12:23   18  it still could be evidence of Mr. Lewis and -- it was

12:23   19  her relationship with him, it was her employment

12:23   20  relationship.  I mean, they've heard that.

12:23   21           But as far as me identifying for them in the

12:23   22  jury instructions or the verdict form an adverse

12:23   23  employment action in connection with that date, that's

12:23   24  where I'm having trouble.

12:23   25           **MR. BARLOW:**  I understand, Your Honor.

12:23  1        **THE COURT:**  So I do think that for purposes

12:23  2  of the jury that I will identify the adverse

12:23  3  employment actions even on the verdict form, the two

12:23  4  right now that I think go to the jury, one being the

12:23  5  box fan write-up, and the other being -- I'm going to

12:24  6  just call it the additional duties.

12:24  7        And I think you can argue -- I'm okay with

12:24  8  you arguing about both dining rooms and the soiled

12:24  9  utility room.

12:24  10        **MR. HARRELL:**  The only thing left in our

12:24  11  motion would be to discuss punitive damages, but I

12:24  12  don't know where you stand on that, so I don't know if

12:24  13  we need to press forward with that at this stage or

12:24  14  not.

12:24  15        **THE COURT:**  Well, I'm not going to allow the

12:24  16  punitive damages to go.  I went back and looked, and

12:24  17  there's absolutely nothing in the pretrial stipulation

12:24  18  about it.

12:24  19        The Court's order setting trial told you all

12:24  20  to discuss the issue of damages, discuss the law

12:24  21  surrounding damages.  It appears you all did that.

12:24  22  And then something caused the Defendants not to pursue

12:24  23  that in their briefing with the Court.

12:25  24        The Defendants did pursue compensatory

12:25  25  damages, so there's a section in their trial brief on

12:25  1   compensatory damages.  I would have to find without

12:25  2   any finding of bad faith or anything like that on your

12:25  3   part, Mr. Barlow, I don't make that finding at all, it

12:25  4   might have been just a miscommunication, but that

12:25  5   wasn't briefed, it should have been briefed if it was

12:25  6   an issue, and I believe the Defendants would have

12:25  7   briefed it if it had been fully disclosed to them as

12:25  8   being an issue, and it wasn't.

12:25  9        So for that reason I'm not going to allow it.

12:25  10  But also, to the extent the Title VII standard

12:25  11  applies, which would be malice or reckless

12:25  12  indifference to Ms. Austin's federally protected

12:25  13  rights, there's not sufficient evidence to support

12:25  14  that going to the jury, not without Mr. Lewis here,

12:26  15  the one that took most of the actions that are

12:26  16  complained of here.  And based on what I've heard here

12:26  17  with Mr. Partridge, there's not enough for that type

12:26  18  of a standard to be met.

12:26  19        Mr. Barlow, do you want a few minutes to look

12:26  20  at notes?

12:26  21        **MR. BARLOW:**  No, Your Honor.

12:26  22        **THE COURT:**  All right.  Then I'm going to --

12:26  23  Ms. Jacobs and I are going to go revise the jury

12:26  24  instructions.  I know you all need to grab a bite to

12:26  25  eat.  Can you hang around, and we'll try to get this

| | | |
|---|---|---|
| 12:26 | 1 | done very quickly and get them back to you, and you |
| 12:26 | 2 | can take them with you and hopefully can somewhere |
| 12:26 | 3 | close, Blimpie's or somewhere, and grab a bite to eat, |
| 12:26 | 4 | look at them, and then when you come back maybe five |
| 12:26 | 5 | minutes before the jury comes in we can walk through |
| 12:26 | 6 | them one last time.  All right? |
| 12:26 | 7 | MR. HARRELL:  Thank you. |
| 12:26 | 8 | THE COURT:  We'll get them out to you in just |
| 12:27 | 9 | a minute. |
| 12:27 | 10 | MR. HARRELL:  Your Honor, what time is the |
| 12:27 | 11 | jury to be back? |
| 12:27 | 12 | THE COURT:  1:30. |
| 12:27 | 13 | MR. HARRELL:  I just wanted to make sure I |
| 12:27 | 14 | have the correct time. |
| 12:27 | 15 | THE COURT:  But don't leave yet. |
| 01:28 | 16 | MR. HARRELL:  Thank you. |
| 01:28 | 17 | (Recess taken 12:27 p.m. to 1:37 p.m.) |
| 01:37 | 18 | THE COURT:  You all have the final version of |
| 01:37 | 19 | the instructions.  Your copies have the headings on |
| 01:37 | 20 | them.  The actual instructions given to the jury will |
| 01:37 | 21 | not contain those headings, but otherwise they will be |
| 01:37 | 22 | the same as what you have. |
| 01:37 | 23 | I was going to seat the jury, but I |
| 01:37 | 24 | understand the Defense wants -- there's some issue |
| 01:37 | 25 | about case law? |

01:37   1          **MR. HARRELL:**  No.  Two things, Your Honor.

01:37   2   One, the verdict form that was sent out still had the

01:37   3   punitive damages -- I'm sorry --

01:37   4          **THE COURT:**  That would surprise me, but let

01:37   5   me check.

01:37   6          **MR. HARRELL:**  Yeah, the verdict form still

01:37   7   has the punitive damages pieces of it in there.

01:38   8          **THE COURT:**  Mine doesn't, so I apologize if

01:38   9   yours does.

01:38   10          **MR. HARRELL:**  Can we get a copy of the

01:38   11   verdict form?  I was going to use it in closing.

01:38   12          **THE COURT:**  Yes.  I apologize for that.

01:38   13          **MR. HARRELL:**  And then, the only thing else I

01:38   14   wanted to do was to make sure that we're clear on the

01:38   15   record, we discussed this earlier this morning, we had

01:38   16   asked for additional case law to be discussed

01:38   17   regarding what is an adverse employment action.  We

01:38   18   understand that the Court has denied that request

01:38   19   and --

01:38   20          **THE COURT:**  I don't know what you're talking

01:38   21   -- additional case law to be discussed on adverse

01:38   22   employment action?

01:38   23          **MR. HARRELL:**  In our proposed jury

01:38   24   instructions we had --

01:38   25          **THE COURT:**  Oh, language in the jury

01:38    1    instructions.

01:38    2         **MR. HARRELL:**  Yes, Your Honor.  I apologize

01:38    3    if I didn't say that eloquently enough.  We had asked

01:38    4    for additional language related to adverse employment

01:38    5    action based on Eleventh Circuit case law.  We

01:38    6    understand that the Court has denied that, but we just

01:38    7    wanted to make sure we've preserved that for the

01:38    8    record.

01:38    9         **THE COURT:**  I see.  You've raised that issue,

01:38   10    it's been denied, and it's preserved in the record.

01:38   11    My position on it is it's a very lengthy instruction,

01:39   12    and comprehensive instruction that's in the pattern on

01:39   13    this claim covers the law sufficiently, and that the

01:39   14    additional language is superfluous, not necessary.

01:39   15         **MR. HARRELL:**  I understand.  Thank you, Your

01:39   16    Honor.

01:39   17         **THE COURT:**  That's preserved.  Anything else

01:39   18    other than the verdict form, which I'm hoping that

01:39   19    Ms. Jacobs --

01:39   20         Did you hear our discussion just now, by

01:39   21    chance?

01:39   22         **MS. JACOBS:**  I'm bringing in new verdict

01:39   23    forms.

01:39   24         **THE COURT:**  Thank you, Tevenia.

01:39   25         Mr. Barlow, how long do you think you'll need

01:39   1   for closing?

01:39   2           **MR. BARLOW:**  Ten minutes, maybe.

01:39   3           **THE COURT:**  What about you all?  Is it --

01:39   4   Mr. Harrell, you're conducting closing?

01:39   5           **MR. HARRELL:**  Yes, Your Honor, and I was

01:40   6   thinking 20 to 30 minutes.

01:40   7           **THE COURT:**  All right, you both -- you'll be

01:40   8   safe if you stay within 30 minutes.

01:40   9           **MR. HARRELL:**  I'll try to be quicker.

01:40   10          **THE COURT:**  Okay.  So, Mr. Barlow, you can

01:40   11  have 30, if you need or want it.

01:40   12          Anything else then before we seat the jury

01:40   13  and I instruct them?  I may not have explained this at

01:40   14  the pretrial conference.  When I instruct the jury, so

01:40   15  I will instruct them up to page -- so through page 17

01:40   16  -- excuse me, no, I'm sorry -- through page 15.  I

01:40   17  apologize -- well, hang on.  This is a little bit

01:41   18  different than in a criminal case.

01:41   19          So I will instruct them through page 17, then

01:41   20  you'll make your closings, and then I will wrap up

01:41   21  with the final instruction on page 18.  Of course, you

01:41   22  can still refer to the verdict form, I just will not

01:41   23  have explained it to them at that point, so it will be

01:41   24  the first time they've seen the verdict form when you

01:41   25  all discuss it, if you choose to, in your closing.

01:41   1    They will have heard all the other instructions, but

01:41   2    they will not have seen the verdict form yet.  And

01:41   3    then, after you give your closings, I'll give the

01:41   4    final on page 18, which does reference the verdict

01:41   5    form.

01:41   6            **MR. HARRELL:**  Your Honor, for purposes of the

01:41   7    closing, can we move back and forth?  We're going to

01:41   8    use the ELMO --

01:41   9            **THE COURT:**  Yes, that will be fine, not a

01:41   10   problem.

01:42   11           **MR. HARRELL:**  Thank you, Your Honor.

01:42   12           **THE COURT:**  Just don't go in the other

01:42   13   direction.

01:42   14           If nothing else, then, we'll bring the jury

01:42   15   in, please, Mr. Thomas, and we'll get them seated.

01:43   16           *(Jury in the box.)*

01:43   17           **THE COURT:**  Ladies and gentlemen, I hope you

01:43   18   had a nice lunch.  As always, I appreciate your

01:43   19   patience.  We are now ready to proceed with the trial.

01:43   20   As I explained earlier, the next phase in the trial

01:43   21   will be your instructions on the law.  And then

01:44   22   following the instructions I'll give to you, the

01:44   23   attorneys will then follow with their closing

01:44   24   arguments, and then I'll have one final instruction to

01:44   25   give you at the very end of the trial.

01:44   1        So in just a moment I'll start with the
01:44   2   instructions.  But before I do, I'd like to take just
01:44   3   a second to thank you all very much for your service
01:44   4   as jurors during the trial.  The trial has been
01:44   5   relatively brief in terms of duration, but that
01:44   6   doesn't in any way diminish the importance of your
01:44   7   duty as jurors.  Whether a trial lasts two days, two
01:44   8   weeks, or two months, a juror's duty and the
01:44   9   importance of that duty are the same.
01:44   10       I've noted that you all have been very
01:44   11  attentive, you've paid attention as the evidence was
01:44   12  presented to you by the attorneys.  I know you will
01:44   13  continue with that careful attention as I instruct you
01:44   14  on the law and the attorneys make their closing
01:44   15  arguments.  And we all appreciate very much the
01:45   16  attention that you've paid thus far, and we know
01:45   17  you'll continue to do so.
01:45   18       You'll be free to follow along with the
01:45   19  instructions.  I'm going to read them to you.  You can
01:45   20  follow along on the overhead screen, if you like.
01:45   21  Also, just so that you know, each one of you will have
01:45   22  your own individual copy of the instructions with you
01:45   23  for your consideration during your deliberations.
01:45   24       Members of the jury, it's now my duty to
01:45   25  instruct you on the rules of law that you must follow

01:45  1    and apply in deciding this case.  When I have
01:45  2    finished, you will go into the jury room and begin
01:45  3    your discussions, or what we call your deliberations.
01:45  4        Your decision in this case must be based only
01:45  5    on the evidence presented here, and you must not let
01:45  6    your decision be influenced in any way by sympathy or
01:45  7    by prejudice for or against anyone.
01:45  8        You must follow and apply all of the law as I
01:45  9    explain it to you, whether you agree with that law or
01:45  10   not, and you must not single out or disregard any of
01:46  11   the instructions on the law.
01:46  12       The fact that a corporation is involved as a
01:46  13   party must not affect your decision in any way.  A
01:46  14   corporation and all other persons stand equal before
01:46  15   the law and must be dealt with as equals in a court of
01:46  16   justice.
01:46  17       When a corporation is involved, of course, it
01:46  18   may act only through people as its employees; and in
01:46  19   general, a corporation is responsible under the law
01:46  20   for the acts and statements of its employees that are
01:46  21   made within the scope of their duties as employees.
01:46  22       As I said before, you should consider only
01:46  23   the evidence; that is the testimony of the witnesses
01:46  24   in this case and the exhibits that I have admitted.
01:46  25   But anything the lawyers say is not evidence and is

01:46 1    not binding on you.  Also, you should not assume from
01:46 2    anything that I've said that I have any opinion about
01:46 3    any of the factual issues in the case.  Except for my
01:46 4    instructions to you on the law, you should disregard
01:46 5    anything I may have said during the trial in arriving
01:46 6    at your own decision concerning the facts.  Your own
01:47 7    recollection and interpretation of the evidence is
01:47 8    what matters.
01:47 9          Now, as you consider the evidence, both
01:47 10   direct and circumstantial, you may use reasoning and
01:47 11   common sense to make deductions and to reach
01:47 12   conclusions.
01:47 13         "Direct evidence" is the testimony of one who
01:47 14   asserts actual knowledge of a fact, such as an
01:47 15   eyewitness.  "Circumstantial evidence" is proof of a
01:47 16   chain of facts and circumstances tending to prove or
01:47 17   disprove any fact in dispute.
01:47 18         However, you need not be concerned about
01:47 19   whether the evidence is direct or circumstantial
01:47 20   because the law makes no distinction between the
01:47 21   weight that you may give to either direct or
01:47 22   circumstantial evidence.
01:47 23         Now, in saying that you must consider all of
01:47 24   the evidence, I do not mean that you must accept all
01:47 25   of the evidence as true or accurate.  You should

01:47  1    decide whether you believe what each witness had to

01:47  2    say and how important that testimony was.  In making

01:47  3    that decision, you may believe or disbelieve any

01:48  4    witness in whole or in part.  Also, the number of

01:48  5    witnesses testifying concerning any particular dispute

01:48  6    is not controlling.

01:48  7             In deciding whether you believe or do not

01:48  8    believe any witness, I suggest that you ask yourself a

01:48  9    few questions:

01:48  10            Did the witness impress you as one who was

01:48  11   telling the truth?

01:48  12            Did the witness have any particular reason

01:48  13   not to tell the truth?

01:48  14            Did the witness have a personal interest in

01:48  15   the outcome of the case?

01:48  16            Did the witness seem to have a good memory?

01:48  17            Did the witness have the opportunity and the

01:48  18   ability to observe accurately the things that he or

01:48  19   she testified about?

01:48  20            Did the witness appear to understand the

01:48  21   questions clearly and to answer them directly?

01:48  22            Did the witness's testimony differ from other

01:48  23   testimony or other evidence?

01:48  24            You should also ask yourself whether there

01:48  25   was evidence tending to prove that the witness

01:48  1    testified falsely concerning some important fact or
01:48  2    whether there was evidence that at some other time the
01:48  3    witness said or did something or failed to say or do
01:49  4    something that was different from the testimony that
01:49  5    the witness gave before you during this trial.
01:49  6            You should keep in mind, of course, that a
01:49  7    simple mistake by a witness does not necessarily mean
01:49  8    that the witness was not telling the truth as he or
01:49  9    she remembers it, because people naturally tend to
01:49  10   forget some things or to remember other things
01:49  11   inaccurately.
01:49  12           So, if a witness has made a misstatement,
01:49  13   you'll need to consider whether that misstatement was
01:49  14   simply an innocent lapse of memory or an intentional
01:49  15   falsehood, and the significance of that may depend on
01:49  16   whether it has to do with an important fact or with
01:49  17   only an unimportant detail.
01:49  18           This case involves a single claim of
01:49  19   retaliation, which I'll explain in a moment.  It is
01:49  20   the responsibility of the Plaintiff to prove every
01:49  21   essential part of her claim by a preponderance of the
01:49  22   evidence.  This is sometimes called the burden of
01:49  23   proof or the burden of persuasion.
01:49  24           A preponderance of the evidence simply means
01:49  25   an amount of evidence that is enough to persuade you

01:49  1   that the Plaintiff's claim or affirmative defense --

01:50  2   which actually will not apply in this case -- but

01:50  3   whether the Plaintiff's claim is more likely true than

01:50  4   not true.

01:50  5        If the evidence fails to establish any

01:50  6   essential part of the Plaintiff's claim by a

01:50  7   preponderance of the evidence, you should find against

01:50  8   the Plaintiff.

01:50  9        In deciding whether any fact has been proved

01:50  10  by a preponderance of the evidence, you may consider

01:50  11  the testimony of all of the witnesses, regardless of

01:50  12  who may have called them, and all of the exhibits

01:50  13  received into evidence, regardless of who may have

01:50  14  produced them.

01:50  15       Now, in this case, the Plaintiff, Henrietta

01:50  16  Austin, claims that the Defendant, Rosewood,

01:50  17  retaliated against her because she took steps to

01:50  18  enforce her lawful rights under the federal Age

01:50  19  Discrimination in Employment Act, also known as the

01:50  20  ADEA, and the Florida Civil Rights Act.

01:50  21       Claims brought under these two statutes are

01:50  22  analyzed in the same way and require proof of the same

01:50  23  elements, thus, your decision will apply equally to

01:50  24  both of Ms. Austin's claims.

01:51  25       Laws that prohibit discrimination in the

workplace also prohibit an employer from taking any
retaliatory action against an employee because the
employee has asserted rights or made complaints under
those laws.

An employee may make a discrimination
complaint as a means of enforcing what she believed in
good faith to be her lawful rights.  So, even if a
complaint of discrimination against an employer is
later found to be invalid or without merit, the
employee cannot be penalized for having made such a
complaint if you find that the employee made the
complaint as a means of seeking to enforce what she
believed in good faith to be her lawful rights.

To establish good faith, however, it is
insufficient for Ms. Austin merely to allege that her
belief in this regard was honest and bona fide.  The
allegations and the evidence must also establish that
the belief, though perhaps mistaken, was objectively
reasonable.

Ms. Austin claims that, because she
complained to her supervisors that she had been
discriminated against on the basis of her age,
Rosewood retaliated against her by increasing her
workload and on one occasion writing her up for
failing to clean the box fan.

01:52  1        Rosewood denies Ms. Austin's retaliation

01:52  2   claim and asserts that it modified the work schedule

01:52  3   of all members of the housekeeping staff in an effort

01:52  4   to maintain comparable obligations for all employees.

01:52  5        To succeed on her claim, Ms. Austin must

01:52  6   prove each of the following facts by a preponderance

01:52  7   of the evidence:

01:52  8        First, that Ms. Austin engaged in a protected

01:52  9   activity;

01:52  10        Second, Rosewood then took an adverse

01:52  11   employment action;

01:52  12        Third, Rosewood took the adverse employment

01:52  13   action because of Ms. Austin's protected activity; and

01:52  14        Fourth, Ms. Austin suffered damages because

01:52  15   of the adverse employment action.

01:52  16        In the verdict form that will be explained in

01:52  17   a moment you'll be asked to answer questions about

01:52  18   these factual issues.

01:52  19        For the first element, Ms. Austin claims that

01:52  20   she engaged in protected activity when she complained

01:53  21   to management about her supervisor treating her

01:53  22   differently based on her age.  That action is

01:53  23   protected activity if it was based on Ms. Austin's

01:53  24   good-faith, reasonable belief that Rosewood

01:53  25   discriminated against her because of her age.

01:53  1        Ms. Austin had a good-faith belief if she

01:53  2  honestly believed that Rosewood discriminated against

01:53  3  her because of her age.

01:53  4        Ms. Austin had a reasonable belief if a

01:53  5  reasonable person would, under the circumstances,

01:53  6  believe that Rosewood discriminated against her

01:53  7  because of her age.

01:53  8        Ms. Austin does not have to prove that

01:53  9  Rosewood actually discriminated against her because of

01:53  10  her age, but she must prove that she had a good-faith,

01:53  11  reasonable belief that Rosewood did so.

01:53  12        For the second element, Ms. Austin claims

01:53  13  that Rosewood took an adverse employment action

01:53  14  against her when it increased her workload and wrote

01:53  15  her up for failing to clean a box fan.  You must

01:53  16  decide whether Rosewood's conduct is an adverse

01:53  17  employment action under the following definition:

01:53  18        An adverse employment action is any type of

01:53  19  action that would have made a reasonable employee

01:54  20  reluctant to make or support a charge of

01:54  21  discrimination.

01:54  22        In other words, if a reasonable employee

01:54  23  would be less likely to complain about or oppose

01:54  24  alleged discrimination because she knew that Rosewood

01:54  25  would increase her workload or write her up for

01:54  1    failing to clean a box fan, then that action is an

01:54  2    adverse employment action.

01:54  3         If the employment action would not make it

01:54  4    less likely for a reasonable employee to make

01:54  5    complaints about or to oppose the alleged

01:54  6    discrimination, it is not an adverse employment

01:54  7    action.

01:54  8         For the third element, if you find that

01:54  9    Ms. Austin engaged in protected activity and that

01:54  10   Rosewood took an adverse employment action against

01:54  11   her, you must decide whether Rosewood took that action

01:54  12   because of Ms. Austin's protected activity.

01:54  13        Put another way, you must decide whether

01:54  14   Ms. Austin's protected activity was the main reason

01:54  15   for Rosewood's decision.

01:54  16        To determine that Rosewood took an adverse

01:54  17   employment action because of Ms. Austin's protected

01:54  18   activity, you must decide that Rosewood would not have

01:55  19   taken the action had Ms. Austin not engaged in the

01:55  20   protected activity but everything else had been the

01:55  21   same.

01:55  22        Rosewood claims that it did not take any

01:55  23   adverse actions against Ms. Austin because she made

01:55  24   complaints of age discrimination, and in fact Rosewood

01:55  25   claims Ms. Austin never made a complaint of age

01:55  1    discrimination.

01:55  2         Instead, Rosewood claims that it took the

01:55  3    actions for another reason.  Specifically Rosewood

01:55  4    claims that it modified the work schedule of all

01:55  5    members of the housekeeping staff in an effort to

01:55  6    maintain comparable obligations for all employees.

01:55  7         An employer may not take an adverse action

01:55  8    against an employee because of the employee's

01:55  9    protected activity.  But an employer may increase an

01:55  10   employee's workload or discipline her for any other

01:55  11   reason, good or bad, fair or unfair.

01:55  12        If you believe Rosewood's reasons for its

01:55  13   decision and you find that Rosewood did not make its

01:55  14   decision because of Ms. Austin's protected activity,

01:55  15   you must not second-guess that decision, and you must

01:56  16   not substitute your own judgment for Rosewood's

01:56  17   judgment, even if you do not agree with it.

01:56  18        As I've explained, Ms. Austin has the burden

01:56  19   to prove that Rosewood's employment actions were

01:56  20   because of Ms. Austin's protected activity.  I've

01:56  21   explained to you that evidence can be direct or

01:56  22   circumstantial.

01:56  23        To decide whether Rosewood's adverse

01:56  24   employment actions were because of Ms. Austin's

01:56  25   protected activity, you may consider the circumstances

01:56   1    of Rosewood's decision.

01:56   2          For example, you may consider whether you
01:56   3    believe the reason Rosewood gave for the decision.   If
01:56   4    you do not believe the reason that it gave for the
01:56   5    decision, you may consider whether the reason was so
01:56   6    unbelievable that it was a coverup to hide the true
01:56   7    retaliatory reasons for the decision.

01:56   8          For the fourth element, you must decide
01:56   9    whether Rosewood's acts were the proximate cause of
01:56   10   damages that Ms. Austin sustained.   Put another way,
01:56   11   you must decide if Rosewood had not increased
01:56   12   Ms. Austin's workload or written her up for failing to
01:56   13   clean the box fan would these damages have occurred.

01:57   14         If you find that Rosewood's acts were the
01:57   15   proximate cause of damages that Ms. Austin sustained,
01:57   16   you must determine the amount of damages.

01:57   17         In considering the issue of compensatory
01:57   18   damages, you should determine what amount, if any, has
01:57   19   been proved by a preponderance of the evidence as
01:57   20   full, just, and reasonable compensation for all of
01:57   21   Ms. Austin's damages as a result of Rosewood's adverse
01:57   22   employment actions, no more and no less.

01:57   23         You must not impose or increase these
01:57   24   compensatory damages to penalize Rosewood, and you
01:57   25   must not base these compensatory damages on

01:57  1   speculation or guesswork.

01:57  2        The only item of compensatory damages that

01:57  3   you may consider in this case relates to emotional

01:57  4   pain and mental anguish Ms. Austin suffered, if any,

01:57  5   as a result of an adverse employment action.   To

01:57  6   determine whether and how much Ms. Austin should

01:57  7   recover for emotional pain and mental anguish, you may

01:58  8   consider both the mental and physical aspects of

01:58  9   injury, tangible and intangible.

01:58  10       Ms. Austin does not have to introduce

01:58  11   evidence of a monetary value for intangible things

01:58  12   like mental anguish.   You must determine what amount

01:58  13   will fairly compensate Ms. Austin for her claims.

01:58  14   There is no exact standard to apply, but the award

01:58  15   should be fair in light of the evidence.

01:58  16       Of course, the fact that I've given you

01:58  17   instructions concerning the issue of Ms. Austin's

01:58  18   damages should not be interpreted in any way as an

01:58  19   indication that I believe that Ms. Austin should or

01:58  20   should not prevail in this case.

01:58  21       Any verdict that you reach in the jury room

01:58  22   must be unanimous.   In other words, to return a

01:58  23   verdict you must all agree.   Your deliberations will

01:58  24   be secret.   You will never have to explain your

01:58  25   verdict to anyone.

01:58   1          It is your duty as jurors to discuss the case

01:58   2   with one another in an effort to reach an agreement,

01:58   3   if you can do so.  Each of you must decide the case

01:58   4   for yourself but only after full consideration of the

01:59   5   evidence with the other members of the jury.

01:59   6          While you're discussing the case, do not

01:59   7   hesitate to reexamine your own opinion and to change

01:59   8   your mind if you become convinced that you were wrong.

01:59   9   But do not give up your honest beliefs just because

01:59   10  the others think differently or merely to get the case

01:59   11  over with.

01:59   12         Remember that in a very real way, you are the

01:59   13  judges, you are the judges of the facts of this case.

01:59   14  Your only interest is to seek the truth from the

01:59   15  evidence in the case.

01:59   16         Ladies and gentlemen, as I said, I'm going to

01:59   17  stop now, and the attorneys will make their closing

01:59   18  arguments to you, and then I'll have one final

01:59   19  instruction for you after they have done so.

01:59   20         Now, the closing arguments are an important

01:59   21  part of the trial.  This is the opportunity for the

01:59   22  attorneys to argue to you, not at you, to argue to you

01:59   23  their respective positions in the case based upon the

01:59   24  evidence that has now been entered into the record.

02:00   25         If you'll remember, at opening statements you

02:00   1    didn't have any evidence yet.  Now the evidence is in

02:00   2    the record.  This is their opportunity to argue,

02:00   3    again, their respective positions or their client's

02:00   4    positions based upon that evidence that has been

02:00   5    admitted.

02:00   6            They may also discuss the law with you that

02:00   7    you've now been given in your jury instructions.  But

02:00   8    nothing the lawyers ever say during the trial is

02:00   9    evidence in the case, and likewise, it is only my

02:00   10   instructions to you on the law that will control as

02:00   11   you deliberate on your verdict.

02:00   12           With that said, please do continue with

02:00   13   careful attention as the attorneys present their

02:00   14   closing arguments to you.  Thank you.

02:00   15           Mr. Barlow, you'll proceed first.

02:00   16           And ladies and gentlemen, because Ms. Austin

02:00   17   has the burden of proof in the case, Mr. Barlow will

02:00   18   get to go first with his closing, and then he also

02:00   19   gets a rebuttal closing after the Defendants make

02:01   20   their closing.

02:01   21                    **CLOSING ARGUMENTS**

02:01   22           **MR. BARLOW:**  May it please the Court?

02:01   23           **THE COURT:**  Yes, sir.

02:01   24           **MR. BARLOW:**  Ladies and gentlemen of the

02:01   25   jury, again, I would like to thank each and every one

02:01  1    of you on behalf of Ms. Austin for being here today.

02:01  2    I know that a lot of this seems like platitudes, but

02:01  3    if everybody got out of jury duty it would be -- I

02:01  4    think we'd be in a worse place.

02:01  5         But I don't tend to talk a lot.  That may

02:01  6    surprise you that I don't tend to talk a lot.  I will

02:01  7    not take up much of your time.  I don't believe that

02:01  8    this case is terribly complicated.  It's pretty

02:01  9    simple.

02:01  10        Ms. Austin worked at a place for a long time.

02:01  11   She got a new supervisor.  The new supervisor comes in

02:01  12   and starts giving a little extra work.  She talks to

02:01  13   him, says, *Hey, I don't really think this is fair.*  He

02:01  14   gives her more work.  And she goes to him again, *Hey,*

02:01  15   *I don't think this is fair.  You can have the younger*

02:01  16   *housekeepers help out with some of the tasks that*

02:01  17   *you're giving me.*  He writes her up for the box fan.

02:01  18        A couple of weeks later she goes to him, *Hey,*

02:02  19   *I'm really upset by this write-up for this box fan,*

02:02  20   *you know, the workload is still bad, you're still*

02:02  21   *making me do all this stuff.  Why don't you have some*

02:02  22   *of the other younger ladies help me in this stuff?*

02:02  23   And he increases her workload again.  She gets the

02:02  24   dining room in the morning by herself.  It'd been

02:02  25   years and years and years that two housekeepers would

02:02  1    clean the dining room in the morning.

02:02  2            And that goes on for a little while.

02:02  3    Ms. Austin says, *Hey, it's not going to change.*  She

02:02  4    goes and talks to Ms. Partridge, and she says, *Hey,*

02:02  5    *look, Mr. Lewis is treating me differently.  I have*

02:02  6    *the heavier workload out of all the women.*

02:02  7            Shortly thereafter Mr. Lewis says, *You*

02:02  8    *shouldn't have went to see Ms. Partridge.  You can*

02:02  9    *have the dining room in the morning [sic] as well.*  So

02:02  10   she has the dining room in the morning [sic] by

02:02  11   herself as well as in the morning.

02:02  12           So Ms. Austin goes to Ms. Partridge one more

02:02  13   time:  *Hey, I've got it in the morning and I've got it*

02:02  14   *in the afternoon by myself.  He's treating me*

02:02  15   *differently.  Every time I talk to him he tells me*

02:02  16   *that I'm complaining and I'm too old to be complaining*

02:02  17   *and that, you know, I just need to be quiet* is

02:03  18   *basically what he says.*

02:03  19           So what happens after that?  Mr. Lewis goes

02:03  20   in there and says, *Hey, look, you shouldn't have went*

02:03  21   *complaining.  Now you get the soiled utility room.*

02:03  22           And all that comes to a head on March 12th.

02:03  23   Each time that this happened Ms. Austin was trying to

02:03  24   stand up for herself -- *Hey, it's not fair.  You're*

02:03  25   *treating me differently because of my age.*  And at

1    each turn she was turned away and she was given more

2    work.

3              Now, Mr. Lewis, he's not here to defend

4    himself, but Ms. Partridge came in here and says, *Hey,*

5    *look, no, no, no, it didn't have anything to do about*

6    *the complaints, didn't have anything to do with her*

7    *age.  We were going to try to make everything*

8    *equitable.*

9              I asked her, *Hey, what's equitable about*

10   *this?  Is it equitable?  Yes.*  And I say, *Well, who*

11   *had their workload changed?*  It's only Ms. Austin.

12   There's been nobody else pointed to that had their

13   workload changed -- none, nobody.  Just her.  And each

14   time it occurred because she complained.

15             And there was the argument from Ms. Partridge

16   that, *Well, it's easy, it's all the same.*  She's

17   telling you that -- and if listen to Mr. Bender's

18   testimony, it's like 3200 square feet to clean that

19   main dining room.  The other places fit six people.

20   There was 15 to 20 tables, and maybe a table in each

21   other's eating area.  It's a little disingenuous.

22             But the important fact you have to take away

23   is, the Court has instructed you that -- what was the

24   reason for the change?  They call it comparable work.

25   That's what they wanted, comparable work.  And it was

*Closing/Barlow*                                                        195

1   anything but comparable work, because hers was the

2   only one that changed.  There were no other changes

3   other than hers.

4         Now, Ms. Austin's complaints, were they real?

5   Did she believe them?  Did she have a reasonable

6   belief that she was being discriminated against based

7   on her age?

8         Mr. Bender testified that Mr. Lewis had told

9   him that, *Hey, you know, all she does is complain.*

10  *She needs to go ahead and retire.*

11        Ms. Austin said several times, *Hey, look,*

12  *Mr. Lewis told me on several occasions that I'm just*

13  *too old, I need to quit whining, and on the last day*

14  *he says, Hey, you need to go, you need to clock out if*

15  *you don't want to work.*

16        The questions that you have to answer that

17  the Judge is going to give you in the verdict form,

18  it's pretty simple:  Did Ms. Austin engage in

19  protected activity?

20        The Court is going to -- well, I can tell you

21  that standing up for yourself and -- having a

22  good-faith belief that you're being discriminated

23  against and standing up for yourself is protected

24  activity.

25        The Court is then going to ask you whether

02:05   1    you found an adverse employment action taken against

02:06   2    Ms. Austin.  And the Court will instruct you that an

02:06   3    adverse employment action could be anything that would

02:06   4    make a reasonable person not want to complain.  It

02:06   5    doesn't have to be firing or termination, just

02:06   6    anything that a reasonable person would think twice

02:06   7    about if they were going to go make a complaint of

02:06   8    harassment discrimination.

02:06   9         And we would submit to you that going to the

02:06   10   supervisor and complaining about age discrimination

02:06   11   and having additional work, the very thing they're

02:06   12   complaining about, would dissuade a reasonable person

02:06   13   from making a complaint of discrimination.

02:06   14        Then, if you answer that question yes, if you

02:06   15   think that an adverse employment action was taken

02:06   16   against Ms. Austin, you'll have an opportunity to

02:06   17   check boxes.  Okay.  What do you think was the adverse

02:06   18   employment action?  You have the option of increasing

02:06   19   Ms. Austin's workload or writing up Ms. Austin for

02:06   20   failing to clean the box fan.  You can check one,

02:07   21   both, or none.

02:07   22        Then the question is -- becomes then:  Was

02:07   23   that adverse employment action taken against

02:07   24   Ms. Austin because of her protected activity?  And the

02:07   25   testimony is unrebutted that Mr. Lewis told her that

02:07  1    she shouldn't have complained to Ms. Austin -- I'm

02:07  2    sorry, she shouldn't have complained to Ms. Partridge,

02:07  3    therefore that clearly was because of -- other than

02:07  4    her complaints, he would not have done it.

02:07  5         Then lastly, the question of damages.  You

02:07  6    have the opportunity, if you will, not necessarily the

02:07  7    obligation -- the Court is going to say, Hey, look, if

02:07  8    you think she suffered any damages, give her what you

02:07  9    think is full and fair.  There is no right or wrong

02:07  10   answer.  There is no standard.

02:07  11        The Court has said, and the law provides

02:07  12   that, whatever you think is fair and just, that's what

02:07  13   you should award, if any.  Thank you.

02:07  14        **THE COURT:**  Thank you.

02:07  15        Mr. Harrell?

02:08  16        **MR. HARRELL:**  One moment, Your Honor.

02:08  17        Good afternoon.  First of all, I'd like to

02:08  18   say thank you on behalf of Rosewood for your time and

02:08  19   attention here the last couple of days.  This is

02:08  20   important to Rosewood as well as it's important to

02:08  21   Ms. Austin, and we do appreciate y'all's time and full

02:08  22   attention during the course of the last two days.

02:09  23        As the Judge explained, the burden of proof

02:09  24   is on Ms. Austin in this case.  It's her burden.  It's

02:09  25   her burden to show by the greater weight of the

02:09   1   evidence that what she says happened was what

02:09   2   happened.  It's not Rosewood's burden to prove

02:09   3   anything in this case.  It's Ms. Austin's burden.  And

02:09   4   that's a burden that she simply has not carried.

02:09   5        In a case like this one where there are two

02:09   6   very different versions of what happened, the burden

02:09   7   of proof is in a very extremely -- the burden of proof

02:09   8   is an extremely important thing to keep in mind as you

02:09   9   go through your jury deliberations.

02:09   10        Because if you all get back there and during

02:09   11   your deliberations ultimately throw up your hands and

02:09   12   say, *We don't know what happened, we don't know what*

02:09   13   *ultimately resulted based off of all the evidence we*

02:09   14   *heard,* then Ms. Austin hasn't carried her burden.  But

02:09   15   more importantly, it's her burden to put forth every

02:09   16   piece of evidence you all need to determine that she

02:09   17   has proven her claim, and we submit that she has not

02:10   18   done that.

02:10   19        Now, I want to be real clear about what this

02:10   20   case is truly about.  This case is about actionable

02:10   21   retaliation.  Ms. Austin claims that she suffered

02:10   22   retaliation for making complaints about age

02:10   23   discrimination, not because she made complaints about

02:10   24   workload, but because she made complaints about age

02:10   25   discrimination.

02:10   1          To make out this claim she has to show that

02:10   2   she complained of age discrimination, not of workload,

02:10   3   of age discrimination.   She has to show that Rosewood

02:10   4   took adverse employment actions.   She has to show that

02:10   5   they took those actions because she complained of age

02:10   6   discrimination.   And finally, she has to prove

02:10   7   damages.

02:10   8          Now, Mr. Barlow talked for a few minutes

02:10   9   about the workload and whether it was equitable or

02:10  10   not.   And ultimately, you've been charged by Judge

02:10  11   Rodgers that this case is not about equitable

02:10  12   workload, it's not ultimately about -- you don't have

02:10  13   to decide whether this new schedule that was

02:11  14   presented, these new assignments were right or wrong.

02:11  15   You simply have to decide whether they were based off

02:11  16   of complaints of age discrimination.

02:11  17          I want to walk you through some critical

02:11  18   pieces of evidence.   To do so, I'm going to step back

02:11  19   over here.

02:11  20          First I want to walk you through -- and

02:11  21   you've seen these before, but I want to walk you

02:11  22   through a couple of important sections regarding the

02:11  23   policies that Rosewood has in place to avoid

02:11  24   discrimination and retaliation.

02:11  25          It's very clear in the policies -- and the

02:11  1    policies are posted in the facility, and Ms. Austin

02:11  2    signed documents, which we'll look at in a second,

02:11  3    saying she had been made aware of the policies that if

02:11  4    you believe you are suffering from any form of

02:12  5    discrimination or harassment, you should contact

02:12  6    people in a certain order.

02:12  7         You should talk to the administrator.  And if

02:12  8    you're not pleased with the result of that discussion,

02:12  9    you should contact the director of operations.  And if

02:12  10   you're not pleased with that, you should contact the

02:12  11   director of HR.

02:12  12        Well, we heard from Ms. Austin that she never

02:12  13   contacted the director of HR.  Patsy Williamson is not

02:12  14   the director of HR, and you didn't hear a single bit

02:12  15   of evidence to tell you that she was.  There was not

02:12  16   contact with the director of HR.

02:12  17        You heard that she tried to contact -- or she

02:12  18   did contact Gene Triplett, director of operations, but

02:12  19   that was on her last day of employment, and she quit.

02:12  20   And this case is not about whether she quit or not.

02:12  21   This case is about whether she was given additional

02:12  22   workload or written up in retaliation for having made

02:12  23   complaints.

02:12  24        Now, Ms. Austin was very clear in her

02:13  25   testimony that she would complain of the workload, but

02:13  1    she never followed the policy.  She never contacted

02:13  2    the director of operations until right before she

02:13  3    quit, and she never contacted the director of human

02:13  4    resources.  That begets the question why, and that's a

02:13  5    question you all have to think about as you go through

02:13  6    your deliberations.

02:13  7         I'll point out another piece of evidence you

02:13  8    all will have with you, again, just to show that

02:13  9    clearly Ms. Austin knew who she could contact.  This

02:13  10   document, Defendant's Exhibit 4, signed by Ms. Austin,

02:13  11   provides that same information that was in the policy.

02:13  12   She knew about it, she had signed it, and again, the

02:13  13   policies are posted in the facility.

02:13  14        And finally, I won't belabor it, but you will

02:13  15   have the associate handbook with you as well.  The

02:13  16   associate handbook contains the same information.

02:13  17   Ms. Austin testified that if she had a problem she

02:13  18   would complain about it.  But she never complained

02:14  19   according to these policies, and again, you all have

02:14  20   the answer the question as to why.

02:14  21        Now, we've heard a little bit about this

02:14  22   write-up for the box fan.  It occurred on January

02:14  23   10th, 2013.  And again, Ms. Austin testified that she

02:14  24   was willing to complain if she had a problem.  She

02:14  25   testified that she complained multiple times.  But

02:14   1   when you look at the document, you take away her

02:14   2   testimony which is unsupported by any documents, and

02:14   3   you look at the actual documents of what happened when

02:14   4   she was there, there's nothing in the associate

02:14   5   comments.  She left it blank.

02:14   6       Does that comport with the idea that she was

02:14   7   consistently complaining of some sort of

02:15   8   discrimination?  That's a question that you all have

02:15   9   to answer.

02:15   10      Again, the EEOC determination, I submit that

02:15   11  y'all should review that.

02:15   12      And finally, the new housekeeping routes.  We

02:15   13  saw this multiple times over the course of the last

02:15   14  two days.  A couple of very critical things about

02:15   15  this.  One, Ms. Partridge suggested that this was

02:15   16  something that they had worked on, her and Mr. Lewis,

02:15   17  early in January to be effective January 14, 2013.

02:15   18      Her testimony was they didn't just put this

02:15   19  into place on the 14th, but it was something that they

02:15   20  had worked on ahead of time, which is critical with

02:15   21  regards to the timeline, because the timeline is

02:15   22  important in a retaliation case.  So keep in mind that

02:15   23  Ms. Partridge specifically testified this is something

02:16   24  that they worked on in advance of January 14th, early

02:16   25  part of January, and ultimately became effective

02:16  1   January 14th.

02:16  2           If you take a look at this document, you'll

02:16  3   see that all of the changes that Ms. Austin said

02:16  4   occurred over this three-month period, they're all

02:16  5   included on here, and they're all effective by January

02:16  6   14, 2013.  That decision was made earlier in the month

02:16  7   and became effective at this point in time.  All the

02:16  8   changes are on there.

02:16  9           What is her explanation for that?  Her

02:16  10  explanation is that this must be something that the

02:16  11  company made up after she left employment.  There's no

02:16  12  evidence that that happened.  That is purely

02:16  13  speculation.

02:16  14          And finally, you have to consider where did

02:16  15  this come from.  And that was a very interesting piece

02:16  16  of testimony that y'all witnessed this morning.

02:16  17  Ms. Austin was asked "Where did you get this?"  And

02:16  18  you all saw that for several minutes she didn't answer

02:17  19  the question, and finally we're made aware that she

02:17  20  entered Rosewood after she had left, she took the

02:17  21  document without permission.  Y'all need to consider

02:17  22  that in the course of your deliberations as to where

02:17  23  this came from.

02:17  24          Now, as part of the instructions that Judge

02:17  25  Rodgers gave y'all, she talked about assessing the

02:17   1   credibility of witnesses.  And again, in a case like

02:17   2   this the credibility of witnesses is very important.

02:17   3   A number of things you have to think about is:

02:17   4        Does a witness has a particular reason for

02:17   5   not telling the truth?  Does Ms. Austin have a reason

02:17   6   for not telling the truth?  She's brought this

02:17   7   lawsuit.  She's asking you to award her money for what

02:18   8   she says happened.  She has a motivation.

02:18   9        Does the memory of a particular witness seem

02:18   10  to be in question?  I submit that Ms. Austin's

02:18   11  testimony was rife with "I don't remember, I don't

02:18   12  recall" concerns, while Mr. Barlow asked her questions

02:18   13  she seemed to be able to tell a certain story.  But on

02:18   14  cross-examination when asked for specific dates of

02:18   15  when she talked to Ms. Partridge, she couldn't give

02:18   16  you a single date, couldn't give you specific

02:18   17  timelines.  I'll talk about why that's important in a

02:18   18  minute, but you need to keep in mind that Ms. Austin's

02:18   19  credibility is something you'll have to decide.  And

02:18   20  based off her testimony, based off of issues related

02:18   21  to where we got certain evidence, based off of her

02:18   22  motivation, y'all need to consider whether that

02:18   23  testimony is credible and whether that testimony is

02:18   24  enough to carry a burden of proof.

02:19   25        Look at the other witnesses involved.

02:19  1    Ms. Partridge.  Ms. Partridge doesn't work for

02:19  2    Rosewood anymore.  Ms. Partridge has no skin in the

02:19  3    game.  She has no motivation to not tell the truth.

02:19  4         Mr. Bender.  Mr. Bender came in here, and he

02:19  5    appeared to tell you the version of the story that he

02:19  6    knew.  Likewise for Ms. Arnold, Ms. Clark.

02:19  7         Think about what these witnesses have to

02:19  8    gain.  They all admitted that they're friends of

02:19  9    Ms. Austin, so I'm sure that they weren't excited

02:19  10   about coming in here to testify that she didn't say

02:19  11   certain things to them.  But what is their motivation

02:19  12   to say anything but the truth?  Those are things that

02:19  13   you'll have to consider.

02:19  14        Now, let's go through the basic points of

02:19  15   what has to be proven for there to be a claim of

02:19  16   retaliation.  It can't just be a complaint about

02:20  17   workload changes.  It has to be a complaint that *I was*

02:20  18   *being subject to age discrimination.*

02:20  19        Ms. Austin tells you the story that she was,

02:20  20   but no one else here corroborates that in any way.

02:20  21   Ms. Partridge says, *No.  When she came to me, she*

02:20  22   *complained about the workload, but she never said that*

02:20  23   *Dwayne was doing anything to her because of her age.*

02:20  24        Ms. Clark.  Ms. Clark testifies, *We were best*

02:20  25   *friends at that point in time.  We spent holidays*

1    *together.  We went to each other's house.*  She never

2    -- Ms. Austin never said a word to Ms. Clark

3    indicating that she was having certain issues with

4    regards to age discrimination.

5          So if she's not telling her own best friend

6    that this was going on, does it make any sense that

7    she's saying it to someone else that she's suffering

8    from these issues?

9          Likewise, Ms. Arnold was never told anything

10   about age discrimination, had conversations on a daily

11   basis with Ms. Austin and there was never any sort of

12   discussion of *I'm being treated this way because of my*

13   *age,* or *I'm being treated this way because I told*

14   *someone I thought it was because of my age*.

15         Now, there's no question that Ms. Austin

16   complained about the workload changes.  But the

17   evidence that she has the burden to prove, I submit

18   that the evidence doesn't back up the idea that she

19   complained of age discrimination.

20         She complained of the workload, we know.

21   Ms. Partridge said, *Yes, she came to me and said 'I*

22   *don't like these changes*.'  But that is not a

23   complaint of age discrimination.  A complaint of age

24   discrimination is, *I'm being treated differently*

25   *because of my age.  Please help me.*  And that never

02:21    1    happened.   There was never a call to the director of
02:21    2    operations from January until the end of her
02:22    3    employment.   There was never a call to the director of
02:22    4    HR at all.   There's no indication, except for what she
02:22    5    comes in and tells us after the fact, that she
02:22    6    suffered from any sort of age discrimination.   And if
02:22    7    she didn't complain of age discrimination, she has not
02:22    8    made out a case, and she has not carried her burden.
02:22    9         The second issue is whether she suffered an
02:22   10    adverse employment action.   And again, you have to
02:22   11    look at the issue of -- as the Judge explained it, the
02:22   12    issue is would a reasonable employee be less likely to
02:22   13    complain because of the action taken.
02:22   14         Well, we heard from Ms. Austin that she
02:22   15    complained about the workload, and she says she got
02:23   16    more, but she continued to complain.   Now, if you
02:23   17    believe that story, it still demonstrates that she
02:23   18    didn't suffer an adverse employment action.
02:23   19         I'd suggest that the evidence is very clear
02:23   20    that there was one change.   There was a change to the
02:23   21    workload that occurred January 14, 2013.   There's one
02:23   22    change -- the dining room twice a day plus the soiled
02:23   23    room all that occurred by this point in time.   And the
02:23   24    testimony of Ms. Partridge and everyone else except
02:23   25    for Ms. Austin's tends to prove that.

02:23   1          Now, really where the heart of the claim for
02:23   2   retaliation comes down to causation.  It's:  Was
02:23   3   Ms. Austin subject to certain actions because she
02:23   4   complained of age discrimination?
02:23   5          And in order to prove a claim of retaliation,
02:24   6   you have to have competent evidence of a timeline that
02:24   7   suggests that something happened on this date and
02:24   8   something followed it, and so on and so forth.  You
02:24   9   have to have a credible timeline.  And that's
02:24   10  something that Ms. Austin was unable to do in this
02:24   11  case.
02:24   12         Now, on direct examination she said, *Well, I*
02:24   13  *did this and this happened, and I did this and this*
02:24   14  *happened*.  But when she was on cross-examination and
02:24   15  Mr. Branning asking her questions, she couldn't
02:24   16  provide dates, she couldn't provide a timeline of
02:24   17  exactly when it happened.  And that's when we started
02:24   18  to hear a lot of testimony of "I don't know, I don't
02:24   19  think so, I don't remember."  And it's her burden of
02:24   20  proof to lay out a timeline from which you can say,
02:24   21  yes, she has proven a case of this happened at this
02:24   22  point in time and this happened later.  And without
02:24   23  those details, she has failed to carry her burden of
02:24   24  proof, she has failed to create a scenario under which
02:25   25  you can say, yes, we know that this happened at this

*Closing/Harrell*                                                209

02:25  1    point in time and this happened later.  So the

02:25  2    timeline is incredibly important.

02:25  3         Rosewood's timeline is entirely consistent

02:25  4    with what the documents in the case show.  The

02:25  5    documents show there was one change in job

02:25  6    assignments.  The documents showed that, as of January

02:25  7    14, all of the changes that occurred happened.  You

02:25  8    have to believe that this document was somehow

02:25  9    fabricated in order to find that that's not the case.

02:25  10        And the other interesting thing, as you heard

02:25  11   Ms. Partridge testify, this didn't just come into

02:25  12   effect on the 14th, but they spent a couple of weeks

02:25  13   looking at it.

02:25  14        And what that means is, these changes were

02:25  15   already in the works before this happens.  This

02:26  16   happens on January 10th.  These changes go into effect

02:26  17   on the 14th.  So Ms. Partridge testifies they were

02:26  18   working on them for a couple of weeks ahead of time,

02:26  19   beginning in January, so these changes were already in

02:26  20   progress before there was ever any sort of write-up

02:26  21   for a box fan.

02:26  22        Now, part of the claim that they make is this

02:26  23   concept that there were complaints to Ms. Partridge

02:26  24   about age discrimination and Ms. Partridge somehow

02:26  25   told Mr. Lewis.  But we don't have any testimony to

02:26    1    support that.  The only testimony we have is from

02:26    2    Ms. Partridge, who says, in fact, that she never

02:26    3    received any complaint of age discrimination from

02:26    4    Ms. Austin.  But more importantly, for purposes of a

02:26    5    retaliation case, she never told Mr. Lewis that she

02:26    6    had made a complaint of age discrimination.

02:27    7         Now, she says she went and talked to

02:27    8    Mr. Lewis about the workload, but this is not a case

02:27    9    about retaliation for complaints about workload.  You

02:27   10    can't find in Ms. Austin's favor under the idea that

02:27   11    there was some sort of retaliation because she

02:27   12    complained about the workload.  You have to believe

02:27   13    that she complained about age discrimination.

02:27   14         Now, finally, with regards to causation,

02:27   15    there's an important fact that came out through the

02:27   16    trial which Ms. Austin can't even avoid, and that fact

02:27   17    is this:  B Hall had changes made to it, not just

02:27   18    Ms. Austin.  These changes to the assignments occurred

02:27   19    for B Hall, and they occurred January 14, 2013.  And

02:27   20    Ms. Austin worked B Hall primarily, but others also

02:27   21    performed these duties on B Hall, so other people

02:27   22    performed this work.

02:27   23         And then, importantly, after Ms. Austin

02:28   24    quits, these are still the duties for B Hall.  The

02:28   25    testimony is this:  B Hall still performs the dining

02:28 1  room twice a day, B Hall still does the soiled utility

02:28 2  room.  So these changes impacted multiple people

02:28 3  besides Ms. Austin, and these changes, therefore,

02:28 4  can't be said to be because of something Ms. Austin

02:28 5  did.

02:28 6       And ultimately, what did you hear from

02:28 7  Ms. Partridge about other people and these duties on

02:28 8  B Hall?  None of them have ever complained about it.

02:28 9       Now, you don't have to decide whether this

02:28 10 was equitable or not, but I think that's an important

02:28 11 fact to keep in mind, no one else who works for

02:28 12 Rosewood that performs B Hall duties has ever

02:28 13 complained.  It's simply Ms. Austin who had been there

02:28 14 a long time doing things a certain way for a long

02:28 15 time, and she doesn't like the change.  Nobody else

02:29 16 has ever made a complaint.

02:29 17      Now, the last factor to consider is the issue

02:29 18 of damages.  And I don't like to talk about damages

02:29 19 because I don't think you get there, but I have to or

02:29 20 else I'd be doing my client a disservice.

02:29 21      But the issue of damages in this case, they

02:29 22 have to show that -- they have to have presented

02:29 23 evidence that she suffered emotional distress that was

02:29 24 proximately caused by the issues she's raised with

02:29 25 Rosewood, and that means that the emotional distress

02:29  1    has to be directly tied to the additional assignments

02:29  2    and this write-up.

02:29  3         Now, you heard Ms. Austin testify about

02:29  4    having some stomach issues after she quit, six months

02:29  5    after she left employment she had some stomach issues.

02:30  6    But you didn't hear any testimony about specific

02:30  7    emotional distress that she suffered during this

02:30  8    timeline between January and April.

02:30  9         She didn't tell you that she suffered from

02:30  10   depression, she didn't tell that she had lost sleep at

02:30  11   night, she didn't tell you that she was having bouts

02:30  12   of crying or any sort of actual evidence -- testimony

02:30  13   that she suffered from emotional distress during the

02:30  14   critical timeline, and therefore, she hasn't carried

02:30  15   her burden.

02:30  16        So if you get this far, the answer to the

02:30  17   question of what damages has she proven by a

02:30  18   preponderance of the evidence, the answer is none.

02:30  19   She hasn't submitted any evidence to support the

02:30  20   concept that ultimately the changes to the workload or

02:30  21   the write-up caused her significant emotional

02:30  22   distress.

02:30  23        Now, when you put all this together, this is

02:30  24   a case that comes down to credibility of the

02:31  25   witnesses.  This is a case that comes down to the

*Closing/Harrell*                                              213

1   evidence that you've been presented.   The only one

2   telling the story that you've heard about "additional

3   workload, complained, additional workload, complained,

4   additional workload," the only person who tells that

5   story is Ms. Austin.   And Ms. Austin couldn't provide

6   specifics, couldn't give you a good timeline to go

7   from, removed a document from Rosewood without

8   permission.   And Ms. Austin is the only one with

9   anything to gain.

10       So I'm going to take a quit minute and walk

11  you through the verdict form.

12       The first question:   "Do you find from a

13  preponderance of the evidence that Henrietta Austin

14  engaged in protected activity?"   I submit that the

15  answer to that should be "No."   She did not complain

16  about age discrimination.

17       This case is about age discrimination, not

18  workload, it's age discrimination.   The answer to that

19  question should be "No."   If you answer no, sign the

20  form and send it back.

21       "2.   That Rosewood took an adverse employment

22  action against Henrietta Austin?"   I submit that the

23  answer is, "No."   She hasn't carried her burden to

24  show that there was an adverse employment action that

25  stopped her from complaining that was based on age

02:32   1   discrimination.

02:32   2         You have to answer "Yes" to move forward with

02:32   3   3, and I submit you should answer "No."

02:32   4         "4.  That Rosewood took adverse employment

02:32   5   action because of the protected activity?"  I submit

02:32   6   the answer is "No."  As we talked a minute ago, this

02:32   7   is where you have to find that there was a specific

02:32   8   timeline in which she can show that one thing was

02:33   9   caused by another thing, and she has been unable to do

02:33   10  so.  I submit that you answer "No."

02:33   11        And finally, when you get to the final

02:33   12  question:  "That Henrietta Austin suffered damages

02:33   13  because of the adverse employment action?"  I submit

02:33   14  to you that there's been no evidence to support

02:33   15  answering that question "Yes," so that question should

02:33   16  be answered "No."

02:33   17        Ladies and gentlemen, this is a case about

02:33   18  retaliation for age discrimination, it's not about

02:33   19  equitable workload, it's not about whether Mr. Lewis's

02:33   20  way of doing things was right or wrong, whether

02:33   21  Ms. Austin's belief of how things should be done is

02:33   22  right or wrong.  This is about retaliation for age

02:33   23  discrimination.

02:33   24        Ms. Austin had the burden to prove age

02:33   25  discrimination.  I submit that she has not carried

02:33   1   that burden, and we hope that you would find that she

02:33   2   did not.  Thank you very much.

02:33   3           **THE COURT:**  Thank you.

02:33   4           Mr. Barlow, rebuttal?

02:34   5       **MR. BARLOW:**  Mr. Harrell discussed some

02:34   6   things with you folks, and one of the things that he

02:34   7   appeared to take issue with was they really don't have

02:34   8   to have a reason, is kind of his point.  And in doing

02:34   9   so, he kind of, I believe, misses the mark, and here

02:35  10   is why:

02:35  11           When a lawsuit is filed, it doesn't matter if

02:35  12   it's for age discrimination, race discrimination,

02:35  13   whatever.  An employee says, *Hey, you did this to me*

02:35  14   *because of my,* whatever it is and whatever that

02:35  15   protected class is.

02:35  16           And then at that point it's incumbent upon

02:35  17   the Defendant to say, *Hey, look, that's not why we did*

02:35  18   *it.  We did it because of this*.  And their point --

02:35  19   their testimony in this case is, *We didn't do it*

02:35  20   *because of her age.  We did it because we wanted to*

02:35  21   *fix the workload*, that's what they said, *We wanted to*

02:35  22   *make it better*.  And yet there is no testimony that

02:35  23   anyone's workload other than Ms. Austin's was changed.

02:35  24           But what they're saying is, *Well, she wasn't*

02:35  25   *really complaining about age discrimination.  She was*

02:35   1   *complaining about the workload.*  But if you listen to

02:35   2   them, their testimony is, *Well, you know, nothing*

02:35   3   *changed.  She always had it, she always had the two in*

02:35   4   *the morning by herself*.  But that's not true.

02:35   5          If that were really true, why would she be

02:35   6   complaining about it?  If she really got the help that

02:36   7   they're claiming she got and she had it the whole

02:36   8   time, why would she complain?

02:36   9          Basically what they're trying to get you to

02:36   10  believe is that Ms. Austin is just old and set in her

02:36   11  ways, and she didn't want to change the way the work

02:36   12  was going.

02:36   13         And if you believe Ms. Austin -- maybe you

02:36   14  do, maybe you don't.  But if you believe Ms. Austin,

02:36   15  you have to find for her.  It's undisputed that she

02:36   16  said, *Hey, look, Mr. Lewis told me 'You shouldn't have*

02:36   17  *went and complained, and therefore I'm going to give*

02:36   18  *you more work.'*  It is undisputed.

02:36   19         If you don't believe her, then you should

02:36   20  find for the Defendant.  That is the only thing that

02:36   21  you can do if you don't believe her.

02:36   22         There was some question about whether, you

02:36   23  know, her credibility, not real sure, sometimes she

02:36   24  got a little confused.  I don't believe that there was

02:36   25  a witness that testified that didn't say "I don't

02:36   1   know."  I don't recall any testimony of any witness

02:36   2   commanding an absolute command of the facts, none.

02:37   3          Mr. Triplett, he didn't know, he didn't

02:37   4   recall some things.  Ms. Partridge, she didn't know,

02:37   5   she didn't recall some things.

02:37   6          Credibility.  Everybody except for Ms. Austin

02:37   7   and Ms. Partridge, they don't work for -- or they all

02:37   8   work for Rosewood.  Mr. Bender, Mr. Triplett,

02:37   9   Ms. Arnold, they all work for them.  So yeah, there's

02:37   10  something in it for them, they get to keep their job.

02:37   11         There was a direction that you look at the

02:37   12  EEOC determination.  It's in evidence.  It doesn't

02:37   13  mean anything.  All it says is, *Yeah, we looked at it.*

02:37   14  *We don't know if anything happened.*

02:37   15         But if you look at it, it will also say, *We*

02:37   16  *can't tell if a violation of the statute occurred.*

02:37   17  But if you look at it, it will say, *This doesn't mean*

02:37   18  *that they did everything by the book either.*  It's

02:37   19  basically a noncommittal response.

02:37   20         They want you to believe that Ms. Austin's

02:37   21  only complaint was about the workload.  And if you

02:38   22  believe that, then you should find in their favor.  If

02:38   23  you don't, then you should find in her favor.  Thank

02:38   24  you.

02:38   25         **THE COURT:**  Thank you.

02:38   1        Ladies and gentlemen, the last instruction

02:38   2   that I have for you I'm going to read in just a

02:38   3   moment, but always you should consider the Court's

02:38   4   instructions on the law as a whole.

02:38   5        If you recall earlier, I said you may not

02:38   6   single out or disregard any of the Court's

02:38   7   instructions.  So please consider this one that I'm

02:38   8   giving you as the last instruction collectively with

02:38   9   all the others.

02:38   10       Ladies and gentlemen, when you go into the

02:38   11  jury room, you should first select one of your members

02:38   12  to act as your foreperson.  The foreperson will

02:38   13  preside over your deliberations and will speak for the

02:38   14  jury here in open court.

02:38   15       As you know, a verdict form has been prepared

02:38   16  for your convenience.  Now, you will just have one

02:38   17  verdict form.  The verdict form has six questions on

02:38   18  it.  It's four pages.  Of course, any response or

02:39   19  decision that you make on the verdict form must be

02:39   20  unanimous.  Any decision that you reach in the jury

02:39   21  room must be a unanimous decision, meaning all of you

02:39   22  must agree to it.

02:39   23       So you have several questions to answer, and

02:39   24  you are directed on how to proceed based on whether

02:39   25  your answer is yes or no to that question.

02:39   1        If your answer is "No" to any of the six

02:39   2   questions, then you will -- and you're instructed in

02:39   3   this regard in the verdict form -- your work will be

02:39   4   completed.  Your foreperson will then sign and date

02:39   5   the verdict form, you'll notify the court security

02:39   6   officer that you've reached a verdict, you'll come

02:39   7   back here in the courtroom, and we'll receive your

02:39   8   verdict.

02:39   9        But if your answer to any of the questions is

02:39   10  "Yes," then you will proceed until you get through all

02:39   11  of -- all of the six questions.  And again, this is

02:39   12  defined for you plainly on the verdict form.

02:39   13       Now, once all of the questions have been

02:40   14  answered, if need be -- again, if you answer "No" to

02:40   15  any of them, your work is done at that point, and you

02:40   16  don't need to go forward with the other questions.

02:40   17       But once you have answered all the questions

02:40   18  that are required to be answered under the definitions

02:40   19  given to you and the instructions in the form, then

02:40   20  have your foreperson sign and date the verdict form,

02:40   21  notify the court security officer that the jury has

02:40   22  reached a verdict, and I'll have you returned here to

02:40   23  the courtroom and we'll receive your verdict.

02:40   24       If at any time you should find it necessary

02:40   25  to communicate with me, I would ask that your

02:40  1    foreperson write down your communication, whether it's

02:40  2    a message, a question, write it down on a piece of

02:40  3    paper.  The court security officer will bring it to my

02:40  4    attention.  I'll respond to you in one of two ways:

02:40  5    Most likely I'll respond to you in writing; or I may

02:40  6    have you returned here to the courtroom and I'll

02:40  7    respond to you orally here in court.

02:40  8         I do want to caution you, though, with regard

02:41  9    to any message or communication that you may send out

02:41  10   of the jury room, to the extent there is a division in

02:41  11   the jury on a question that you must answer on the

02:41  12   verdict form, please do not indicate what the

02:41  13   numerical division is.  We do not need to know that

02:41  14   you're divided seven to one, four to four, five to

02:41  15   two.  We don't need to know that numerical division.

02:41  16        All right.  Let me turn to counsel and ask if

02:41  17   there's any objections to the instructions as

02:41  18   delivered?  Mr. Barlow?

02:41  19        **MR. BARLOW:**  I believe they comport with your

02:41  20   prior rulings, Your Honor.

02:41  21        **THE COURT:**  Thank you.

02:41  22        Mr. Harrell?

02:41  23        **MR. HARRELL:**  Nothing other than what was

02:41  24   previously argued.

02:41  25        **THE COURT:**  Thank you.

02:41  1          Ladies and gentlemen, at this time out of

02:41  2  respect for the very serious responsibility that you

02:41  3  are all about the undertake, I'm going to rise and

02:41  4  direct that all those in the courtroom also now rise

02:41  5  as you retire to consider your verdict.  And you may

02:41  6  take your pads with you.  We'll bring the jury

02:41  7  instructions in to you in just a few moments.  Thank

02:42  8  you.

02:42  9          *(Jury out.)*

02:42  10          Be seated for just a moment.  Please get with

02:42  11  Ms. Simms, assist her in gathering the evidence to be

02:42  12  taken back to the jury room, make sure everything is

02:42  13  in place and she has everything.

02:42  14          And then, I'd ask that you all remain here at

02:42  15  the courthouse until three o'clock just to see --

02:42  16  sometimes the jury has a question right off the bat.

02:42  17  Otherwise, after three, just please be within five

02:42  18  minutes or ten minutes or so of a phone call in case

02:42  19  we have a question or a verdict.

02:42  20          But we will be in recess awaiting the jury's

02:42  21  verdict.  Is there anything else we need to discuss?

02:43  22          **MR. BRANNING:**  Should we leave our cell phone

02:43  23  numbers with somebody?

02:43  24          **THE COURT:**  Yes, Ms. Simms will get those

02:43  25  from you definitely.

02:43   1          MR. BARLOW:  Judge, I'll just tell you, the

02:43   2   lady who sat right there, the one who fell down

02:43   3   earlier, she was raising her hand on the way out.  I

02:43   4   thought she might have a question.

02:43   5          THE COURT:  I thought she was telling them

02:43   6   that her leg was okay.

02:43   7          MR. BRANNING:  I think that's --

02:43   8          MR. BARLOW:  I don't know.  I saw her raising

02:43   9   her hand and I thought --

02:43   10         COURT SECURITY OFFICER:  She didn't indicate

02:43   11  anything.

02:43   12         THE COURT:  I was going to say, she would

02:43   13  have let the security officer know if she had

02:43   14  anything.

02:43   15         Okay, we'll be in recess awaiting the jury's

02:43   16  verdict.

07:48   17         (Recess taken 2:43 p.m. to 7:50 p.m.)

07:50   18         THE COURT:  All right, everyone, the jury, as

07:50   19  you know, has been out since -- well, just before

07:50   20  three.

07:50   21         MR. BARLOW:  Five hours.

07:50   22         THE COURT:  I'm sorry, Mr. Barlow?

07:50   23         MR. BARLOW:  Five hours.

07:50   24         THE COURT:  Okay, so five hours.  We've

07:50   25  checked with them a couple of times.  They ordered

07:50　1　dinner, and we checked with them after that.  I think

07:50　2　they were productive and moving forward.  The problem

07:50　3　is we're going to lose HVAC in about ten minutes.

07:50　4　　　　　　And so we checked with them again just a

07:51　5　little bit ago, and what it sounds like is they want

07:51　6　to come back tomorrow.  And I think that's probably

07:51　7　the best thing, given that we're going to lose HVAC in

07:51　8　ten minutes.  So that's what we're going to do.

07:51　9　　　　　　Other than that, I don't have anything to

07:51　10　report.  Obviously, I don't know where they are in

07:51　11　their deliberations other than that they're still

07:51　12　moving forward.

07:51　13　　　　　　So anything from you all before we recess for

07:51　14　the evening?

07:51　15　　　　　　　**MR. BARLOW:**  What time would you like us to

07:51　16　return, Judge?

07:51　17　　　　　　　**THE COURT:**  I think I'll have them return at

07:51　18　nine.  It's late.  Is that okay with you all?

07:51　19　　　　　　　**MR. BARLOW:**  I guess what I'm asking is, do

07:51　20　you have instructions for the attorneys other than to

07:51　21　wait for a call?

07:51　22　　　　　　　**THE COURT:**  Oh, yes, I'd like you to be here

07:51　23　at nine.  What I typically do, Mr. Barlow -- that's a

07:51　24　good question -- is I usually will read them the

07:51　25　instruction on duty to deliberate, and then instruct

07:51 1    them to consider that along with all the other

07:51 2    instructions they've been given, and then to continue.

07:52 3    So I would ask that you all be here.

07:52 4        The parties, if you'd like to be here,

07:52 5    they're welcome to be here.  Mr. Triplett, I know, is

07:52 6    not here.  But you can waive your right to be here,

07:52 7    it's up to you, but you'll need to be here when the

07:52 8    verdict is ready, when the jury has reached a verdict.

07:52 9        Anything else?

07:52 10       *(No response.)*

07:52 11       No?

07:52 12       All right.  Bring them this, please,

07:52 13   Mr. Thomas.

07:53 14       *(Jury in the box.)*

07:53 15       Ladies and gentlemen, we appreciate very much

07:53 16   how hard you've been working today.  You've been

07:54 17   deliberating for approximately five hours, I believe,

07:54 18   and that's fine.  The problem that we have right now

07:54 19   as far as you going forward is we're going to lose the

07:54 20   HVAC system in about 6 minutes.

07:54 21       **MS. SPENCER:**  You mean it's going to get

07:54 22   warm?

07:54 23       **THE COURT:**  Yes, surprise.  You would welcome

07:54 24   that?

07:54 25       **MS. SPENCER:**  Yes.

**THE COURT:** So I'm going to send you home for the evening and ask that you return tomorrow morning and continue your deliberations, so we'll start tomorrow morning at nine.

Please drive carefully going home. Remember my instructions to you. It's very important, because you've been in your deliberations, that you keep those instructions close in mind.

Don't discuss the case amongst yourselves, even when you're leaving this evening. You can only talk about the case when you're in the jury deliberation room together. Don't talk about it with anyone at home. Don't discuss it on any social media sites. And please don't conduct any research on your own into the matters that have been discussed. Avoid any news reports of the trial, should there be any.

And very importantly, I know you've been discussing the case, I know you have some opinions about it, or I assume you do, but just put those aside for this evening and wait until you get back tomorrow morning with the other members of the jury to begin to think about those opinions and just hold off until then to start that process again.

Any questions? Yes, ma'am?

**MS. SPENCER:** Is it okay when your family --

07:55  1    your sons, older sons hound you, to make up a crazy

07:55  2    story about what's going on?

07:55  3         THE COURT:  You mean about the trial?

07:55  4         MS. SPENCER:  Uh-huh.

07:55  5         THE COURT:  You can tell them that there's

07:55  6    this really mean judge who --

07:55  7         MS. SPENCER:  Like it's a Mafia case?

07:55  8         THE COURT:  Like what?

07:56  9         MS. SPENCER:  It's okay to tell them it's a

07:56  10   Mafia case?

07:56  11        THE COURT:  You can tell them whatever you

07:56  12   want as long as it's not the truth, as long as it's

07:56  13   not what's really been happening here in this

07:56  14   courtroom.

07:56  15        MS. SPENCER:  And that's what I'll do because

07:56  16   they just --

07:56  17        THE COURT:  You can tell them that you have

07:56  18   the order of the Court and you're subject to that and

07:56  19   you're not permitted to discuss the case, or you can

07:56  20   make something up.

07:56  21        MS. SPENCER:  Mafia case is just fine.

07:56  22        THE COURT:  Yes, sir?

07:56  23        MR. DUCLOS:  When you said Seminoles and

07:56  24   Gators yesterday, I had to wear my Gators tie.

07:56  25        THE COURT:  Oh, I see that.  I didn't notice

07:56 1    that until now, you have both, good for you.  That's

07:56 2    good.  You also have a sense of humor after five hours

07:56 3    of deliberation, so that's a good sign.

07:56 4         We'll see you tomorrow morning.  Please drive

07:56 5    carefully.  Get a good night's sleep, we'll see you

07:57 6    back at nine a.m. tomorrow morning.  Your notepads

07:57 7    will be available for you at that time.

07:57 8         Goodnight.  Thank you again very much for

07:57 9    your service.

07:57 10    **MS. SPENCER:**  Thank you.

07:57 11    *(Jury out.)*

07:57 12    **THE COURT:**  I don't know if I've ever had

07:57 13    that question before.

07:57 14         Anything else you all have before we

07:57 15    reconvene in the morning?

07:57 16    *(No response.)*

07:57 17         I do ask that you be here at nine a.m. and

07:57 18    then we'll send the jury out, and you'll be free to go

07:57 19    about your day, just be available five or ten minutes

07:57 20    of a phone call.

07:57 21         You all have a good evening.  See you at

07:57 22    nine a.m. tomorrow.

23    *(**Whereupon, proceedings adjourned for the day**

24    **at 7:57 p.m. and continued on May 17, 2017, located in**

25    **DAY THREE.**)*

```
 1                    --------------------

 2    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.  Any
 3    redaction of personal data identifiers pursuant to the Judicial
      Conference Policy on Privacy are noted within the transcript.

 4
      Donna L Boland
 5    _____           5-29-2017
      Donna L. Boland, RPR, FCRR            Date
 6    Official Court Reporter

 7

 8                          INDEX

 9                                                          PAGE

10    Charge Conference                                        2
```

```
11    WITNESSES FOR THE PLAINTIFF:

12    HENRIETTA AUSTIN
          Cross-Examination by Mr. Branning (cont'd)         25
13        Redirect Examination by Mr. Barlow                 82

14    PATSY WILLIAMSON
          Direct Examination by Mr. Barlow                   95
15        Cross-Examination by Mr. Branning                  98

16    LARRY BENDER
          Direct Examination by Mr. Barlow                  100
17        Cross-Examination by Mr. Harrell                  109
          Redirect Examination by Mr. Barlow                112
18        Recross-Examination by Mr. Harrell                114

19
      WITNESSES FOR THE DEFENSE:
20
      GENE TRIPLETT
21        Direct Examination by Mr. Branning                118
          Cross-Examination by Mr. Barlow                   124
22        Redirect Examination by Mr. Branning              127

23    NICOLE PARTRIDGE
          Direct Examination by Mr. Harrell                 131
24        Cross-Examination by Mr. Barlow                   135
          Redirect Examination by Mr. Harrell               138

25
```

**INDEX**   (cont'd.)

|  |  | PAGE |
|---|---|---|
| ***MIRIAM CLARK*** | | |
| Direct Examination by Mr. Harrell | | 141 |
| Cross-Examination by Mr. Barlow | | 144 |
| Redirect Examination by Mr. Harrell | | 148 |
| ***TONETTE ARNOLD*** | | |
| Direct Examination by Mr. Harrell | | 148 |
| Cross-Examination by Mr. Barlow | | 151 |
| Redirect Examination by Mr. Harrell | | 156 |
| Rule 50 Motion/Argument | | 158 |
| Jury Instructions | | 177 |
| **CLOSING ARGUMENTS:** | | |
| By Mr. Barlow | | 191 |
| By Mr. Harrell | | 197 |
| Rebuttal by Mr. Barlow | | 215 |
| Final Instructions | | 218 |
| **CERTIFICATE OF REPORTER** | | **228** |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


HENRIETTA AUSTIN,                    )
                                     )
          Plaintiff,                 )
                                     )
                                     )   Case No. 3:15cv40/MCR
                                     )
vs.                                  )   Pensacola, Florida
                                     )   May 17, 2017
                                     )   9:02 a.m.
                                     )
FL HUD ROSEWOOD, LLC,                )
                                     )
          Defendant.                 )
_____)


DAY THREE


TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.
(Pages 1-20)


APPEARANCES


FOR THE PLAINTIFF:          RICHARD D. BARLOW, ESQUIRE
                            Odom & Barlow, PA
                            1800 North "E" Street
                            Pensacola, Florida  32501


FOR THE DEFENDANT:          JEREMY C. BRANNING, ESQUIRE
                            DANIEL E. HARRELL, ESQUIRE
                            Clark, Partington, Hart, Larry
                              Bond & Stackhouse
                            125 West Romana Street, Suite 800
                            Pensacola, Florida  32502

Donna L. Boland, RPR, FCRR
United States Court Reporter
100 N Palafox Street * Pensacola, Florida  32502
Donna_Boland@flnd.uscourts.gov

### *P R O C E E D I N G S*

1

2          (Court called to order at 9:02 a.m.; Parties

07:59   3   present with counsel.)

08:08   4          **THE COURT:**  Good morning.  As I said

09:02   5   yesterday before I sent the jury home for the evening,

09:02   6   this morning I'm going to just read to them the duty

09:02   7   to deliberate instruction and then remind them, of

09:02   8   course, that they must consider all the instructions

09:02   9   together as a whole, and then I'll send them out to

09:02   10  continue their deliberations.

09:02   11         I did want to bring up one matter in regards

09:02   12  to the jury.  After the verdict is received, I always

09:02   13  meet with the jury before I send them on their way,

09:02   14  talk with them just a little bit about their service.

09:03   15  In this case -- and I do this in some civil cases, and

09:03   16  I'm willing to do it in this case, if you all are

09:03   17  interested, and that is to see if any of the jurors

09:03   18  individually would like to meet with you all or be

09:03   19  willing to meet with you all to discuss their

09:03   20  observations of the trial.

09:03   21         Sometimes attorneys want to do that,

09:03   22  sometimes they pass on the opportunity.  Most of the

09:03   23  time -- if not every member of the jury, most of the

09:03   24  members are willing to do that.  So I leave it to you

09:03   25  all to think about that.  And actually, if one side

09:03  1  wants to do it and the other doesn't, that's fine,

09:03  2  too.  You don't both have to agree.  But just think

09:03  3  about it, and then when we get the verdict I'll ask

09:03  4  you.  And if you're interested, then I'll bring it up

09:03  5  to them when I go in and talk with them.

09:03  6       Let's bring them in.

09:05  7       *(Jury in the box.)*

09:05  8       Mr. XXXXXX you have another great tie on this

09:05  9  morning.

09:05  10       **MR. XXXXXX:**  I have M&M's in the jury room.

09:05  11       **THE COURT:**  Well, good morning, everyone.  I

09:05  12  thank you all for being back on time this morning.

09:05  13       I'm going to read to you or repeat an

09:05  14  instruction that I gave you yesterday on the duty to

09:05  15  deliberate, and then I'll excuse you to continue with

09:05  16  your deliberations.

09:05  17       But please do remember at all times that you

09:05  18  should consider all of the Court's instructions on the

09:05  19  law as a whole.  Even though I'm reading you one of

09:05  20  the instructions, please do consider them all as a

09:05  21  whole.

09:05  22       Ladies and gentlemen, any verdict that you

09:05  23  reach in the jury room must be unanimous.  In other

09:05  24  words, to return a verdict you must all agree.  Your

09:05  25  deliberations will be secret.  You will never have to

09:05  1  explain your verdict to anyone.

09:05  2         It is your duty as jurors to discuss the case

09:05  3  with one another in an effort to reach an agreement,

09:05  4  if you can do so.  Each of you must decide the case

09:05  5  for yourself but only after full consideration of the

09:05  6  evidence with the other members of the jury.

09:06  7         While you're discussing the case, do not

09:06  8  hesitate to reexamine your own opinion and to change

09:06  9  your mind if you become convinced that you are wrong.

09:06  10  But do not give up your honest beliefs solely because

09:06  11  the others think differently or merely to get the case

09:06  12  over with.

09:06  13         Remember that in a very real way, you are the

09:06  14  judges, you are the judges of the facts in this case,

09:06  15  and your only interest is to seek the truth from the

09:06  16  evidence in the case.

09:06  17         With that, I thank you, and you'll be excused

09:06  18  to continue with your deliberations.

09:06  19         *(Jury out.)*

09:06  20         We'll be in recess awaiting the jury's

09:07  21  verdict.  Maybe stick around five or ten minutes and

09:07  22  then be within five or ten minutes of a phone call.

10:01  23         *(Recess taken 9:07 a.m. to 10:03 a.m.)*

10:03  24         **THE COURT:**  We have a jury communication or

10:03  25  question for the Court.  I'll read it to you.  It's

10:04  1   one question.   "What is the definition of constructive

10:04  2   discharge?"

10:04  3         So I have proposed a written response, so

10:04  4   I'll read it to you.   What I propose to respond is:

10:04  5   "There is no claim for constructive discharge in this

10:04  6   case and no claim that Ms. Austin's end of employment

10:04  7   was an adverse employment action.   Thus, the jury

10:04  8   should not consider the end of Ms. Austin's employment

10:04  9   in any way in deciding the issue of damages."

10:04  10        That's what I propose to give in response.

10:04  11        Mr. Harrell?

10:04  12        **MR. HARRELL:**   Can we say "the issues of

10:04  13   liability or damages"?

10:04  14        **THE COURT:**   No, because they've heard the

10:04  15   evidence, so I'm not going to say "the issue of

10:04  16   liability," no.

10:05  17        **MR HARRELL:**   Can I make a short argument on

10:05  18   that for the record?

10:05  19        **THE COURT:**   Well, you can, Mr. Harrell, but I

10:05  20   already decided this during the trial, and I said that

10:05  21   -- and I think I gave the jury a limiting instruction

10:05  22   at that time, and that's when they heard the word

10:05  23   "constructive discharge," and I said there was no

10:05  24   constructive discharge claim here.   But what I told

10:05  25   them was they couldn't consider anything in connection

10:05    1    with her -- I don't know if I used the term

10:05    2    "termination" but the end of employment in connection

10:05    3    with an adverse employment action.  But I didn't say

10:05    4    it to the jury but I said to you all that I found that

10:05    5    it was relevant, though, as circumstantial evidence of

10:05    6    her employment -- the circumstances of her employment

10:05    7    and Mr. Lewis's intent.  And I just -- there's --

10:06    8    we're only talking about a four-month period of time,

10:06    9    at most, I guess from y'all's standpoint.  So, I mean,

10:06   10    you can make the argument, if you want to make it for

10:06   11    the record, but I'm not going to change my decision.

10:06   12         MR. HARRELL:  Sure.

10:06   13         THE COURT:  I mean, they've heard this

10:06   14    evidence, and I'm not going to tell them *You've heard*

10:06   15    *it but you can't consider it for anything in the case.*

10:06   16         MR. HARRELL:  Your Honor, we'll just -- for

10:06   17    the record, we'll say that we would propose "the issue

10:06   18    of liability or damages," understanding your decision

10:06   19    on that, but for the record we're preserving the issue

10:06   20    on that.

10:06   21         THE COURT:  All right.  Mr. Barlow, from you?

10:06   22         MR. BARLOW:  It's fine, Your Honor.

10:07   23         THE COURT:  All right.  You all might want to

10:07   24    stick around for 10 or 15 minutes to see if there's

10:07   25    another question, or there may be a verdict.  I don't

10:07  1   know.  Sometimes when we respond, then we get a

10:07  2   verdict right after that.  But, of course, I have no

10:07  3   way of knowing if that's the case or not with this

10:07  4   jury.

10:07  5        All right, Ms. Simms, I'll give this to you

10:07  6   to take to the jury, and we'll be in recess awaiting

10:07  7   the jury's verdict.

10:08  8        *(Recess taken 10:08 a.m. to 10:21 a.m.)*

10:21  9        **THE COURT:**  So in giving further thought to

10:21  10  Mr. Harrell's objection to the last communication that

10:21  11  the Court sent to the jury in response to its

10:21  12  communication about constructive discharge, I do think

10:21  13  I need to clarify the instruction or the communication

10:21  14  for the jury.

10:21  15       The Defendants have requested that the

10:21  16  instruction read that the jury should not consider the

10:21  17  end of Ms. Austin's employment on the issue of damages

10:21  18  and liability.  And my communication, as you know,

10:21  19  said on the issue of damages.

10:21  20       My thinking at the time was that -- and the

10:21  21  reason I responded to Mr. Harrell as I did was that

10:21  22  the circumstances surrounding that last day of her

10:22  23  employment are relevant in the case, and so I do think

10:22  24  the jury can consider that last day as part of the

10:22  25  history of her employment, and because it involved

10:22    1    particularly Mr. Lewis I think they can consider it.

10:22    2          But on the issue of sort of the fact that her

10:22    3    employment ended, which is what the communication

10:22    4    referred to, I think the Defendants are correct, that

10:22    5    the jury cannot consider that in any way in deciding

10:22    6    any issue in the case.

10:22    7          And so -- and there's a distinction there.   I

10:22    8    mean, the circumstances surrounding that last day is

10:22    9    not synonymous with the fact that her employment

10:22   10    ended.  So what I'm going to tell the jury is that

10:22   11    they should not consider the fact that Ms. Austin's

10:22   12    employment ended in any way in deciding any of the

10:22   13    issues in the case.

10:22   14          And I think that that's appropriate, but you

10:23   15    can be heard if you wish to be heard.

10:23   16          **MR. HARRELL:**  That sounds appropriate.  Can

10:23   17    we see it just to --

10:23   18          **THE COURT:**  Sure.  Mr. Barlow, you can see it

10:23   19    and then you can respond.

10:23   20          And I think this is correct, I mean, this is

10:23   21    legally correct.  The fact that her employment ended

10:23   22    -- absent a constructive discharge claim, the fact

10:23   23    that her employment ended is not relevant.  I mean,

10:23   24    it's not an adverse employment action, and so it's

10:23   25    just -- it's not relevant.

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
| 10:23 | 1  | **MR. BRANNING:**  Has the jury received the last     |
| 10:23 | 2  | communication?                                         |
| 10:23 | 3  | **THE COURT:**  They have.                             |
| 10:23 | 4  | **MR. HARRELL:**  We have no problem with this,        |
| 10:23 | 5  | Your Honor.                                            |
| 10:23 | 6  | **MR. BARLOW:**  With all due respect, Your            |
| 10:23 | 7  | Honor, I don't believe that this communication would   |
| 10:24 | 8  | be accurate.  I believe that the jury can consider     |
| 10:24 | 9  | Mr. Lewis's communications with Ms. Austin because she |
| 10:24 | 10 | has to show that she had a reasonable, good-faith      |
| 10:24 | 11 | belief that she was being discriminated against        |
| 10:24 | 12 | because of her age.                                    |
| 10:24 | 13 | **THE COURT:**  Right, but that's not the same as      |
| 10:24 | 14 | the fact of her employment ending.  What in the world  |
| 10:24 | 15 | could that relate to in this case?  The fact that her  |
| 10:24 | 16 | employment ended, if there's no constructive discharge |
| 10:24 | 17 | claim in this case, what could that be relevant to?    |
| 10:24 | 18 | **MR. BARLOW:**  I just don't know that the jury       |
| 10:24 | 19 | would read it that way.  If that's the way the Court   |
| 10:24 | 20 | believes the jury would read, that's fine.  I'm just   |
| 10:24 | 21 | not sure that that would -- I guess maybe "separation  |
| 10:24 | 22 | from employment" would sound better to me, that she    |
| 10:24 | 23 | was separated from employment.                         |
| 10:24 | 24 | **THE COURT:**  Okay, I can use the word               |
| 10:24 | 25 | "separation" if that makes it more clear, you think.   |

10:24  1          **MR. HARRELL:**  We think that it's fine as

10:24  2    written.  "Separation" tends to indicate that there

10:24  3    was a reason behind it.  I mean, her employment ended,

10:25  4    that's what happened.

10:25  5          **THE COURT:**  Yeah, I guess I agree,

10:25  6    Mr. Barlow.  I don't want -- they should not be in any

10:25  7    way considering the fact that her employment ended,

10:25  8    that she's no longer an employee of Rosewood as of

10:25  9    April 12th, 2013, in any way in deciding any issue in

10:25  10   the case.

10:25  11         **MR. BARLOW:**  I agree with that assertion,

10:25  12   Your Honor.  I think what my concern is, is that, you

10:25  13   know, they can, and I think they should, consider the

10:25  14   facts leading up to her employment ending.

10:25  15         **THE COURT:**  Well, I certainly would never

10:25  16   tell them they should consider anything, but this

10:25  17   doesn't tell them they can't consider that.

10:25  18         **MR. BARLOW:**  I agree, Your Honor.  My concern

10:25  19   is that they may not understand that when you put in

10:25  20   there "but you may consider the facts leading up to

10:25  21   the end of her employment."

10:26  22         **THE COURT:**  Well, maybe I do need to clarify

10:26  23   that.

10:26  24         **MR. HARRELL:**  Your Honor, if I can be heard

10:26  25   on that.  I think the jury instructions already tell

them that they can consider all the evidence they've heard in the case.  Pointing out that specifically would draw attention to it and, in that regard, would create an issue that -- they don't need to be retold here is what you can consider specifically about one issue.  The instructions they've already been given already tell them they can consider the evidence in the case, and that is sufficient.

**THE COURT:**  Yeah, Mr. Barlow, I don't want to comment on the evidence, so I'm not going to make the clarification.  This tells them they can't consider the fact that her employment ended.  It doesn't speak to anything leading up to the fact of her employment ending.  And I have told them they can consider all the evidence, and I'm going to leave it at that.

So if you want to object on the record, that's fine, you can do so now, and then I need to get the instruction to them.

**MR. BARLOW:**  I object, Your Honor.

**THE COURT:**  Anything else?

**MR. BRANNING:**  No, Your Honor.

**THE COURT:**  This satisfies your concern?

**MR. HARRELL:**  Yes, Your Honor.

**THE COURT:**  All right.  I'll send the instruction to them or the communication to them.  I,

10:27   1   again, suggest that you hang around for ten minutes or

10:27   2   so to see if we have another question come out.

10:27   3   *(Recess taken 10:27 p.m. to 1:38 p.m.)*

10:27   4   **THE COURT:**  We've been advised that the jury

01:38   5   has reached a verdict.   And I'm sorry your client is

01:38   6   not here, but I can't help that.   I'm not going to

01:38   7   keep the jury waiting.   I mean, if he was that

01:38   8   interested, he should have waited around.   I'm just

01:38   9   not going to keep them waiting for him to show up.

01:38   10   So I want to have a word with everyone in the

01:38   11   courtroom.   Of course, we don't know what the verdict

01:38   12   is.   We never do.   This is an adversarial system.   We

01:38   13   have two sides to this trial, and so most likely,

01:38   14   although I don't know what the verdict is, one side is

01:38   15   going to be happy and one side is going to be unhappy.

01:38   16   And that's fine, that's just the nature of the system.

01:38   17   But the point I want to make is, regardless

01:38   18   of whether you're pleased with the verdict or you're

01:38   19   unhappy with the verdict, I don't want there to be any

01:38   20   show or display of emotion one way or the other in the

01:38   21   courtroom until after the jury has left the courtroom.

01:38   22   They're not here voluntarily.   They do the

01:38   23   best job they can do with what we give them.   You give

01:39   24   them the facts, I give them the law, they go into the

01:39   25   deliberation room, and they do justice.   They're not

01:39  1  trained or professional jurors, and I don't want them

01:39  2  to be made to feel poorly or bad in any way about the

01:39  3  verdict that they've reached.

01:39  4       So please, examine your own conscience and

01:39  5  decide if you can sit here quietly one way or the

01:39  6  other and hear the verdict.  If you don't think you

01:39  7  can --

01:39  8       Ms. Austin, you're the only party here.  I

01:39  9  know the attorneys can sit quietly.  Are you able to

01:39  10  sit quietly even if the verdict is not in your favor?

01:39  11      **MS. AUSTIN:**  Yes, ma'am.

01:39  12      **THE COURT:**  I just wanted to be sure,

01:39  13  because, again, I don't want them to be made feel

01:39  14  badly about the decision that they've obviously worked

01:39  15  very hard to reach.

01:39  16       So to counsel:  I appreciate the way you've

01:40  17  handled the trial.  You've been very professional,

01:40  18  obviously, with the Court, but also with one another.

01:40  19  There hasn't been any real serious tangles between the

01:40  20  two sides, and I appreciate that.  It makes it much

01:40  21  more enjoyable for me to preside over a trial in which

01:40  22  the attorneys -- I mean, you stipulated to most

01:40  23  everything, and it just seemed to go very smoothly

01:40  24  from my standpoint, so I appreciate that very much.

01:40  25       And then, finally to the issue I spoke with

01:40  1   you all about this morning with the jury.  Is anyone

01:40  2   interested in having me ask the jurors if they would

01:40  3   be willing to meet with you?  And it would only be the

01:40  4   attorneys.  The parties are not included in that.

01:40  5   That's just -- I won't have any takers on the side of

01:40  6   the jury I think if the parties were included.

01:40  7          Mr. Barlow or Mr. Branning?

01:40  8          **MR. BRANNING:**  We would be interested in

01:40  9   that, Your Honor.

01:40  10         **THE COURT:**  Mr. Barlow?

01:40  11         **MR. BARLOW:**  As well, Your Honor.

01:40  12         **THE COURT:**  Well, then, I'll go in and meet

01:41  13   with them.  It takes me a few minutes to do that, and

01:41  14   then I'll come back out and tell you how many of them

01:41  15   are interested in sticking around to talk to you for a

01:41  16   few minutes.

01:41  17         Is Mr. Triplett on his way?

01:41  18         **MR. BRANNING:**  Yes, Your Honor.

01:41  19         **THE COURT:**  I'm not going to be able to -- I

01:41  20   don't know how far away he is.

01:41  21         **MR. BRANNING:**  Understood.

01:41  22         **THE COURT:**  They've been here a long time and

01:41  23   so I think we're going to need to go ahead and hear

01:41  24   the verdict.

01:41  25         **MR. BRANNING:**  Yes, Your Honor.

01:41  1          **THE COURT:**  All right.  If you would bring

01:41  2     them in, please.

01:42  3                *(Jury in the box.)*

01:42  4          Ladies and gentlemen, has the jury reached a

01:42  5     verdict?

01:42  6          **THE FOREPERSON:**  We have, Your Honor.

01:42  7          **THE COURT:**  Thank you.  If you would, please

01:42  8     provide the verdict form or the envelope to

01:42  9     Mr. Thomas.  Thank you.

01:42  10          All right, Ms. Simms, if you would please

01:42  11     publish the jury's verdict.

01:43  12          **MADAM CLERK SIMMS:**   "United States District

01:43  13     Court, Northern District of Florida, Pensacola

01:43  14     Division.  Henrietta Austin, Plaintiff, versus

01:43  15     Rosewood, LLC, Defendant.  Case No. 3:15cv40/MCR/EMT.

01:43  16          "Verdict.  We, the jury in the above-entitled

01:43  17     and numbered case, unanimously return the following

01:43  18     verdict:

01:43  19          "Do you find from a preponderance of the

01:43  20     evidence:

01:43  21          "1.  That Henrietta Austin engaged in

01:43  22     protected activity?"  The answer is "Yes."

01:43  23          "2.  That Rosewood took an adverse employment

01:43  24     action against Henrietta Austin?"  The answer is

01:43  25     "Yes."

01:43  1    "3.  If you found that Rosewood took an
01:43  2 adverse employment action, then check the following:"
01:43  3    The following are checked:  "Increasing
01:43  4 Henrietta Austin's workload and writing up Henrietta
01:44  5 Austin for failing to clean the box fan.
01:44  6    "4:  That Rosewood took the adverse
01:44  7 employment action because of Henrietta Austin's
01:44  8 protected activity?"  The answer is "Yes."
01:44  9    "5.  That Henrietta Austin suffered damages
01:44  10 because of the adverse employment action?"  The answer
01:44  11 is "Yes."
01:44  12    "6.  That Henrietta Austin should be awarded
01:44  13 damages to compensate for emotional pain and mental
01:44  14 anguish?"  The answer is "Yes."  And the amount is
01:44  15 $125,000.
01:44  16    "So say we all the 17th day of May," signed
01:44  17 by the jury foreperson.
01:44  18    **THE COURT:**  Thank you.
01:44  19    So ladies and gentlemen, I have one final
01:44  20 question for each of you, and that's whether the
01:44  21 verdict that you've heard read by the clerk is your
01:44  22 verdict individually as well as the verdict of the
01:44  23 jury has a whole.
01:44  24    So I'll call you by your juror number,
01:44  25 starting with Ms. XXXXXXX as No. 1, and I'll ask you

01:44  1   again just that question, yes or no, is it your

01:45  2   verdict individually as well as the verdict of the

01:45  3   jury as a whole.

01:45  4            No. 1?

01:45  5            **JUROR NO. 1:**  Yes.

01:45  6            **THE COURT:**  2?

01:45  7            **JUROR NO. 2:**  Yes.

01:45  8            **THE COURT:**  3?

01:45  9            **JUROR NO. 3:**  Yes.

01:45  10           **THE COURT:**  4?

01:45  11           **JUROR NO. 4:**  Yes.

01:45  12           **THE COURT:**  5?

01:45  13           **JUROR NO. 5:**  Yes.

01:45  14           **THE COURT:**  6?

01:45  15           **JUROR NO. 6:**  Yes.

01:45  16           **THE COURT:**  7?

01:45  17           **JUROR NO. 7:**  Yes.

01:45  18           **THE COURT:**  8?

01:45  19           **JUROR NO. 8:**  Yes.

01:45  20           **THE COURT:**  Ladies and gentlemen, a judgment

01:45  21   in favor of Ms. Austin and against Rosewood will be

01:45  22   entered consistent with your verdict.

01:45  23           This does conclude your service with us here

01:45  24   as jurors.  We do appreciate very much the service

01:45  25   that you've rendered.  Before excusing you, I do have

01:45　　1　　a couple of privileges that I'd like to make sure you

01:45　　2　　are aware of, and these are privileges that are

01:45　　3　　enjoyed by jurors in our system.

01:45　　4　　　　　　One is that no juror can ever be required to

01:45　　5　　talk about what took place in the jury room except by

01:45　　6　　way of a court order.  And it would be a very rare

01:45　　7　　occasion on which I would ever enter such an order

01:45　　8　　requiring any juror to disclose the discussions,

01:46　　9　　debates, if there were any, or anything that took

01:46　　10　　place in the jury room.

01:46　　11　　　　　　Of course, our constitution does provide for

01:46　　12　　the freedom of speech.  And so, if you would like to

01:46　　13　　speak about your personal participation as a juror

01:46　　14　　during this trial, then you are certainly free to do

01:46　　15　　so now that the verdict has been received.

01:46　　16　　　　　　However, if you choose to speak to someone

01:46　　17　　about your work as a juror here, I would just ask that

01:46　　18　　you please be sensitive to and protect the confidences

01:46　　19　　of your fellow jurors in that regard.

01:46　　20　　　　　　Also, another privilege that you'll enjoy

01:46　　21　　based on your service here during this trial is that

01:46　　22　　you'll be excused from further federal jury duty for

01:46　　23　　the next two years in this court.  So that doesn't

01:46　　24　　mean you won't be summoned to return, because that's

01:46　　25　　done at random by a big computer that we don't have

01:46    1    any control over.  But if you are summoned to return

01:46    2    for jury duty in the United States District Court for

01:46    3    the Northern District of Florida at any point within

01:46    4    the next two years, all you need to do is contact the

01:47    5    clerk's office, give them your name -- the number will

01:47    6    appear on your form -- and we will have a record of

01:47    7    your service in this trial, and you'll be excused, no

01:47    8    questions asked.  And again, that extends for the next

01:47    9    two years.

01:47    10    There is a caveat, though.  This does not

01:47    11    excuse you from jury duty in any other jurisdiction.

01:47    12    So if you're summoned by the state court or circuit

01:47    13    court in one of the areas in which you reside, then

01:47    14    certainly you'll need to appear for that jury duty or

01:47    15    don't bother telling them about this duty because I

01:47    16    don't think it will get you out of that service.

01:47    17    Also, if you are inclined to return or you

01:47    18    would like to return for jury duty in our court, this

01:47    19    excusal doesn't mean we don't want you back.  So you

01:47    20    are excused, but if you would like to return and serve

01:47    21    again, then it would certainly be our pleasure, and if

01:47    22    it's in my court, my privilege to have you back.

01:48    23    So with the thanks of all those who

01:48    24    participated in the trial, I'm going to excuse you

01:48    25    now.  You'll step into the jury room for some final

01:48  1    instructions and then you'll be on your way.  Thank

01:48  2    you very much.

01:48  3              *(Jury out.)*

01:48  4              Be seated, please.  I assume you all still --

01:48  5    the attorneys still want to speak with the jury?

01:48  6              **MR. BARLOW:**  Yes, Your Honor.

01:48  7              **MR. BRANNING:**  Yes, Your Honor.

01:48  8              **THE COURT:**  It's going to take me a few

01:48  9    minutes to go in and speak with them.  You all can

01:48  10   talk to your clients.  But then when the jury comes

01:48  11   back in, it just needs to be the lawyers here in

01:48  12   speaking with the jury.

01:48  13             We'll be in recess.

14             *(Proceedings concluded at 1:48 p.m.)*

15                   --------------------

16   *I certify that the foregoing is a correct transcript*
     *from the record of proceedings in the above-entitled*
17   *matter.  Any redaction of personal data identifiers*
     *pursuant to the Judicial Conference Policy on Privacy*
18   *are noted within the transcript.*

19   *Donna L Boland*

20   **Donna L. Boland, RPR, FCRR**          **5-30-2017**
     **Official Court Reporter**              **Date**

21

22

23

24

25